IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT<br>1612 K Street NW<br>Washington, DC 20001<br><br>and<br><br>NATIONAL ACTIVE AND RETIRED FEDERAL EMPLOYEES ASSOCIATION<br>606 N. Washington Street<br>Alexandria, VA 22314,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT<br>1900 E Street NW<br>Washington, DC 20415,<br><br>CHARLES EZELL, in his official capacity as Acting Director of the Office of Personnel Management<br>1900 E Street NW<br>Washington, DC 20415,<br><br>and<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America<br>1600 Pennsylvania Ave NW<br>Washington, DC 20500,<br><br>Defendants. | Case No. _____ |

## COMPLAINT

1.    This case challenges President Donald J. Trump's attempt to dismantle a cornerstone of American democracy: a federal civil service rooted in merit and integrity. Over the course of more than a century, Congress has repeatedly acted to ensure that government employees

faithfully implement the laws Congress passes without fear of political interference or retaliation. Defendants have abused executive power in an effort to undermine that statutory framework so that they can purge career civil servants and replace them with partisan loyalists.

2.     On January 20, 2025, the President issued Executive Order No. 14171 (the "2025 Executive Order"), which reinstated and amended the President's 2020 Executive Order No. 13957 (the "Amended 2020 Executive Order," and collectively, the "Executive Orders"). Together, the Executive Orders aim to redesignate thousands of career civil servants into a new schedule of civil service positions—Schedule Policy/Career ("Schedule P/C")—in a manner that would strip these career civil servants of employment protections established by Congress. Schedule P/C would, for the first time since Congress began dismantling the spoils system almost 150 years ago, permit the executive to treat career civil servants in the same manner as political appointees—that is, to fire them at will, including for the purposes of political patronage and personal loyalty.

3.     On the day he issued the 2025 Executive Order, President Trump stated, "Most of those bureaucrats are being fired – they're gone. It should be all of them."[1] As he signed it, the President declared that he was "getting rid of all the cancer, the cancer caused by the Biden administration."[2] And during the presidential campaign, Vice President J.D. Vance declared that

---

[1] Erich Wagner, "*Trump: Agencies Should Fire 'All' Bureaucrats*," Government Executive (Jan. 20, 2025), https://www.govexec.com/workforce/2025/01/trump-agencies-should-fire-all-bureaucrats/402353/

[2] Alan Rappeport, "*Federal Employees Union Sues Trump Over Worker Protections*," New York Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/trump-schedule-f-federal-workers.html.

President Trump should "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people."[3]

4.      On January 27, 2025, Defendant Ezell, in his capacity as Acting Director of the Office of Personnel Management ("OPM"), issued a Memorandum (the "2025 OPM Guidance") to all executive agencies implementing the Executive Orders and directing agencies to act accordingly.

5.      The Executive Orders and the 2025 OPM Guidance strike at the heart of the Civil Service Reform Act ("CSRA"). The CSRA embodies America's long history and tradition of Congress establishing, defining, and regulating the civil service system to protect the general welfare, ensure the proper execution of the laws Congress passes, and advance the public interest in a federal workforce grounded in merit and free from corruption, political bias, and improper influences. The CSRA accomplishes that in part by providing employment protections for career civil servants.

6.      Schedule P/C erases a centerpiece of the CSRA: the distinction between political appointees and career civil servants. The CSRA excludes *political appointees* from civil service protections upon a determination that their positions are "confidential, policy-determining, policy-making, or policy-advocating positions"—a term of art that the CSRA uses specifically to establish an exclusion for political appointees. The CSRA does not permit the President to reinterpret that exclusion to strip civil service protections from *non-political appointees* in the career civil service, as the Executive Orders and the 2025 OPM Guidance purport to do.

---

[3] Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://tinyurl.com/4rsvn7xv.

7.      Moreover, by purporting to strip career civil servants of congressionally granted employment protections without due process, the Executive Orders and 2025 OPM Guidance violate the Fifth Amendment to the U.S. Constitution.

8.      The 2025 Executive Order also states that it holds "inoperative and without effect" existing law—specifically, an OPM regulation duly promulgated by notice-and-comment procedures—to immediately effectuate the President's agenda of politicizing the civil service. This action disregards legal constraints requiring that this regulation, established via notice-and-comment rulemaking, be rescinded only through the same process.

9.      The Executive Orders and the 2025 OPM Guidance thus constitute an unlawful executive power grab contrary to this nation's history and traditions, its constitutional framework, and the comprehensive statutory scheme enacted by Congress to ensure a merit-based civil service able to faithfully execute the laws.

10.     The Trump Administration has expressly asserted its intent to ignore the laws passed by Congress, with the White House Press Secretary recently saying: "[The President] is the executive of the executive branch, and therefore he has the power to fire anyone within the executive branch that he wishes to."[4]

11.     Without court intervention, Defendants will continue to unlawfully terminate career civil servants for political reasons on a mass scale unprecedented in American history.

12.     Plaintiffs ask the Court to declare unlawful and enjoin Defendants' actions.

---

[4]    Press Briefing by Press Secretary Karoline Leavitt (Jan. 29, 2024), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-secretary-karoline-leavitt

## PARTIES

### I.    Plaintiffs

13.    Plaintiff **Government Accountability Project ("GAP")** is an independent, non-partisan, and non-profit organization headquartered in Washington, D.C., that promotes corporate and government accountability by protecting whistleblowers, advancing occupational free speech, and empowering citizen activists. GAP's mission is to provide a safe, effective voice for employees who use free speech rights to challenge abuses of power that betray the public trust.

14.    Plaintiff **National Active and Retired Federal Employees Association ("NARFE")** is a non-profit organization whose mission is to promote the general welfare of current federal civilian employees and federal retirees and their survivors, to advise and assist them with respect to their federal benefits, to represent their interests before appropriate authorities, and to support legislation and regulations beneficial to such employees and retirees and oppose those detrimental to their interests.

15.    NARFE brings this action in its own capacity and on behalf of its current federal employee members.

### II.    Defendants

16.    Defendant the **United States Office of Personnel Management** is an agency that serves as the chief human resources agency and personnel policy manager for the federal government. It is charged with the management of the federal civil service and is responsible for implementing the Executive Orders and the 2025 OPM Guidance.

17.    Defendant **Charles Ezell, sued in his official capacity**, is Acting Director of OPM. He is responsible for implementing the Executive Orders. On January 27, 2025, Ezell issued the 2025 OPM Guidance.

18.    Defendant **President Donald J. Trump, sued in his official capacity**, is President of the United States of America. He issued the Executive Orders.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this case arises under the Constitution and laws of the United States.

20.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district. Additionally, Plaintiff GAP resides in this district.

## STATEMENT OF FACTS

I.    **Legal Background**

   A.    **The History and Tradition of Congressional Regulation of the Civil Service**

21.    For the past century and a half, Congress has legislated a structure for the civil service that balances the President's domain over political appointees whose positions are expected to turn over with each new administration with Congress's role in ensuring the integrity and effectiveness of career civil servants.

22.    At least as far back as the 19th century, Congress and the public understood that incompetence, inefficiency, and corruption in the executive branch threatened the public interest and required congressional intervention. *See Elrod v. Burns*, 427 U.S. 347, 353-54 (1976) (noting that "only a few decades after Andrew Jackson's administration," there was "strong discontent with the corruption and inefficiency of the patronage system of public employment").

23.    In the Pendleton Act, formally titled An Act to Regulate and Improve the Civil Service of the United States, ch. 27, 22 Stat. 403 (Jan. 16, 1883), Congress set aside roughly ten percent of federal positions for non-political, merit-based hiring—determined on the basis of

competitive exams—rather than on their history of partisanship or other inappropriate considerations.

24.    Between 1883 and 1978, Congress repeatedly passed and amended legislation pertaining to the federal civil service, with the overall trend of expanding merit-system principles and procedural protections for career civil service positions. Among other statutes, in 1912, Congress enacted the Lloyd LaFollette Act, which legislated a for-cause removal standard for employees in the "classified service" (today, the "competitive service"). Lloyd-LaFollette Act, § 6, 37 Stat. 555 (1912). The Lloyd-LaFollette Act also established procedural protections, including requiring written notice of the reasons for an employee's removal and an opportunity to respond.

25.    In 1978, public outrage over the scandals of the Nixon administration led Congress to enact the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978), to comprehensively promote the competence, integrity, and merit of America's career civil service. *See* CSRA, S. Rep. No. 95-969, 6 (1978) (discussing the unsavory personnel practices of the Nixon administration and explaining: "There is little doubt that a vigorous protector of the merit system is needed. The lack of adequate protection was painfully obvious during the civil service abuses only a few years ago.").

### B.    The Structure of the Career Civil Service System

26.    Congress's role in shaping the structure of the civil service is well-established. Dating back to the Pendleton Act in 1883, Congress has classified the civil service into various sub-categories. Under the CSRA, the civil service today generally consists of three main categories: the "competitive service," in which appointments are generally made through competitive procedures, 5 U.S.C. § 2102; the "excepted service," for positions specifically excepted from competitive service hiring procedures and examinations by statute or expressly delegated statutory authority, 5 U.S.C. § 2103; and the Senior Executive Service, which is

statutorily defined largely by the exercise of significant leadership or supervisory functions, 5 U.S.C. §§ 2101a, 3132(a)(2).

27.    In general, most career excepted service employees in the executive branch have the same protections against adverse employment actions as competitive service employees do.

28.    Congress delegated authority to except civil service positions from the competitive service to the executive in 5 U.S.C. § 3302, which permits the President to "prescribe rules governing the competitive service" by "provid[ing], as nearly as conditions of good administration warrant, for [] necessary exceptions of positions from the competitive service."

29.    Positions excepted by the President from the competitive service are listed in schedules of excepted service positions codified at 5 C.F.R. § 6.2. Before the issuance of the 2025 Executive Order, there were five excepted service schedules: Schedules A, B, C, D, and E. Schedules A, B, and D generally list career civil service positions that, for various and specific reasons, require exceptions from the hiring and examination procedures that generally apply to the competitive service. Schedule E lists certain administrative law judge positions. Schedule C lists political appointee positions.

30.    President Dwight Eisenhower established Schedule C on March 31, 1953, via Executive Order No. 10440, as a dedicated schedule to house political appointee positions. This action further codified the distinction between political appointee positions and career positions, including career positions then listed in other excepted schedules. To distinguish such political appointee positions from career positions, President Eisenhower referred to them in Executive Order No. 10440 as positions of "a confidential or policy-determining character." The Civil Service Commission also identified the purpose of the new schedule: "This action was taken in

order to make a clear distinction between jobs which belong in the career service and those which should be subject to change with a change in administration."[5]

31.     Today, of the roughly 2.3 million employees in the federal workforce, only 4,000 or so are political appointees; the rest are non-political career civil servants.

**C.     The Role of Civil Service Protections in Congressional Regulation of the Federal Workforce**

32.     The Senate committee responsible for the bill that became the CSRA made clear that Congress intended the CSRA to protect the public interest in ensuring that laws enacted by Congress are executed competently:

> [T]he Committee has viewed civil service reform from the standpoint of the public, rather than the more limited perspective of either the employee or manager. The 'rights of employees' to be selected and removed only on the basis of their competence are concomitant with the public's need to have its business conducted competently. Similarly, the need for Federal executives to manage their personnel responsibilities effectively can only be justified by the benefit derived by the public from such management flexibility. An employee has no right to be incompetent; a manager has no right to hire political bed fellows.

S. Rep. No. 95-969, 4 (1978); *see also U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557 (1973) (explaining that "the judgment of history, a judgment made by this country over the last century is that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service").

---

[5] U.S. Civil Serv. Comm'n, 70th Annual Report, 2 (Nov. 16, 1953), https://tinyurl.com/2p92x9v8; *see also* Press Release, U.S. Civil Serv. Comm'n, 2 (Aug. 25, 1955) ("Policy-making and confidential positions are placed in Schedule C and exempted from civil-service requirements in order to make a clear distinction between the career service and the policy-making or confidential positions which exist primarily to carry out the objectives of any national administration.").

33.     As the Senate's committee report explained, one of the CSRA's primary goals was to "[a]llow civil servants to be able to be hired and fired more easily, *but for the right reasons*." S. Rep. No. 95-969, 4 (1978) (emphasis added).

34.     To further this goal, the CSRA contains two important sets of employment rights and protections that it grants to career civil servants but *not* to political appointees.

35.     First, 5 U.S.C. chapter 75, subchapter II ("Chapter 75(II)") generally protects career civil servants from the most extreme actions—such as removal, extended suspension, and reduction in grade or pay ("Adverse Actions")—by requiring that such actions be taken only for cause and in accordance with specified procedures (the "Chapter 75(II) Protections"). Chapter 75(II) also establishes a right on the part of covered career employees to appeal Adverse Actions to a dedicated and independent tribunal, the Merit Systems Protection Board ("MSPB"), which has the power to reverse such actions and order corrective action.

36.     Second, 5 U.S.C. chapter 23 ("Chapter 23") generally protects career civil servants from a specified list of various personnel actions motivated by an improper purpose, such as political affiliation discrimination, unlawful preference, or retaliation against whistleblowers (the "Chapter 23 Protections"). The Chapter 23 Protections also cover all practices prohibited by Chapter 75(II) when taken for a prohibited purpose.

37.     Individual actions that violate the Chapter 23 Protections are, under certain circumstances, subject to review by the MSPB.

38.     In establishing these protections in the CSRA, Congress granted them to career civil servants in both the competitive and excepted service.[6] But Congress decided not to extend

---

[6] As originally enacted, certain protections did not apply to employees in excepted service positions who were ineligible for veterans' preference. CSRA § 204(a), 92 Stat. 1135-44. In the

protections to *political appointees*, in recognition of the President's broader authority in that regard.

39.    In both Chapters 23 and 75(II), Congress distinguished political appointees from career civil servants by excluding positions of a "confidential, policy-determining, policy-making, or policy-advocating character"[7]—borrowing and expanding on the language used by President Eisenhower in establishing Schedule C in Executive Order No. 10440.

40.    Both the legislative history and the broader legislative context make clear that Congress used this phrase to mean political appointees. This ensured that career civil servants would be empowered to competently execute Congress's laws while the President would retain discretion regarding political appointees.

41.    The Senate's committee report on the CSRA stated that the exception for "positions of a confidential, policy-determining, policy-making or policy advocating character" was limited to political appointees, noting that the "exception for positions of a confidential, policy-determining, policy-making or policy advocating character, is *an extension of the exception for appointments confirmed by the Senate*. These positions are currently placed in *Schedule C* (positions at GS-15 and below) or filled by *Non-Career* Executive Assignment (GS-16, -17, and -18)." S. Rep. No. 95-969, 50 (1978) (emphases added).

42.    From the enactment of the CSRA in 1978 until today (with the exception of President Trump's short-lived 2020 Executive Order), the executive branch has consistently

---

Civil Service Due Process Amendments of 1990, Pub. L. No. 101-376, 104 Stat. 461 (1990), Congress extended the general scope of these protections to include non-preference-eligible excepted service employees.

[7] The use of this term in Chapters 23 and 75, respectively, differs only in the former's use of the Oxford comma. For consistency, Plaintiffs use the punctuation that appears in Chapter 23 throughout.

deemed "confidential, policy-determining, policy-making, or policy-advocating" roles to mean political appointees and has never placed employees who hold confidential, policy-determining, policy-making, or policy-advocating positions in any service schedule other than Schedule C.

43.    The MSPB, in deciding cases related to the Chapter 23 and Chapter 75(II) Protections, has repeatedly acknowledged this. *See O'Brien v. Off. of Indep. Counsel*, 74 M.S.P.R. 192, 206 (1997) ("[T]he terms 'confidential, policy-determining, policy-making, and policy-advocating' are a shorthand way of describing positions to be filled by 'political appointees.'") (quoting *Special Counsel v. Peace Corps*, 31 M.S.P.R. 225, 231 (1986)).

44.    In keeping with that clear meaning, Congress has defined the term "political appointee" and similar terms in several other statutes to include individuals holding "confidential, policy-determining, policy-making, or policy-advocating" positions. *See, e.g.*, 6 U.S.C. § 349(d)(3)(B) ("[T]he term 'political appointee' means any employee who occupies a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character."); 38 U.S.C. § 725(c)(1) ("[T]he term 'political appointee' means an employee of the Department who holds . . . a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character[.]"); 7 U.S.C. § 6992(e)(2)(D) ("the term 'political appointee' means an individual occupying . . . a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character," whether in Schedule C or elsewhere).

45.    The legislative history of amendments to the CSRA further underscores Congress's clear purpose in using this term of art to ensure that the CSRA granted rights to career civil servants but not political appointees. The House committee report on the 1990 amendments states:

12

> The bill generally extends procedural rights to attorneys, teachers, chaplains, and scientists, but not to presidential appointees. . . . Again, the key to the distinction between those to whom appeal rights are extended and those to whom such rights are not extended is the expectation of continuing employment with the Federal Government. Lawyers, teachers, chaplains, and scientists have such expectations; presidential appointees and temporary workers do not.
>
> . . . .
>
> The bill explicitly denies procedural protections to presidential appointees, individuals in Schedule C positions and individuals appointed by the President and confirmed by the Senate. Employees in each of these categories have little expectation of continuing employment beyond the administration during which they were appointed. They explicitly serve at the pleasure of the President or the presidential appointee who appointed them.

H.R. Rep. No. 101-328, 3-4 (1989).[8]

46.    The CSRA thus reflects Congress's clear judgment that career civil service protections from arbitrary or politically motivated employment actions are necessary to protect the congressional and public interest in the integrity, efficiency, and effectiveness of the federal workforce in executing the laws Congress passes.

47.    Congress expressly delegated to OPM authority to *expand* (but not restrict) coverage of the Chapter 75(II) Protections and Chapter 75(II)'s procedures (which apply equally to the Chapter 23 Protections) "to any position or group of positions excepted from the competitive service by regulation of the Office which is not otherwise covered by this subchapter." 5 U.S.C. § 7511(c).

---

[8] Not all political appointees are appointed by the President, explaining the separate reference to Schedule C in the above text.

48.    The CSRA does not, however, grant any authority to the executive to *restrict* coverage of the Chapter 75(II) Protections by removing federal employees Congress intended to cover from their scope.

49.    Congress also delegated authority to OPM to "prescribe regulations to carry out the purpose" of Chapter 75(II). 5 U.S.C. § 7514.

**D.    OPM Promulgated a Notice and Comment Rule Consistent With This Congressionally Mandated Structure**

50.    On September 18, 2023, OPM issued a notice of proposed rulemaking identifying amendments to several of its regulations pursuant to its rulemaking authority under, among other things, 5 U.S.C. §§ 4305, 7504, and 7514. 88 Fed. Reg. 63862, 63869.

51.    GAP and NARFE each submitted a comment in support of the proposed rule.

52.    OPM received over 4,000 comments during the public comment period, which it considered and discussed when issuing a final rule.

53.    On April 4, 2024, OPM issued a final rule, and the amendments became effective on May 4, 2024 (the "2024 OPM Notice and Comment Rule"). 89 Fed. Reg. 24982.

54.    The 2024 OPM Notice and Comment Rule was based on, among other things, OPM's "determination that injecting politicization into the nonpartisan career service . . . would not only harm government employees, agencies, and services, but also the American people that rely on them[.]" *Id.* at 24995.

55.    Relevant here, OPM promulgated definitions for the terms "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy-determining," defining each to mean:

> of a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the

14

> President and the Administration, and that carries no expectation of
> continued employment beyond the presidential administration
> during which the appointment occurred.

*Id.* at 25045 (codified at 5 C.F.R. §§ 210.102(b)(3) and (b)(4)).

56. This definition aligned the relevant regulations with the statutory text, structure, and purpose, as well as congressional intent, legislative history, legal precedent, and longstanding practice related to the congressional design for the civil service. *Id.* at 25042.

57. Also relevant here, OPM added subpart F to 5 C.F.R. part 302, establishing procedures for how agencies are to identify and move employees into and within the excepted service.

58. Subpart F requires agencies seeking to involuntarily move employees or their positions to a new excepted service schedule (such as Schedule P/C) to inform the employee that they will retain their accrued Chapter 75(II) rights notwithstanding their movement or the movement of their positions. 5 C.F.R. § 302.0602(c).

59. Subpart F also provides such employees with rights to appeal to the MSPB in the event the agency asserts that such a move will eliminate "any procedural and appeal rights" that had previously accrued to the employee. *Id.* § 302.603.

## II. The Executive Orders and OPM Guidance

### A. The Creation of Schedule P/C and the Stripping of Civil Service Protections from Career Civil Service Positions

60. The 2025 Executive Order amends Executive Order No. 13957, originally issued by then-President Trump on October 21, 2020, thereby creating the Amended 2020 Executive Order, and reissuing it with an effective date of January 20, 2025.[9]

---

[9] President Biden revoked Executive Order No. 13957 on January 22, 2021, via Executive Order No. 14003.

61.     Section 4 of the Amended 2020 Executive Order purports to create Schedule P/C, a new excepted service schedule for "[c]areer positions of a confidential, policy-determining, policy-making, or policy-advocating character that are not normally subject to change as a result of a Presidential transition."

62.     "Career positions" "that are not normally subject to change as a result of a Presidential transition" are career civil service positions generally covered by CSRA civil service protections under 5 U.S.C. §§ 7511(a) and 2302(a)(2)(B).

63.     The Amended 2020 Executive Order's description of such positions as "of a confidential, policy-determining, policy-making, or policy-advocating character" is intended to strip the CSRA's civil service protections from any employees in positions listed in Schedule P/C because positions of that character are excluded from civil service protections by 5 U.S.C. §§ 7511(b)(2) and 2302(a)(2)(B)(i).

**B.      The Rescission of Duly Promulgated Federal Regulations Without Notice and Comment**

64.     Section 4 of the 2025 Executive Order directs Defendant Ezell to "amend the Civil Service Regulations to rescind all changes made by [the 2024 OPM Notice and Comment Rule]" that would impede the purpose or affect implementation of the Amended 2020 Executive Order. At the same time, Section 4 declares that "[u]ntil such rescissions [of the 2024 OPM Notice and Comment Rule] are effectuated (including through the resolution of any judicial review), 5 CFR part 302, subpart F, 5 CFR 210.102(b)(3), and 5 CFR 210.102(b)(4)"—all regulations promulgated as part of the 2024 OPM Notice and Comment Rule—"shall be held inoperative and without effect."

16

65.    In so doing, the 2025 Executive Order purports to rescind regulations duly promulgated by OPM pursuant to notice and comment without engaging in a notice-and-comment rulemaking.

**C.    The Administration's Further Attempts to Eviscerate the Career Civil Service**

66.    On January 27, 2025, Defendant Ezell issued the 2025 OPM Guidance, a memorandum containing guidance for implementation of the Executive Orders.

67.    The 2025 OPM Guidance says that positions transferred to the new Schedule P/C will be "exempted from the adverse action procedures set forth in chapter 75"—meaning that employees in those positions will be terminable at will with no recourse.

68.    The 2025 OPM Guidance provides additional guidance to agencies to consider in identifying positions to recommend for transfer to Schedule P/C and notes that, although such recommendations are not due for 120 days, "[a]gencies may, and are encouraged to, submit such petitions on a rolling basis."

69.    The 2025 OPM Guidance also directs agencies to "disregard" 5 C.F.R. §§ 210.102(b)(3) and (b)(4) in identifying positions for inclusion in Schedule P/C. And it declares that the "U.S. Merit Systems Protection Board lacks authority to hear appeals pursuant to the now-inoperative subpart F."

70.    The 2025 OPM Guidance says that "[a] new executive order will subsequently effectuate the transfers [of positions] into Schedule [P/C]."

71.    After issuing the 2025 OPM Guidance, OPM sent an email to virtually all federal employees stating that federal agencies would be downsized through "the reclassification to at-will status for a substantial number of federal employees." Jan. 28, 2025, OPM Deferred Resignation Email to Federal Employees.

72.    The impact of Schedule P/C transfers promises to be profound. Defendants have made clear that they intend to use their arrogated power to exclude a substantial number of career civil servants from CSRA protections, as a vehicle for mass terminations and the replacement of many terminated employees with new employees chosen for their loyalty to the President. In the prior Trump Administration, for example, one agency—the Office of Management and Budget—responded to the 2020 Executive Order by designating *68 percent* of its employees as Schedule F (the equivalent of Schedule P/C in the original 2020 Executive Order), including lower-level GS-9 and 10 positions.[10]

73.    Defendants' unlawful actions come against a backdrop of a broad array of executive actions designed to eviscerate the career civil service and replace it with a coterie of individuals appointed on the basis of political patronage rather than merit. The President has illegally fired Inspectors General; terminated career criminal prosecutors and FBI agents for lawfully investigating crimes; terminated, transferred, and placed on leave career employees whose jobs involved lawfully carrying out policies of the prior administration; rescinded job offers from some of those who had been hired by the previous administration but not yet started in those roles; terminated without due process individuals who refused to carry out illegal firings; requested lists of probationary employees—who, by definition, were all hired by a Democratic administration—and suggested they would be terminated; and more.

---

[10] U.S. Gov't. Accountability Off., GAO-22-105504, *Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category of Federal Positions*, at 13-15 (2022), https://tinyurl.com/ycxbj56d.

### III.    Harm to Plaintiffs

#### A.    GAP

74.    Federal employees who reasonably believe that they have information concerning evidence of illegality, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety (collectively, "Reportable Conduct") often come to GAP for legal advice and assistance. GAP supports many of these whistleblowers with legal representation and strategic guidance in exercising their rights to make protected whistleblower disclosures.

75.    The Executive Orders, the 2025 OPM Guidance, and the actions they direct will result in a large number of career federal employees losing their Chapter 23 Protections against retaliation for whistleblowing, directly impeding GAP's ability to fulfill its mission.

#### 1.    Whistleblower Protections

76.    Retaliation against whistleblowers is among the personnel practices prohibited by Chapter 23, and protected through procedures in Chapter 75(II) and 5 U.S.C. chapter 12 ("Chapter 12"). The protections generally protect employees and applicants who disclose information they reasonably believe evidences Reportable Conduct if such disclosure is "not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs." 5 U.S.C. § 2302(b)(8)(A). *See also id*. § 2302(b)(8)(B) (disclosures to Inspectors General and designated employees); *id*. § 2302(b)(8)(C) (disclosure to Congress and congressional committees); *id*. § 2302(b)(9).

Additional statutory provisions prohibit retaliation for exercising the rights granted under Section 2302(b)(8). *Id.* § 2302(b)(9).[11]

77.    For decades, Congress has continued to refine and expand the CSRA's whistleblower protections and the laws applying those provisions, including in 1989, 1994, 1998, 2000, 2002, 2012, 2016, 2017, 2018, and 2019.[12] And nearly every year from 1987 to 2012 (when it codified the language in the Whistleblower Protection Enhancement Act of 2012), Congress added Senator Chuck Grassley's "Grassley Rider" to appropriations bills, barring the use of appropriated funds to implement or enforce non-disclosure agreements against executive branch

---

[11] As a demonstration of the importance Congress places on such protections, Congress has also provided different whistleblower protections for employees in specific agencies. *See* 5 U.S.C. § 2303 (Federal Bureau of Investigation); § 2304 (Transportation Security Administration); § 3234 (intelligence agencies, including the Central Intelligence Agency, Defense Intelligence Agency, and National Security Agency). Congress has strengthened whistleblower protections for intelligence community employees in 1998, 2014, 2022, and 2024. *See, e.g.*, Intelligence Community Whistle Blower Protection Act of 1998, Pub. L. 105-272, tit. VII, 112 Stat. 2413 (1998) (contained in the Intelligence Authorization Act for Fiscal Year 1999); Intelligence Authorization Act for Fiscal Year 2014, Pub. L. 113-126, tit. VI, § 601, 128 Stat. 1390 (2014); Consolidated Appropriations Act, 2022, Pub. L. 117-103, div. X, tit. V, § 502, 136 Stat. 49 (2022); Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. 118-159, div. F, tit. LXVII, §§ 6701-6703, __ Stat. __ (2024).

[12] *See, e.g.*, Whistleblower Protection Act, Pub. L. 101-12, 103 Stat. 16 (1989); H.R. 2970, Act to reauthorize the Office of Special Counsel, and for other purposes, Pub. L. 103-424, § 5, 108 Stat. 4361, 4363 (1994); Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. 106-181, § 307, 114 Stat. 61 (2000) (pertinent portion codified at 49 U.S.C. § 40122(g)(2)(A)); Homeland Security Act, Pub. L. 107-296, § 883, 116 Stat 2247 (2002); Whistleblower Protection Enhancement Act, Pub. L. 112-199, 126 Stat. 1465 (2012); Federal Bureau of Investigation Whistleblower Protection Enhancement Act, Pub. L. 114-302, 130 Stat. 1516 (2016); Dr. Chris Kirkpatrick Whistleblower Protection Act, Pub. L. 115-73, 131 Stat. 1235 (2017); Department of Veterans Affairs Accountability and Whistleblower Protection Act, Pub. L. 115-41, 131 Stat. 862 (2017); National Defense Authorization Act for Fiscal Year 2018, Pub. L. 115-91, § 1097, 131 Stat. 1283, 1618 (2017); Whistleblower Protection Coordination Act, Pub. L. 115-192, 132 Stat. 1502 (2018); National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92, § 5721, 133 Stat. 1198, 2175-76 (2019).

employees unless the agreements contained a warning that the agreement would not be construed to conflict with 5 U.S.C. § 2302(b)(8) and other whistleblower protection authorities.[13]

78.    Congress also established a robust enforcement mechanism for Section 2302's whistleblower protections in Chapter 12. The Office of Special Counsel ("OSC") is authorized to receive and investigate allegations of prohibited personnel practices, 5 U.S.C. § 1212(a), and take action before the MSPB to enforce violations, 5 U.S.C. §§ 1214, 1215.

79.    Congress provided an even more robust enforcement mechanism in connection with whistleblower complaints arising under 5 U.S.C. §§ 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D). For such complaints, the employee, former employee, or applicant for employment has the right to file an "individual right of action" appeal with the MSPB if OSC terminates the investigation into their claim. *Id.* §§ 1214(a)(3), 1221. Such complaints are adjudicated before the MSPB, pursuant to 5 U.S.C. § 7701, with the right of judicial review, pursuant to 5 U.S.C. §§ 7702 and 7703, and provision for attorney's fees, § 7701(g).

## 2.    Impact on GAP

80.    GAP has represented or helped thousands of federal employee whistleblowers, assisting them to make protected disclosures and navigate these protections.

81.    GAP produces resources about whistleblowing for employees considering reporting abuses and for key whistleblower allies, such as journalists and public interest advocates. For example, GAP publishes a whistleblower guide for federal employees, *Truth-Telling Government: A Guide to Whistleblowing for Federal Employees, Contractors, & Grantees*, as well as guides for journalists and civil society organizations who may interact with whistleblowers.

---

[13] *See, e.g.*, Treasury, Postal Service and General Government Appropriations Act, 1992, Pub. L. 102-141, § 620, 105 Stat. 834, 872 (1991).

82.    GAP advances its mission, in part, by maintaining a blog and by producing news articles, press releases, reports, and fact sheets based on evidence that whistleblowers have provided about public employers' unethical or illegal activities.

83.    GAP frequently supplements and further corroborates whistleblowers' disclosures through investigations, contributing to thousands of articles in major news outlets over the years.

84.    GAP's investigations sparked by federal whistleblowers have uncovered and publicized, and obtained corrective action regarding, misconduct involving drug safety, anti-terrorism efforts, protection of U.S. troops, dangerous nuclear waste, unsafe nuclear power plants, contaminated meat, and illegal domestic surveillance.

85.    GAP's ability to conduct these investigations and publicize their findings depends on whistleblowers' willingness to share information with it.

86.    When a whistleblower approaches GAP, GAP spends significant time taking information from the potential client and advises the potential whistleblower on their rights and options and the risks of retaliation should they decide to proceed.

87.    GAP regularly assists and represents federal employees who meet the criteria for inclusion in Schedule P/C described in the Amended 2020 Executive Order and 2025 OPM Guidance.

88.    Because of the CSRA's civil service protections, GAP has historically been able to tell prospective federal employee whistleblowers in covered positions that laws exist to protect federal employees from retaliation for whistleblowing and create a dedicated pathway (the administrative process before OSC and MSPB) for vindicating those rights. GAP would reinforce this message by pointing to its stellar record of defending whistleblowers from retaliation.

89.    When GAP's whistleblowing clients decide to proceed and are subjected to retaliatory action by their federal government employing agency, GAP often provides them legal representation to challenge the retaliatory action in OSC/MSPB proceedings and otherwise.

90.    Prevailing parties in OSC/MSPB proceedings are entitled to attorney's fees, and settlements in such proceedings often include attorney's fees. When GAP successfully represents clients in OSC/MSPB proceedings and the client is awarded attorney's fees, those fees are typically paid to GAP.

91.    Since 2020, GAP has represented over 25 employees in OSC/MSPB proceedings and recovered approximately $375,000 in attorney's fees for such representation.

92.    The whistleblower protections of Chapter 23 and the concomitant procedural protections of Chapters 75(II) and 12 are critical to providing whistleblowers with the confidence to come forward and disclose misconduct, including to GAP.

93.    Individuals moved into the newly created Schedule P/C will lose the whistleblower protections that form the basis of GAP's work. As a result, GAP must fundamentally alter its intake process to tell potential federal whistleblowers that if they are moved to Schedule P/C they will lose protections against retaliation and will be unlikely to prevail in the event of employer retaliation for their whistleblowing. This fundamentally alters GAP's relationships with clients and its ability to work on their behalf.

94.    The whistleblower protections of Chapter 23 and the concomitant procedural protections of Chapter 75(II) and Chapter 12 are critical to providing whistleblowers with the confidence to come forward and disclose misconduct, including to GAP.

95.    The direct, immediate, and foreseeable effect of the Executive Orders, the OPM Guidance, and the actions they direct is to chill potential whistleblowers from disclosing

misconduct, negatively impacting GAP's ability to carry out its mission and its work of representing federal employee whistleblowers and investigating and disclosing the misconduct that they identify.

96.     The impact will not be limited to employees effectively stripped of their whistleblower protections or counseled by GAP about their loss of rights. The chilling of directly affected employees will lead to other whistleblowers—who would have been motivated by the suppressed disclosures—staying silent and not seeking assistance from GAP.

97.     The chilling of whistleblowers who would otherwise seek GAP's assistance will also result in fewer GAP clients obtaining attorney's fees through the OSC/MSPB process and so in GAP obtaining fewer attorney's fee awards and/or settlements.

98.     In addition, many federal employees—even those who are not chilled—will lose their right to pursue whistleblower retaliation claims in the OSC/MSPB process, further shrinking GAP's client base and attorney's fee revenue.

99.     The chilling of whistleblowers who would otherwise seek GAP's assistance will also result in fewer disclosures made to, and fewer investigations conducted by, GAP, impeding GAP's ability to share information with the public through its blog, news articles, press releases, reports, fact sheets, and other publications.

100.    Since the Executive Orders were promulgated, GAP has spent time advising clients concerned about suffering retaliation for prior protected whistleblowing activity, including in the event that their positions are moved to Schedule P/C and they are thus stripped of whistleblower protections. These inquiries have required GAP to expend additional resources counseling and advising clients due to increased call volume and lengthier counseling sessions.

101.    The Executive Orders and the 2025 OPM Guidance will also require GAP to revise its federal employee whistleblower guide and other educational materials to reflect the establishment of a new category of career federal employees and the loss of whistleblower protections for many federal employees. Updating these materials will entail redrafting and reformatting these resources, redistributing them through multiple partner channels, social media, and press outreach, and conducting new trainings for federal employees, the press, and public interest partners such as unions, professional associations, and civil society organizations that interact with federal employees in the course of their work.

102.    Already, GAP has responded to numerous inquiries seeking information about the Executive Orders and their impact. Responding to these inquiries, which is a core part of GAP's mission, has diverted GAP staff from engaging in other activities.

103.    GAP is in the process of hiring additional staff to address the increased need for legal services and other demands on its resources caused by the Executive Orders and the 2025 OPM Guidance. GAP has also expended resources training pro bono volunteers to add capacity for rapid response and legal support as a result of the Executive Orders and the 2025 OPM Guidance.

104.    GAP submitted a comment in the rulemaking that produced the 2024 OPM Notice and Comment Rule. Had Defendants not unilaterally rescinded, held inoperative, and directed agencies to disregard provisions of the 2024 OPM Notice and Comment Rule, but instead sought comment on such proposed rescission, GAP would have commented on this proposed change.

**B.    NARFE**

105.    NARFE's membership consists of approximately 128,000 current and former federal employees who are or will be eligible to receive an annuity or survivor annuity from the

federal retirement programs of any agency of the United States government. Of those, up to 13,000 are current federal employees.

106.    One of the primary benefits that NARFE offers its members is the NARFE Federal Benefits Institute, a members-only resource for information about federal benefits available to current and former federal employees under federal retirement, health, and other benefits laws. The Federal Benefits Institute provides written materials, webinars, and other information concerning federal benefits to NARFE members.

107.    The federal benefits about which NARFE advises and guides its members generally accrue with longevity of federal employment. Thus, long-term employees are particularly interested in federal retirement benefits and NARFE membership becomes increasingly valuable the longer that a federal employee spends in the federal civil service. Federal employees thus are increasingly likely to seek out NARFE membership the longer they spend—or expect to spend—in the federal service.

108.    The Executive Orders, the 2025 OPM Guidance, and the actions they direct will harm NARFE by making fewer of its members long-term federal employees and by reducing the pool of future long-term federal employees from which NARFE recruits new members.

109.    In July 2024, NARFE embarked on an eighteen-month campaign to increase its membership, at substantial cost, with an emphasis on pursuing active federal employees for membership. NARFE has found that active federal employee members are likely to be younger and maintain their memberships for longer than retired or former employee members and thus present a greater lifetime value to NARFE.

110.    The conversion of thousands or tens of thousands of federal jobs into essentially at-will positions likely to change with presidential administrations will erode the pool of long-term

federal employees potentially interested in NARFE membership, and impede NARFE's membership drive, which will have a smaller target audience from which to seek members. As a result, NARFE would have to have a higher rate of success in recruiting each active federal employee they reach in order to achieve the same recruitment targets.

111.    One component of the Federal Benefits Institute is access to a members-only personal assistance phone line to answer questions and provide information about federal benefits.

112.    Since the issuance of the 2025 Executive Order, the NARFE Federal Benefits Institute personal assistance phone line has experienced an increase in outreach. There was a greater-than-one-hundred-percent increase in phone inquiries in the five business days immediately following President Trump's inauguration, compared to the number of inquiries in the five business days from January 22-26, 2024. This increased outreach has been heavily focused on questions regarding the impact of Schedule P/C.

113.    The week that Schedule P/C was issued, the substantial increase in call volume meant that roughly one hundred calls initially went unanswered—significantly expanding the amount of time spent on callbacks, raising the average cost of serving each member, and thus impairing NARFE's ability to serve its members.

114.    This substantial increase in call volume has detracted from NARFE's ability to focus resources on other components of the Federal Benefits Institute, including developing additional written materials for members, expanding on frequently asked questions to post on NARFE's website, or drafting additional updates for NARFE's weekly e-newsletter. Having less time and fewer resources to devote to these communications impedes NARFE's ability to communicate with and support its broader membership.

115.    Many of NARFE's career employee members are entitled to the civil service protections set forth in Chapters 23 and 75 of the CSRA.

116.    NARFE has members currently employed by the federal government in career positions that meet the criteria for inclusion in Schedule P/C described in the Amended 2020 Executive Order and 2025 OPM Guidance.

117.    By purporting to render 5 C.F.R. part 302, subpart F inoperative and without effect, the 2025 Executive Order and the 2025 OPM Guidance have stripped these career employees of their right to challenge, via an MSPB appeal, their transfer into Schedule P/C.

118.    The Executive Orders and the 2025 OPM Guidance render many NARFE members subject to transfer to Schedule P/C and threaten to imminently strip these employees of their civil service protections by upending the clear delineation between career and political appointees.

119.    The Executive Orders and the 2025 OPM Guidance threaten the careers and livelihoods of NARFE members and put their retirement benefits in jeopardy.

## CAUSES OF ACTION

### COUNT I
**Administrative Procedure Act (5 U.S.C. §§ 702, 706)**
**Failure to Provide Notice and Comment Pursuant to 5 U.S.C. §§ 553, 1103, 1105**
**(All Plaintiffs as to Defendants Ezell and OPM)**

120.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

121.    OPM is an agency within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551.

122.    A court reviewing an agency action "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

123.    The OPM Director is subject to the APA's procedural requirements contained in 5 U.S.C. § 553(b), (c), and (d) when exercising his functions assigned by statute. 5 U.S.C. §§ 1103(b), 1105.

124.    OPM promulgated the 2024 OPM Notice and Comment Rule, including 5 C.F.R. part 302, subpart F, 5 C.F.R. §§ 210.102(b)(3) and (b)(4) (the "Rescinded Provisions"), pursuant to the notice-and-comment provisions of the APA, 5 U.S.C. § 553.

125.    The 2025 OPM Guidance effectively rescinds 5 C.F.R. §§ 210.102(b)(3) and (b)(4), as it directs agencies to "disregard" those duly promulgated provisions in identifying positions for inclusion in Schedule P/C.

126.    The 2025 OPM Guidance itself disregards 5 C.F.R. part 302, subpart F, stating *inter alia* that the "U.S. Merit Systems Protection Board lacks authority to hear appeals pursuant to the now-inoperative subpart F for the same reason." Thus, the 2025 OPM Guidance effectively rescinds 5 C.F.R. part 302, subpart F as well.

127.    The 2025 OPM Guidance represents final agency action with regard to the Rescinded Provisions.

128.    In issuing the 2025 OPM Guidance, OPM did not claim or establish that any of the exceptional circumstances under which an agency may avoid the requirements for notice-and-comment rulemaking apply, and none apply here. *See* 5 U.S.C. §§ 553(b)(A), (B).

129.    Defendants Ezell and OPM failed to provide notice and an opportunity for public comment, as required by 5 U.S.C. §§ 553, 1103, and 1105, prior to effectively rescinding the Rescinded Provisions.

130.    Plaintiffs commented on the 2024 OPM Notice and Comment Rule and would have submitted a comment with regard to its rescission, if they had been given the opportunity to do so.

131.    Plaintiffs have already been harmed and will continue to be harmed by Ezell's and OPM's actions.

132.    Ezell's and OPM's failure to comply with the APA's procedures is unlawful and may be set aside by this Court under 5 U.S.C. § 702 and 5 U.S.C. § 706(2)(D).

133.    This claim challenges Defendants' failure to observe procedure as to the recission of the Rescinded Provisions. Any relief sought pursuant to this claim is limited solely to addressing Defendants' procedural violation.

## COUNT II
### Administrative Procedure Act (5 U.S.C. §§ 702, 706)
### Agency Action in Violation of the CSRA, 5 U.S.C. §§ 2302, 7511
### (All Plaintiffs as to Defendants Ezell and OPM)

134.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

135.    OPM is an agency within the meaning of the APA. *See* 5 U.S.C. § 551.

136.    A court reviewing an agency action "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

137.    The exclusion from civil service protections for positions of a "confidential, policy-determining, policy-making, or policy-advocating character" in 5 U.S.C. §§ 2302(a)(2)(B) and 7511(b) is limited to political appointees.

138.    That limitation is further codified in the 2024 OPM Notice and Comment Rule.

139.    The 2025 OPM Guidance directs agencies to act in a manner inconsistent with the CSRA and the 2024 OPM Notice and Comment Rule. The 2025 OPM Guidance states that OPM, the President, and agencies will identify career positions for inclusion in Schedule P/C for the purpose of excepting those positions from civil service protections.

140.    The 2025 OPM Guidance represents final agency action insofar as it purports to apply the exclusion for positions of a "confidential, policy-determining, policy-making, or policy-advocating character" to career positions.

141.    Ezell's and OPM's actions conflict with the CSRA and its implementing regulations and exceed Ezell's and OPM's authority in violation of the APA.

142.    Plaintiffs have already been harmed and will continue to be harmed by Ezell's and OPM's actions.

143.    Ezell's and OPM's actions are unlawful and may be set aside by this Court under 5 U.S.C. § 702 and 5 U.S.C. §§ 706(2)(A) and (C).

## COUNT III
### Executive Action in Violation of the CSRA, 5 U.S.C. §§ 2302, 7511, and in Excess of Delegated Authority
### (All Plaintiffs as to All Defendants)

144.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

145.    The exclusion from civil service protections for positions of a "confidential, policy-determining, policy-making, or policy-advocating character" in 5 U.S.C. §§ 2302(a)(2)(B) and 7511(b)(2) are limited to political appointees.

146.    That limitation is further codified in the Rescinded Provisions of the 2024 OPM Notice and Comment Rule.

147.    Section 4 of the Amended 2020 Executive Order's creation of Schedule P/C purports to apply an exclusion from the CSRA's protections to career civil servants, even though Congress limited that exclusion to political appointees.

148.    Section 4 of the 2025 Executive Order purports to immediately render the Rescinded Provisions "inoperative and without effect" until such time as OPM's "recissions" of these regulations "are effectuated (including the resolution of any judicial review)."

31

149.    The above-referenced provisions of Section 4 of the Amended 2020 Executive Order and Section 4 of the 2025 Executive Order are invalid as in conflict with the CSRA and its implementing regulations and are therefore without effect.

150.    Defendants OPM and Ezell's actions pursuant to Section 4 of the 2020 Executive Order and Section 4 of the 2025 Executive Order are also in excess of authority.

151.    Plaintiffs have already been harmed and will continue to be harmed by the Defendants' actions.

152.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

153.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT IV
**Executive Action Purporting to Rescind Duly Enacted Federal Regulation
in Excess of Executive Authority
(All Plaintiffs as to All Defendants)**

154.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

155.    OPM promulgated the 2024 OPM Notice and Comment Rule, including the Rescinded Provisions, pursuant to the notice-and-comment provisions of the APA, 5 U.S.C. §§ 1103, 1005, and 553.

156.    Section 4 of the 2025 Executive Order purports to immediately render the Rescinded Provisions "inoperative and without effect."

157.    No aspect of the President's authority under the Constitution or any statute— including 5 U.S.C. §§ 3301, 3302, or 7511—authorizes the President to suspend or invalidate duly-enacted regulations promulgated pursuant to notice-and-comment rulemaking.

158.    Having been promulgated via notice-and-comment rulemaking, the 2024 OPM Notice and Comment Rule can only be amended or repealed through further notice-and-comment rulemaking.

159.    Because the purported rescission of the Rescinded Provisions did not provide an opportunity for notice and comment, it is in excess of the President's authority and without effect.

160.    Defendants OPM and Ezell's actions pursuant to Section 4 of the 2025 Executive Order are also in excess of authority.

161.    Plaintiffs have already been harmed and will continue to be harmed by the Defendants' actions.

162.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

163.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

<u>**COUNT V**</u>
**Actions in Violation of the Fifth Amendment's Due Process Clause**
**(All Plaintiffs as to All Defendants)**

164.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

165.    Federal career civil servants have a vested property interest in the employment protections granted by the CSRA as well as in their continued employment.

166.    Defendants' actions alleged herein violate the Fifth Amendment to the U.S. Constitution insofar as they purport to strip federal career civil servants of their vested property interests without providing those affected with sufficient notice and an opportunity to be heard.

167.    Plaintiffs have already been harmed and will continue to be harmed by the Defendants' actions.

168.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

169.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT VI
### Declaratory Judgment Act (28 U.S.C. § 2201)
### (All Plaintiffs as to All Defendants)

170.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

171.    For the reasons discussed above, the above-referenced provisions of Section 4 of the Amended 2020 Executive Order and Section 4 of the 2025 Executive Order are invalid and in violation of the law.

172.    With exceptions not relevant here, in any "case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

173.    This Court can and should exercise its power under the Declaratory Judgment Act to issue a declaration regarding the violations of law set forth above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that this Court:

a.    Enter a judgment declaring that the 2025 OPM Guidance's direction that agencies "disregard" 5 C.F.R. §§ 210.102(b)(3) and (b)(4) and its determination that the MSPB lacks authority to hear appeals under 5 C.F.R. part 302, subpart F, are unlawful for being issued without providing the public an opportunity for notice and comment under 5 U.S.C. § 553;

b.    Enter a judgment declaring that the 2025 OPM Guidance's direction that agencies "disregard" 5 C.F.R. §§ 210.102(b)(3) and (b)(4) and its determination that the MSPB lacks authority to hear appeals under 5 C.F.R. part 302, subpart F, are unlawful for being not in accordance with the CSRA and/or in excess of OPM's statutory jurisdiction, authority, or limitations;

34

c.      Enter a judgment declaring that the provision of Section 4 of the Amended 2020 Executive Order that amends 5 C.F.R. § 6.2 to create Schedule P/C and directs further action in that regard is unlawful and in excess of authority;

d.      Enter a judgment declaring that the provision of Section 4 of the 2025 Executive Order that declares 5 C.F.R. part 302, subpart F, and 5 C.F.R. §§ 210.102(b)(3), and (b)(4) inoperative and without effect is unlawful and in excess of authority;

e.      Enter a judgment declaring that the above-referenced provisions of Section 4 of the 2025 Executive Order, Section 4 of Amended 2020 Executive Order, and the 2025 OPM Guidance violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

f.      Vacate and set aside all provisions of the Executive Orders and the 2025 OPM Guidance that the Court declares unlawful;

g.      Enjoin Defendants from implementing all provisions of the Executive Orders and the 2025 OPM Guidance that the Court declares unlawful, or from taking any actions to enforce or apply them;

h.      Award Plaintiffs their reasonable attorney's fees and costs; and

i.      Award such other relief as the Court deems just and proper.

Dated:   February 6, 2025                 Respectfully submitted,

THE PROTECT DEMOCRACY PROJECT, INC.

By:    /s/    *Erica J. Newland*
Erica J. Newland (D.C. Bar No. 90001983)
Ori Lev (D.C. Bar No. 452565)*
Julia L. Torti**
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave. NW, Suite #163
Washington, D.C. 20006
Tel: (202) 579-4582
Fax: (202) 769-3176
erica.newland@protectdemocracy.org
ori.lev@protectdemocracy.org
jules.torti@protectdemocracy.org

SELENDY GAY PLLC
Andrew Dunlap**
Corey Stoughton (D.C. Bar No. 472867)*
Drake Reed**
Sarah Chase**
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
adunlap@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com
schase@selendygay.com

* Application for admission forthcoming
**Pro hac vice application forthcoming

*Counsel for Plaintiffs*