IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT<br>1612 K Street NW<br>Washington, DC 20001<br><br>    and<br><br>NATIONAL ACTIVE AND RETIRED FEDERAL<br>EMPLOYEES ASSOCIATION<br>606 N. Washington Street<br>Alexandria, VA 22314,<br><br>               Plaintiffs,<br><br>        v.<br><br>UNITED STATES OFFICE OF PERSONNEL<br>MANAGEMENT<br>1900 E Street NW<br>Washington, DC 20415,<br><br>SCOTT KUPOR, in his official capacity as<br>Director of the Office of Personnel Management<br>1900 E Street NW<br>Washington, DC 20415,<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States of America<br>1600 Pennsylvania Ave NW<br>Washington, DC 20500,<br><br>    and<br><br>THE UNITED STATES OF AMERICA<br>U.S. Attorney's Office for the District of<br>Columbia<br>601 D Street NW<br>Washington, DC 20530,<br><br>              Defendants. | Case No. 25-0347(PLF) |

**AMENDED COMPLAINT**

**INTRODUCTION**

1.      This case challenges Defendants' attempt to dismantle a cornerstone of American democracy: a federal civil service rooted in merit and integrity. For well over a century, Congress has legislated to ensure that government employees can faithfully implement the laws Congress enacts without fear of political interference or retaliation. Defendants have abused their executive power to undermine that statutory framework so that they can purge career civil servants and replace them with partisan loyalists.

2.      The Civil Service Reform Act (the "CSRA") embodies the long history of Congress establishing, defining, and regulating the civil service system to protect the general welfare, ensure the proper execution of the laws that Congress passes, and advance the public interest in a federal workforce grounded in merit and free from corruption, political bias, and improper influences.

3.      The CSRA does this, in part, by giving employment protections to career civil servants—federal employees whose positions are designed to endure from one administration to the next. It excludes *political* appointees from civil service protections upon a determination that their positions are of a "confidential, policy-determining, policy-making, or policy-advocating character" (the "Exclusion Phrase"), recognizing that their positions are designed to follow the elected officials who appoint them. The Exclusion Phrase is a term of art that the CSRA uses specifically to establish an exclusion for political appointees. The Exclusion Phrase does not allow the executive to strip civil service protections from the civil service's *non-political, career* employees.

4.      Despite this, on January 20, 2025, President Donald J. Trump issued Executive Order No. 14171 ("EO 14171"), setting in motion a process for redesignating tens of thousands of *non-political, career* civil service positions into a new schedule of civil service positions— Schedule Policy/Career ("Schedule P/C")—that would strip these career positions (and the

employees currently occupying them) of their congressionally mandated employment protections. EO 14171 reinstated and amended the President's 2020 Executive Order No. 13957 (as amended, "Amended EO 13957").

5.    On February 6, 2026, the Office of Personnel Management ("OPM") issued a final rule governing this process ("the Final Rule"), and on June 3, 2026, President Trump issued Executive Order No. 14410 ("EO 14410") (with EO 14171 and Amended EO 13957, the "Executive Orders"), purporting to effectuate an initial redesignation of thousands of positions. EO 14410 also further amended Amended EO 13957.

6.    If allowed to take effect as planned, Schedule P/C would permit the executive to treat career civil servants as political appointees and fire them at will, including for purposes of political patronage and personal loyalty, all contrary to the CSRA.

7.    Statements by President Trump and his senior advisors make clear that a central purpose of Schedule P/C is to replace career civil servants with political loyalists. On January 20, 2025, the day he issued EO 14171, President Trump said: "Most of those bureaucrats are being fired, they're gone. It should be all of them."[1] As he signed it, he said that he was "getting rid of all the cancer[,] the cancer caused by the Biden administration."[2] Later that week, the White House

---

[1] Erich Wagner, *Trump: Agencies Should Fire 'All' Bureaucrats*, Government Executive (Jan. 20, 2025), https://www.govexec.com/workforce/2025/01/trump-agencies-should-fire-all-bureaucrats/402353/ [https://perma.cc/W6AQ-N392].

[2] Alan Rappeport, *Federal Employees Union Sues Trump Over Worker Protections*, N.Y. Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/trump-schedule-f-federal-workers.html [http://archive.today/LiMSS].

Press Secretary said: "[The President] is the executive of the executive branch, and, therefore, he has the power to fire anyone within the executive branch that he wishes to."[3]

8.      These comments are consistent with earlier statements that evince a purpose to replace civil servants with political loyalists. Describing advice he would give to President Trump, then-senator J.D. Vance, now Vice President, said he would advise Trump to "[f]ire every single midlevel bureaucrat, every civil servant in the administrative state, replace them with our people."[4] In October 2024, Russell Vought, now serving as Director of the Office of Management and Budget, said in reference to Schedule P/C and other changes to the civil service: "We want the bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains."[5] In October 2025, when

---

[3]   Press Briefing by Press Secretary Karoline Leavitt (Jan. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-secretary-karoline-leavitt [https://perma.cc/NNA6-R86N].

[4] Andrew Prokop, *J.D. Vance's Radical Plan to Build a Government of Trump Loyalists*, Vox (July 18, 2024), https://www.vox.com/politics/361455/jd-vance-trump-vice-president-rnc-speech [https://perma.cc/HS7F-WDEF].

[5] Molly Redden, Andy Kroll & Nick Surgey, *'Put them in trauma': Inside a key MAGA leader's plans for a new Trump agenda*, Government Executive (Oct. 28, 2024), https://www.govexec.com/management/2024/10/inside-key-maga-leaders-plans-new-trump-agenda/400607/ [https://perma.cc/QA8K-GNFG].

referencing mass firings of civil servants during a government shutdown, the President shared an AI-generated video of Vought dressed as the grim reaper.[6]



9.     On June 3, 2026, the White House issued a document (the "Fact Sheet") about EO 14410 that stated "President Trump is delivering on his promise to dismantle the deep state."[7] OPM Director Kupor said in an interview after EO 14410 was signed that Schedule P/C "provides a mechanism, obviously, for people in those agencies to be able to be removed effectively at will."[8] On June 8, 2026, OPM issued a memorandum to the heads of departments and agencies regarding

---

[6] Donald Trump (@realDonaldTrump), Truth Social (Oct. 2, 2025, at 22:39 ET), https://truthsocial.com/@realDonaldTrump/posts/115307915499158903 [http://archive.today/GXxTV].

[7] The White House, *Fact Sheet: President Donald J. Trump Increases Accountability in the Federal Workforce* (June 3, 2026), https://www.whitehouse.gov/fact-sheets/2026/06/fact-sheet-president-donald-j-trump-increases-accountability-in-the-federal-workforce/ [https://perma.cc/N5F7-MDE9].

[8] Andrea Hsu, *Trump strips job protections from 8,000 federal workers*, WYPR (June 3, 2026), https://www.wypr.org/2026-06-03/trump-strips-job-protections-from-8-000-federal-workers [https://perma.cc/4GYV-FG7M].

Schedule P/C that ominously included as an appendix a "Sample Termination Notice to Schedule Policy/Career Employee[s]."[9]

10.      In his second term, the President has taken numerous other steps to purge the federal workforce of those that the administration believes do not share his political views: He has fired Inspectors General; terminated career criminal prosecutors and federal law enforcement officers for lawfully investigating crimes adverse to the President's interests or for refusing to investigate spurious "crimes" when doing so served his interests; terminated, transferred, and placed on leave career employees whose jobs involved lawfully carrying out policies of the prior administration that the President disfavored and employees carrying out the policies of this administration who refused to cross ethical red lines; rescinded job offers from civil servants hired by the previous administration who had not yet started their jobs; fired workers at multiple agencies who signed letters to leadership voicing opinions on matters of public concern; and more. Defendants' actions challenged herein are part of this pattern.

11.      Defendants' actions are contrary to, and not authorized by, the CSRA, which limits positions of a "confidential, policy-determining, policy-making, or policy-advocating character" to political appointees, *i.e.*, those individuals hired with consideration of their political views and whose positions are understood to be subject to change as the result of a change in presidential administration. Defendants' actions also violate the separation of powers by usurping Congress's authority to establish and set rules for the federal civil service.

---

[9] *Initial Implementing Guidance for Schedule Policy/Career Final Rule*, OPM (Feb. 5, 2026), https://www.opm.gov/chcoc/latest-memos/opm-schedule-policycareer-implementation-guidance-memorandum.pdf [https://perma.cc/5MQH-DH6B]; *Sample Termination Notice to Schedule Policy/Career Employee – June 8, 2026*, OPM (June 8, 2026), https://www.opm.gov/policy-data-oversight/hiring-information/hiring-authorities/schedule-policycareer/sample-termination-notice-to-schedule-policycareer-employee.pdf [https://perma.cc/DJ7J-QV88].

12. Defendants' actions violate the Fifth Amendment to the U.S. Constitution by purporting to strip incumbent career civil servants of congressionally granted employment protections without the due process protections of notice and an opportunity to be heard.

13. The Final Rule is arbitrary and capricious because it is not supported by the record set forth in the Final Rule, does not adequately respond to evidence of the benefits of existing protections granted by the CSRA (collectively, the "CSRA Protections") and the adverse consequences of the Final Rule raised by commenters, does not engage in reasoned decision-making, relies on factors that Congress did not authorize OPM to consider, and fails to account for the serious reliance interests implicated by the change in policy from an earlier rule issued by OPM on April 9, 2024.

14. The Court should declare the Final Rule and the Executive Orders unlawful; set aside the Final Rule; declare Defendants' purported stripping of CSRA Protections from incumbent career employees moved or whose positions are moved into Schedule P/C without notice or an opportunity to be heard unconstitutional; enjoin Defendants from stripping CSRA Protections from any such employee as a result of their movement into Schedule P/C; and enjoin Defendants OPM and Kupor from implementing or taking any actions to enforce or apply the unlawful provisions of the Final Rule and the executive orders.

## PARTIES

### I.    Plaintiffs

15. Plaintiff **Government Accountability Project ("GAP")** is an independent, non-partisan, and non-profit organization headquartered in Washington, D.C. that promotes corporate and government accountability through effective, impactful whistleblower disclosures; protecting whistleblowers; providing legal guidance to whistleblowers on how to make an

7

effective, impactful, and legally protected disclosure; promoting whistleblowing as a means of ensuring accountability for fraud, waste, abuse, and threats to public safety; advancing occupational free speech; and empowering citizen activists. GAP's mission is to provide a safe, effective voice for employees who use free speech rights to challenge abuses of power that betray the public trust.

16. GAP brings this action in its own capacity.

17. Plaintiff **National Active and Retired Federal Employees Association ("NARFE")** is a non-profit membership organization whose mission is to promote the general welfare of current federal civilian employees and federal retirees and their survivors, to advise and assist them with respect to their federal benefits, to represent their interests before appropriate authorities, and to support legislation and regulations beneficial to such employees and retirees and oppose those detrimental to their interests.

18. NARFE brings this action in its own capacity and on behalf of its current federal employee members.

## II. Defendants

19. Defendant **OPM** is an agency that serves as the chief human resources agency and personnel policy manager for the federal government. It is charged with the management of the federal civil service and is responsible for implementing the executive orders and the Final Rule challenged in this action.

20. Defendant **Scott Kupor, sued in his official capacity**, is Director of OPM. He is responsible for implementing the executive orders and the Final Rule challenged in this action.

21. Defendant **President Donald J. Trump, sued in his official capacity**, is President of the United States of America. He issued the executive orders challenged in this action.

8

22.    Defendant **United States of America** is named as a defendant pursuant to 5 U.S.C. § 702.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

24.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district. Additionally, Plaintiff GAP resides in this district.

## STATEMENT OF FACTS

### I.    Legal Background

### A.    The History of Congressional Regulation of the Civil Service

25.    For the past century and a half, Congress has legislated a structure for the civil service that balances the President's authority over political appointees, whose positions are expected to turn over with each new administration, with Congress's role in ensuring the integrity and effectiveness of the career civil service.

26.    At least as far back as the nineteenth century, Congress and the public understood that incompetence, inefficiency, and corruption in the executive branch threatened the public interest and required congressional intervention. *See Elrod v. Burns*, 427 U.S. 347, 353-54 (1976) (noting that "only a few decades after Andrew Jackson's administration," there was "strong discontent with the corruption and inefficiency of the patronage system of public employment").

27.    In the Pendleton Act, formally titled An Act to Regulate and Improve the Civil Service of the United States, ch. 27, 22 Stat. 403 (1883), Congress set aside roughly ten percent of federal positions for non-political, merit-based hiring on the basis of competitive exams rather than

allowing the executive unregulated authority over such positions, which to that point had led to hiring on the basis of a candidate's history of partisanship or other non-merit based considerations.

28.     Between 1883 and 1978, Congress repeatedly passed and amended legislation pertaining to the federal civil service, with the overall trend of expanding merit-system principles and procedural protections for career civil service positions. In 1912, for example, Congress passed the Lloyd-LaFollette Act, which established a for-cause removal standard for employees in the "classified service" (today, the "competitive service"). Lloyd-LaFollette Act, ch. 389, § 6, 37 Stat. 555 (1912). The Lloyd-LaFollette Act also established procedural protections, including requiring written notice of the reasons for an employee's removal and an opportunity to respond.

29.     In 1978, public outrage over the scandals of the Nixon administration, including attempts to advise political appointees to subvert civil service protections and to enlist civil servants in political election work, led Congress to enact the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978), to comprehensively promote the competence, integrity, and merit of America's career civil service. *See* CSRA, S. Rep. No. 95-969, 6 (1978) (discussing the personnel practices of the Nixon administration and explaining: "There is little doubt that a vigorous protector of the merit system is needed. The lack of adequate protection was painfully obvious during the civil service abuses only a few years ago.").

**B.     The Structure of the Career Civil Service System**

30.     Congress's role in shaping the structure of the civil service is well established. Starting with the Pendleton Act in 1883, Congress classified the civil service into sub-categories. Under the CSRA, the civil service today generally consists of three main categories: (1) the "competitive service," for appointments generally made through competitive procedures, 5 U.S.C. § 2102; (2) the "excepted service," for positions specifically excepted from competitive service hiring procedures and examinations by statute or expressly delegated statutory authority,

5 U.S.C. § 2103; and (3) the Senior Executive Service, for positions expressly excluded from the competitive service by statute based on the nature of the position's function, 5 U.S.C. §§ 2101a, 3132(a)(2).

31.    Congress delegated authority to except civil service positions from the competitive service to the executive in 5 U.S.C. § 3302, which permits the President to "prescribe rules governing the competitive service" that "provide, as nearly as conditions of good administration warrant, for [] necessary exceptions of positions from the competitive service."

32.    Positions excepted from the competitive service are categorized in schedules of such positions codified at 5 C.F.R. § 6.2. Before the executive actions challenged herein, there were five excepted service schedules: Schedules A, B, C, D, and E. Schedules A, B, and D generally cover career civil service positions that, for various and specific reasons, require exceptions from the hiring and examination procedures that generally apply to the competitive service. These career, excepted service employees accrue the same protections against adverse employment actions as competitive service employees (*i.e.*, the positions are "excepted" from hiring requirements that apply to the competitive service but not from removal protections). Schedule E covers administrative law judge positions.

33.    Schedule C covers political appointee positions (described, as explained below, as those of a "confidential or policy-determining character"), 5 C.F.R. § 6.2, to which CSRA Protections do not apply.

34.    President Dwight Eisenhower established Schedule C on March 31, 1953, via Executive Order No. 10440, as a dedicated schedule for political appointee positions. This action codified the distinction between career positions and political appointee positions, including political positions then listed in other excepted schedules. To distinguish political appointee

positions from career positions, President Eisenhower referred to them in Executive Order No. 10440 as positions of "a confidential or policy-determining character."

35.     The Civil Service Commission, the predecessor to OPM, explained the purpose of the new Schedule C: "This action was taken in order to make a clear distinction between jobs which belong in the career service and those which should be subject to change with a change in administration."[10] The Civil Service Commission made clear that "[t]o maintain the integrity of the merit system, it is essential that career employees not become identified with the policy-determining function of particular programs of any administration."[11]

36.     Of the roughly 2.3 million employees in the federal workforce at the start of the Trump administration, 4,000 or so were political appointees. The rest were non-political, career civil servants.[12]

### C.     The Role of Civil Service Protections in Congressional Regulation of the Federal Workforce

37.     The Senate committee responsible for the bill that became the CSRA made clear that Congress intended the CSRA to protect the public interest in ensuring that laws enacted by Congress are executed by competent professionals instead of loyalists:

> [T]he Committee has viewed civil service reform from the *standpoint of the public*, rather than the more limited perspective of either the employee or manager. The 'rights of employees' to be *selected and removed only on the basis of their competence* are

---

[10] U.S. Civil Serv. Comm'n, 70th Annual Report, 2 (Nov. 16, 1953), https://tinyurl.com/2p92x9v8; *see also* Press Release, U.S. Civil Serv. Comm'n, 2 (Aug. 25, 1955) ("Policy-making and confidential positions are placed in Schedule C and exempted from civil-service requirements in order to make a clear distinction between the career service and the policy-making or confidential positions which exist primarily to carry out the objectives of any national administration.").

[11] U.S. Civil Serv. Comm'n, 71st Annual Report, 8 (Nov. 15, 1954), https://tinyurl.com/4wshua7r.

[12] In addition to Schedule P/C, on July 17, 2025, the President created an additional Schedule G covering certain additional political positions, an action not challenged herein.

> concomitant with the public's need to have its business conducted competently. Similarly, the need for Federal executives to manage their personnel responsibilities effectively can only be justified by the benefit derived by the public from such management flexibility. An employee has no right to be incompetent; *a manager has no right to hire political bed fellows*.

S. Rep. No. 95-969, 4 (1978) (emphasis added); *see also U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557 (1973) (describing "the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service").

38.     As the Senate's committee report explained, one of the CSRA's primary goals was to "[a]llow civil servants to be able to be hired and fired more easily, *but for the right reasons*." S. Rep. No. 95-969, 4 (1978) (emphasis added).

39.     To further this goal, the CSRA contains two important sets of employment rights and protections that it grants to career civil servants but *not* to political appointees.

40.     First, 5 U.S.C. chapter 75, subchapter II ("Chapter 75(II)") generally protects career civil servants from the most extreme actions—such as removal, lengthy suspension, and reduction in grade or pay ("Adverse Actions")—by requiring that such actions be taken only for cause and in accordance with specified procedures (the "Chapter 75(II) Protections"). Chapter 75(II) also establishes a right on the part of covered career employees to appeal Adverse Actions to a dedicated and independent tribunal, the Merit Systems Protection Board ("MSPB"), which has the power to reverse Adverse Actions and order corrective action.

41.     Second, 5 U.S.C. chapter 23 ("Chapter 23") generally protects career civil servants from a specified list of various personnel actions motivated by an improper purpose, such as political affiliation discrimination, unlawful preference, or retaliation against whistleblowers (the

13

"Chapter 23 Protections"). The Chapter 23 Protections also cover all practices prohibited by Chapter 75(II) when taken for a prohibited purpose. Whistleblower retaliation and, under certain circumstances, other personnel actions that violate the Chapter 23 Protections are subject to review by the MSPB.

42.     Whistleblowers—federal employees who disclose information they reasonably believe is evidence of illegality, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety (collectively, "Reportable Conduct")—are protected by Chapter 23's protections against retaliation and through procedures in Chapter 75(II). 5 U.S.C. §§ 2302(b)(8) (prohibiting retaliation for whistleblowing), 2302(b)(9) (prohibiting retaliation for exercising the rights granted under Section 2302(b)(8)).

43.     Congress also established an enforcement mechanism for whistleblower and other prohibited personnel practice protections in Chapter 12. It authorized the Office of Special Counsel ("OSC") to receive and investigate allegations of prohibited personnel practices, 5 U.S.C. § 1212(a), petition the MSPB for corrective action, 5 U.S.C. § 1214(b)(2)(C), and file a complaint seeking disciplinary action against an offending federal official with the MSPB, 5 U.S.C. § 1215.

44.     Congress provided an even more robust enforcement mechanism for whistleblower complaints arising under 5 U.S.C. §§ 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D). For those complaints, the employee, former employee, or applicant for employment has the right to file an "individual right of action" appeal with the MSPB if OSC terminates the investigation of their claim. *Id.* §§ 1214(a)(3), 1221. Such complaints are adjudicated before the MSPB, pursuant to 5 U.S.C. § 7701, with the right of judicial review, pursuant to 5 U.S.C. §§ 7702 and 7703, and provision for attorney's fees, 5 U.S.C. §§ 5596(b)(1)(A)(ii), 7701(g).

14

45.     These whistleblower protections also authorize government attorneys in Washington, D.C., to disclose Reportable Conduct to appropriate parties, notwithstanding client confidentiality obligations. *See*, *e.g.*, D.C. Rules of Pro. Conduct R. 1.6(e)(2)(B).

46.     In accordance with the structure established by the CSRA, the vast majority of career civil servants obtain Chapter 75(II) Protections after a probationary period of one or two years, 5 U.S.C. § 7511(a)(1)(A)-(C), and Chapter 23 Protections even earlier, 5 U.S.C. § 2302.

47.     Congress granted Chapter 75(II) Protections and Chapter 23 Protections (together, the "CSRA Protections") to career civil servants in both the competitive and excepted services.[13] Congress did not extend those protections to *political appointees*, in recognition of the President's authority over them.

48.     In both Chapters 23 and 75(II), Congress distinguished political appointees from career civil servants by using the Exclusion Phrase and excluding positions of a "confidential, policy-determining, policy-making, or policy-advocating character."[14] Congress borrowed and expanded on the language used by President Eisenhower in establishing Schedule C in Executive Order No. 10440 ("confidential or policy-determining"), cementing the Exclusion Phrase's role as the statutory demarcation for political appointees.

49.     Both the legislative history and the broader legislative context show that Congress used the Exclusion Phrase to mean political appointees. This ensured that career civil servants

---

[13] As originally enacted, certain protections did not apply to employees in excepted service positions who were ineligible for veterans' preference. CSRA § 204(a), 92 Stat. 1135-44. In the Civil Service Due Process Amendments of 1990, Pub. L. No. 101-376, 104 Stat. 461 (1990), Congress extended the general scope of these protections to include non-preference-eligible excepted service employees.

[14] The use of this term in Chapters 23 and 75, respectively, differs only in the former's use of the Oxford comma. For consistency, Plaintiffs use the punctuation that appears in Chapter 23 throughout except when quoting other sources.

could competently execute Congress's laws without undue political interference while the President would retain discretion over the hiring and firing of political appointees.

50. The Senate's committee report on the CSRA confirmed that the exception for Exclusion Phrase positions was limited to political appointees. It stated that the "exception for positions of a confidential, policy-determining, policy-making or policy-advocating character, is an extension of the exception for appointments confirmed by the Senate. These positions are currently placed in Schedule C (positions at GS-15 and below) or filled by Non-Career Executive Assignment (GS-16, -17, and -18)." S. Rep. No. 95-969, 50 (1978).

51. From the enactment of the CSRA in 1978 until today (with the exception of President Trump's short-lived effort to take actions similar to those challenged here at the very end of his first term), the executive branch has consistently deemed "confidential, policy-determining, policy-making, or policy-advocating" roles to mean political appointees. From 1978 until this administration, the executive branch had never placed career employees in positions designated as "confidential, policy-determining, policy-making, or policy-advocating," nor had it designated any positions as "confidential, policy-determining, policy-making, or policy-advocating" in any excepted service schedule other than Schedule C.

52. The MSPB, in deciding cases related to Chapter 23 and Chapter 75(II) Protections, has repeatedly acknowledged this. As it explained: "[T]he terms 'confidential, policy-determining, policy-making, and policy-advocating' are a shorthand way of describing positions to be filled by 'political appointees.'" *O'Brien v. Off. of Indep. Counsel*, 74 M.S.P.R. 192, 206 (1997) (quoting *Special Counsel v. Peace Corps*, 31 M.S.P.R. 225, 231 (1986)).

53. In keeping with that clear meaning, Congress has defined the term "political appointee" and similar terms in several other statutes to include individuals holding "confidential,

16

policy-determining, policy-making, or policy-advocating" positions. *See, e.g.,* 6 U.S.C. § 349(d)(3)(B) ("[T]he term 'political appointee' means any employee who occupies a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character."); 38 U.S.C. § 725(c) ("[T]he term 'political appointee' means an employee of the Department who holds . . . a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character."); 7 U.S.C. § 6992(e)(2) ("[T]he term 'political appointee' means an individual occupying . . . a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character," whether in Schedule C or elsewhere.); 5 U.S.C. § 9803(c)(2) ("[T]he term 'political appointee' means an employee who holds . . . a position which has been excepted from the competitive service by reason of its confidential, policy-determining, policy-making, or policy-advocating character.").

54. The legislative history of amendments to the CSRA underscores Congress's purpose in using the Exclusion Phrase as a term of art to grant employment protections to career civil servants but not political appointees. The House committee report on the 1990 amendments states:

> The bill generally extends procedural rights to attorneys, teachers, chaplains, and scientists, but not to presidential appointees. . . . Again, the key to the distinction between those to whom appeal rights are extended and those to whom such rights are not extended is the expectation of continuing employment with the Federal Government. Lawyers, teachers, chaplains, and scientists have such expectations; presidential appointees and temporary workers do not.
>
> . . . .
>
> The bill explicitly denies procedural protections to presidential appointees, individuals in Schedule C positions and individuals appointed by the President and confirmed by the Senate. Employees

17

in each of these categories have little expectation of continuing employment beyond the administration during which they were appointed. They explicitly serve at the pleasure of the President or the presidential appointee who appointed them.

H.R. Rep. No. 101-328, 3-4 (1989).[15]

55.    Congress delegated to OPM the authority to expand coverage of the Chapter 75(II) Protections and Chapter 75(II)'s procedures "to any position or group of positions excepted from the competitive service by regulation of the Office which is not otherwise covered by this subchapter." 5 U.S.C. § 7511(c).

56.    The CSRA does not grant any authority to the executive to remove coverage of the Chapter 75(II) Protections from federal employees whom Congress intended to cover.

57.    The CSRA thus reflects Congress's clear judgment that career civil service protections from arbitrary or politically motivated employment actions are necessary to protect the congressional and public interest in the integrity, efficiency, and effectiveness of the federal workforce in executing the laws Congress passes.

**D.    In 2023-2024, OPM Promulgated Notice-and-Comment Regulations Consistent with This Congressionally Mandated Structure**

58.    Congress delegated authority to OPM to "prescribe regulations to carry out the purpose" of Chapter 75(II). 5 U.S.C. § 7514.

59.    On September 18, 2023, OPM issued a notice of proposed rulemaking pursuant to its rulemaking authority under, among other things, 5 U.S.C. §§ 4305, 7504, and 7514, identifying proposed amendments to several of its regulations. 88 Fed. Reg. 63862, 63869 (Sep. 18, 2023).

---

[15] Not all political appointees are appointed by the President, explaining the separate reference to Schedule C in the above text.

60.     Plaintiffs GAP and NARFE each submitted a comment in support of the proposed rule.

61.     OPM received over 4,000 comments during the public comment period, which it considered and discussed when issuing a final rule.

62.     On April 9, 2024, OPM issued a final rule (the "Prior Rule"), and the amendments became effective on May 9, 2024. 89 Fed. Reg. 24982 (Apr. 9, 2024).

63.     The Prior Rule was based on, among other things, OPM's "determination that injecting politicization into the nonpartisan career civil service . . . would not only harm government employees, agencies, and services, but also the American people that rely on them." *Id.* at 24995.

64.     Relevant here, the Prior Rule affirmed the accepted definition of the terms "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy-determining," defining each to mean:

> of a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President and the Administration, and that carries no expectation of continued employment beyond the presidential administration during which the appointment occurred.

*Id.* at 25045 (codified at 5 C.F.R. §§ 210.102(b)(3) and (b)(4)).

65.     This definition aligned the regulations with the CSRA's statutory text, structure, and purpose, as well as congressional intent, legislative history, legal precedent, and longstanding practice related to the congressional design for the civil service. *Id.* at 25042.

66.     The Prior Rule also added subpart F to 5 C.F.R. part 302, establishing procedures for how agencies are to identify and move employees into and within the excepted service.

19

67. Subpart F required agencies seeking to involuntarily move employees or their positions to a new excepted service schedule (such as Schedule P/C) to inform the employees that they will retain their accrued Chapter 75(II) rights notwithstanding their movement or the movement of their positions. 5 C.F.R. § 302.602(c).

68. Subpart F also provided such employees with rights to appeal to the MSPB if the agency asserted that such a move would eliminate "any procedural and appeal rights," *i.e.*, CSRA Protections, that had previously accrued to the employee. *Id.* § 302.603(b).

## II. The Creation of Schedule P/C and the Stripping of Civil Service Protections from Career Civil Service Employees

### A. The Creation of Schedule P/C

69. Almost immediately after the 2025 inauguration, Defendants initiated a series of executive actions to break with the longstanding, congressionally mandated structure of the federal workforce by purporting to strip career civil servants of their CSRA Protections and drastically expand the number of positions excluded from those protections.

70. On January 20, 2025, President Trump issued EO 14171, which reinstated and amended EO 13957.[16]

71. Section 4 of Amended EO 13957 purports to create Schedule P/C, a new excepted service schedule for "[c]areer positions of a confidential, policy-determining, policy-making, or policy-advocating character [that are] not normally subject to change as a result of a Presidential transition."

---

[16] The text of EO 13957, as amended by EO 14171 and further amended by EO 14410, is available at: https://www.opm.gov/policy-data-oversight/hiring-information/hiring-authorities/schedule-policycareer/amended-executive-order-13957.pdf [https://perma.cc/4K7Y-WAYQ].

72.    The "career positions" described in the order are career civil service positions generally covered by CSRA Protections.

73.    Amended EO 13957's description of such positions as being "of a confidential, policy-determining, policy-making, or policy-advocating character" is intended to strip the CSRA Protections from any employees in positions placed in Schedule P/C by invoking the Exclusion Phrase used in 5 U.S.C. §§ 7511(b)(2) and 2302(a)(2)(B)(i).

74.    On January 27, 2025, then-Acting OPM Director Charles Ezell issued a Memorandum to all executive agencies (the "2025 OPM Guidance") implementing EO 14171 and Amended EO 13957 and directing agencies to act accordingly.[17]

75.    The 2025 OPM Guidance confirmed Defendants' intent to strip CSRA Protections from incumbent career employees whose positions are moved to Schedule P/C. It said that those positions will be "exempted from the adverse action procedures set forth in chapter 75"—meaning that employees in those positions will be terminable at will.

76.    On February 6, 2026, OPM published the Final Rule, ostensibly to "strengthen employee accountability and the democratic responsiveness of American Government." 91 Fed. Reg. 5580, 5580 (Feb. 6, 2026).

77.    Among other things, the Final Rule rescinded the Prior Rule's codification of the definitions of "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy determining" as being of a character exclusively associated with a "noncareer political appointment." *Id*. at 5580, 5653 (removing 5 C.F.R. §§ 210.102(b)(3) and

---

[17] Memorandum from Charles Ezell, Acting Director of OPM, to Heads and Acting Heads of Departments and Agencies, *Guidance on Implementing President Trump's Executive Order titled, "Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce"* (Jan. 27, 2025), https://www.opm.gov/media/sqfnpy4n/opm-memorandum-re-schedule-policy-career-guidance-01-27-25-final-2.pdf [https://perma.cc/VV69-VTBY].

(b)(4)). The Final Rule instead rejected the notion that the Exclusion Phrase "is a term of art which refers solely to political appointees," and found instead that each of the Exclusion Phrase's component parts separately describe what the Final Rule refers to as "policy-influencing" positions that "include but are not limited to political appointments." *Id.* at 5595-96. Indeed, the Final Rule uses "policy-influencing" as shorthand for the Exclusion Phrase. *Id.* at 5580 n.1.

78.     The Final Rule purports to expand the types of positions that may be considered of a "confidential, policy-determining, policy-making, or policy-advocating character"—and so not covered by the CSRA Protections—by adding a new provision, 5 C.F.R. § 213.3601, for "Career positions of a confidential, policy-determining, policy-making, or policy-advocating character." Section 213.3601(a) states:

> As authorized by the President, agencies may make appointments under this section to career positions of a confidential, policy-determining, policy-making, or policy-advocating character that are not in the Senior Executive Service. Positions filled under this authority are excepted from the competitive service and constitute Schedule Policy/Career.

91 Fed. Reg. at 5654.

79.     According to OPM, employees who are moved, or whose positions are moved, to Schedule P/C lose their accrued CSRA Protections,[18] and employees hired into Schedule P/C positions are not eligible to accrue CSRA Protections. *Id.* at 5580, 5605, 5657 (amending 5 C.F.R. §§ 752.401(c), (d)(2); 752.405(a)).

---

[18] Employees might be moved into a vacant Schedule P/C position, or the President might move an employee's current position into Schedule P/C. In either event, once in Schedule P/C, OPM's position is that the employee is no longer afforded CSRA Protections, regardless of whether such protections had already accrued to the employee and whether the employee voluntarily agreed to being placed in Schedule P/C.

22

80.     The Final Rule also rescinded subpart F of 5 C.F.R. part 302, which the Prior Rule had added to ensure that the movement of employees or encumbered positions into excepted service schedules (such as Schedule P/C) could not eliminate incumbent employees' accrued CSRA Protections without notice and an opportunity for an appeal hearing. *Id.* at 5580, 5655. On February 23, 2026, the MSPB amended its regulations to remove those appeal rights in light of the Final Rule. *Appellate Jurisdiction Update*, 91 Fed. Reg. 8359 (Feb. 23, 2026) (repealing 5 C.F.R. § 1201.3(a)(12)).

81.     The Final Rule made clear that "individualized due process"—*i.e.*, notice and an opportunity to be heard—"will not be provided" to incumbent employees whose positions are moved to Schedule P/C and whose CSRA Protections are thereby eliminated. 91 Fed. Reg. at 5632 (citation modified).

82.     The Final Rule estimated that the new Schedule P/C would affect approximately 50,000 civil service positions, or about 2 percent of the federal workforce, and that approximately 45,000 of those positions will be filled by incumbent employees who, according to OPM, would lose their accrued CSRA Protections. *Id.* at 5639-40, 5650.

83.     Concurrent with issuance of the Final Rule, OPM also issued "initial implementing guidance" to all agencies (the "Implementing Guidance").[19] The Implementing Guidance reiterated OPM's claim that employees moved into Schedule P/C lose their CSRA Protections. *Id.* at 3.

---

[19] Memorandum from Scott Kupor, Director of OPM, to Heads of Departments and Agencies, *Initial Implementing Guidance for Schedule Policy/Career Final Rule (Improving Performance, Accountability and Responsiveness in the Civil Service)* (Feb. 5, 2025), https://www.opm.gov/chcoc/latest-memos/opm-schedule-policycareer-implementation-guidance-memorandum.pdf [https://perma.cc/5MQH-DH6B].

84.     The Implementing Guidance also contained links to appendices and templates. *Id.* at 6. Appendix 4 to the Implementing Guidance consists of template notices to applicants and employees of Schedule P/C positions. The template notice for incumbent employees, captioned "Sample Acknowledgment of Conditions of Continued Employment for Employee Moved to Schedule Policy/Career" seeks the signature of the employee on the form and states, among other things, "I understand that my position does not confer appeal rights to the Merit System Protections Board (MSPB) concerning performance, discipline, or any other matter arising under chapters 23, 43, and 75 of title 5, United States Code" and "I understand that the above paragraphs are conditions of my continued employment."[20]

85.     The implementing guidance further confirmed OPM's intention to remove CSRA Protections from positions moved into Schedule P/C and from the employees holding those positions.

**B.      Initial Movement of Positions into Schedule P/C**

86.     Section 5(a) of Amended EO 13957 directed each head of an executive agency, as defined by 5 U.S.C. § 105, with the exception of the Government Accountability Office, to conduct a "preliminary review of agency positions covered by" Chapter 75(II) within 90 days and a "complete review of such positions within 210 days." It also directed agency heads to petition the Director of OPM to "recommend that the President place in Schedule Policy/Career" those

---

[20] Appendix 4 to the Implementing Guidance, https://www.opm.gov/policy-data-oversight/hiring-information/hiring-authorities/schedule-policycareer/opm-templates-notices-to-applicants-and-employees-of-schedule-policycareer.pdf [https://perma.cc/PT3F-4P83]. The initial version of the employee notice template in Appendix 4 stated: "I understand that the above paragraphs are conditions of my continued employment and if I do not agree to this acknowledgement, my employment in this position will be terminated and I may be removed from federal service. I knowingly and voluntarily accept this reassignment." OPM changed the template to replace the language shortly after issuance of the Implementing Guidance.

positions that the agency head determines to be of a "confidential, policy-determining, policy-making, or policy-advocating character and that are not normally subject to change as a result of a Presidential transition."

87.     Section 5(d) of Amended EO 13957 directed the Director of OPM to then "promptly recommend to the President which positions should be placed in Schedule Policy/Career."

88.     Amended EO 13957 and the 2025 OPM Guidance each identify types of positions that may be appropriate for redesignation to Schedule P/C, although neither purports to constitute an exclusive list of criteria for redesignation.

89.     On June 3, 2026, the President issued EO 14410, the first executive order purporting to move positions into Schedule P/C. Like the Final Rule, EO 14410 ignores the careful distinction drawn by Congress between political appointees and other federal workers in the executive branch; it refers to "policy-influencing positions" as shorthand for the Exclusion Phrase.

90.     EO 14410 purports to "effectuate[]" the transfer to Schedule P/C of an initial set of positions listed in Appendix A to the Order ("the Appendix").[21] EO 14410 §§ 1, 5. The Fact Sheet stated that the Order "reclassifies about 8,000 senior policy-influencing positions into Schedule Policy/Career,"[22] though that number does not appear in the Order itself and is not ascertainable

---

[21] The White House, *Appendix to Executive Order, Implementing Schedule Policy/Career in the Excepted Service*, The White House, https://www.whitehouse.gov/wp-content/uploads/2026/06/2026SchedulePolicyCareer.eo_.APPENDIX.pdf [https://perma.cc/A9NU-6NEQ] (last visited June 23, 2026). The Appendix is also located at 91 Fed. Reg. at 34896-35124.

[22] Fact Sheet, *supra* note 7.

25

by a review of the Appendix, which only identifies positions by agency position description number.[23]

91.　To justify this action, EO 14410 § 5(a) states:

> The positions set forth in the Appendix to this order are determined to have a confidential, policy-determining, policy-making, or policy-advocating character. It is further determined that it is necessary and warranted by conditions of good administration to except these positions from the competitive service because of their confidential, policy-determining, policy-making, or policy-advocating character.

92.　EO 14410 does not contain any suggestion that the President exercised discretion to modify the lists of positions OPM recommended to be placed into Schedule P/C. To the extent that the President did exercise any such discretion, EO 14410 does not contain his reasoning.

93.　The sole factual basis referenced in EO 14410 to support the determination that the listed positions should be reclassified is the alleged perception of some federal supervisors and executives that civil servants are too difficult to remove:

> Schedule Policy/Career positions are exempted from the adverse action procedures that make removals for poor performance or misconduct so difficult that barely two-fifths of Federal supervisors believe they could remove subordinates who engage in serious misconduct, and only a quarter believe they could remove serious underperformers. Further, two-thirds of senior Federal executives report that their agencies rarely or never reassign or dismiss underperforming managers.

EO 14410 § 1.

94.　The Fact Sheet also stated that "97% of reclassified positions are GS-15 or Senior Level positions (or the equivalent in agencies with different pay plans)."[24] This is a reference to

---

[23] A single position description can comprise a number of positions (*i.e.*, multiple employees may all be on the same position description).

[24] Fact Sheet, *supra* note 7.

the 15-grade General Schedule ("GS") used by many agencies that runs from GS-1 to GS-15, with GS-15 being the most senior. The Appendix includes neither the GS level nor any other information about seniority of the positions that were purportedly reclassified.

95.     Many of the positions in the Appendix are not of a "confidential, policy-determining, policy-making, or policy-advocating character," even if that phrase applied to career positions. For example, the Appendix includes the following positions whose advertised duties do not relate to making policy:

a. General Attorney at the Nuclear National Security Administration, a position whose duties were advertised as "[p]rovid[ing] legal advice and counsel on complex areas of law and legal procedures arising out of NNSA programs, projects and functions, advising of the legal aspects and consequences of proposed courses of action."[25]

b. Supervisory Cyber Training, Readiness, and Exercises Planner at Department of the Navy, a position whose duties were advertised as being responsible for "long range planning for development and maturation of Navy's cyber training," including providing a "comprehensive assessment and validation of the effectiveness of training, readiness and exercises to support mission objectives and operational readiness."[26]

c. Economist at the Department of the Navy, a position advertised only at a GS-14 level and below and whose duties were advertised as "conduct[ing] econometric modeling and forecasting of the impact of plans and policies, economic-related research and studies to identify any positive or negative impacts to the Personnel Force and Inventory."[27]

d. Supervisory Equal Opportunity Investigator at the Equal Employment Opportunity Commission, a position whose duties were advertised as one who "[s]upervises and provides substantive technical and administrative guidance to a

---

[25] *General Attorney, Department of Energy, National Nuclear Security Administration*, USAJobs, https://www.usajobs.gov/job/818402300 [https://perma.cc/5Q5G-R4Z3] (last visited June 23, 2026).

[26] *Supervisory Cyber, Training, Readiness, & Exercises Planner, Department of the Navy,* USAJobs, https://www.usajobs.gov/job/702755800 [https://perma.cc/HR5F-KWQV] (last visited June 15, 2026).

[27] *Economist, Department of the Navy*, USAJobs, https://www.usajobs.gov/job/676287100 [https://perma.cc/FEM5-Y5W8] (last visited June 15, 2026).

staff of investigators, investigator support assistants, and other support staff" and "[p]lans, directs, coordinates and monitors all enforcement and case development activities of the Local Office."[28]

96.     The Appendix is inconsistent in its treatment of similar positions at different agencies. For example, it includes multiple Contract Specialist roles within the Department of Defense (listed as the Department of War in the Appendix),[29] but similar positions at other agencies are not included—even though publicly available job descriptions on USAJobs.gov suggest that those roles exist at multiple agencies.[30]

97.     In other instances, similar roles with the same duties and responsibilities at the same agency have been classified inconsistently—with some positions being included in the Appendix and other positions not being included.

---

[28] *Supervisory Equal Opportunity Investigator (Local Director)*, *Equal Employment Opportunity Commission*, USAJobs, https://www.usajobs.gov/job/610979500 [https://perma.cc/ERH5-VEYF] (last visited June 23, 2026).

[29] Appendix at 39, 91 Fed. Reg. at 34934 (Position description numbers AQC110246, AQC1102418B, AQC110241B, AQC110242, and AQC1102420B.)

[30] *Compare Contract Specialist, Department of the Air Force, Air Force Civilian Career Training*, USAJobs, https://www.usajobs.gov/job/846856600 [https://perma.cc/R66T-LJBB] (last visited June 15, 2026), *with Contract Specialist, Department of Energy, National Nuclear Security Administration*, USAJobs, https://www.usajobs.gov/job/872748100 [https://perma.cc/5QL4-S4N8] (last visited June 15, 2026), *Contract Specialist, Department of Homeland Security, Coast Guard*, USAJobs, https://www.usajobs.gov/job/871914900 [https://perma.cc/U4E4-DMT6] (last visited June 15, 2026), *Contract Specialist, Department of Homeland Security, Citizenship and Immigration Services*, USAJobs, https://www.usajobs.gov/job/871857200 [https://perma.cc/E3GN-RYL7] (last visited June 15, 2026), *and Contract Specialist, Department of Justice, Executive Office for U.S. Attorneys and the Office of the U.S. Attorneys*, USAJobs, https://www.usajobs.gov/job/870703300 [https://perma.cc/5TUM-SPBN] (last visited June 15, 2026).

98.     It has long been known that federal Position Descriptions often do not accurately describe the duties of the roles to which they are attached, and employees moved to Schedule P/C have reported that their Position Descriptions inaccurately reflect their job duties.

99.     The inclusion of positions that do not appear to be of a "confidential, policy-determining, policy-making, or policy-advocating character" in the Appendix (even if that phrase encompassed career positions) and the inconsistent inclusion of similar positions across and within agencies, both belie the President's stated goal of "enhance[ing] accountability in [] policy-influencing positions," EO 14410 § 1, and demonstrate the importance of providing impacted individuals notice and an opportunity to be heard as to whether a particular position is, in fact, of a "confidential, policy-determining, policy-making, or policy-advocating character."

100.    The inconsistent treatment of similar positions across and within agencies shows that the criteria in Amended EO 13957 and the 2025 OPM Guidance regarding which positions qualify as "of a confidential, policy-determining, policy-making, or policy-advocating character" were vague, overbroad, and did not provide meaningful guidance to agencies, resulting in arbitrary and capricious government decision-making.

101.    While EO 14410 is the first executive order purporting to reschedule positions, the Final Rule sets up a process for further reclassifications. Although the Fact Sheet states that EO 14410 reclassifies "about 8,000 senior policy-influencing positions,"[31] OPM stated in the Final Rule that "[h]aving conducted initial review of agency recommendations for Schedule Policy/Career conversions, OPM can state its initial estimate of 50,000 positions was a reasonable approximation of potential conversions." 91 Fed. Reg. at 5606.

---

[31] Fact Sheet, *supra* note 7.

102.    At one or more agencies, employees have been informed that a second group of positions will be moved later this year.

103.    Statements by Defendants suggest that the positions included in the Appendix are only the beginning. After issuing the 2025 OPM Guidance, OPM sent an email to virtually all federal employees stating that federal agencies would be downsized through "the reclassification to at-will status for a substantial number of federal employees."[32]

104.    In the first Trump Administration, the Office of Management and Budget had responded to the 2020 EO 13957 by designating *68 percent* of its employees as Schedule F (the predecessor to Schedule P/C in the original EO 13957).[33] This included employees in GS-9 and GS-10 positions.[34] Likewise, in 2025 agencies recommended moving GS-9 and GS-10 employees into Schedule P/C. Although such positions appear not to have been reclassified via EO 14410, they may be included in the second group of positions expected to be moved later this year.

105.    None of the executive actions described herein provide for prior notice to any incumbent career employee who is moved, or whose position is moved, to Schedule P/C. They also do not provide an opportunity for the incumbent employee to be heard as to whether their position meets either the statutory criterion of being a position of a "confidential, policy-determining, policy-making, or policy-advocating character" (even if that phrase applied to career

---

[32] U.S. Off. Pers. Mgmt., *Deferred Resignation Email to Federal Employees*, OPM (Jan. 28, 2025), https://www.opm.gov/about-us/fork/original-email-to-employees    [https://perma.cc/83TE-4YXX].

[33] U.S. Gov't Accountability Off., GAO-22-105504, Civil Service Agency Responses and Perspectives on Former Executive Order to Create a New Schedule F Category of Federal Positions 14 (2022).

[34] *Id.* at 19.

positions) or the additional criteria for inclusion in Schedule P/C set forth in Amended EO 13957 or the 2025 OPM Guidance.

### III.    The Flawed Rulemaking Process that Led to the Final Rule

106.    The flawed rulemaking process that gave rise to the Final Rule did not give employees adequate notice and an opportunity to be heard on the movement of their positions.

107.    On April 23, 2025, OPM issued a proposed rule (the "Proposed Rule") to create the legal framework for the new Schedule P/C. 90 Fed. Reg. 17182 (April 23, 2025). By the end of the notice and comment period on June 7, 2025, the Proposed Rule had elicited over 40,000 comments. GAP and NARFE each submitted comments opposing the Proposed Rule. According to OPM's analysis, 94% of comments were opposed to the Proposed Rule. Final Rule, 91 Fed. Reg. at 5581.

108.    On February 6, 2026, OPM nonetheless published the Final Rule, which is substantially similar to the Proposed Rule.

109.    The Final Rule is a judicially reviewable final agency action under 5 U.S.C. § 704.

110.    OPM's purported rationale for the Final Rule is that CSRA Protections make it too difficult to hold career civil servants "accountable" for (a) "poor performance" or "misconduct"; and (b) career civil servants' alleged use of their positions to advance their personal political or policy preferences instead of implementing the President's agenda, which the Final Rule refers to as "policy resistance." 91 Fed. Reg. at 5585–93. The administrative record does not establish a reasoned basis for this rationale.

111.    The administrative record, which consists of surveys, anecdotes, media reports, and academic studies, does not establish that poor performance, misconduct, or "policy resistance" are widespread or significant enough problems among career employees to warrant the changes in the Final Rule. At best, that record shows isolated concerns involving a small number of employees.

31

As a result, OPM failed to draw a rational connection between the stated problem and the changes made by the Final Rule.

112.    OPM relied on self-serving comments submitted by the administration's own political appointees under the guise of "agency comments," 91 Fed. Reg. at 5592, 5623, a form of circular reasoning that does not constitute reasoned decision-making.

113.    OPM also drew extensively upon the America First Policy Institute's *Tales from the Swamp* report,[35] without acknowledging that the report's author, James Sherk, is now a member of the White House Domestic Policy Council and a key architect of Schedule P/C. 91 Fed. Reg. at 5593, 5622. Sherk spoke at the signing of EO 14410, where he confirmed that he was "very much involved" in the executive order and was told by President Trump, "[y]ou did a great job on this."[36]

114.    OPM did not provide any empirical basis to conclude that individuals who perform work "of a confidential, policy-determining, policy-making, or policy-advocating character" are disproportionately likely to have poor performance, engage in misconduct, or policy resistance, or have that poor performance, misconduct, or policy resistance go unaddressed through existing CSRA mechanisms for addressing performance or misconduct.

115.    OPM failed to adequately address or weigh evidence from commenters showing that (a) most career employees are strong performers; (b) career employees are responsive to

---

[35] James Sherk, *Tales from the Swamp: How Federal Bureaucrats Resisted President Trump*, Am. First Pol'y Institute, (Feb. 1, 2021), https://web.archive.org/web/20250621044545/https://www.americafirstpolicy.com/assets/uploads/files/Tales_from_the_swamp.pdf.

[36] The White House, *President Trump Signs Executive Orders, June 3, 2026*, at 15:05-15:53 (YouTube, June 3, 2026), https://www.youtube.com/watch?v=4EUzlV7-Dew&t=914s [http://archive.today/g1USu].

32

changes in administration and not resistant to new presidential agendas; and (c) existing disciplinary procedures are capable of addressing, and have historically been used to address, the small number of career employees whose performance, misconduct, or "policy resistance" warrants discipline or termination.

116. OPM failed to adequately address or weigh evidence showing that the CSRA Protections improve career employee performance and integrity, including evidence showing that tenure protection is associated with higher performance, spurs innovation, has a stabilizing effect, improves morale, and facilitates retention and recruitment of skilled workers. OPM's purported rationales run counter to the evidence before it.

117. OPM failed to adequately address or weigh evidence showing that the Final Rule will harm the integrity, efficiency, and effectiveness of the federal workforce by causing existing career employees to leave their positions because they have been stripped of their CSRA Protections and by reducing the federal government's ability to recruit and hire strong candidates for career positions.

118. OPM failed to adequately address or weigh evidence showing that the Final Rule will discourage productive dissent and discussion within the federal workforce, interfere with the exercise of professional judgment, and chill whistleblowing needed to protect the public from health and safety risks, corruption, waste and gross mismanagement by leaving career employees who fear retaliation without recourse.

119. OPM failed to adequately address or weigh evidence showing that the Final Rule will expose career employees to retaliation or discrimination based on their actual or perceived political viewpoints or loyalty to the President and risks a return to the spoils system. Although the Final Rule states that Schedule P/C is not to be used for patronage purposes in hiring or firing,

OPM did not seriously address statements made and actions taken by the President and members of his administration indicating the opposite. While the Final Rule instructs agencies to develop their own policies prohibiting patronage, such policies do not provide the same protection against political discrimination as the judicially enforceable CSRA Protections. OPM did not adequately consider that internal agency policies, which are subject to change by the agency and whereby agencies will be the judge of their own behavior, are not adequate safeguards against bad-faith action.

120. OPM did not adequately address the contradiction between the stated rationale of reducing partisanship in the civil service and the Final Rule's elimination of protections against politically motivated prohibited personnel practices.

121. OPM did not meaningfully consider or provide a reasoned basis for rejecting alternatives to the Final Rule proposed by commenters that would better address the Final Rule's stated rationale, including reforms to the performance management process, improvements to employee and manager training, and changes to the culture or perception of the performance management system that OPM's own cited sources recognize are a concern. For example, OPM states that "enhanced training is unlikely to be enough to meaningfully change an entrenched culture," 91 Fed. Reg. at 5587 n.89, but it does not demonstrate that it has attempted to provide enhanced training, review the quality of such training, mandate and monitor participation in such training, or evaluate the performance of attendees after such training.

122. As discussed in Part I, *supra*, Congress designed a comprehensive legislative scheme in the CSRA that reflected Congress's judgment about the optimal level of process to grant tenured civil servants prior to an Adverse Action or termination. Congress constructed the Exclusion Phrase to refer only and specifically to positions filled by individuals hired by reference

34

to political affiliation and who were understood to leave their positions at the end of a presidential administration. In granting discretion to the Executive Branch to interpret the Exclusion Phrase, Congress did not authorize or intend for OPM to consider other factors, including whether the CSRA Protections make it too difficult to remove career employees for poor performance or misconduct and alleged "policy resistance." In substituting its own judgment for that of Congress, OPM relied on factors that Congress did not intend—or authorize—the executive branch to consider in construing the Exclusion Phrase.

123.    OPM did not adequately weigh the serious reliance interests implicated by its change in policy from the Prior Rule and the historic understanding of the meaning of the Exclusion Phrase. OPM discounted the public's interest in a stable, skilled, and experienced civil service, including the potential loss of non-political, career employees with critical scientific and security knowledge. It also dismissed without adequate consideration the reliance interests of regulated entities and companies that benefit from stability and continuity within the civil service.

124.    OPM's Notice of Proposed Rulemaking was deficient because it failed to provide actual notice of which positions would be moved to Schedule P/C. Because the stated criteria are vague, overbroad, and insufficiently related to the stated purposes of the Final Rule, the Notice of Proposed Rulemaking did not give members of the public, current civil servants, and prospective applicants a meaningful opportunity to comment on the Proposed Rule. Nor did the Final Rule provide clarity. Instead, OPM stated it "is not in a position to list comprehensive characteristics of positions that will be moved to Schedule Policy/Career." 91 Fed. Reg. at 5608.

125.    OPM incorrectly asserted that the Final Rule merely updates the Code of Federal Regulations to reflect the "self-executing" nature of Amended EO 13957 and EO 14171 (the "EOs"). OPM's reliance on the EOs as a legal basis for the Final Rule reflects the absence of

35

reasoned decision-making and/or seriously flawed reasoning because (a) the EOs are ultra vires and violate the separation of powers and therefore cannot provide a legal basis for the Rule; and (b) by their terms, the EOs are not inconsistent with all aspects of the Prior Rule rescinded by the Final Rule and do not otherwise require many of the other changes made by the Final Rule.

## IV.  Harm to Plaintiffs

### A.  Government Accountability Project

126.  GAP's core mission is to provide a safe, effective voice for employees who use free speech rights to challenge abuses of power that betray the public trust. In effectuating this mission, GAP acts to help its clients make effective and impactful legally protected whistleblower disclosures.

127.  GAP provides services to federal employees who reasonably believe that they have information concerning Reportable Conduct. GAP's services include legal advice, representation, and strategic guidance in exercising employees' rights to make protected whistleblower disclosures. GAP has assisted thousands of federal employee whistleblowers to make protected disclosures and navigate these protections.

128.  GAP spends significant time providing advice to potential federal whistleblowers on their rights, options and risks of retaliation should they decide to proceed. GAP employs 25 full-time employees, nine of whom devote at least half their time to providing or facilitating services to federal employees.

129.  Many federal whistleblowers, including some of those supported by GAP, were, at the time of their whistleblowing, in positions that meet the criteria for inclusion in Schedule P/C.

130.  A central component of GAP's specialized services is describing the contours of the whistleblower protections afforded by the CSRA to clients and assisting clients in navigating

these legal protections to ensure that the client reports Reportable Conduct in a way that maximizes both the impact of the disclosure and the individual client's available protections.

131.    Federal employees moved into Schedule P/C will lose the whistleblower protections of Chapter 23 and the concomitant procedural protections of Chapters 75(II) and 12, which are not afforded to individuals in Exclusion Phrase positions. 5 U.S.C. § 2302(a)(2)(B)(i).

132.    These whistleblower protections are critical to providing federal employee whistleblowers with the confidence to come forward and disclose misconduct, including to GAP. GAP's federal employee clients have reported that the existence of these whistleblower protections has been an important factor in their willingness both to share Reportable Conduct and to make a disclosure containing a level of detail sufficient to bring about change related to the Reportable Conduct. Some would not have come forward and blown the whistle absent those protections.

133.    Because of these whistleblower protections, GAP has historically been able to tell potential federal employee whistleblowers that laws exist to protect them from retaliation for whistleblowing and create a dedicated pathway (the administrative process before OSC and MSPB) for vindicating those protections. GAP has been able to encourage and support whistleblowing by pointing to its stellar record of defending such whistleblowers from retaliation, including through legal representation to challenge retaliatory action in OSC and MSPB proceedings and otherwise.

134.    As a result of the Executive Orders and the Final Rule, and the actions they support and direct, GAP's core activities have been and will continue to be disrupted. GAP must now tell potential federal whistleblowers that if they are moved to Schedule P/C they will lose their protections against retaliation for whistleblowing. This fundamentally alters GAP's relationship with clients, affecting their willingness to make disclosures; GAP's ability to work on their behalf;

37

the level of services GAP can provide; the demand for those services; and the general counseling GAP provides to potential clients inquiring about GAP's services.

135.    In addition to affecting the number of whistleblowers who are willing to make a disclosure with GAP's assistance, Defendants' actions will also affect the level of detail of the disclosures and whistleblowers' willingness to identify themselves. This materially affects the likelihood that the disclosure will be impactful and thus impedes GAP's goal of effectuating significant whistleblower disclosures.

136.    The Executive Orders, the Final Rule, and the actions they support and direct thus will chill, and likely already have chilled, many potential whistleblowers from disclosing misconduct. This negatively impacts GAP's ability to carry out its mission of representing federal employee whistleblowers, helping its clients make disclosures that are both legally protected and effective, and investigating and disclosing the identified misconduct.

137.    This chilling effect will not be limited to employees directly affected by Schedule P/C. The chilling of directly affected employees will cause additional potential whistleblowers, who otherwise would have been motivated by the suppressed disclosures, to remain silent and not seek assistance from GAP.

138.    Prevailing parties in OSC/MSPB proceedings are entitled to attorney's fees, and settlements in such proceedings often include such fees. When GAP successfully represents clients in OSC/MSPB proceedings and the client is awarded attorney's fees, those fees are typically paid to GAP.

139.    Since 2020, GAP has represented over 40 employees in OSC/MSPB proceedings and recovered approximately $375,000 in attorney's fees for such representations.

38

140. The chilling effects of Defendants' conduct on existing and potential whistleblowers and the loss of rights to pursue whistleblower retaliation claims for those who are not chilled will result in fewer GAP clients obtaining attorney's fees through the OSC/MSPB process and in GAP obtaining fewer attorney's fee awards and/or settlements, shrinking GAP's revenue.

141. GAP also frequently supplements and further corroborates whistleblowers' disclosures through investigations, contributing to thousands of articles in major news outlets over the years. GAP also maintains a blog and produces news articles, press releases, reports, and fact sheets based on evidence that whistleblowers have provided about Reportable Conduct.

142. GAP's investigations in collaboration with federal whistleblowers have uncovered and publicized, and obtained corrective action regarding, misconduct involving drug safety, anti-terrorism efforts, protection of U.S. troops, dangerous nuclear waste, unsafe nuclear power plants, contaminated meat, immigration detention abuse, and illegal domestic surveillance.

143. GAP's ability to conduct these investigations and publicize their findings depends on whistleblowers' willingness to share information with it. That willingness, in turn, is dependent on, and significantly enhanced by, access to congressionally-created protections intended to bring Reportable Conduct to light and fight waste, fraud, and abuse in the federal government. The chilling of whistleblowers will result in fewer disclosures made to, and fewer investigations conducted by, GAP, impeding GAP's ability to uncover and share relevant information with the public.

144. GAP was required to revise its intake procedure for potential new clients, and the advice it provides existing clients concerned about retaliation for prior protected whistleblowing

activity, in the event that these individuals' positions are moved to Schedule P/C and they are thus stripped of whistleblowing protections.

145.    GAP has expended resources training pro bono volunteer attorneys for rapid response and legal support because of the Executive Orders, the 2025 OPM Guidance, and the Final Rule.

146.    GAP also produces resources about whistleblowing for federal employees considering reporting abuses, for journalists, and for civil society organizations and others who may interact with whistleblowers. For example, GAP publishes a whistleblower guide for federal employees, *Truth-Telling Government: A Guide to Whistleblowing for Federal Employees, Contractors, & Grantees*.

147.    As a result of the Defendants' conduct, GAP must revise its federal employee whistleblower guide and other resources to reflect the establishment of Schedule P/C and the loss of whistleblower protections for many federal employees. This requires redrafting and reformatting these resources, redistributing them through multiple partner channels, social media, and press outreach, and conducting new trainings for federal employees, the press, and public interest partners such as unions, professional associations, and civil society organizations that interact with federal employees in the course of their work. GAP has also had to expand its federal employee advocacy work to include developing new resources concerning the impact of Schedule P/C, advising on legislative reform to counteract the negative impacts of Schedule P/C, and tracking agency implementation of Schedule P/C.

**B.    NARFE**

148.    NARFE's membership consists of approximately 120,000 current and former federal employees who are or will be eligible to receive an annuity or survivor annuity from the

federal retirement programs of any agency of the United States government. Of those, up to 12,000 are current federal employees.

149.    NARFE has current federal employee members in career positions that have been moved into Schedule P/C by EO 14410 ("Impacted Members"). Those Impacted Members were not provided advance notice that their positions would be moved or an opportunity to be heard as to why their positions were not positions of a "confidential, policy-determining, policy-making, or policy-advocating character."

150.    The Executive Orders, the Final Rule, and the actions they support and direct have harmed, and will harm, NARFE's Impacted Members directly, including by stripping them of their CSRA Protections, denying them advance notice that their positions would be moved and denying them an opportunity to be heard as to why their positions were not positions of a "confidential, policy-determining, policy-making, or policy-advocating character." By rescinding 5 C.F.R. part 302, subpart F, the Final Rule has stripped these career employees of their right to challenge, via an MSPB appeal, the movement of their positions into Schedule P/C. NARFE's Impacted Members will reasonably fear termination or other adverse employment action as retaliation for speech perceived as disfavored by the Administration. Current NARFE members whose positions have not yet been reclassified into Schedule P/C will also reasonably fear reclassification and subsequent adverse employment action as retaliation for speech perceived as disfavored by the Administration.

151.    NARFE's Impacted Members have been and will be chilled in their expression of political views in their personal capacities. They also have been and will be chilled in their expression of views in their official capacities—including identifying legal or other obstacles to

policy implementation, which could be seen as insufficiently supportive of Administration priorities or views.

152.  NARFE's core mission is to further the interests of its federal employee and federal retiree members. NARFE pursues this mission by providing counseling and educational services to its members and monitoring and advising on changes in legislation and regulation that might affect its members' interests. Protecting federal employees' CSRA Protections is germane to NARFE's mission.

153.  Neither the claims asserted herein nor the relief requested requires the participation of NARFE's members in this lawsuit.

154.  One of NARFE's core activities, and a primary benefit NARFE offers its members, is the NARFE Federal Benefits Institute, a members-only resource for information about federal retirement, health, and other benefits available to current and former federal employees. The Federal Benefits Institute provides a members-only personal assistance phone line to answer questions and provide information about federal benefits. It also provides written materials, webinars, and other information concerning federal benefits to NARFE members.

155.  NARFE advises and guides its members about benefits that generally accrue with the length of federal employment. Long-term employees are particularly interested in federal retirement benefits, so NARFE membership becomes increasingly valuable the longer a federal employee spends in the federal civil service. Federal employees are thus increasingly likely to seek out NARFE membership the longer they spend, or expect to spend, in the federal service.

156.  In July 2024, NARFE embarked on an ongoing campaign to increase its membership, at substantial cost, with an emphasis on pursuing active federal employees. NARFE has found that active federal employee members are likely to be younger and maintain their

memberships for longer than retired or former employee members. They thus present a greater lifetime value to NARFE. Since January 2025, more than 3,000 active federal employees have joined NARFE and NARFE's share of total and new members who are current federal employees was higher in 2025 than it had been in 2024.

157.    The Executive Orders, the Final Rule, and the actions they support and direct will reduce the number of long-term federal employees in the civil service by making more positions subject to at-will dismissal.

158.    The Executive Orders, the Final Rule, and the actions they support and direct will erode the pool of long-term federal employees potentially interested in NARFE membership and so impede NARFE's ability to recruit members by providing a smaller employee pool of long-term employees. NARFE will have to have a higher rate of success in recruiting active federal employees to achieve the same overall recruitment targets.

159.    Since the issuance of EO 14171, Amended EO 13957 and the Final Rule, many more NARFE members have sought assistance through the NARFE Federal Benefits Institute personal assistance phone line. In the five business days immediately following President Trump's second inauguration, the number of phone inquiries more than doubled compared to the five business days from January 22-26, 2024. Following the issuance of the Final Rule on February 6, 2026, NARFE also experienced a fifty percent increase in phone inquiries over its average call volume. This increased outreach included questions regarding the impact of Schedule P/C.

160.    This substantial increase in call volume detracted from NARFE's ability to focus resources on other components of the Federal Benefits Institute, including responding to questions about federal benefits through the members-only phone line, developing additional written materials for members, expanding on frequently asked questions to post on NARFE's website, or

drafting additional updates for NARFE's weekly e-newsletter. Defendants' actions have caused NARFE to devote less time and fewer resources to the Federal Benefits Institute and to NARFE's core mission of providing counseling and communications to support its broader membership.

## CAUSES OF ACTION

### COUNT I

**Administrative Procedure Act (5 U.S.C. §§ 702, 706(2)(A), (C))**
**Agency Action in Violation of the CSRA, 5 U.S.C. §§ 2302, 7511**
**(All Plaintiffs as to Defendants Kupor and OPM)**

161.    Plaintiffs incorporate the above paragraphs by reference.

162.    OPM is an agency within the meaning of the APA. *See* 5 U.S.C. § 551.

163.    The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

164.    The Final Rule and associated agency actions are final agency action.

165.    The exclusion from civil service protections for positions of a "confidential, policy-determining, policy-making, or policy-advocating character" in 5 U.S.C. §§ 2302(a)(2)(B)(i) and 7511(b)(2) is limited to political appointees; that is, individuals hired with consideration of their political views and whose positions are understood to be subject to change as the result of a change in presidential administration.

166.    The Final Rule is inconsistent with the CSRA and exceeds Kupor's and OPM's authority in violation of the APA insofar as the Final Rule purports to apply the exclusion to career civil service positions.

167.    Plaintiffs have been harmed and will continue to be harmed by Defendants' actions.

168.    The Final Rule should be held unlawful and set aside by this Court under 5 U.S.C. §§ 702, 706(2)(A), (C), and 28 U.S.C. § 2201(a).

**COUNT II**
**Ultra Vires Executive Action in Violation of the CSRA, 5 U.S.C. §§ 2302, 7511,**
**and in Excess of Delegated Authority**
**(All Plaintiffs as to All Defendants)**

169.    Plaintiffs incorporate the above paragraphs by reference.

170.    The exclusion from civil service protections for positions of a "confidential, policy-determining, policy-making, or policy-advocating character" in 5 U.S.C. §§ 2302(a)(2)(B) and 7511(b)(2) is limited to political appointees; that is, individuals hired with consideration of their political views and whose positions are understood to be subject to change as the result of a change in presidential administration.

171.    Defendants' actions purport to apply this exclusion to career civil service positions, move career civil service positions and employees into Schedule P/C, and strip them of CSRA Protections.

172.    Defendants' actions are in conflict with the CSRA and are ultra vires because they exceed executive authority provided by the statute.

173.    Plaintiffs have been harmed and will continue to be harmed by Defendants' actions.

174.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

**Count III**
**Separation of Powers**
**(All Plaintiffs as to All Defendants)**

175.    Plaintiffs incorporate the above paragraphs by reference.

176.    Article I of the Constitution vests all legislative power in Congress, including the power to "make all Laws which shall be necessary and proper for carrying into Execution" all powers of the United States. U.S. Const., art. I, §§ 1, 8 cl. 18. Pursuant to those powers, which

45

include the powers to create offices and otherwise structure the federal government, Congress has enacted the CSRA and the other statutes establishing and setting rules for the federal civil service.

177.    Defendants assert that the "President's authority to manage the civil service is a core function of the office based on Article II of the Constitution." 91 Fed. Reg. at 5607. Defendants' actions pursuant to the President's Article II authority are in direct conflict with Congress' exercise of its constitutional authority. "[W]hen 'the President takes measures incompatible with the expressed or implied will of Congress … he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (*quoting Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

178.    Defendants have asserted that the congressionally established structure and rules for the civil service "frustrate the President's constitutional ability to faithfully execute the law," 91 Fed. Reg. at 5581 and that if the CSRA prohibited the creation of Schedule P/C it "would raise serious constitutional concerns," *id.* at 5633, both with respect to officers and non-officer employees, *id.* at 5633-38.

179.    Defendants' assertion of executive authority to override Congress' constitutional authority to establish and set rules for the federal civil service violates the separation of powers.

180.    Plaintiffs have been harmed and will continue to be harmed by Defendants' actions.

181.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

**COUNT IV**
**Administrative Procedure Act (5 U.S.C. §§ 702, 706(2)(A))**
**Arbitrary and Capricious Agency Action**
**(All Plaintiffs as to Defendants Kupor and OPM)**

182.    Plaintiffs incorporate the above paragraphs by reference.

183.    OPM is an agency within the meaning of the APA. *See* 5 U.S.C. § 551.

184.    The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary … [or] capricious." 5 U.S.C. § 706(2)(A).

185.    The Final Rule and associated agency actions are final agency action.

186.    The Final Rule is arbitrary and capricious for all of the reasons set forth above.

187.    Plaintiffs have been harmed and will continue to be harmed by Defendants' actions.

188.    Because the Final Rule is arbitrary and capricious, this Court should hold it unlawful and set it aside under 5 U.S.C. §§ 702, 706(2)(A), and 28 U.S.C. § 2201(a).

<u>COUNT V</u>
**Administrative Procedure Act (5 U.S.C. §§ 702, 706(2)(B))**
**Agency Action in Violation of the Fifth Amendment's Due Process Clause**
**(All Plaintiffs as to Defendants Kupor and OPM)**

189.    Plaintiffs incorporate the above paragraphs by reference.

190.    OPM is an agency within the meaning of the APA. *See* 5 U.S.C. § 551.

191.    The APA requires courts to "hold unlawful and set aside" agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

192.    The Final Rule and associated agency actions are final agency action.

193.    Federal career civil servants have a vested property interest in the employment protections granted by the CSRA as well as in their continued employment.

194.    The Final Rule provides that incumbent employees whose positions are moved to Schedule P/C will lose their CSRA Protections. The Final Rule establishes the legal framework for, and a process by which, career positions will be moved to Schedule P/C without any notice to, or opportunity to be heard by, incumbent employees.

195.    The Final Rule violates the Fifth Amendment to the U.S. Constitution by establishing a process by which incumbent federal career civil servants are to be deprived of their

vested property interests in CSRA Protections without providing them with notice and an opportunity to be heard.

196.    Plaintiffs have been harmed and will continue to be harmed by Defendants' actions.

197.    Because the Final Rule is unconstitutional with respect to encumbered career positions and incumbent employees in those positions, the Court should hold it unlawful and set it aside under 5 U.S.C. §§ 702, 706(2)(B), and 28 U.S.C. § 2201(a).

## COUNT VI
### Ultra Vires Executive Action in Violation of the Fifth Amendment's Due Process Clause
### (All Plaintiffs as to All Defendants)

198.    Plaintiffs incorporate the above paragraphs by reference.

199.    Federal career civil servants have a vested property interest in the employment protections granted by the CSRA as well as in their continued employment.

200.    Defendants violated the Fifth Amendment to the U.S. Constitution by creating Schedule P/C and moving positions to that schedule without ensuring that incumbent employees retain their vested property rights in CSRA Protections or providing them with notice and an opportunity to be heard.

201.    Plaintiffs have been harmed and will continue to be harmed by Defendants' actions.

202.    This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

a.    Stay the Final Rule and issue all other necessary and appropriate process to preserve status or rights under 5 U.S.C. § 705;

b.    Declare the Final Rule unlawful for being not in accordance with the CSRA and/or exceeding OPM's statutory jurisdiction, authority, or limitations under 5 U.S.C. § 706(2)(A) and/or (C);

48

c.    Declare the Final Rule unlawful for being arbitrary and capricious agency action under 5 U.S.C. § 706(2)(A);

d.    Declare the Final Rule unconstitutional with respect to encumbered positions and incumbent employees;

e.    Declare unlawful and in excess of authority (1) the provisions of Section 4 of Amended EO 13957 that amend 5 C.F.R. § 6.2 to create Schedule P/C and direct further action in that regard; and (2) the provisions of sections 1 and 5 of, and the Appendix to, EO 14410 that purport to move employees or positions to Schedule P/C;

f.    Declare that the provisions of Section 4 of Amended EO 13957 that amend 5 C.F.R. § 6.2 to create Schedule P/C and direct further action in that regard, and the provisions of sections 1 and 5 of, and the Appendix to, EO 14410 that purport to move employees or positions to Schedule P/C, violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution with respect to encumbered positions and incumbent employees;

g.    Declare that incumbent employees who are moved involuntarily, or whose positions are moved, into Schedule P/C retain any CSRA Protections accrued prior to such movement;

h.    Vacate and set aside all provisions of the Final Rule that the Court declares unlawful;

i.    Enjoin Defendants OPM, Kupor, and the United States of America (acting through its agencies) from implementing, or from taking any action to enforce or apply, all provisions of the Final Rule and the Executive Orders that the Court declares unlawful;

j.    Award Plaintiffs their reasonable attorney's fees and costs; and

k.    Award such other relief as the Court deems just and proper.


Dated:    June 24, 2026                          Respectfully submitted,


                                    By:    /s/ Ori Lev
                                           PROTECT DEMOCRACY PROJECT
                                           Ori Lev (D.C. Bar No. 452565)
                                           Erica J. Newland (D.C. Bar No. 90001983)
                                           Julia L. Torti*
                                           Protect Democracy Project
                                           2020 Pennsylvania Ave. NW, Suite #163
                                           Washington, D.C. 20006
                                           Tel: (202) 579-4582

49

Fax: (202) 769-3176
ori.lev@protectdemocracy.org
erica.newland@protectdemocracy.org
jules.torti@protectdemocracy.org

SELENDY GAY PLLC
Andrew R. Dunlap*
Corey Stoughton (D.C. Bar No. 472867)
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
adunlap@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*