**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:25-cv-00347-PLF |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 3

I. STATUTORY FRAMEWORK .......... 3

A. The Competitive and Excepted Service .......... 3

B. The President and OPM's Authority over the Federal Workforce .......... 4

C. The Administrative Scheme .......... 5

D. The Statutory Basis for Policy/Career Designations .......... 7

II. FACTUAL AND PROCEDURAL BACKGROUND .......... 8

A. The Prior Executive Orders and Regulations .......... 8

B. The 2025 Policy/Career Order and OPM Guidance .......... 10

C. The 2026 Policy/Career Proposed Rule and Final Rule .......... 11

D. The 2026 Schedule Policy/Career Executive Order .......... 13

E. This Lawsuit .......... 13

ARGUMENT .......... 14

I. PLAINTIFFS LACK ARTICLE III STANDING .......... 14

A. Plaintiff NARFE lacks associational standing. .......... 15

B. Plaintiff NARFE lacks organizational standing. .......... 17

C. Plaintiff GAP lacks organizational standing. .......... 21

II. PLAINTIFFS' CLAIMS ARE PRECLUDED BY THE CIVIL SERVICE REFORM ACT .......... 23

A. Congress intended to preclude district court jurisdiction .......... 24

B. These claims are of the type Congress intended to be reviewed through the CSRA's administrative scheme........................................ 26

III. ALL CLAIMS AGAINST THE PRESIDENT, AND ALL CLAIMS RELATING TO THE PRESIDENT'S EXERCISE OF HIS STATUTORY DISCRETION, SHOULD BE DISMISSED. ................................................. 35

A. None of the relief that Plaintiffs seek is available against the President, so he should be dismissed as a Defendant in this case........... 36

B. The President's exercise of his own statutory discretion is not reviewable. ......................................................................................... 38

C. Plaintiffs cannot evade these limitations by bringing an ultra vires claim. .................................................................................................. 40

IV. DEFENDANTS SHOULD NOT BE REQUIRED TO PRODUCE AN ADMINISTRATIVE RECORD IN CONNECTION WITH THIS MOTION. ........................................................................................ 41

CONCLUSION ................................................................................................. 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abney v. United States*,
431 U.S. 651 (1977) .......... 30, 31

*AFGE v. Sec'y of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) .......... 24, 25, 28, 34

*Akbar v. Cuccinelli*,
2020 WL 1287817 (D.D.C. Mar. 18, 2020) .......... 41

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006) .......... 16, 17

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
No. 25-cv-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) .......... 32

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*,
770 F. Supp. 3d 1215 (N.D. Cal. 2025) .......... 33

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*,
771 F. Supp. 3d 1127 (N.D. Cal. 2025) .......... 33

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) .......... 23, 24, 25, 27

*Am. Foreign Serv. Ass'n v. Trump*,
768 F. Supp. 3d 6 (D.D.C. 2025) .......... 32

*Am. Life League, Inc. v. Reno*,
47 F.3d 642 (4th Cir. 1995) .......... 23

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
801 F. Supp. 2d 383 (D. Md. 2011) .......... 39

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
698 F.3d 171 (4th Cir. 2012) .......... 39

*Anselmo v. King*,
902 F. Supp. 273 (D.D.C. 1995) .......... 6

*Ariz. All. for Retired Ams. v. Mayes*,
No. 22-16490, --- F. 4th ----, 2026 WL 2277101 (9th Cir. Aug. 7, 2026) .......... 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................................ 36

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ........................................................ passim

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) ........................................................ 25, 28

*Cause of Action Inst. v. IRS*,
390 F. Supp. 3d 84 (D.D.C. 2019)........................................................ 22

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ........................................................ 16, 17

*Chamber of Com. of U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011)........................................................ 16

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ........................................................ 40

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................ 15, 20, 21

*Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch*,
No. 21-cv-853 (JDB), 2022 WL 951271 (D.D.C. Mar. 30, 2022) ........................................ 16

*Connecticut v. U.S. Dep't of the Interior*,
344 F. Supp. 3d 279 (D.D.C. 2018)........................................................ 41

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................................ passim

*Dep't of Lab.*,
766 F. Supp. 3d 32 (D.D.C. 2025)........................................................ 16, 33

*Desai v. U.S. Citizenship & Immigr. Servs.*,
2021 WL 1110737 n.7 (D.D.C. Mar. 22, 2021) ........................................................ 41

*Detroit Int'l Bridge Co. v. Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016)........................................................ 39

*Detroit Int'l Bridge Co. v. Canada*,
875 F.3d 1132 (D.C. Cir. 2017)........................................................ 39

*Detroit Int'l Bridge Co. v. Canada*,
883 F.3d 895 (D.C. Cir. 2018)........................................ 39

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ........................................ passim

*Farm Sanctuary v. USDA*,
No. 24-382, 2026 WL 1030616 (2d Cir. Apr. 16, 2026)........................................ 19

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................ 15, 17, 18, 19

*Fed. Express Corp. v. Dep't of Com.*,
39 F. 4th 756 (D.C. Cir. 2022) ........................................ 49

*Fed. L. Enf't Officers Ass'n* v. *Ahuj*a,
("FLEOA"), 62 F.4th 551 (D.C. Cir. 2023) ........................................ 27, 29, 34

*Filebark v. DOT*,
555 F.3d 1009 (D.C. Cir. 2009)........................................ 25, 26, 34

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005)........................................ 29

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........................................ 35, 36, 37

*Glob. Health Council v. Trump*,
153 F.4th 1........................................ 31, 36, 37

*Glob. Health Council v. Trump*,
No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025)........................................ 31

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004)........................................ 24, 33

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988)........................................ 40

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ........................................ 36

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ........................................ 18, 19

*Hearth, Patio & Barbecue Ass'n v. EPA*,
11 F.4th 791 (D.C. Cir. 2021) .................... 17

*Heckler v. Ringer*,
466 U.S. 602 (1984) .................... 29

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................... 15

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025).................... 36

*Jarkesy v. SEC*,
803 F.3d 9 (D.C. Cir. 2015).................... 24

*Jerome Stevens Pharms., Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005).................... 22

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025).................... 35, 40

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................... 15

*Lyons v. VA*,
273 F. App'x 929 (Fed. Cir. 2008) .................... 27

*Marshall v. HHS*,
587 F.3d 1310 (Fed. Cir. 2009) .................... 27

*Maryland* v. *US*DA,
("USDA"), 777 F. Supp. 3d 432 (D. Md. 2025).................... 33

*Mdewakanton Sioux Indians of Minnesota v. Zinke*,
264 F. Supp. 3d 116 (D.D.C. 2017).................... 42

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) .................... 36, 37

*Murthy v. Missouri*,
603 U.S. 43 (2024) .................... 20, 21, 22

*N.Y. Republican State Comm. v. SEC*,
799 F.3d 1126 (D.C. Cir. 2015).................... 23

*Nat'l Treasury Emps. Union v. Helfer*,
53 F.3d 1289 (D.C. Cir. 1995) ..................... 3

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ..................... 37

*Nat'l Treasury Emps. Union v. Trump*,
770 F. Supp. 3d 1 (D.D.C. 2025) ..................... 32

*New York v. Trump*,
181 F.4th 132 (D.C. Cir. 2026) ..................... 29, 31, 32

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ..................... 37

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ..................... 36

*Nohria v. Renaud*,
2021 WL 950511 n.3 (D.D.C. Mar. 14, 2021) ..................... 41

*NRC v. Texas*,
605 U.S. 665 (2025) ..................... 40

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ..................... 40

*OPM v. Am. Fed'n of Gov't Emps.*,
145 S.Ct. 1914 (2025) ..................... 33

*Padilla v. Mnuchin*,
No. 1:18-cv-2302, 2020 WL 1852431 (D. Colo. Apr. 13, 2020) ..................... 6

*Padilla v. Mnuchin*,
836 Fed. App'x 674 (10th Cir. 2020) ..................... 6

*Sackett v. EPA*,
566 U.S. 120 (2012) ..................... 28

*Stanley v. Dep't of Just.*,
423 F.3d 1271 (Fed. Cir. 2005) ..................... 28

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ..................... 36

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ........ passim

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 15, 18

*Trump v. Cook*,
609 U.S. ---, 146 S. Ct. 2234 (2026) ........ 36

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ........ 37

*Tulare Cnty. v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) ........ 39

*Tulare Cnty. v. Bush*,
306 F.3d 1138 (D.C. Cir. 2002) ........ 39

*Twin Rivers Paper Co. v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) ........ 16, 17

*U.S. ex rel. McLennan v. Wilbur*,
283 U.S. 414 (1931) ........ 37

*United States v. Fausto*,
484 U.S. 439 (1988) ........ 24, 25, 34

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ........ 15

*Wilbur v. U.S. ex rel. Kadrie*,
281 U.S. 206 (1930) ........ 37

**Statutes**

5 U.S.C. § 702 ........ 26

5 U.S.C. § 704 ........ 43

5 U.S.C. § 706 ........ 35

5 U.S.C. § 1204 ........ 27, 31, 34

5 U.S.C. § 2102 ........ 3

5 U.S.C. § 3302 ........ 1, 4, 7, 38, 39

5 U.S.C. § 7511 ........ 38

5 U.S.C. § 7512 ........ 6

5 U.S.C. § 7703 ........ 24, 27, 28

5 U.S.C. §§ 1211–12 ........ 5

5 U.S.C. §§ 7511–14 ........ 7, 39

28 U.S.C. § 1295 ........ 6

28 U.S.C. § 1331 ........ 23

**Rules**

Federal Rule of Civil Procedure 12(b) ........ 41

Federal Rule of Civil Procedure 12(b)(1) ........ 2, 35, 42

Federal Rule of Civil Procedure 12(b)(6) ........ 35

Local Civil Rule 7(n) ........ 41, 42

**Regulations**

5 C.F.R. part 210 ........ 21

5 C.F.R. part 213 ........ 20

5 C.F.R. part 302 ........ 19

5 C.F.R. part 1200 ........ 15

5 C.F.R. § 210.102 ........ 9, 10

5 C.F.R. § 213.101 ........ 11, 12

5 C.F.R. § 213.3601 ........ 12

5 C.F.R. § 1200.3 ........ 6, 7

5 C.F.R. § 1201.34 ........ 6

**Other Authorities**

*Recruiting and Hiring Students and Recent Graduates*, Exec. Order No. 13,562, 75 Fed. Reg. 82,585 (Dec. 27, 2010) ........ 7

*Excepting Administrative Law Judges from the Competitive Service*, Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 10, 2018) ........ 7

*Creating Schedule F in the Excepted Service*, Exec. Order No. 13,957, 85 Fed. Reg. 67,631 (Oct. 21, 2020) ........ 8, 12

*Protecting the Federal Workforce*, Exec. Order No. 14,003 § 2(b), 86 Fed. Reg. 7231 (Jan. 22, 2021) ........ 8

*Upholding Civil Service Protections and Merit System Principles*, 88 Fed. Reg. 63,862 (Sep. 18, 2023) ........ 8

*MSPB*, Interim Final Rule, Organization and Procedures, 89 Fed. Reg. 72,957 (Sep. 9, 2024) 6, 8

*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, Exec. Order No. 14,171 § 3, 90 Fed. Reg. 8625 (Jan. 20, 2025) ........ 10

*Improving Performance, Accountability and Responsiveness in the Civil Service*, 90 Fed. Reg. 17,182 (Apr. 23, 2025) ........ 11

*Improving Performance, Accountability and Responsiveness in the Civil Service*, 91 Fed. Reg. 5580 (Feb. 6, 2026) ........ 21, 22

*Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14,410, § 1, 91 Fed. Reg. 34,893 (June 3, 2026) ........ 1, 4, 13

## INTRODUCTION

This case challenges the President's exercise of discretionary authority, explicitly authorized by Congress, over the President's own subordinates. The Pendleton Civil Service Act of 1883 ("Pendleton Act") created the classified civil service by providing for "competitive examinations for testing the fitness of applicants," while allowing "any necessary exceptions" to those competitive standards. *See* 22 Stat. 403, § 2 (1883). The Pendleton Act was later amended in 1966 to expressly authorize the President to provide for "necessary exceptions of positions from the competitive service." 5 U.S.C. § 3302(1); Pub. L. No. 89-554, 80 Stat. 378, 417–18 (Sept. 6. 1966). Congress further provided that certain civil-service protections "do[] not apply to an employee . . . whose position has been determined to be a confidential, policy-determining, policy-making or policy-advocating character by . . . the President for a position that the President has excepted from the competitive service." *Id.* § 7511(b)(2)(A).

In Executive Order 14,410, the President exercised this explicit statutory authority to designate roughly 8,000 federal employees as occupying positions that are of "a confidential, policy-determining, policy-making or policy-advocating character." *Id.* In the President's judgment, that relatively small class of employees in "[s]enior policy-influencing positions" "play particularly important roles" in assisting the President in fulfilling his constitutional duties. *Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14,410, § 1, 91 Fed. Reg. 34,893 (June 3, 2026). Although those positions will continue to "be filled based on merit and not political affiliation," the President determined that "ensuring that such employees can be removed for misconduct or poor performance is essential to protecting democratic self-government by an elected President," *id.*, and thus were appropriately designated as excepted from the competitive service under 5 U.S.C. §§ 3302(1) and 7511(b)(2)(A). And so, on the merits, neither the President, nor his subordinates at the Office of the Personnel Management who have assisted him in implementing these directives, have violated any provision of federal law.

Regardless, the Court need not and should not reach the merits here, because the Court lacks subject-matter jurisdiction for three independent reasons. First, Plaintiffs have not carried

their burden to show Article III standing. Although Plaintiffs' filings purport to vindicate the rights of federal employees—the overwhelming majority of whom are not affected in any way by the actions challenged here—*no* federal employee is a party to this case. Instead, the Plaintiffs are two advocacy organizations—neither of which has identified *any* member affected by the President's actions, and neither of which can identify any concrete and cognizable Article III injury.

Second, Plaintiffs' suit is foreclosed by the comprehensive remedial scheme set forth in the Civil Service Reform Act of 1978 ("CSRA"). The CSRA precludes federal district court jurisdiction over suits like this one—focused on Executive Branch employment policies and guidance—and instead channels those challenges into a dedicated and reticulated administrative scheme. That administrative scheme ultimately allows for judicial review in an Article III court, if necessary—the U.S. Court of Appeals for the Federal Circuit. But Plaintiffs cannot sidestep Congress's choices to channel review outside of federal district court.

Third, this suit does *not* present the more typical fact pattern of an attempt to seek review of agency action taken by the President's subordinates, exercising their own statutory authority. Instead, this suit directly challenges *the President's* exercise of *the President's* direct and discretionary statutory authority. That distinction matters for purposes of judicial review: "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 477 (1994). That principle requires dismissal of all claims relating to the President's exercise of discretionary statutory authority—in particular, all claims (and all requests for relief) relating to the President's issuance of Executive Order 14410, to identify positions to place into the new Schedule Policy/Career.

Accordingly, because Plaintiffs have not carried their burden to establish subject-matter jurisdiction, Defendants move to dismiss this case, in its entirety, under Federal Rule of Civil Procedure 12(b)(1).

## BACKGROUND

## I. STATUTORY FRAMEWORK

### A. The Competitive and Excepted Service

Subject to various exceptions, "civil service employees in the executive branch of the federal government, other than those in the Senior Executive Service, are either in the 'competitive service' or the 'excepted service.'" *Nat'l Treasury Emps. Union v. Helfer*, 53 F.3d 1289, 1290 (D.C. Cir. 1995) ("*NTEU*"); *see* 5 U.S.C. § 2102. Most federal employees are in the competitive service, but roughly one third are in the excepted service. *See* Congressional Research Service, Categories of Federal Civil Service Employment: A Snapshot 4, R45635 (Mar. 26, 2019).[1] The "competitive service" consists of "all civil service positions in the executive branch, except" "positions which are specifically excepted from the competitive service by or under statute," certain political appointees, and "positions in the Senior Executive Service." 5 U.S.C. § 2102(a).

Positions in the competitive service are subject to specific provisions for hiring and removal not applicable to the excepted service. *See, e.g.*, *id.* § 3304. While federal employees generally are entitled to many substantive and procedural protections related to their employment, *e.g., id.* § 2302(a)(2)(B), those restrictions and procedural protections do not apply to the same extent to all those in the excepted service, *compare id.* § 7511(a)(1)(A) ("employee" entitled to certain rights includes individual in competitive service with one-year continuous service), *with id.* § 7511(a)(1)(C) ("employee" entitled to those same rights includes individual in excepted service with two years continuous service).

As relevant here, certain otherwise-required procedures for taking adverse personnel actions do not apply where a position is "determined to be of a confidential, policy-determining, policy-making or policy-advocating character" by "the President," by "the Office of Personnel Management," or by "the head of an agency." *Id.* § 7511(b)(2).

---

[1] Available at https://fas.org/sgp/crs/misc/R45635.pdf (last visited Aug. 23, 2026).

### B. The President and OPM's Authority over the Federal Workforce

Article II of the U.S. Constitution vests the entire executive power in the President. In addition, Congress has, by statute, provided for substantial presidential authority over the federal workforce. Indeed, numerous statutory provisions provide that "[t]he President may prescribe rules governing" a variety of Executive Branch personnel issues, including exceptions from the competitive service. *Id.* § 3302; *see, e.g.*, *id.* § 2301 (administering applicability of the merit system principles), *id.* § 2302 (excepting positions from prohibited personnel practice requirements), *id.* § 2951 (directing reports from appointing authorities), *id.* § 3132 (providing applicability of and exclusions for the Senior Executive Service), *id.* § 3301 (developing rules for admission into the civil service), *id.* § 3304 (creating competitive examination procedures), 3321 (designing probationary status directions), *id.* § 7301 ("The President may prescribe regulations for the conduct of employees in the executive branch."), *id.* § 7511(b)(2) (designating positions to be of a confidential, policy-determining, policy-making or policy-advocating character). The breadth and depth of statutory authorization for direct Presidential action in this sphere cannot be overstated. Beginning with the Pendleton Act in 1883, and in repeated subsequent enactments, Congress has called upon the President to make rules and develop Executive Branch personnel policies at his discretion.

Congress has also provided OPM with various responsibilities in this sphere. After all, the President could not manage the vast Executive Branch workforce on his own. Thus, the OPM Director is tasked with "executing, administering, and enforcing —. . . the civil service rules and regulations of the President and the Office and the laws governing the civil service." *Id.* § 1103(a)(5)(A). He is similarly tasked with "aiding the President, as the President may request, in preparing such civil service rules as the President prescribes, and otherwise advising the President on actions which may be taken to promote an efficient civil service and a systematic application of the merit system principles." *Id.* § 1103(a)(7). And for the competitive service specifically: "[t]he Office of Personnel Management shall aid the President, as he may request, in

preparing the rules he prescribes under this title for the administration of the competitive service." *Id.* § 1301.

OPM need not only assist as the President personally exercises his statutory powers. Thus, "the President may delegate, in whole or in part, authority for personnel management functions, including authority for competitive examinations, to the Director of the Office of Personnel Management." *Id.* § 1104(a)(1). And in certain instances Congress provided OPM its own authorities. *See, e.g.*, *id.* §§ 5107, 5112 (providing OPM with the authority to set standards for pay scales); *id.* § 5405 (allowing OPM to promulgate regulations governing the Human Capital Performance Fund).

When "any rule or regulation . . . is proposed by [OPM]" "[t]he Director shall publish in the Federal Register general notice of [the] rule or regulation." *Id.* § 1103(b)(1). The Director is also more generally subject to certain requirements in the APA. *Id.* § 1105. However, outside the Director and rules "proposed" by OPM, the scheme excepts personnel rules and regulations from notice-and-comment requirements. *Id.* § 553(a)(1), (2).

**C. The Administrative Scheme**

Congress created the Office of Special Counsel ("OSC") to, among other things, protect employees, applicants for employment, and former employees from prohibited personnel practices. *See* 5 U.S.C. §§ 1211–12. The Special Counsel may receive and investigate complaints of prohibited personnel practices and may petition the MSPB for a stay of personnel actions pending investigation, and based on the results of an investigation, seek corrective action. *See id.* § 1214(a)(1)(A), (b)(1)(A)(i), (b)(1)(D). At the request of the Special Counsel for a stay, any member of the MSPB must order such stay unless the member determines that, under the facts and circumstances involved, such a stay would not be appropriate. *See id.* The MSPB may extend the period of any stay; if it lacks a quorum, any remaining member may, upon request by the Special Counsel, extend the period of any stay. *See id.* § 1214(b)(1)(B). If the MSPB determines that the Special Counsel has demonstrated that certain prohibited personnel practices have occurred, exist, or are to be taken, it may order appropriate corrective action. *See id.* § 1214(b)(4)(B). Any

employee, former employee, or applicant for employment adversely affected by an order or decision of the MSPB may obtain judicial review of that order or decision, depending on the claims asserted, in the United States Court of Appeals for the Federal Circuit, another circuit court, or a district court. *See id.* § 1214(c)(1); *see also id.* § 7703(b).

Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See id.* § 1204(a)(1). The MSPB's three members are appointed by the President and confirmed by the Senate to staggered seven-year terms. *See id.* §§ 1201, 1202(a). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *See id.* §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions, depending on the claims asserted, in the Federal Circuit, another circuit court, or a district court. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

MSPB regulations set forth at 5 C.F.R. part 1200: (i) allow employees to proceed as a class, *see id.* § 1201.27; *see also Anselmo v. King*, 902 F. Supp. 273, 275 n.1 (D.D.C. 1995) ("The MSPB has the power to certify a class."); (ii) allow persons or organizations who want to participate in a proceeding because they believe the proceeding, or its outcome, may affect their rights or duties to intervene, *see* 5 C.F.R. § 1201.34; and (iii) allow matters to be joined or consolidated, *see id.* § 1201.36. With limited exceptions, "[i]ntervenors have the same rights and duties as parties[.]" *Id.* § 1201.34(d). The regulations also allow participation of an amicus curiae. *See id.* § 1201.34(e).

If there are fewer than three members of the MSPB, the Board may operate with two sitting members. *See Padilla v. Mnuchin*, No. 1:18-cv-2302, 2020 WL 1852431, at *7 (D. Colo. Apr. 13, 2020), *aff'd*, 836 F. App'x 674 (10th Cir. 2020). In addition, the MSPB promulgated a rule in 2024 that expanded the functions it can perform without a quorum or when there is deadlock between only two present Board members. *See MSPB*, Interim Final Rule, Organization and Procedures, 89 Fed. Reg. 72,957, 72,957-58 (Sep. 9, 2024) (codified at 5 C.F.R. § 1200.3). As a result, where two "Board members are unable to decide any case by majority vote, the decision, recommendation, or other order under review may be deemed the final decision or order of the Board." 5 C.F.R. § 1200.3(b). And where only one or no Board members are able to act, the lone

Board member or the Clerk of the Board may direct various types of matters, such as settlement, to "an administrative judge or other official[.]" *Id.* § 1200.3(c)-(d).

**D. The Statutory Basis for Policy/Career Designations**

As discussed, since the creation of the civil service in the 19th Century, the President has been directly vested with the ability to except positions from the competitive service. Section 3302 provides that the "President may prescribe rules governing the competitive service" and that such rules "shall provide, as nearly as conditions of good administration warrant," for "necessary exceptions of positions from the competitive service." 5 U.S.C. § 3302(1). For decades, the Executive Branch has managed the federal civil service by creating such exceptions. *See, e.g.*, *Excepting Administrative Law Judges from the Competitive Service*, Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 10, 2018); *Recruiting and Hiring Students and Recent Graduates*, Exec. Order No. 13,562, 75 Fed. Reg. 82,585 (Dec. 27, 2010). Such exceptions enable a more nimble federal workforce and make the Executive Branch more responsive to the will of the people.

In addition, Congress specified a particular type of position—one determined to be of a confidential, policy-determining, policy-making or policy-advocating character—as qualifying for exclusion. Congress directed that a "position [that] has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by" "the President," OPM, or the head of an agency, would be exempt from various procedures governing removal, certain suspensions, reductions in pay, and other related actions. 5 U.S.C. §§ 7511–14. Positions in this category, the subject of this suit, will be referred to as "policy-influencing positions."

All told, policy-influencing positions were recognized by Congress as requiring special attention and Presidential control—including exemptions from otherwise restrictive and time-consuming procedures where the agency wishes to remove such employees. It ensured a broad space for Presidential rulemaking to designate such positions and a high degree of accountability for these particularly sensitive positions.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Prior Executive Orders and Regulations

On October 21, 2020, President Trump invoked his authority under Sections 3301, 3302, and 7511 and created a new schedule "excepted from the competitive service" for "career positions in the Federal service of a confidential, policy-determining, policy-making, or policy-advocating character." *Creating Schedule F in the Excepted Service*, Exec. Order No. 13,957 §§ 1, 4, 85 Fed. Reg. 67,631 (Oct. 21, 2020). Under this Executive Order, each agency was ordered that it must submit to OPM the specific positions it proposed should be added to this new schedule. *Id.* § 5(a)(i). The Director of OPM was directed to review those submissions and determine which, if any, should in fact be excepted. *Id.* § 5(d).

Upon taking office, President Biden issued Executive Order 14,003 revoking the prior order and instructing agencies to "immediately suspend, revise, or rescind proposed actions, decisions, petitions, rules, regulations or other guidance pursuant to, or to effectuate, [the prior order]." *Protecting the Federal Workforce*, Exec. Order No. 14,003 § 2(b), 86 Fed. Reg. 7231 (Jan. 22, 2021). OPM then took additional action. In 2023, it issued a notice of proposed rulemaking titled "Upholding Civil Service Protections and Merit System Principles." 88 Fed. Reg. 63,862 (Sep. 18, 2023). It sought to implement, by rule: (1) retention by employees of adverse action protections when their positions are held to be policy-influencing; (2) a definition of "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy-determining" as covering only "noncareer, political appointments"; and (3) "specific additional procedures that apply when moving positions from the competitive service to the excepted service, or from one excepted service schedule to another," especially when such movements would affect adverse action coverage. *Id*. OPM later issued a final rule ("April 2024 Final Rule"). *Upholding Civil Service Protections and Merit System Principles*, 89 Fed. Reg. 24,982 (Apr. 9, 2024).

Several regulatory provisions brought into effect by the April 2024 Final Rule are relevant to this litigation. First, OPM implemented its proposed definitions for policy-influencing positions:

> *Confidential, policy-determining, policy-making, or policy-advocating* means of a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President and the Administration, and that carries no expectation of continued employment beyond the presidential administration during which the appointment occurred.
>
> *Confidential or policy determining* means of a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President and the Administration, and that carries no expectation of continued employment beyond the presidential administration during which the appointment occurred.

5 C.F.R. § 210.102(b)(3), (4) (citing as statutory authority 5 U.S.C. §§ 1302, 3301, and 3302).

Next, OPM added "Subpart F" titled "Moving Employees and Positions into and Within the Excepted Service," to the relevant regulatory scheme. 89 Fed. Reg. at 25030, 25046–47. The new subpart established various procedural requirements that Executive Branch officials must follow before moving positions into a new excepted service schedule, or moving individual employees with accrued civil service protections into a position without such protections. *See id.* Subpart F also provided certain appeal rights to the Merit Systems Protection Board ("MSPB") for employees whose positions were involuntarily moved into an excepted service schedule. *Id.* at 25047. Specifically, it allowed appeals challenging a failure to follow certain requirements established in Subpart F, the voluntariness of moving to a new position in the excepted service, and the "eliminat[ion of] competitive status or any procedural and appeal rights that had previously accrued." *Id.*

The regulations provided other protections for employees related to being moved to a different schedule. *See, e.g.*, *id.* at 25046 (establishing that "[a]n employee who was in the competitive service and had competitive status" at the time of an involuntary move into the excepted service "remains in the competitive service for the purposes of status and any accrued adverse action protections").

### B. The 2025 Policy/Career Order and OPM Guidance

When President Trump assumed office for a second time in January 2025, he issued a new executive order, the Policy/Career Order, revoking President Biden's order and reinstating his earlier order with some modifications. The President established a new excepted service schedule for positions of a confidential, policy-determining, policy-making, or policy-advocating character that are not normally subject to change as a result of a Presidential transition—tracking the language used by Congress. *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, Exec. Order No. 14,171 § 3, 90 Fed. Reg. 8625 (Jan. 20, 2025). The President directed that the OPM Director, in consultation with the Executive Office of the President, provide additional guidance to agencies about what positions might qualify, in addition to the President's own guidance. *Id.* § 5. He established that agencies would recommend positions that may be suitable for the new schedule to OPM, and that OPM's Director would then decide what positions OPM would recommend to the President. *Id.* §§ 3(e), 5. Recognizing that 5 C.F.R. § 210.102(b)(3), (4) and 5 C.F.R. part 302, subpart F were issued with delegated Presidential authority, he reasserted his statutory prerogative and rendered those regulations inoperative. *Id.* § 4. Lastly, the President affirmed that "[e]mployees in or applicants for Schedule Policy/Career positions are not required to personally or politically support the current President or the policies of the current administration." *Id.* § 3(f)(ii).

On January 27, OPM issued guidance pursuant to the President's directive. OPM, *Guidance on Implementing President Trump's Executive Order titled, "Restoring Accountability To Policy-Influencing Positions Within the Federal Workforce"* (Jan. 27, 2025) (January 27 Memorandum").[2] For the most part, the January 27 Memorandum consists of guidance on positions that may qualify for Schedule Policy/Career and the procedure for future agency recommendations. *Id.* at 1–5. OPM also noted to agencies that the President, through the

[2] Available at https://www.opm.gov/media/sqfnpy4n/opm-memorandum-re-schedule-policy-career-guidance-01-27-25-final-2.pdf (last visited Aug. 23, 2026).

Policy/Career Order, had rendered certain regulations inoperative and without effect. *Id.* at 5. Lastly, OPM explained that, as the Policy/Career Order requires, "agencies will be forbidden from making Schedule Policy/Career appointments based on political affiliation." *Id.* at 5–6. The appendix of the memorandum includes a consolidated version of the reinstated prior order as modified by the Policy/Career Order. *See id.*, Appendix 1 ("Consolidated Order").

**C. The 2026 Policy/Career Proposed Rule and Final Rule**

On April 23, 2025, OPM published a proposed rule for implementing Schedule Policy/Career ("Proposed Rule"). *Improving Performance, Accountability and Responsiveness in the Civil Service*, 90 Fed. Reg. 17,182 (Apr. 23, 2025). The Proposed Rule addressed several factors that OPM believes received "inadequate consideration" when OPM promulgated the April 2024 Final Rule, including that (i) "adverse action procedures and appeals make it very challenging for agencies to effectively address poor performance or serious misconduct;" (ii) civil servants may not impartially implement an administration's policy, which can generate problematic policy resistance; (iii) the limitation of "confidential, policy-determining, policy-making, or policy-advocating" and "confidential or policy-determining" positions to exclusively noncareer political appointments is based on the misguided interpretation that these categories are terms of art. *See id.* at 17,189–98. To that end, the Proposed Rule proposed to amend the Excepted Service regulations in 5 C.F.R. part 213 to incorporate Schedule Policy/Career into OPM's civil service regulations. *Id.* at 17,200.

In particular, the Proposed Rule proposed amending 5 C.F.R. § 213.101 to include two new definitions for "career positions" and "noncareer positions" for purposes of part 213 to clarify the distinction between noncareer Schedule C positions and career Schedule Policy/Career positions. *Id.* OPM also proposed to remove the definitions of policy-influencing positions added by the April 2024 Final Rule because these "are not terms of art that refer to political appointments in Schedule C. Rather, they have their plain English meaning—confidential positions or those that determine, make, or advocate for policy." *Id.* at 17,202. The Proposed Rule also proposed eliminating certain procedural protections for employees whose positions were moved or who

were involuntarily transferred into a policy-influencing excepted service position. *Id.* Next, the Proposed Rule proposed amendments to the procedures for moving positions into, or between excepted service schedules. *Id.* at 17,204. Finally, the Proposed Rule also proposed retaining the competitive service hiring procedures for positions moved into Schedule Policy/Career. *Id.* at 17,207. After considering over 40,000 comments, OPM ultimately implemented the ideas laid out in the Proposed Rule when it promulgated the Final Rule implementing Schedule Policy/Career on February 6, 2026. *See Improving Performance, Accountability and Responsiveness in the Civil Service* ("Final Rule"), 91 Fed. Reg. 5580 (Feb. 6, 2026).

The Final Rule begins by adding definitions to 5 C.F.R. § 213.101 to clarify the distinction between noncareer Schedule C positions and career Schedule Policy/Career positions as contemplated by the Proposed Rule. *Id.* at 5608, 5653. The Final Rule then amends the regulations for the excepted service to state that the President may himself place positions into Schedule Policy/Career. *Id.* at 5608. The Final Rule also includes several provisions to include references to Schedule Policy/Career where applicable throughout. *See id.* at 5609. Next, the Final Rule amends the regulations for Schedule C appointments to align with the text of Civil Service Rule 6.2, as amended by E.O. 13,957. *See id.* The Final Rule also added a new section at 5 C.F.R. § 213.3601 to create Schedule Policy/Career. *Id.* at 5610, 5654. The Final Rule then amends 5 C.F.R. part 210 (Basic Concept and Definitions) to remove the definitions for positions of a "confidential, policy-determining, policy-making, or policy-advocating character" and those that are "confidential or policy-determining," which had equated these phrases with political appointees. *Id.* at 5612. OPM then rescinded the changes in the April 2024 Final Rule that purported to allow employees whose positions were moved or who were involuntarily transferred into a position in the policy-influencing excepted service to remain covered by chapter 75 adverse action procedures and MSPB appeals. *Id.* Finally, OPM also (i) amended 5 C.F.R. parts 212 and 302 to modify the procedures for moving positions into or between excepted service schedules, *see id.* at 5614; and (ii) modified part 302 to clarify that appointments to Schedule Policy/Career positions will be

made using the hiring procedures that would have otherwise been used had the position not been moved into the new schedule, *id.* at 5619.

### D. The 2026 Schedule Policy/Career Executive Order

On June 3, 2026, President Trump issued Executive Order 14,410, *Implementing Schedule Policy/Career in the Excepted Service*, 91 Fed. Reg. 34,893 (June 3, 2026). Executive Order 14,410 published a list of positions that the President had determined were of a "confidential, policy-determining, policy-making, or policy-advocating character," and should therefore be placed in Schedule Policy/Career. *Id.* at 34,896–35,124.

### E. This Lawsuit

On February 6, 2025, Plaintiffs, two non-profit advocacy organizations interested in government accountability and federal workers, filed this suit. Compl., ECF No. 1. On March 27, 2025, Defendants filed their Consent Motion for Extension and Briefing Schedule, ECF No. 23. The Court granted the motion in its March 28, 2025 Minute Order, in which it ordered Defendants to respond to the then-operative complaint on or before May 2, 2025, and set a schedule requiring Plaintiffs to file an opposition to Defendants' motion to dismiss within 30 days of its filing, with Defendants to file a reply within 14 days of the filing of Plaintiffs' opposition. On April 24, 2025, Plaintiffs filed their Revised Motion for Modified Briefing Schedule, ECF No. 31, based on the publication of the Proposed Rule, and requested that the briefing schedule be modified to allow Plaintiffs to file an amended complaint within 21 days after OPM issues a final rule, with Defendants to respond to the amended complaint within 30 days, Plaintiffs to oppose any motion to dismiss within 30 days of its filing, and Defendants to reply in support of any motion to dismiss within 14 days of the filing of the opposition. *See id.* at 5. The Court granted this motion on April 29, 2025. *See* Memo. Op. & Order, ECF No. 32.

On February 18, 2026, shortly after the publication of the Final Rule, 91 Fed. Reg. 5580, Plaintiffs filed their Unopposed Motion for Extension of Time to File Amended Complaint, ECF No. 33, which the Court granted in its February 23, 2026 Minute Order. This Minute Order vacated the previous briefing deadlines, and ordered Plaintiffs to file an amended complaint on or before

the latter of April 8, 2026, or 21 days after the issuance of an executive order moving positions to Schedule Policy/Career if such order is issued prior to April 8, 2026, with defendants to respond to the amended complaint within 30 days, plaintiffs to file any opposition within 30 days of a motion to dismiss, and defendants to reply in support within 14 days of the filing of an opposition. On March 31, 2026, Plaintiffs filed their Unopposed Motion for Modification of Scheduling Order, ECF No. 34, requesting that the Court allow Plaintiffs to file an amended complaint within 21 days of the issuance of an executive order moving positions into Schedule Policy/Career, but otherwise retain the briefing schedule. The Court granted the motion on April 2, 2026. Order, ECF No. 35.

On June 24, 2026, Plaintiffs filed their Amended Complaint, ECF No. 37. On July 17, 2026, Defendants moved for a 30-day extension of their deadline to respond to the Amended Complaint, ECF No. 38, which the Court granted on July 20, 2026, Order, ECF No. 40. Defendants now move to dismiss for lack of subject-matter jurisdiction.

## ARGUMENT

The Court lacks jurisdiction over this matter for three entirely independent reasons. First, Plaintiffs have not carried their burden to demonstrate Article III standing. Second, Plaintiffs' claims are precluded because Congress has channeled these employment claims into a comprehensive and reticulated administrative scheme with its own procedures and limitations on judicial review. Third, with respect to all claims against the President (and all claims relating to the President's exercise of his own statutory discretion), "judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 477 (1994).

### I. PLAINTIFFS LACK ARTICLE III STANDING.

Although this suit purports to vindicate the rights of federal employees, none is a party to this suit. Instead, this case was filed by two organizations: the Government Accountability Project (GAP) and the National Active and Retired Federal Employees Association (NARFE). Although both organizations plainly have strongly held policy objections to the actions challenged here, neither has suffered a concrete and cognizable Article III injury. Plaintiff NARFE fails to identify any member with Article III standing—indeed, NARFE does not identify any member at all. And

Plaintiff GAP does not even try to establish standing as a membership association—instead, its primary theory of standing is speculation that winning this suit might mean more "attorney's fee awards and/or settlements" down the road, Am. Compl. ¶ 140, in representing hypothetical future whistleblowers challenging hypothetical future misconduct. All of these theories lack merit.

**A. Plaintiff NARFE lacks associational standing.**

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

Plaintiff NARFE sues (in part) "on behalf of its current federal employee members," Am. Compl. ¶ 18—that is, it relies on the doctrine of associational standing, as a membership organization. Generally, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

NARFE fails to satisfy the very first requirement: identification of at least one member with standing. For an associational plaintiff to carry that burden at the motion to dismiss stage, it is not enough to generally allege that unidentified members have been injured. *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (requiring plaintiffs to provide individual affidavits supporting standing in the context of direct review of an administrative decision by a circuit court). Instead, Plaintiffs must provide some individual allegations of harm that support standing. These are "settled rules" in the D.C. Circuit. *Id.*; *see also, e.g.*, *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured."); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. It is not enough to show . . . that there is a substantial likelihood that at least one member may have suffered an injury-in-fact. Our standard has never been that it is likely that at least one member has standing. At the very least, the identity of the party suffering an injury in fact must be firmly established."); *AFL-CIO v. Dep't of Lab.*, 766 F. Supp. 3d 32, 37 (D.D.C. 2025) ("Associational standing's first requirement, however, necessitates more than generalizations about the organization's members. The organization must point to *a particular member* and establish she would have standing if she were a plaintiff herself."); *Commissioned Officers Ass'n of U.S. Pub. Health Serv. v. Bunch*, No. 21-cv-853 (JDB), 2022 WL 951271, at *4 (D.D.C. Mar. 30, 2022) ("[T]he D.C. Circuit held that an organization failed to establish standing when it had 'failed to submit any member affidavits with its opening brief,' did not 'identify any individual members' in its own affidavit, and 'fail[ed] to identify individual members' in its brief.") (quoting *Twin Rivers*, 934 F.3d at 613).[3]

[3] *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), is not to the contrary. To the extent that opinion found a likelihood of associational standing in the absence of specifically identified members, it expressly did so at the "early juncture" of a motion for preliminary relief, when a plaintiff need only show that it is "*likely* to be able to establish standing

NARFE does not identify any members at all—much less a member who has suffered a concrete and particularized Article III injury, caused by Defendants, and traceable to the challenged actions. The closest it comes is an allegation in the complaint that "NARFE has current federal employee members in career positions that have been moved into Schedule P/C by EO 14410." Am. Compl. ¶ 149. That generalized allegation, however, does not "show that at least one *specifically-identified* member has suffered an injury-in-fact." *Am. Chemistry Council*, 468 F.3d at 820 (emphasis added). Instead, that is a bare allegation "that *unidentified* members have been injured," *Twin Rivers*, 934 F.3d at 613 (emphasis added)—exactly what the D.C. Circuit has repeatedly held as insufficient. Accordingly, NARFE has not adequately pleaded the elements of associational standing.

**B. Plaintiff NARFE lacks organizational standing.**

Unable to establish associational standing, Plaintiff NARFE also purportedly "brings this action in its own capacity" as an organization. Am. Compl. ¶ 18. Generally, "organizations may have standing to sue on their own behalf for injuries they have sustained." *Alliance*, 602 U.S. at 393-94. "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals," *id.*—that is, unlike under the rubric of associational standing, they cannot rely on alleged injuries to their members. In an effort to carry this burden, Plaintiff NARFE identifies two alleged injuries to the organization: (1) diversion of resources to respond to the challenged actions, *see* Am. Compl. ¶¶ 159-60; and (2) the possibility that the actions challenged here "will erode the pool of long-term federal employees potentially interested in NARFE membership and so impede NARFE's ability to recruit members," *id.* ¶ 158. Neither theory works.

---

later in the case." *Id.* at 1229 (emphasis added). Indeed, the opinion expressly reaffirmed the general rule set forth above. *See id.* ("It is true that, at the merits stage, 'when a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured.'") (quoting *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021)). That general rule applies here.

**1. Diversion of Resources.** NARFE relies explicitly on a diversion-of-resources theory of organizational standing. To support this theory, NARFE alleges that, "[f]ollowing the issuance of the Final Rule on February 6, 2026," it "experienced a fifty percent increase in phone inquiries over its average call volume," and that some unidentified percentage of those phone calls "included questions regarding the impact of Schedule P/C." *Id.* ¶ 159. That increase in call volume has allegedly "caused NARFE to devote less time and fewer resources" to "NARFE's core mission of providing counseling and communications to support its broader membership," *Id.* ¶ 160.

As an initial matter, NARFE says nothing about the magnitude of this allegedly increased call volume. And so, for example, it would be fully consistent with the complaint if NARFE usually got 10 calls per week, but in mid-February 2026 it was getting 15 calls per week, and two of those calls mentioned Schedule P/C. Even if this sort of diversion-of-resources theory were still permissible, *but see infra* at 18-19, that fact would still be insufficient to show a legally cognizable Article III injury—answering a few unexpected phone calls on behalf of active or retired federal employees is, as a factual matter, impossible to describe as a meaningful "impair[ment]" of the organization's "ability to provide . . . services" in support of its mission. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Nor does this sort of "alleged injury"—that is, a moderately busier phone line—have any "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424.

But more fundamentally, even if NARFE has seen a significant increase in call volume and that increase has actually "caused NARFE to devote less time and fewer resources" to other activities, Am. Compl. ¶ 160, that still isn't enough. That is because NARFE's diversion-of-resources theory of standing is foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).

The *Alliance* plaintiffs, medical associations and several individual doctors, challenged FDA actions making it easier for doctors to prescribe mifepristone. *Id.* at 376. Those plaintiffs did not themselves prescribe or use mifepristone, and FDA did not impose any relevant regulatory requirements on plaintiffs. The *Alliance* Court observed that organizations may "sue on their own

behalf for injuries *they* have sustained," *id.* at 393 (quoting *Havens*, 455 U.S. at 379 n.19) (emphasis added), but also clarified that an organization cannot establish injury by asserting the rights of others: "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

In doing so, as particularly relevant here, *Alliance* also explicitly rejected the argument that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that the Supreme Court's prior decision in "*Havens* does not support such an expansive theory of standing." *Id.* at 395. The upshot is, after *Alliance*, a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.

Here, in response to the government's actions, Plaintiff NARFE has allegedly had "to devote less time and fewer resources" to its other operations. Am. Compl. ¶ 160. That is exactly the sort of diversion-of-resources argument that cannot survive *Alliance*. *See, e.g.*, *Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490, --- F. 4th ----, 2026 WL 2277101, at *7 (9th Cir. Aug. 7, 2026) (overruling prior circuit precedent allowing resource-diversions standing, explaining that "[i]t was not enough that the organizations in *Hippocratic Medicine* had diverted resources in response to the FDA's actions"); *Farm Sanctuary v. USDA*, No. 24-382, 2026 WL 1030616, at *2 (2d Cir. Apr. 16, 2026) (after *Alliance*, holding that "the diversion of an organization's resources or frustration of its mission" is "inadequate to establish standing"). Accordingly, this diversion-of-resources theory cannot support NARFE's organizational standing.

**2. Possible Future Recruitment Challenges.** NARFE's second theory of organizational standing proceeds in multiple steps. First, NARFE alleges that "[t]he Executive Orders, the Final Rule, and the actions they support and direct will reduce the number of long-term federal employees in the civil service by making more positions subject to at-will dismissal." Am. Compl. ¶ 157. Second, and (presumably) due to that alleged reduction, those same actions "will erode the pool of long-term federal employees potentially interested in NARFE membership and so impede

NARFE's ability to recruit members by providing a smaller employee pool of long-term employees." *Id.* ¶ 158. This theory is both impermissibly speculative and, in any event, contradicted by other allegations in the amended complaint.

As for speculativeness, "it is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). "In keeping with this principle," the Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* (quoting *Clapper*, 568 U.S. at 413).

NARFE's recruitment theory fails that test. Other than naked "guesswork" about how the *millions* of federal employees will react to actions that affect roughly 8,000 of them, *id.*, there is no way to know whether the actions challenged here will increase, decrease, or have no effect at all on the total number of federal employees—much less the number of federal employees who are interested in membership in NARFE. Plaintiffs make no effort whatsoever to disentangle the many other potentially relevant variables: future hiring patterns, terminations, resignations, retirement decisions, and membership choices of the millions of "third part[ies] not before the court" who comprise the federal workforce. *Id.* (citation omitted).

Indeed, according to the amended complaint, "NARFE's core mission is to further the interests of its federal employee and federal retiree members," including by "[p]rotecting federal employees' CSRA Protections" and "advising on changes in legislation and regulation that might affect its members' interests." Am. Compl. ¶ 152. Given that focus, one might expect the government actions challenged here to *increase* interest in NARFE membership among current federal employees. And, in fact, NARFE brags about exactly that, alleging that its "share of total and new members who are current federal employees was higher in 2025 than it had been in 2024." *Id.* ¶ 156. So there is no reason to think (and plenty of reasons to doubt) that NARFE's "speculative chain of possibilities" will ever come to pass. *Murthy*, 603 U.S. at 70 (quoting *Clapper*, 568 U.S. at 414). That is fatal to this theory of standing.

**C. Plaintiff GAP lacks organizational standing.**

Plaintiff GAP "brings this action in its own capacity" as an organization, Am. Compl. ¶ 16—that is, unlike NARFE, it makes no attempt to show associational standing through its members (if any). But much like NARFE, GAP's allegations of organizational standing all rest on impermissibly "speculative chain[s] of possibilities" about "the independent action[s] of . . . third part[ies] not before the court." *Murthy*, 603 U.S. at 57, 70 (citations omitted).

GAP alleges that "[f]ederal employees moved into Schedule P/C will lose the whistleblower protections of Chapter 23 and the concomitant procedural protections of Chapters 75(II) and 12." Am. Compl. ¶ 131 (citing 5 U.S.C. § 2302(a)(2)(B)(i)). This change, the theory goes, will "affect[] the number of whistleblowers who are willing to make a disclosure with GAP's assistance," and "also affect the level of detail of the disclosures and whistleblowers' willingness to identify themselves." *Id.* ¶ 135. Those changes, in turn, will "materially affect[] the likelihood that the disclosure will be impactful and thus impedes GAP's goal of effectuating significant whistleblower disclosures." *Id.* And in the end, this will all allegedly cost GAP some money: it alleges that the "chilling effects" described above "will result in fewer GAP clients obtaining attorney's fees through the OSC/MSPB process and in GAP obtaining fewer attorney's fee awards and/or settlements, shrinking GAP's revenue." *Id.* ¶ 140.

Much like NARFE's theory of possible future recruitment challenges, this theory of standing depends entirely on "guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 413). The size of GAP's future client base might be increased, decreased, or entirely unaffected by the actions challenged here—an empirical question that will turn on countless complex variables, the overwhelming majority of which are not even acknowledged (much less addressed) by any plausible allegations (or any allegations at all) in the amended complaint.

As with NARFE's professed concerns about future recruitment, GAP's pessimism about its future fee revenue is also in substantial tension with its own complaint. For one thing, the amended complaint suggests that it has only represented approximately "40 employees in

OSC/MSPB proceedings" since 2020. Am. Compl. ¶ 139. Relative to the millions of federal employees—and even the 8,000 or so employees who may be affected by the actions challenged here—a baseline of fee recoveries for a single-digit number of clients per year makes it extraordinarily speculative whether any possible future change will be attributable to this suit.

For another thing, if it were really true (as GAP alleges) that "[t]his case challenges Defendants' attempt to dismantle a cornerstone of American democracy," *id.* ¶ 1, one could imagine seeing a substantial *increase* in whistleblower disclosures, by all classes of federal employees. To that end, GAP's website expresses no concerns at all about its ability to attract clients. In addition to a lengthy list of press releases about various whistleblower representations, *see* GAP, *Press Releases*, https://whistleblower.org/press/ (last visited on Aug. 24, 2026), its 2025 "Year in Review" blog post begins: "2025 has kept Government Accountability Project busy!" GAP, *Year in Review: Looking Back on 2025* (Dec. 29, 2025), https://perma.cc/V2EP-86T3.[4] Under these circumstances, other than "guesswork" about third parties, *Murthy*, 603 U.S. at 57, there is no basis for GAP's convenient assumption that reclassification of roughly 8,000 (of several million) federal employees is going to erode its client base or its future fee awards.

Further, Section 6(a) of E.O. 13957, as amended, requires agencies to "establish rules to prohibit the same personnel practices prohibited by section 2302(b) of title 5, United States Code, with respect to any employee or applicant for employment in Schedule Policy/Career of the excepted service." Consequently, the net effect of E.O. 13957—which was reinstated and made to refer to Schedule Policy/Career rather than Schedule F by E.O. 14171, 90 Fed. Reg. at 8625—with respect to such prohibited personnel practices is to transfer responsibility for whistleblower protections for policy-influencing employees from OSC to agencies, not to eliminate those protections altogether. It is entirely speculative that agency-level protections will encourage

[4] "[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Cause of Action Inst. v. IRS*, 390 F. Supp. 3d 84, 91 (D.D.C. 2019) ("[F]actual allegations receive closer scrutiny in the 12(b)(1) context than in the 12(b)(6) context.") (Jackson, K.B., J.).

whistleblowers to come forward at a lower rate than OSC-level protections, much less that the difference in disclosures between the two systems will be so significant that it materially affects GAP's revenues from whistleblower attorney fee awards.

Finally, GAP also tries out a diversion-of-resources theory of standing, alleging (largely without explanation) that its "core activities have been and will continue to be disrupted." Am. Compl. ¶ 134. As examples, GAP alleges that it "has expended resources training pro bono volunteer attorneys for rapid response and legal support because of the Executive Orders, the 2025 OPM Guidance, and the Final Rule." *Id.* ¶ 145; *see also id.* ¶ 147 ("GAP must revise its federal employee whistleblower guide and other resources to reflect the establishment of Schedule P/C and the loss of whistleblower protections for many federal employees."). That theory fails, under *Alliance*, for the same reasons as discussed above with respect to NARFE. *See supra* at 18-19.

## II. PLAINTIFFS' CLAIMS ARE PRECLUDED BY THE CIVIL SERVICE REFORM ACT.

Even if Plaintiffs had Article III standing, Plaintiffs cannot show subject-matter jurisdiction because Congress has channeled jurisdiction over federal employment matters like the suit Plaintiffs bring away from district courts, thus precluding jurisdiction here. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*") (ordering a jurisdictional dismissal of a federal-employee-union suit because of the comprehensive statutory scheme). The legal basis for this exclusive channeling is both well-settled and constitutionally significant. "Congress, subject only to Article III of the Constitution, establishes the jurisdiction of the inferior federal courts." *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir. 1995). It accordingly has great leeway to expand or restrict jurisdiction, which it has exercised here by creating an exclusive administrative scheme for claims like Plaintiffs'.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331[]." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure

and time period" for challenging agency actions, a plaintiff may be precluded from seeking relief through a suit in district court. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). This is the case with the CSRA. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 8 (2012) (CSRA precludes constitutional claims); *AFGE v. Trump*, 929 F.3d at 756 (CSRA precludes APA claims).

Congress can preclude district court review two different ways. The first is explicitly. *Axon*, 598 U.S. at 185 ("[P]roviding in so many words that district court jurisdiction will yield."). The second, applicable here, is implicitly. In the latter case, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Id*. To resolve an implicit preclusion question, the Court must determine whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Applying the two steps of the *Thunder Basin* analysis of implied preclusion here, jurisdiction over Plaintiffs' claims is precluded.

**A. Congress intended to preclude district court jurisdiction.**

The first step, Congress's intent to preclude, is well satisfied: Congress established a detailed statutory scheme for adjudicating disputes relating to federal employment. Taken as a whole, it is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988) (analyzing the CSRA). It provides for "administrative and judicial review" regarding disputes between employees or unions and the federal government. *AFGE v. Trump*, 929 F.3d at 752; *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (discussing the CSRA more broadly). So federal labor and employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—either the Merit Systems Protection Board ("MSPB") for employment disputes or the Federal Labor Relations Authority ("FLRA") for labor disputes.

Judicial review, if any, is available only in a court of appeals. *See AFGE v. Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham*, 358 F.3d at 934 (citing *Fausto*, 484 U.S. at 448–50); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" for an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme does. Accordingly, as the D.C. Circuit has repeatedly recognized, the CSRA precludes jurisdiction in the district courts over federal employee and federal union disputes. *See AFGE v. Trump*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) ("*Air Force*")). Indeed, the Court has already held that the scheme "foreclose[s] judicial review" for employees "to whom the CSRA grants administrative and judicial review." *Elgin*, 567 U.S. at 11 (emphasis removed).

Of course, Plaintiffs here are not employees subject to a possible reclassification or otherwise affected by the Policy/Career Executive Order and its implementation. But that is no matter. The "deliberate exclusion of [a group] from the provisions establishing administrative and judicial review for personnel action of the sort at issue . . . prevents [the group] from seeking review." *Fausto*, 484 U.S. at 455; *see also Block v. Community Nutrition Inst.*, 467 U.S. 340, 346–47 (1984) (similar). The Supreme Court has also applied this holding in the *Thunder Basin* context. In *Elgin*, it explained that "the CSRA's 'elaborate' framework . . . demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review." *Elgin*, 567 U.S. at 11 (emphasis removed) (quoting *Fausto*, 484 U.S. at 443). Thus, if it is true that the CSRA excludes administrative review options for Plaintiff, it supports, rather than detracts from, evidence of Congress's intent to preclude. *See Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

Indeed, a CSRA-related challenge rarely focuses on this first step. *See AFGE v. Trump*, 929 F.3d at 755. Through the reticulated administrative scheme Congress intended the CSRA to foreclose judicial review. "[T]his comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get." *Filebark v. DOT*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (Tatel, J.) (citation omitted); *see also Elgin*, 567 U.S. at 8 (CSRA also precludes constitutional claims). That suffices to satisfy the first *Thunder Basin* step.

It is the second *Thunder Basin* step, whether particular claims in a suit are of the type Congress intended to be reviewed in this scheme, that ultimately matters. That is, whether "Congress's creation of a 'comprehensive review process' like [this] one[] here ousted district courts of jurisdiction." *See Axon*, 598 U.S. at 186 (citation omitted). So this Court must "ask[] another question: whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Id.* (citation omitted). As explained below, the answer is yes, and as a result, consideration of these claims is precluded.

**B. These claims are of the type Congress intended to be reviewed through the CSRA's administrative scheme.**

To determine whether Congress's preclusion scheme reaches these claims, the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim;" (2) "is the claim wholly collateral to the statute's review provisions;" and (3) "is the claim outside the agency's expertise?" *Id.* (cleaned up). These "considerations" are ultimately guideposts to "best . . . understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim." *Id.* And it is critical to remember that APA and constitutional claims are as amenable to channeling as any other type. *See, e.g.*, *Elgin*, 567 U.S. at 8; *Filebark*, 555 F.3d at 1010. It is the content of the claim that matters—not the manner in which a plaintiff attempts to raise it.

Plaintiffs have brought six claims. In Count I, they allege that the Final Rule is inconsistent with the CSRA and exceeds Defendants' authority under the law in violation of the APA, 5 U.S.C. §§ 702, 706(2)(A), (C), by excluding designated positions from certain civil service protections. *See* Am. Compl. ¶¶ 165–66, 168. In Count II, Plaintiffs allege that designating certain positions under Schedule Policy/Career exceeds the authority provided by the CSRA and is ultra vires action. *See id.* ¶ 171. In Count III, Plaintiffs allege that Defendants' implementation of Schedule Policy/Career conflicts with Congress's "exercise of its constitutional authority," *id.* ¶ 177, in enacting the CSRA, and therefore "violates the separation of powers," *id.* ¶ 179. In Count IV, Plaintiffs allege that the Final Rule is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). Am. Compl. ¶ 186. In Count V, Plaintiffs allege that the Final Rule violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and as a result must be held "unlawful and set" aside under the APA, 5 U.S.C. § 706(2)(B). Am. Compl. ¶¶ 195, 197. Finally, in Count VI, Plaintiffs allege that Defendants' implementation of Schedule Policy/Career is also ultra vires because it allegedly violates the Due Process Clause. *Id.* ¶¶ 200, 202.

As to the first *Thunder Basin* factor, the administrative scheme under the CSRA provides for meaningful judicial review. This is so even if the scheme Congress established does not allow for Plaintiffs "to obtain 'pre-implementation' review" "or immediate relief." *See AFGE v. Trump*, 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. Here, as in *AFGE v. Trump*, it suffices that certain parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757. Here, the Special Counsel may file a complaint that requires MSPB review; a party may petition the MSPB for review; and a reviewable final order may be reviewed under Section 7703. *See* 5 U.S.C. §§ 1204(f), 7703. That Congress made some access discretionary, and limited judicial review to specified persons and circumstances, reflects deliberate design—not a deficiency that licenses a new district-court path.

Here, all of Plaintiffs' claims fit within the administrative scheme. The gravamen of Plaintiffs' first three Counts is that the Final Rule and Schedule Policy/Career violate the CSRA. *See* Am. Compl. ¶¶ 161–68 (Count I, APA Claim for exceeding authority under CSRA), *id.* ¶¶ 169–74 (Count II, ultra vires in violation of CSRA), *id.* ¶¶ 175–81 (Count III, separation of powers issue as to Congress's enactment of CSRA). It is well established that an employee may challenge an employment action as conflicting with a federal rule, guidance, or statute within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("*FLEOA*"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance and rules through the MSPB system). The same is true for constitutional challenges to employment actions taken, such as Plaintiffs' claims in Count III, *see* Am. Compl. ¶¶ 175–81, that the implementation of Schedule Policy/Career violates the separation of powers, and their claims involving due process allegations in Counts V and VI, *see id.* ¶¶ 189–202. *See Elgin*, 567 U.S. at 16–17 ("That issue, . . . could be meaningfully addressed in the Court of Appeals that Congress had authorized to conduct judicial review." (citation omitted)).

In fact, the Federal Circuit has specifically considered, on appeal from the MSPB, whether a position was validly designated as "confidential, policy-determining, policy-making, or policy-advocating [in] character." *Stanley v. Dep't of Just.*, 423 F.3d 1271, 1273 (Fed. Cir. 2005). And the administrative law claims in Counts I (inconsistent with CSRA), IV (arbitrary and capricious), and V (contrary to constitutional due process), and ultra vires claims in Counts II (conflict with CSRA) and VI (alleged violations of constitutional due process) fall comfortably within the court's authority to "review the record and hold unlawful and set aside any agency action, findings, or conclusions" that are "obtained without procedures required by law, rule, or regulation having been followed" or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 7703(c)(1), (2); Am. Compl. ¶¶ 161–68 (Count I), *id.* ¶¶ 169–74 (Count II), *id.* ¶¶ 182–88 (Count IV), *id.* ¶¶ 189–97 (Count V), *id.* ¶¶ 198–202 (Count

VI). And as explained below, *see infra* at 30–32, Plaintiffs' separation of powers claims in Count III, *see* Am. Compl. ¶¶ 175–81, are intimately intertwined with their claims about alleged violations of the CSRA. In sum, there are certain methods, for certain parties, to obtain certain relief on these very topics.

That separate, non-employee groups, like these Plaintiff organizations, may not be included in these pathways is no issue. "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong." *Sackett v. EPA*, 566 U.S. 120, 130 (2012); *see Block*, 467 U.S. at 346–47 (similar). Indeed, "[w]ere [the Court] to hold otherwise, a union local could circumvent the CSRA's strictures by requesting that a national union file general APA claims outside the CSRA on its behalf." *See Air Force*, 716 F.3d at 639. And it would be natural for Congress to preclude those not directly involved in the federal employment relationship—whether they be nonaffiliated third-party entities, advocacy organizations with current federal employees as members, or unions—from filing a separate attack on employment policies. And "[n]othing about the fact that plaintiffs' action is a systemic challenge to [personnel] policy mitigates" this preclusion. *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (Roberts, J.) (holding an APA challenge asserted against an OPM policy precluded). Plaintiffs cannot evade administrative channeling here simply "because it is not their preferred remedial path." *New York v. Trump*, 181 F.4th 132, 141 (D.C. Cir. 2026).

As to the second *Thunder Basin* factor, the asserted claims are not wholly collateral to the CSRA's system of review. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.*

Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* Instead, the plaintiffs claimed that the insulation of certain administrative law judges from removal violated the separation of powers. *Id.* at 182–83. Because the plaintiffs brought structural constitutional challenges alleging they were "subject[] to an illegitimate proceeding, led by an illegitimate decisionmaker," *id.* at 191, the Court determined that the second *Thunder Basin* factor pointed toward allowing district court review, *id.* at 192–93.

No such separation between the subject matter of Defendants' actions and Plaintiffs' claims exists here. All of Plaintiffs' claims here revolve around whether Defendants' actions in issuing the Final Rule and implementing Schedule Policy/Career violate the CSRA, the APA, or the Due Process Clause, and as a result, none is collateral to the CSRA's system of administrative review of employment claims. Even resolution of Plaintiffs' separation of powers claims in Count III rests on whether the Final Rule and implementation of Schedule Policy/Career were lawful exercises of executive authority under the CSRA. *See* Am. Compl. ¶¶ 176, 179; *cf. Axon*, 598 U.S. at 191.

When making a claim that is collateral to a second claim in litigation, a litigant does not rely on the merits of his arguments as to the second claim. For example, in the criminal context, a defendant's claim that the indictment should be dismissed on double jeopardy grounds is collateral to and does not rely on the defendant's claims about his guilt or innocence. As the Supreme Court has explained, "[i]n arguing that the Double Jeopardy Clause of the Fifth Amendment bars his prosecution, the defendant makes no challenge whatsoever to the merits of the charge against him. Nor does he seek suppression of evidence which the Government plans to use in obtaining a conviction. . . . Rather, he is contesting the very authority of the Government to hale him into court to face trial on the charge against him. . . . The elements of that claim are completely independent of his guilt or innocence." *Abney v. United States*, 431 U.S. 651, 659–60 (1977) (internal citations removed). There is no such separation between Plaintiffs' claims that Defendants violated the CSRA and APA in implementing Schedule Policy/Career on the one hand, *see* Am. Compl. ¶¶ 161–74, 182–97, and their separation of powers claims in Count III, *see id.* ¶¶ 175–81, on the other hand.

In fact, once Plaintiffs' statutory claims are resolved, their separation of powers claims follow as a matter of course. That is because Plaintiffs' constitutional theory in Count III is that "Defendants' assertion of executive authority to override Congress' constitutional authority to establish and set rules for the federal civil service violates the separation of powers." *Id.* ¶ 179. The only congressionally established "rules for the federal civil service," *see id.*, that are at issue here are contained in the CSRA. *See id.* ¶ 176. But the assessment of whether Defendants have exceeded their authority to "override" the CSRA is really the same statutory claim addressed in Plaintiffs' other counts—not a separation-of-powers claim—and one that lacks any cause of action under recent D.C. Circuit precedent.

Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472. Rather, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The D.C. Circuit recently reaffirmed that principle. *See Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir.) ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."), *reh'g en banc denied*, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). So reframing their statutory-authority claim as a constitutional one does not cause Count III to fall out of the administrative scheme, and thus gets Plaintiffs no closer to relief. A claim that is truly collateral to their challenge to the validity of the Final Rule under the CSRA would not depend on the argument that the Final Rule is not a lawful use of executive authority under the CSRA. *Cf. Abney*, 431 U.S. at 659. Their separation of powers claim in Count III fails that test and is not collateral to the CSRA's administrative scheme.

As noted *supra* at 28–29, questions about whether an employment action conflicts with statute, or violates due process can be resolved through the administrative scheme. Plaintiffs' claims seek to challenge Defendants' actions as conflicting with the substantive requirements of reclassification; due process requirements for employment relationships; and whether the challenge actions violate the CSRA. But the OSC and MSPB are well versed in these questions

too, including the particulars of classification and the interplay of federal employment authorities. Plaintiffs' claims thus lie at the heart of the CSRA and are not collateral to its administrative scheme. *Accord New York*, 181 F.4th at 141 (states' claim did not involve a structural constitutional issue that would normally be resolved by courts, and "fit[] squarely within the statutory review scheme"). In fact, Plaintiffs seek the very relief that the MSPB may supply, and in the context Congress specified: invalidation of an OPM regulation, or of its implementation, insofar as it requires prohibited personnel practices. *See* 5 U.S.C. § 1204(f)(2)–(3). Accordingly, the second *Thunder Basin* factor weighs against district court review.

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. The OSC and MSPB specialize in prohibited personnel practices, merit-system principles, adverse actions, and civil-service implementation—exactly the kinds of issues that some future plaintiff might seek to raise as to Schedule Policy/Career. And Plaintiffs' constitutional labels do not change the analysis. Indeed, *Elgin* directly addresses the point. As the Court noted: "preliminary questions unique to the employment context" include fact questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the agency these "threshold questions" may "alleviate [the other] concerns." *See id.* Moreover, "at *Thunder Basin* step two, the presumption is that a statutory review scheme is exclusive with respect to claims within its scope," *New York*, 181 F.4th at 142, and nothing about Plaintiffs' claims suggests that presumption should not apply here.

* * *

So all the guideposts indicate Congress's intent to preclude these kinds of claims from district court review. Instead, they are channeled through the CSRA. If the Court has any lingering questions because *these* Plaintiffs may be unable to challenge these particular claims in this type of way, it should be unbothered. Congress may not have provided certain parties, removed from the employment relationship, a pathway to challenge certain employment and labor policies.

Indeed, several district courts have recently examined challenges to the legality of new employment policies by the Executive Branch and have consistently rejected them under the *Thunder Basin* inquiry. This includes, for example, a broad APA challenge to the legality of the policies underpinning the "Deferred Resignation Program." *See Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025), *appeal docketed*, 25-1959 (1st Cir. Oct. 15, 2025); *see also Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 5 (D.D.C. 2025) (finding implied preclusion for "constitutional and statutory challenges to the firing of probationary employees, the deferred resignation program, and [an] Executive Order"); *Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 20–24 (D.D.C. 2025) (same for "alleged unlawful dismantling of USAID" because "the alleged injuries on which plaintiffs rel[ied] in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID" (cleaned up)). It is true that some district courts have permitted non-employee plaintiffs to bring suit despite the CSRA's claim channeling, but these cases are distinguishable.

First, in *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM* ("*AFGE v. OPM*"), a group of public-sector unions and private organizations argued that OPM had no authority to direct federal agencies to terminate certain federal probationary employees. *See* 771 F. Supp. 3d 1127, 1131 (N.D. Cal.), *appeal filed*, No. 25-5875 (9th Cir. Sep. 18, 2025). The court granted a preliminary injunction, *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 770 F. Supp. 3d 1215 (N.D. Cal. 2025), which the Supreme Court stayed pending resolution of the government's appeal, *OPM v. Am. Fed'n of Gov't Emps.*, 145 S.Ct. 1914 (2025). In *AFGE v. OPM*, the district court eventually determined that the *Thunder Basin* factors weighed against preclusion of the unions' claims because (i) the general claims about the limits of OPM's authority were outside the MSPB's and FLRA's respective expertise; (ii) the structural constitutional claims were wholly collateral; and (iii) the OPM Acting Director had stated that the terminations of probationary employees were "unreviewable through the MSPB," and had no prospect of review through the FLRA. *Id.* at 1132–

34. Though similarly styled as a separation of powers claim, for the reasons explained *supra* at 30–32, this reasoning does not apply to Plaintiffs' Count III, let alone to any of their other claims.

In a similar case, the district court granted a preliminary injunction requiring the Government, *inter alia*, to reinstate the probationary employees that resided or worked in the plaintiff states. *Maryland v. USDA* ("*USDA*"), 777 F. Supp. 3d 432, 494 (D. Md. 2025). However, that injunction was subsequently stayed by the Fourth Circuit, *see* Order at 4, ECF No. 42, filed in *USDA*, No. 25-1248 (4th Cir. Apr. 9, 2025), and the matter was eventually dismissed for lack of a cognizable and redressable injury, *see* Order at 15, ECF No. 98, filed in *USDA*, No. 25-1248 (4th Cir. Sept. 8, 2025). Ultimately, both district courts in *AFGE v. OPM* and *USDA* rejected channeling arguments partly under the mistaken impression that a party not included in an exclusive statutory scheme must be able to avoid it. *See USDA*, 777 F. Supp. 3d at 462–63; *AFGE v. OPM*, 771 F. Supp. 3d at 1135. But that premise is incorrect.

As then-Judge Roberts explained for the D.C. Circuit in *Graham*, the CSRA in some circumstances will properly provide a plaintiff "no relief and preclude[] other avenues of relief." 358 F.3d at 935. There, for example, the aggrieved employee lacked any recourse for an alleged failure of the agency to follow its own regulations. *Id.* And Judge Tatel similarly explained in *Filebark* that the CSRA precluded "use [of] the APA to litigate [a] pay dispute with the Federal Aviation Administration" even though "the CSRA provide[d plaintiffs] no protection." 555 F.3d at 1010. This is not a bug of the CSRA. It is a feature. "[W]e treat the CSRA and Congress's related employment statutes as covering the field of federal employee claims, and so our cases expressly teach that *those left out of this scheme are left out on purpose*." *Id.* at 1014 (emphasis added); *accord Air Force*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts[] . . . [it] may not raise the claim at all.").

The APA confirms this channeling. Section 704 authorizes review of agency action made reviewable by statute and of final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Congress addressed the relevant agency action through a specific structure—MSPB regulation review of OPM rules issued under § 1103, *see* 5 U.S.C. § 1204(a)(4),

(f), followed, where available, by § 7703 review. Plaintiffs cannot invoke the APA to replace that scheme with immediate district-court litigation.

*FLEOA* is directly instructive. There, the D.C. Circuit held that a group could not avoid the CSRA review path by styling a systemwide challenge to OPM policy as an APA suit, explaining that the APA may not be used to bypass the civil-service remedial regime for claims of the type Congress intended to be reviewed within the scheme. *See FLEOA*, 2 F.4th at 559–64. The same is true here: Plaintiffs challenge OPM civil-service regulations and the asserted loss of civil-service protections—matters Congress assigned to the CSRA's administrative and judicial-review channels. *Elgin* reinforces the point, holding the CSRA scheme exclusive even for many constitutional challenges and emphasizing the statute's comprehensive design and the primacy of MSPB and Federal Circuit review. 567 U.S. at 10–23. And *Fausto* holds that the CSRA's comprehensive structure can preclude alternative judicial review where Congress withheld or limited review for particular matters. 484 U.S. at 448–55.

For these reasons, Plaintiffs claims are precluded by the CSRA, and should be dismissed. *See Thunder Basin*, 510 U.S. at 207, 212, 218.

## III. ALL CLAIMS AGAINST THE PRESIDENT, AND ALL CLAIMS RELATING TO THE PRESIDENT'S EXERCISE OF HIS STATUTORY DISCRETION, SHOULD BE DISMISSED.

Even if Plaintiffs could overcome every other jurisdictional problem in this case, at a minimum, this Court should dismiss (1) all claims against the President of the United States (and thus dismiss the President as a defendant), as well as (2) all claims (and requests for relief) as to the President's exercise of his statutory discretion (including claims against the other Defendants). For example, to the extent that any of Plaintiffs' counts are based on the President's issuance of E.O. 14410 to identify positions to place into the new Schedule Policy/Career, those counts fail for lack of jurisdiction. Similarly, there is no jurisdiction to support the relief that Plaintiffs request

as to the President's exercise of his discretion in E.O. 14410, *see* Am. Compl., Prayer for Relief at (e)–(f).[5]

This result follows directly from binding precedent. Although courts often review agency implementation of Executive Orders relating to the exercise of authority vested by Congress in a subordinate agency official, this case presents a different fact pattern: statutory authority that Congress authorized *the President* to directly exercise himself. And "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton*, 511 U.S. at 477.

### A. None of the relief that Plaintiffs seek is available against the President, so he should be dismissed as a Defendant in this case.

First, Plaintiffs cannot sue the President under the APA because "the President is not an agency within the meaning of the" APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) ("[B]ecause 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework.") (quoting *Franklin*, 505 U.S. at 796).

Second, the Court's equitable authorities are likewise unavailable as applied to the President. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And at least outside of the narrow context of principal officer removal challenges, *see Trump v. Cook*, 609 U.S. ---, 146 S. Ct. 2234 (2026), there is no tradition of equitable relief against the President. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13

[5] Defendants bring this argument under Federal Rule of Civil Procedure 12(b)(1). If necessary, however, if the Court concludes that this argument is not jurisdictional, Defendants alternatively advance the same argument under Federal Rule of Civil Procedure 12(b)(6).

(D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' . . . This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (citations omitted)).

To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866). The Supreme Court reaffirmed that principle in *Franklin*, in declining to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." 505 U.S. at 800-01. That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive "relief are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). And the narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court can compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). But the acts of the President here are not "ministerial."

Third, Plaintiffs' (mostly unexplained) references to the Declaratory Judgment Act likewise cannot warrant issuance of a declaration in lieu of an injunction. The D.C. Circuit has observed that courts "have never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827-28 (Scalia, J., concurring in part and concurring in the judgment). Declaratory relief is therefore unavailable for essentially the same reasons as an injunction.

Because none of the relief that Plaintiffs request here would properly run against the President, he should be dismissed as a Defendant. *See, e.g.*, *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018) ("Given that the Court will not grant Plaintiffs the relief that they seek against the President himself, the President should be dismissed.").

**B. The President's exercise of his own statutory discretion is not reviewable.**

The arguments above will be familiar to this Court. Even in the absence of direct relief against the President, courts often exercise judicial review of actions by *subordinate* agency officials, exercising *their* congressionally delegated authority—including where the President has directed the exercise of that authority, such as by Executive Order. *See, e.g.*, *Glob. Health Council v. Trump*, 153 F.4th at 17 n.14 ("Presidential action may be reviewed through APA challenges to final agency action by subordinates implementing the President's directives where such review is not otherwise precluded.").

This case is different, though, because it is (at least in substantial part) about statutory discretion that Congress authorized *the President himself* to exercise directly. Accordingly, in addition to dismissing all claims against the President (and thus dismissing the President as a Defendant), the Court should also dismiss *all* claims relating to the President's exercise of his own statutory discretion—that is, all claims (and requests for relief) relating to Executive Order No. 14410, including claims against the other Defendants. That result follows directly from the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994).

In *Dalton*, the plaintiffs "sought to enjoin the Secretary of Defense . . . from carrying out a decision by the President to close the Philadelphia Naval Shipyard." *Id.* at 464. The plaintiffs argued that the Secretary of Defense and others had violated the statutory requirements for recommending such closures to the President, and also that the President himself had violated statutory constraints in *accepting* those allegedly unlawful recommendations. *See id.* at 466; *id.* at 468 (explaining that the Court of Appeals had "adjudg[ed] the President's actions for compliance with the 1990 Act"); *id.* at 474 ("The President is said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations.").

The Supreme Court squarely held that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [this Court's] review." *Id.* at 476. And so, after *Dalton*, it is settled that "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477.

That holding controls here, at least with respect to all claims relating to the President's exercise of his own statutory discretion—that is, all claims relating to Executive Order No. 14410. Congress authorized the President to "prescribe rules governing the competitive service." 5 U.S.C. § 3302. And it likewise explicitly authorized the President to provide for "necessary *exceptions* of positions from the competitive service." *Id.* § 3302(1) (emphasis added). And were there any doubt, 5 U.S.C. § 7511(b)(2)(A), explicitly states that certain civil-service protections "do[] not apply to an employee . . . whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by . . . the President for a position that the President has excepted from the competitive service." Those are the very authorities invoked by the President in Executive Order 14,410. *See* E.O. 14,410 ("By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 3301, 3302, 5595 and 7511 of title 5, United States Code, it is hereby ordered. . . .").

Nor can Plaintiffs challenge the President's exercise of his own statutory discretion indirectly through claims against OPM. At least with respect to the President's policy decisions that are reflected in Executive Order 14,410, OPM's role is simply to effectuate those Presidential

decisions. And where, as here, an agency is carrying out "action on behalf of the President, involving discretionary authority committed to the President," that action is equally "'presidential' and unreviewable under the APA." *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402-03 (D. Md. 2011) (similar), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) (similar, as to action by the Forest Service "carrying out directives of the President"), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).

In sum, under *Dalton* and its progeny, "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [this Court's] review." 511 U.S. at 476. That is fatal to all of Plaintiffs' claims (against any Defendants) relating to the President's discretionary decisions in Executive Order 14410 as to which employees should be "except[ed] . . . from the competitive service," 5 U.S.C. § 3302(1), because their "position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by . . . the President," *id.* § 7511(b)(2)(A).

### C. Plaintiffs cannot evade these limitations by bringing an ultra vires claim.

Plaintiffs cannot evade these limitations on review by invoking the ultra vires doctrine. An ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). "Only error that is patently a misconstruction of the [statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quoting *Fed. Express Corp. v. Dep't of Com.*, 39 F. 4th 756, 764 (D.C. Cir. 2022)). And "an agency violates a 'clear and mandatory' statutory command only when the error is 'so extreme that one may view it as jurisdictional or nearly so.'" *Id.* (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Even then, "[u]ltra vires review is also

unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review." *NRC*, 605 U.S. at 681.

Plaintiffs point to nothing close to a statutory violation of that sort here. Instead, they offer no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim. *Id.* at 682. In any event, this form of statutory "ultra vires review is not available because" Plaintiffs also have "an alternative path to judicial review" through administrative channels. *Id.*; *see supra* at 27–29 (discussing available forms of review).

Nor can Plaintiffs repackage alleged statutory violations as constitutional claims to evade these limits on ultra vires review. As discussed above, *see supra* at 31 (discussing Plaintiffs' allegations as to separation of powers), and as *Dalton* itself confirms, the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472 (collecting cases); *accord Glob. Health Council*, 153 F.4th at 16 ("*Armstrong* as well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review."). That principle is likewise fatal to any ultra vires claim here.

## IV. DEFENDANTS SHOULD NOT BE REQUIRED TO PRODUCE AN ADMINISTRATIVE RECORD IN CONNECTION WITH THIS MOTION.

Local Civil Rule 7(n) that in "cases involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first." On its face, Rule 7(n) appears to impose this requirement on all dispositive motions, even for a motion to dismiss under Federal Rule of Civil Procedure 12(b) for lack of jurisdiction that does not rely on the record—such as this Motion. However, Rule 7(n) also indicates that it is designed to aid in the decision of a dispositive motion that relies on an administrative record. *See* LCvR 7(n)(1) (requiring an appendix for "those portions of the administrative record that are cited or otherwise relied upon"). Because this Motion does not cite to or otherwise rely on the administrative record,

Rule 7(n) should not apply at this juncture, and in any event, the Court should waive any applicable requirement under Rule 7(n) under these circumstances, as courts in this district routinely do when the administrative record is unnecessary to decide the motion. *See, e.g., Desai v. U.S. Citizenship & Immigr. Servs.*, 2021 WL 1110737, at *5 n.7 (D.D.C. Mar. 22, 2021) ("Consistent with other courts in this jurisdiction, the Court shall grant the Government's motion to waive compliance with Local Civil Rule 7(n)'s requirement that the agency submit an index of the administrative record." ); *Nohria v. Renaud*, 2021 WL 950511, at *4 n.3 (D.D.C. Mar. 14, 2021) ("[f]ollowing the practice of other courts in this jurisdiction" and "waiv[ing] compliance with Local Civil Rule 7(n) because 'the administrative record is not necessary for [the court's] decision'" (citations omitted)); *Akbar v. Cuccinelli*, 2020 WL 1287817, at *4 (D.D.C. Mar. 18, 2020) (waiving the requirements of Local Rule 7(n) because there "no need for the full administrative record" where the court granted a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1)); *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) ("[T]he Court grants Federal Defendants' motion to waive compliance with Local Civil Rule 7(n) because the Court need not consider the administrative record in evaluating the motions before it," which included a motion to dismiss); *Mdewakanton Sioux Indians of Minnesota v. Zinke*, 264 F. Supp. 3d 116, 123 n.12 (D.D.C. 2017) ("[C]onstruing Defendants' motion to dismiss as incorporating a motion to waive compliance with Local Civil Rule 7(n), the Court grants the motion because the administrative record is not necessary for its decision here." (citation removed)). This Court should do the same.

**CONCLUSION**

This case should be dismissed, in its entirety, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

Dated: August 24, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
D.C. Bar No. 995500
Chief Litigation Counsel
KEVIN K. BELL
GA Bar No. 967210
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-3240
E-mail: stephen.pezzi@usdoj.gov

*Counsel for the United States*