**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GOVERNMENT ACCOUNTABILITY PROJECT, *et al.*,

Plaintiffs,

v.

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,

Defendants.

Civil Action No. 1:25-cv-00347-PLF

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. The CSRA's Balanced Approach to Structuring the Federal Civil Service ..... 3

B. The President's Attempts to Dismantle Congress's Structure and Defy Statutory Restrictions ..... 9

ARGUMENT ..... 14

I. Plaintiffs Have Standing ..... 14

A. NARFE Has Associational Standing ..... 14

B. NARFE Has Organizational Standing ..... 17

A. GAP Has Organizational Standing ..... 18

1. Impact to Core Business Activities ..... 19

2. Diversion of Resources ..... 23

II. The Court Has Jurisdiction over Plaintiffs' Claims Under *Thunder Basin* ..... 25

A. Precluding Jurisdiction Here Would Foreclose Judicial Review ..... 26

B. Plaintiffs' Claims Are Wholly Collateral to the MSPB's Review Scheme ..... 30

C. The MSPB Has No Specialized Expertise over Plaintiffs' Claims ..... 33

D. The CSRA Does Not Remove Judicial Review of Plaintiffs' Claims ..... 34

III. The Court Has Inherent Equitable Power to Enjoin the Executive Orders (and Agency Action Implementing Them) as *Ultra Vires* ..... 35

A. The President's Actions Are Subject to Review and Relief Under the Traditional Standard for *Ultra Vires* Review ..... 36

B. The 2026 EO and Its Implementation Are Reviewable ..... 39

C. Plaintiffs' Separation of Powers Claim Properly Challenges Defendants' Assertion of Constitutional Authority for Their Actions ..... 42

CONCLUSION ..... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramowitz v. Lake*,
803 F. Supp. 3d 1 (D.D.C. 2025),
*appeal filed* Sep. 3, 2025 ........ 33

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agriculture*,
946 F.3d 615 (D.C. Cir. 2020) ........ 24

*Am. Ass'n of Nurse Practitioners v. McMahon*,
836 F. Supp. 3d 175 (D.D.C. 2026) ........ 17

*Am. Ass'n of Physics Tchrs., Inc. v. Nat'l Sci. Found.*,
804 F. Supp. 3d 45 (D.D.C. 2025) ........ 45

*Am. Fed'n of Gov't Emps., v. Nicholson*,
475 F.3d 341 (D.C. Cir. 2007) ........ 28

*Am. Fed'n of Gov't Emps. v. Trump*,
139 F.4th 1020 (9th Cir. 2025) ........ 26, 30, 33

*Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*,
835 F. Supp. 3d 191 (D.D.C. 2025) ........ 23, 30

*Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. Dep't of Lab.*,
778 F. Supp. 3d 56 (D.D.C. 2025) ........ 15

*Am. Foreign Serv. Ass'n v. Trump*,
783 F. Supp. 3d 248 (D.D.C. 2025),
*stay granted on other grounds*, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ........ 28

*Am. Hist. Ass'n v. Trump*,
835 F. Supp. 3d 1 (D.D.C. 2026) ........ 44

*Am. School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ........ 36, 37, 38

*American Federation of Government Employees v. Secretary of Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ........ 28, 32

*American Federation of Government Employees v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ........ 28, 29

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
801 F. Supp. 2d 383 (D. Md. 2011),
*aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012) .......... 42

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 36

*Armstrong v. Reynolds*,
22 F.4th 1058 (9th Cir. 2022) .......... 16

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
598 U.S. 175 (2023) .......... *passim*

*Bakken v. U.S. Military Academy*,
833 F. Supp. 3d 460 (S.D.N.Y. 2026) .......... 30, 32, 33

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .......... 38

*Beckwith v. County of Clark*,
827 F.2d 595 (9th Cir. 1987) .......... 16

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .......... 35

*Brighton Park Neighborhood Council v. McMahon*,
2026 WL 1707623 (D.D.C. June 12, 2026) .......... 16

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 43

*Carr v. Saul*,
593 U.S. 83 (2021) .......... 34

*Chadwell v. Merit Sys. Prot. Bd.*,
629 F.3d 1306 (Fed. Cir. 2010) .......... 28

*Chamber of Com. of the U.S. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) .......... 14

*Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec.*,
815 F. Supp. 3d 73 (D.D.C. 2025),
*appeal pending*, No. 25-5473 (D.C. Cir.) .......... 41

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .......... 39

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................ 23

*Comans v. Exec. Off. of the President*,
No. 1:25-cv-01237 (E.D. Va. July 21, 2026), ECF 64 ........................................... 45

*Comm. on Judiciary of United States House of Representatives v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020)............................................................................... 5

*Cook v. Trump*,
2025 WL 2654786 (D.C. Cir. Sep. 15, 2025)......................................................... 39

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*,
2026 WL 1480903 (D.D.C. May 27, 2026)............................................................ 45

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009)............................................................................. 15

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015)............................................................................. 15

*Ctr. for Taxpayer Rts. v. I.R.S.*,
2026 WL 2635380 (D.C. Cir. Sep. 8, 2026)...................................... 19, 22, 23, 24

*Ctr. for Taxpayer Rts. v. I.R.S.*,
815 F. Supp. 3d 1 (D.D.C. 2025),
*aff'd* 2026 WL 2635380 (D.C. Cir. Sep. 8, 2026) ...................................... 20, 21, 24

*Dalton v. Specter*,
511 U.S. 462 (1994) ................................................................... 39, 40, 41, 42

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................................ 22

*Detroit Int'l Bridge Co. v. Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016),
*aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir. 2017),
*op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018) ......................... 40, 42

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) ........................................................................................ 22

*E.Q. v. DHS*,
2026 WL 946181 (D.D.C. Apr. 8, 2026)....................................................... 21, 23

*Earthworks v. U.S. Dep't of the Interior*,
496 F. Supp. 3d 472 (D.D.C. 2020),
*aff'd*, 105 F.4th 449 (D.C. Cir. 2024)................................................................. 22

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ....................25, 29, 30, 34

*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024)....................15, 26, 35

*Fed. Educ. Ass'n v. Trump*,
2025 WL 2738626 (D.C. Cir. Sep. 25, 2025)....................29

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025),
*stay denied*, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025)....................28

*Federal Law Enforcement Officers Association v. Ahuja*,
62 F.4th 551 (D.C. Cir. 2023)....................32

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023),
*cert. granted, and judgment vacated as moot*, 144 S. Ct. 480 (2023)....................35

*Filebark v. U.S. Dep't of Transp.*,
555 F.3d 1009 (D.C. Cir. 2009)....................25, 35

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) ....................16

*Food & Drug Admin. v. All. For Hippocratic Med.*,
602 U.S. 367 (2024) ....................20, 24

*Frazier v. Merit Sys. Prot. Bd.*,
672 F.2d 150 (D.C. Cir. 1982)....................22

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
561 U.S. 477 (2010) ....................31, 45

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025)....................44

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ....................20, 25

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Brock*,
477 U.S. 274 (1986) ....................15

*Kingdom v. Trump*,
2025 WL 1568238 (D.D.C. June 3, 2025)....................42

*Kyne. Chamber of Com. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)....................38, 40

*Lamb v. Holder*,
82 F. Supp. 3d 416 (D.D.C. 2015)....................30

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949)....................36

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025),
*aff'd*, 2026 WL 1991571 (D.C. Cir. July 2, 2026)....................21, 44

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025),
*aff'd* 2026 WL 1991571 (D.C. Cir. July 2, 2026)....................15

*League of Women Voters of Mass. v. Trump*,
2026 WL 2620871 (D. Mass. Sep. 4, 2026)....................38

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................19

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026)....................38

*Leedom v. Kyne*,
358 U.S. 184 (1958)....................37, 38, 39

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................39

*Lucas v. Am. Fed'n of Gov't Emps.*,
151 F.4th 370 (D.C. Cir. 2025)....................26, 30

*Manivannan v. U.S. Dep't of Energy*,
42 F.4th 163 (3d Cir. 2022)....................26, 35

*McGrain v. Daugherty*,
273 U.S. 135 (1927)....................4

*Morrison v. Olson*,
487 U.S. 654 (1988)....................45

*Myers v. United States*,
272 U.S. 52 (1926)....................43

*Nat'l Ass'n of Immigr. Judges v. Owen*,
139 F.4th 293 (4th Cir. 2025),
*rev'd on other grounds sub nom. Margolin v. Nat'l Ass'n of Immigr. Judges*,
608 U.S. 339 (2026) ....................26

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026)....................39

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
821 F. Supp. 3d 62 (D.D.C. 2026)....................45

*Nat'l Treasury Emps Union v. I.R.S.*,
2006 WL 416161 (D.D.C. Feb. 22, 2006)....................18

*Nat'l Treasury Emps. Union v. Trump*,
780 F. Supp. 3d 237 (D.D.C. 2025),
*stay granted on other grounds*, 2025 WL 1441563 (D.C. Cir. May 16, 2025)....................28

*Nuclear Regulatory Comm'n v. Texas*,
605 U.S. 665 (2025) ....................37, 38, 39

*O'Brien v. Off. of Indep. Couns.*,
74 M.S.P.R. 192 (1997)....................9

*Oregon Env't Council v. I.R.S.*,
836 F. Supp. 3d 1 (D.D.C. 2026)....................22

*People for the Ethical Treatment of Animals v. Stein*,
466 F. Supp. 3d 547 (M.D.N.C. 2020)....................22

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015)....................23

*Peterson v. Atlanta Hous. Auth.*,
998 F.2d 904 (11th Cir. 1993)....................16

*Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*,
573 F. Supp. 3d 324 (D.D.C. 2021)....................17

*Rural Dev. Innovations Ltd. v. Marocco*,
2026 WL 710260 (D.D.C. Mar. 13, 2026)....................45

*Sackett v. Environmental Protection Agency*,
566 U.S. 120 (2012) ....................32

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002)....................14, 17

*Special Counsel v. Peace Corps*,
31 M.S.P.R. 225 (1986) ........ 9, 40

*State Nat'l Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015) ........ 16

*State v. Su*,
121 F.4th 1 (9th Cir. 2024) ........ 42

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ........ *passim*

*Trump v. Cook*,
2026 WL 1855613 (U.S. June 29, 2026) ........ 36, 38, 39, 44

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ........ 4

*Trump v. Slaughter*,
609 U.S. 422 (2026) ........ 26, 44, 45

*Tulare Cnty. v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001),
*aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002) ........ 40, 41, 42

*United States v. Fausto*,
484 U.S. 439 (1988) ........ 4, 29

*United States v. Garde*,
673 F. Supp. 604 (D.D.C. 1987) ........ 22

*United States v. Perkins*,
116 U.S. 483 (1886) ........ 43, 45

*Webster v. Doe*,
486 U.S. 592 (1988) ........ 35, 43

*Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) ........ 20, 23

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.D.C. 2025) ........ 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........ 36, 45

**Statutes**

5 U.S.C. ........ 4

5 U.S.C. § 1105 ........ 10

5 U.S.C. § 1201 ........ 25

5 U.S.C. § 1202 ........ 25

5 U.S.C. § 1221 ........ 4, 27

5 U.S.C. § 2101a........ 5

5 U.S.C. § 2102 ........ 5

5 U.S.C. § 2103 ........ 5

5 U.S.C. § 2302 ........ *passim*

5 U.S.C. § 3302 ........ 5, 9, 39, 40

5 U.S.C. § 4303 ........ 27

5 U.S.C. § 5596 ........ 19

5 U.S.C. § 7511 ........ *passim*

5 U.S.C. § 7512 ........ *passim*

5 U.S.C. § 7513 ........ 4, 27

5 U.S.C. § 7701 ........ 19, 25, 27

5 U.S.C. § 9803 ........ 9

6 U.S.C. § 349 ........ 9

7 U.S.C. § 6992 ........ 9

28 U.S.C. § 1331 ........ 25, 35

38 U.S.C. § 725 ........ 9

5.U.S.C. § 3132 ........ 5

**Rules and Regulations**

5 C.F.R. § 6.2........ 5

5 C.F.R. § 210.102 (2024)........ 10

5 C.F.R. § 213.3102........ 40

5 C.F.R. § 302 .......... 10, 11, 27

Fed. R. Civ. P. 12 .......... 23, 36

**Constitutional Provisions**

United States Constitution Article II .......... 41, 43, 44, 45

**Other Authorities**

85 Fed. Reg. 67631 (Oct. 26, 2020) .......... 9, 10, 11

86 Fed. Reg. 7231 (Jan. 27, 2021) .......... 10

89 Fed. Reg. 24982 (Apr. 9, 2024) .......... 10, 12, 18

90 Fed. Reg. 17,182 (Apr. 23, 2025) .......... 12

90 Fed. Reg. 8625 (Jan. 31, 2025) .......... 11, 12

91 Fed. Reg. 5580 (Feb. 2, 2026) .......... *passim*

91 Fed. Reg. 34893 (June 10, 2026) .......... 12, 13

1 The Congressional Register 347 (Thomas Lloyd ed., 1789) (statement of Rep. Elias Boudinot), https://tinyurl.com/4f492amp; .......... 3

Amendment of Civil Service Rule VI, Exec. Order No. 10440 (Mar. 31, 1953) .......... 6

An Act for Establishing an Executive Department, to be Denominated the Department of Foreign Affairs, 1 Stat. 28 ch. 4 (1789) .......... 3

An Act to Establish an Executive Department, to be Denominated the Department of War, 1 Stat. 49 (1789) .......... 3

An Act to Establish the Treasury Department, 1 Stat. 65 Department, ch. 12 (1789) .......... 3

Civil Service Amendments of 1976: Hearings on H.R. 12080 Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Off. and Civil Serv., 94th Cong. 7 (1976) (statement of Robert E. Hampton, Chairman, Civil Serv. Comm'n) .......... 7

Civil Serv. Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461 (1990) .......... 4

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 .......... *passim*

*Deferred Resignation Email to Federal Employees*, OPM (Jan. 28, 2025), https://www.opm.gov/about-us/fork/original-email-to-employees/ .......... 14

Defs.' Combined Reply in Supp. of Their Mots. to Dismiss the *Doe* & *Garman* Compls, *Doe 1 v. Patel*, No. 1:26-cv-00959 (D.D.C. Aug. 18, 2026), ECF 38 ....................43

Defs.' Resp. to Ct.'s Aug. 18, 2026, Minute Ord. Regarding Pls.' Notices of Suppl. Auth., *Gordon v. Exec. Off. of the President*, No. 1:25-cv-02409 (D.D.C. Sep. 15, 2026), ECF 30 ....................43

Defs.' Suppl. Br. in Supp. of R. 12(b)(1) Mot. to Dismiss for Lack of Juris., *Comans v. Exec. Off. of the President*, No. 1:25-cv-01237 (E.D. Va. Apr. 7, 2026), ECF 41 ....................43

Eli Coustan, *Undermining independence and eroding transparency: Examining Schedule Policy/Career reclassifications,* Partnership for Public Service (Aug. 13, 2026), https://tinyurl.com/mpbzhfjn ....................13

Executive Order 14251 ....................27, 28

Extending the Competitive Classified Civil Service, Exec. Order No. 7916 (June 24, 1938) ....................6

*Fact Sheet: President Donald J. Trump Increases Accountability in the Federal Work Force*, The White House (June 3, 2026), https://tinyurl.com/225usdmn ....................13

The Federal Executive Service: Hearings on H.R. 3807 Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Off. and Civil Serv., 92d Cong. 13 (1972) (statement of Robert E. Hampton, Chairman, Civil Serv. Comm'n), https://tinyurl.com/yc49x8m3; ....................7

GAP (as part of Make It Safe Coalition), Comment Letter (June 6, 2025), https://www.regulations.gov/comment/OPM-2025-0004-31925 ....................12

H.R. Rep. No. 95-1207 (1978) ....................8

H.R. Rep. No. 101-328 ....................9

Lloyd-LaFollette Act, ch. 389, § 6, 37 Stat. 555 (1912) ....................3

Mem. of L. in Supp. of Defs.' Mot. for J. on the Pleadings, *Comey v. U.S. Dep't of Just.*, No. 1:25-cv-07625 (S.D.N.Y. June 5, 2026), ECF 68 ....................43

NARFE, Comment Letter (June 6, 2025), https://www.regulations.gov/comment/OPM-2025-0004-33033 ....................12

Oral Argument, *Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec.*, No. 25-5473 (D.C. Cir. argued Mar. 9, 2026), https://tinyurl.com/35udscfc ....................41

Pendleton Civil Service Act, ch. 27, 22 Stat. 403 (1883) ....................3

Postal Reorganization Act, Pub. L. No. 91-375, § 13(b)(2), 84 Stat. 719 (1970) ....................7

President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States, 7 (1937), https://tinyurl.com/y9neuwru .............................. 6

Press Release, U.S. Civil Serv. Comm'n (Aug. 25, 1955), https://tinyurl.com/295ttpfh .............................. 7

Pub. L. No. 95-454, tit. II, § 204(a), 92 Stat. 1111 (Oct. 13, 1978) .............................. 7

S. Rep. No. 74-1011 (1935) .............................. 35

S. Rep. No. 95-969, 48 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723 .............................. 8, 25

*Suppl. Br. for Applicant, Trump v. Cook*, 2025 WL 3284267 .............................. 39

U.S. Civil Serv. Comm'n, 70th Ann. Rep. (Nov. 16, 1953), https://tinyurl.com/5n994a7j .............................. 7

## PRELIMINARY STATEMENT

Defendants' creation and implementation of a new "Schedule Policy/Career" for the federal civil service ("Schedule P/C") strikes at a landmark statute at the heart of America's nonpartisan, professional civil service: the Civil Service Reform Act of 1978 ("CSRA"). Responding to the scandals of the Nixon administration and building on a longstanding historical tradition of explicit legislative control over the structure of the civil service, Congress sought to extend employment protections to career civil servants to ensure that they, unlike political appointees, could remain protected from demands that they place partisan loyalty before professional competence and judgment. In doing so, Congress codified a long-used term of art—positions of a "confidential, policy-determining, policy-making or policy-advocating character" (the "Exclusion Phrase"), 5 U.S.C. § 7511(b)(2)—in order to distinguish political appointees from career civil servants. For nearly a century preceding the events giving rise to this case—fifty years before and another fifty years after the passage of the CSRA—both Congress and the executive branch have consistently used the Exclusion Phrase exclusively for the purpose of distinguishing federal employees hired on the basis of political affiliation and subject to change with new presidential administrations from those nonpartisan, merit-based hires whose employment continues from one administration to the next.

Defendants have turned that long-held understanding of the Exclusion Phrase on its head, misusing powers Congress granted the President for purposes of control over political appointments to remove employment protections from an extraordinarily broad swath of civil servants in precisely the manner Congress meant to avoid. According to Defendants, the President may designate virtually any career position as one described by the Exclusion Phrase, thereby rendering any employee who holds that position terminable at-will and subject to retaliation for whistleblowing (among other lost protections). This new "interpretation" defies a century of settled constitutional principles governing the relationship between the legislative and executive branches. Although the government's challenged actions expressly invoked the constitutional

clash at the heart of this case, Defendants' motion to dismiss conspicuously avoids it.

Instead, the government raises jurisdictional arguments, all of which fail. *First*, Plaintiffs National Active and Retired Federal Employees Association ("NARFE") and the Government Accountability Project ("GAP") each have standing to bring these claims. NARFE submits sworn declarations from members whose tenured positions Defendants moved into Schedule P/C, stripping them of their protected property interests in their CSRA protections and chilling their speech. Schedule P/C will also shrink the pool of career federal employees from which NARFE draws its members and dues. As to GAP, removing whistleblower protections predictably deters federal employees from coming forward, impairing GAP's core work of representing whistleblowers and investigating misconduct and limiting GAP's ability to earn attorney's fees. Defendants' actions have already forced GAP to overhaul its client advice, intake, and educational resources. That is a concrete organizational injury, not advocacy spending.

*Second*, the CSRA does not preclude original district court judicial review of Plaintiffs' claims by channeling them to the Merit Systems Protection Board ("MSPB"). Every factor established by the Supreme Court's relevant test in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-16 (1994), favors jurisdiction in this Court. The MSPB is no longer the independent agency Congress intended. Moreover, Defendants have closed the very doors through which they seek to channel Plaintiffs' claims. Precluding this Court's jurisdiction would therefore foreclose all meaningful judicial review, a factor that is all but dispositive. Plaintiffs do not bring the type of claim the CSRA channels to the MSPB because they do not challenge any personnel action against any employee; they challenge Defendants' authority to create Schedule P/C, a claim that is wholly collateral to the MSPB review scheme and outside that tribunal's expertise.

*Third*, Defendants cannot escape this Court's review by asserting that the President's actions (and those of agencies implementing his decisions), even if illegal, are beyond the reach of any court. The validity of Plaintiffs' *ultra vires* claims against the President is long-established and has recently been reaffirmed by the Supreme Court. Defendants' effort to distract from that precedent fails. Their claim that their actions are unreviewable because Congress gave the

President unfettered discretion to create Schedule P/C also fails, because Congress in fact confined the President's power to strip CSRA protections to political appointees by using the Exclusion Phrase. Finally, Defendants cannot argue for dismissal of Plaintiffs' constitutional separation of powers claim when they themselves have invoked constitutional authority to override the congressional constraints of the CSRA, instigating a separation of powers clash and establishing this Court's jurisdiction over that claim.

## BACKGROUND

### A. The CSRA's Balanced Approach to Structuring the Federal Civil Service

The structure of the federal civil service is the product of Congress's careful balancing of the President's control over political appointees—whose positions are expected to turn over with each new administration—and Congress's interest in ensuring the integrity and effectiveness of the career employees who execute the laws across administrations. Congress has legislated the structure of the executive branch since the earliest days of the Republic. 1 The Congressional Register 347 (Thomas Lloyd ed., 1789) (statement of Rep. Elias Boudinot) ("If we take up the present constitution, we shall find it contemplates departments of an executive nature in aid of the President: it then remains for us [Congress] to carry this intention into effect."), https://tinyurl.com/4f492amp; An Act for Establishing an Executive Department, to be Denominated the Department of Foreign Affairs, ch. 4, 1 Stat. 28 (1789); An Act to Establish an Executive Department, to be Denominated the Department of War, 1 Stat. 49 (1789); An Act to Establish the Treasury Department, ch. 12, 1 Stat. 65 (1789).

Congress's rejection of a spoils system for federal government employment in favor of this balanced approach to legislating the structure of the federal civil service is at the heart of this case. In the 19th century, Congress began reserving specific executive branch positions solely for non-political, merit-based hiring, and it has expanded this mandate to many new positions since. *See* Pendleton Civil Service Act, ch. 27, 22 Stat. 403 (1883); Lloyd-LaFollette Act, ch. 389, § 6, 37 Stat. 555 (1912). Congress's opposition to the spoils system reached outrage levels in 1978, when

the scandals of the Nixon administration led it to enact the CSRA. The CSRA "comprehensively overhauled the civil service system," *United States v. Fausto*, 484 U.S. 439, 443 (1988) (cleaned up), to promote competence, integrity, and merit by protecting civil servants from unwarranted adverse action. The CSRA, Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), which has been amended over the years to apply its adverse action protections to an ever greater share of civil servants, *see, e.g.*, Civil Serv. Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461 (1990), remains the legal underpinning of today's independent federal civil service.

The CSRA creates several mutually reinforcing sources of protection for federal employees, each housed in a separate chapter of Title 5. Subchapter II of Chapter 75 ("Chapter 75(II)") generally protects career civil servants from the most extreme actions—such as removal, extended suspension, and reduction in grade or pay ("For Cause Actions")—except for cause and after notice and an opportunity to be heard. 5 U.S.C. §§ 7512-13. Employees who experience For Cause Actions in violation of Chapter 75(II) may bring claims challenging those specific employment actions to what was intended to be an independent tribunal—the MSPB. *Id.* § 7513(d).

Chapter 23 generally protects career civil servants from a specified list of personnel actions, such as political affiliation discrimination or retaliation against whistleblowers ("Prohibited Personnel Practices" and, together with the For Cause Actions, the "CSRA Covered Personnel Actions"). *Id.* § 2302(b).[1] The whistleblower protections in Chapter 23 include a prohibition on retaliation and a right to seek redress for whistleblower retaliation before the MSPB. *Id.* §§ 1221, 2302(b)(8)-(9). Those protections are necessary to effectuate Congress's core powers and responsibilities. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) ("Without information, Congress would be shooting in the dark, unable to legislate wisely or effectively." (cleaned up)); *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927) (whistleblower protections help

[1] Chapter 23 also separately prohibits all of the same For Cause Actions as Chapter 75(II) when those actions are motivated by an improper purpose. *Id.* Other chapters of title 5, like Chapter 43, provide additional protections against other adverse employment actions.

effectuate Congress's own "power of inquiry"); *Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 760 (D.C. Cir. 2020) (en banc).

The civil service today generally consists of three categories: the "competitive service," 5 U.S.C. § 2102; the "excepted service," *id.* § 2103; and the Senior Executive Service, *id*. §§ 2101a, 3132(a)(2). Competitive service and excepted service employees differ in the way they are *hired*—via competitive exam (competitive service) or otherwise (excepted service). Once hired, however, the same protections against adverse employment actions generally apply. *See* 5 U.S.C. §§ 2302(a)(2)(B) ("covered position" includes both competitive and excepted service); 7511(a)(1) ("employee" includes both competitive and excepted service).

Simply moving a position from the competitive service to the excepted service (or vice versa), without more, does not affect the employee's protections in connection with CSRA Covered Personnel Actions. The government misleads the Court when it suggests that moving a position from the competitive to the excepted service is a means to alter that position's protection from "removal" under the CSRA. *See* Gov. Mot. at 3. For most employees in the excepted service, there is a longer vesting period for such protections—two years instead of the usual one, *id.*—but Congress designed the system so that the substantive protections for civil servants under Chapters 23 and 75(II) do not change whether they are designated as competitive or excepted service.

Congress granted the President authority to "except" positions from the competitive service. 5 U.S.C. § 3302(1). Such excepted service positions are listed in the Civil Service Regulations, which are promulgated by the Office of Personnel Management ("OPM"). 5 C.F.R. § 6.2. Separately—in an entirely different chapter of Title 5—Congress granted the President authority to remove the protections of Chapters 23 and 75(II) from a defined subset of federal positions—those which are "of a confidential, policy-determining, policy-making or policy-advocating character." 5 U.S.C. § 7511(b)(2) (i.e., the Exclusion Phrase); *see also id.* § 2302(a)(2)(B)(i) (using the Exclusion Phrase to identify positions excluded from Chapter 23 protections).

The legislative record and consistent historical practice make it abundantly clear that

Congress intended the Exclusion Phrase to refer to a specific and narrow class of federal government positions: those whose occupants are hired on the basis of political affiliation and are expected to change along with a change in presidential administration—in short, political appointees. Over nearly a century, both before and after the CSRA adopted the Exclusion Phrase in its detailed structure for the federal civil service, the federal government has used some variation of that phrase to refer to political appointees. President Franklin Roosevelt first used components of the phrase in the 1930s in Executive Order 7916, which he issued in response to criticisms that his New Deal policies marked a return to the spoils system of civil service employment by circumventing competitive hiring requirements. *See* Extending the Competitive Classified Civil Service, Exec. Order No. 7916 (June 24, 1938). That Executive Order moved into the competitive service "all positions in the Executive civil service ... except (1) policy-determining positions and (2) other positions which special circumstances require should be exempted[.]" *Id.* President Roosevelt then set up the Brownlow Commission—a non-partisan commission of three political science scholars—to, among other things, identify these "policy-determining positions." It recommended that "the merit principle should be extended to all except the highest governmental positions. To this course both of the great political parties are pledged. The merit system should be extended … [u]pward to include all permanent positions in the Government service except a very small number of a high executive and policy-forming character." President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States, 7 (1937), https://tinyurl.com/y9neuwru.

In 1953, President Eisenhower issued Executive Order 10440 with the express intent of separating the schedules for career and political excepted service positions, by housing the latter in a new Schedule C. Amendment of Civil Service Rule VI, Exec. Order No. 10440 (Mar. 31, 1953). To identify political appointee positions for listing in Schedule C, President Eisenhower reached for a variation of the same phrase used by President Roosevelt and further developed by the Brownlow Commission: Schedule C housed "positions of a confidential or policy-determining character." *Id.* As the Civil Service Commission (the predecessor to OPM) explained at the time,

the purpose of Schedule C was "to make a clear distinction between jobs which belong in the career service and those which should be subject to change with a change in administration." U.S. Civil Serv. Comm'n, 70th Ann. Rep., 2 (Nov. 16, 1953), https://tinyurl.com/5n994a7j.[2]

In 1970, when Congress wanted to prohibit political affiliation discrimination in post office hiring, it used the phrase "of a confidential or policy-determining character" to identify those positions (along with presidential appointees and noncareer executives) to whom the ban on political affiliation discrimination did not apply—*i.e.*, political appointees who by definition are chosen for political reasons. Postal Reorganization Act, Pub. L. No. 91-375, § 13(b)(2), 84 Stat. 719, 786 (1970).

Thus, when Congress intentionally incorporated the Exclusion Phrase into the CSRA, its long-standing usage made it a term of art synonymous with "political appointee." As originally passed, the CSRA provided only two exclusions from the protections it established: one for presidential appointees subject to the Senate's advice and consent and the other for positions covered by the Exclusion Phrase. Pub. L. No. 95-454, tit. II, § 204(a), 92 Stat. 1111, 1136, (Oct. 13, 1978) (adding 5 U.S.C. § 7511(b)(2)). The Senate committee report on the CSRA made clear

---

[2] The Civil Service Commission understood these positions to also encompass "policymaking" and policy "advocacy," notwithstanding the use of the shorter phrase "confidential or policy-determining." *See, e.g.*, The Federal Executive Service: Hearings on H.R. 3807 Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Off. and Civil Serv., 92d Cong. 13 (1972) (statement of Robert E. Hampton, Chairman, Civil Serv. Comm'n) (describing "positions which have responsibility for the formulation *or advocacy* of administration policies, or which involve a confidential relationship with a Presidential appointee") (emphasis added), https://tinyurl.com/yc49x8m3; Civil Service Amendments of 1976: Hearings on H.R. 12080 Before the Subcomm. on Manpower & Civil Serv. of the H. Comm. on Post Off. and Civil Serv., 94th Cong. 7 (1976) (statement of Robert E. Hampton, Chairman, Civil Serv. Comm'n) ("Leaving aside the comparatively small number of jobs—about 1,500—that the Commission has excepted because of their *advocac*y, confidential, or *policymakin*g nature, we think political considerations must play no part in filling the approximately 1 million other excepted positions.") (emphasis added); Press Release, U.S. Civil Serv. Comm'n, at 2 (Aug. 25, 1955) ("*Policy-making* and confidential positions are placed in Schedule C and exempted from civil-service requirements in order to make a clear distinction between the career service and the policy-making or confidential positions which exist primarily to carry out the objectives of any national administration." (emphasis added)), https://tinyurl.com/295ttpfh at 2.

that the Exclusion Phrase category was exclusively for political appointees by describing it as an extension of the exclusion for advice/consent appointees:

> The first exception [to § 7511(a)] is for positions which require senate confirmation. The exception is continued from current law. The second, a new exception for positions of a confidential, policy-determining, policy-making or policy advocating character, is an extension of the exception for appointments confirmed by the Senate [and] [t]hese positions are currently placed in Schedule C (positions at GS-15 and below), or filled by Non-Career Executive Assignment.

S. Rep. No. 95-969, 48 (1978), as reprinted in 1978 U.S.C.C.A.N. 2723, 2770.

The House committee had the same understanding:

> An employee whose position is of a confidential or policy determining character, generally political appointees, would not be entitled to the benefits of this legislation. At the present time, the Civil Service Commission issues regulations to define positions which are of a policy or confidential nature, and the committee believes the current regulatory definitions for these positions are adequate.

H.R. Rep. No. 95-1207, at 5 (1978).

This congressional understanding persisted through subsequent statutory amendments. When the 101st Congress extended CSRA protections to cover most excepted service employees in 1990, it further endorsed this understanding of the 95th Congress's use of the Exclusion Phrase in 1978:

> The bill generally extends procedural rights to attorneys, teachers, chaplains, and scientists, *but not to presidential appointees*. … Again, the key to the distinction between those to whom appeal rights are extended and those to whom such rights are not extended is *the expectation of continuing employment with the Federal Government*. Lawyers, teachers, chaplains, and scientists have such expectations; presidential appointees and temporary workers do not.
>
> ....
>
> The bill explicitly denies procedural protections to presidential appointees, individuals in Schedule C positions and individuals appointed by the President and confirmed by the Senate. Employees in each of these categories have little expectation of continuing employment beyond the administration during which they were appointed. They explicitly serve at the pleasure of the President or

> the presidential appointee who appointed them.

H.R. Rep. No. 101-328, at 4 (emphasis added). The reference to "Schedule C positions" was to positions then covered by the Exclusion Phrase.

Consistent with this understanding, Congress has elsewhere defined the term "political appointee" by reference to the Exclusion Phrase. *See, e.g.*, 5 U.S.C. § 9803(c)(2); 6 U.S.C. § 349(d)(3)(B); 7 U.S.C. § 6992(e)(2)(D); 38 U.S.C. § 725(c)(1). And the MSPB has similarly understood the Exclusion Phrase to be but just "a shorthand way of describing positions filled by 'political appointees.'" *O'Brien v. Off. of Indep. Couns.*, 74 M.S.P.R. 192, 206 (1997) (quoting *Special Counsel v. Peace Corps*, 31 M.S.P.R. 225, 231 (1986)).

The President's authority under 5 U.S.C. § 7511(b)(2) to designate positions as ones "of a confidential, policy-determining, policy-making or policy-advocating character," and in so doing to remove those positions from the CSRA's protections, is thus clearly limited to political appointee positions. That authority is distinct from the President's authority to except positions from the competitive service under 5 U.S.C. § 3302. In cabining the President's authority under § 7511 and separating it from the President's discretionary power under § 3302, Congress protected career civil servants from political attacks on their independence while reserving to the President authority to decide for himself how to regulate the removal of political appointees.

### B. The President's Attempts to Dismantle Congress's Structure and Defy Statutory Restrictions

Toward the end of his first term in office, President Trump issued Executive Order 13957 (the "2020 EO"), which created a Schedule F in the excepted service. 85 Fed. Reg. 67631 (Oct. 26, 2020). The new Schedule F would consist of positions of "a confidential, policy-determining, policy-making, or policy-advocating character *not normally subject to change as a result of a Presidential transition*." *Id.* §§ 1, 3, 4 (emphasis added). This was an oxymoron, as Congress intended the Exclusion Phrase to refer only to positions that *are* subject to change as a result of a presidential transition. President Trump's view was that Chapters 75(II) and 23 (among other provisions of Title 5) would no longer apply to positions listed in Schedule F, rendering those positions essentially terminable at will. The 2020 EO's self-contradictory description of federal

civil service positions thus ignored the line that Congress drew around the President's authority to designate Exclusion Phrase positions (notwithstanding his broader authority to except positions from the competitive service).

President Biden revoked the 2020 EO. Exec. 14003, 86 Fed. Reg. 7231 (Jan. 27, 2021). Following that revocation, and after undertaking notice-and-comment rulemaking, OPM issued a rule intended to reinforce the legal principles that Schedule F flouted and layer additional protections on the independence of the civil service. Upholding Civil Service Protections and Merit System Principles, 89 Fed. Reg. 24982 (Apr. 9, 2024) (the "2024 Final Rule").[3] OPM based the 2024 Final Rule on, among other things, its "determination that injecting politicization into the nonpartisan career service ... would not only harm government employees, agencies, and services, but also the American people that rely on them[.]" *Id.* at 24,995.

The 2024 Final Rule promulgated definitions of the Exclusion Phrase (and certain variations on the Exclusion Phrase) to match the specific legislative meaning of that phrase set forth above, defining each as follows:

> [O]f a character exclusively associated with a noncareer political appointment that is identified by its close working relationship with the President, head of an agency, or other key appointed officials who are responsible for furthering the goals and policies of the President and the Administration, and that carries no expectation of continued employment beyond the presidential administration during which the appointment occurred.

*Id.* at 25045 (codified at 5 C.F.R. § 210.102(b)(3), (b)(4) (2024)).

The 2024 Final Rule also added subpart F to 5 C.F.R. part 302 ("Subpart F"), which governed how agencies were to move employees into and within the excepted service. *Id.* at 25,030-35. Recognizing the property interest that federal civil servants have in both their employment and their removal protections, Subpart F required agencies seeking to involuntarily move employees or their positions to a new excepted service schedule—such as the former

---

[3] Defendants suggest that OPM's actions are generally exempt from APA review. Gov. Mot. at 5. That is incorrect. *See* 5 U.S.C. § 1105.

Schedule F—to inform the employee that they will retain their accrued Chapter 75(II) rights notwithstanding the movement of their positions. 5 C.F.R. § 302.602(c) (2024). Subpart F also provided such employees with rights to appeal to the MSPB in the event their employing agency asserted that such a move would eliminate "any procedural and appeal rights" that had previously accrued to the employee. *Id.* § 302.603; *see also* Gov. Mot. at 9 (describing Subpart F).

On January 20, 2025, President Trump issued Executive Order 14171 (the "2025 EO"). 90 Fed. Reg. 8625 (Jan. 31, 2025). The 2025 EO reinstates and amends the 2020 EO (as amended, the "Amended 2020 EO"). The Amended 2020 EO purports to create Schedule P/C of the federal civil service—a rebranded Schedule F. The Amended 2020 EO deploys the same oxymoronic description of the positions affected—"[c]areer positions of a confidential, policy-determining, policy-making, or policy-advocating character that are not normally subject to change as a result of a Presidential transition," Amended 2020 EO, § 4—with the same improper purpose of stripping these positions of Chapter 75(II) and Chapter 23 protections against CSRA Covered Personnel Actions.

The Amended 2020 EO directs all executive agencies to review all positions covered by Chapter 75(II) to identify positions to be moved to Schedule P/C and to submit a list of recommended positions to OPM, which, in turn, would recommend to the President positions to be placed in Schedule P/C. *Id.* § 5. The Amended 2020 EO directs agencies to consider broad categories of positions far beyond what one would typically consider "policy-determining," including "participation" in the drafting of regulations or guidance, supervision of attorneys, and "viewing, circulating or otherwise working with proposed regulations, guidance, [or] executive orders." *Id.* § 5(c). The Amended 2020 EO also authorizes OPM to identify additional, unspecified criteria for moving positions. *Id.* § 5(c)(vii).

The 2025 EO further directs OPM to "amend the Civil Service Regulations to rescind all changes made by [the 2024 Final Rule]" that would impede the purpose or affect implementation of the Amended 2020 EO, and declares that "[u]ntil such rescissions are effectuated (including through the resolution of any judicial review)," Subpart F and the 2024 Final Rule's definitions of

the variations of Exclusion Phrase "shall be held inoperative and without effect." 2025 EO § 4.

On April 23, 2025, OPM issued a notice of proposed rulemaking to implement the Amended 2020 EO and the 2025 EO. 90 Fed. Reg. 17,182 (Apr. 23, 2025). OPM received over 40,000 comments on the proposed rule, the overwhelming majority of which opposed the rule. Improving Performance, Accountability and Responsiveness in the Civil Service, 91 Fed. Reg. 5580, 5581 (Feb. 2, 2026) (94% of comments opposed the rule). Plaintiffs each commented on the proposed rule.[4]

On February 6, 2026, OPM issued the final rule. 91 Fed. Reg. at 5580 ("2026 Final Rule"). The 2026 Final Rule incorporates Schedule P/C into the Civil Service Regulations by amending various provisions of those regulations. *Id.* at 5653-57. Among other changes, the 2026 Final Rule (1) establishes Schedule P/C as a new schedule of excepted service career positions; (2) removes the definition of the variations of the Exclusion Phrase from the regulations; (3) clarifies that the adverse action provisions of Chapter 75(II) do not apply to positions in Schedule P/C; and (4) removes Subpart F (which, as described above, provided incumbent employees involuntarily moved to a new excepted service schedule, such as Schedule P/C, with rights to appeal to the MSPB in the event their employing agency asserts that such a move will eliminate previously accrued rights). *See generally id.* at 5580 (summarizing rule); *see also* Am. Compl. ¶¶ 76-85 (describing 2026 Final Rule and implementing guidance).

On June 3, 2026, President Trump issued Executive Order 14410 (the "2026 EO" and, together with the Amended 2020 EO and the 2025 EO, the "Challenged EOs"), the first executive order purporting to move career federal civil service positions into Schedule P/C. 91 Fed. Reg. 34893 (June 10, 2026). The 2026 EO provides that the positions associated with the approximately 4,900 position descriptions listed in its Appendix "are determined to have a confidential, policy-determining, policy-making, or policy-advocating character" and "are hereby placed in Schedule

---

[4] *See* GAP (as part of Make It Safe Coalition), Comment Letter (June 6, 2025), https://www.regulations.gov/comment/OPM-2025-0004-31925; NARFE, Comment Letter (June 6, 2025), https://www.regulations.gov/comment/OPM-2025-0004-33033.

Policy/Career." *Id.* § 5(a), (b). The Appendix identifies position descriptions by title of the position and position description number (which is unique to each agency). *Id.* at App. A separate White House Fact Sheet asserted that the 2026 EO moved "about 8,000 senior policy-influencing positions" (because multiple positions might be on the same position description) into Schedule P/C. *Fact Sheet: President Donald J. Trump Increases Accountability in the Federal Work Force*, The White House (June 3, 2026), https://tinyurl.com/225usdmn.[5] No incumbent employees were provided advance notice that their position would be moved to Schedule P/C or an opportunity to be heard as to why their position was not of a confidential, policy-determining, policy-making, or policy-advocating character. 2026 Final Rule, 91 Fed. Reg. at 5632; Impacted Member 1 Decl. ¶ 6;[6] Impacted Member 2 Decl. ¶ 6; Impacted Member 3 Decl. ¶ 6; Impacted Member 4 Decl. ¶ 6; Impacted Member 5 Decl. ¶ 6; Impacted Member 6 Decl. ¶ 6; Impacted Member 7 Decl. ¶ 5.

Both the President and OPM have drawn a direct link between Schedule P/C and the President's desire to target formerly protected civil servants for termination. As the government acknowledges, the purpose of Schedule P/C is "ensuring that such employees can be removed," Gov. Mot. at 1. While the government spins that purpose as narrowly focused on poor performers, this administration's official statements and actions show an expansive desire to reshape a civil service that it perceives as insufficiently loyal to the current officeholder. Am. Compl. ¶¶ 7-10. After President Trump issued the 2025 EO, OPM sent an email to virtually all federal employees stating that federal agencies would likely be downsized through "the reclassification to at-will

---

[5] Setting aside that the Exclusion Phrase is a term of art that cannot be collapsed to mere association with "policy-making," many of the positions listed do not even relate to policy-making. *See, e.g.*, Am. Compl. ¶ 95; Eli Coustan, *Undermining independence and eroding transparency: Examining Schedule Policy/Career reclassifications*, Partnership for Public Service (Aug. 13, 2026), https://tinyurl.com/mpbzhfjn. Nor is there any discernible rhyme or reason in Defendants' actions: in many cases, similar positions were treated differently, with some moved to Schedule P/C and others not moved, with no explanation for the differential treatment. *See* Am. Compl. ¶¶ 96-97.

[6] The Impacted Member Declarations are those filed as attached to the Declaration of Corey Stoughton in Support of Plaintiffs' Motion for Leave to Identify Plaintiffs' Declarants by Pseudonym filed at ECF No. 44-1.

status for a substantial number of federal employees." *Deferred Resignation Email to Federal Employees*, OPM (Jan. 28, 2025) ("Deferred Resignation Email"), https://www.opm.gov/about-us/fork/original-email-to-employees/. Government officials have made clear that the 2026 EO is only the beginning and they expect additional positions will be moved to Schedule P/C. Am. Compl. ¶¶ 102-03; Impacted Member 1 Decl. ¶ 13; Impacted Member 4 Decl. ¶ 11; Impacted Member 5 Decl. ¶ 13; Impacted Member 6 Decl. ¶ 14; Impacted Member 7 Decl. ¶ 11. OPM has predicted that 50,000 positions will ultimately be moved—nearly 2% of the federal workforce. 2026 Final Rule, 91 Fed. Reg. at 5606.

## ARGUMENT

### I. Plaintiffs Have Standing

#### A. NARFE Has Associational Standing

NARFE is a non-profit membership organization whose mission is to promote the general welfare of current federal civilian employees and federal retirees and their survivors, to advise and assist them with respect to their federal benefits, to represent their interests before appropriate authorities, and to support legislation and regulations beneficial to such employees and retirees and oppose those detrimental to their interests. Am. Compl. ¶ 17; Ex. 1,[7] Declaration of John Hatton ("Hatton Decl.") ¶ 5. NARFE's membership consists of approximately 116,000 current and former federal employees, up to 12,000 of whom are current federal employees. Am. Compl. ¶ 148; Hatton Decl. ¶ 6.

NARFE has associational standing to bring suit on behalf of its members because "(1) at least one of its members would have standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Chamber of Com. of the U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Sierra Club v.*

---

[7] Unless otherwise indicated, exhibit cites are to the exhibits to the Declaration of Corey Stoughton in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss filed contemporaneously herewith.

*EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)). The government contests only the first prong of this test, arguing that NARFE must identify at least one member with standing. *See* Gov. Mot. at 15-17.[8] NARFE meets this requirement, as it provides seven declarations from current tenured federal employee members in career positions who have been moved into Schedule P/C by the 2026 EO ("Impacted Members"). *See also* Am. Compl. ¶¶ 149-51.

It is clear that NARFE's Impacted Members have suffered "concrete and particularized injury that is caused by, or fairly traceable to," Schedule P/C. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009). Indeed, Defendants do not contest that movement to Schedule P/C would constitute such an injury, only that Plaintiffs failed to identify anyone who has suffered it. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015); *League of United Latin Am. Citizens v. Executive Office of the President*, 780 F. Supp. 3d 135, 181, 190 (D.D.C. 2025), *aff'd* 2026 WL 1991571 (D.C. Cir. July 2, 2026). Specifically, Schedule P/C has deprived Impacted Members of their protected property interest in their protections from CSRA Covered Personnel Actions and moved them into at-will positions without advance notice or an opportunity to be heard as to why their positions were not of a "confidential, policy-determining, policy-making, or policy-advocating character." *See* Impacted Member 1 Decl. ¶¶ 5-7; Impacted Member 2 Decl. ¶¶ 5-7; Impacted Member 3 Decl. ¶¶ 5-7; Impacted Member 4 Decl. ¶¶ 5-7; Impacted Member 5 Decl. ¶¶ 5-7; Impacted Member 6 Decl. ¶¶ 5-7; Impacted Member 7 Decl. ¶¶ 4-6; *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir.

---

[8] The government does not dispute that NARFE meets the second and third prongs of the associational standing test. The interests NARFE seeks to protect—career federal employees' rights to the civil service protections provided by the CSRA, which enable employees to maintain long careers in the federal government—are clearly germane to NARFE's mission to "promote the general welfare of current federal civilian employees" and to "support legislation and regulations beneficial to such employees and retirees and oppose those detrimental to their interests." Am. Compl. ¶ 17; Hatton Decl. ¶ 5. And courts routinely hold that individual member participation is not required where, as here, only vacatur, declaratory, and injunctive relief is sought. *See, e.g., Int'l Union, United Auto., Aerospace & Agr. Implement Workers v. Brock*, 477 U.S. 274, 287 (1986); *Am. Fed'n of Lab. and Cong. of Indus. Orgs. v. Dep't of Lab.*, 778 F. Supp. 3d 56, 74 (D.D.C. 2025).

2024) ("[A] property interest exists if the employee can be removed only for cause." (citation modified)); *Beckwith v. County of Clark*, 827 F.2d 595, 598 (9th Cir. 1987) (plaintiff had "a property right in his civil service status"); *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 914-15 (11th Cir. 1993) (property interest in employment status); *Armstrong v. Reynolds*, 22 F.4th 1058, 1073, 1077 (9th Cir. 2022) (property interest in whistleblower protection). There is "little question" that Impacted Members have standing to challenge Schedule P/C given the impact it has on the legal structure governing their employment. *Cf. State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) ("The Supreme Court has stated that there is ordinarily little question that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." (citation modified)).

Additionally, the Impacted Members now reasonably fear termination or other adverse employment actions as retaliation for conduct or speech perceived as disfavored by the administration. They have been, and will be chilled, in their expression of both political views in their personal capacities and of views in their official capacities that could be seen as insufficiently supportive of administration priorities. For example, the Impacted Members are less willing to raise issues with their supervisors, advocate for the positions and opinions of their teams, push back against concerning policy decisions, and engage in productive internal debate within their agencies. Impacted Member 1 Decl. ¶¶ 9-11; Impacted Member 2 Decl. ¶¶ 9-10; Impacted Member 4 Decl. ¶¶ 9-10; Impacted Member 5 Decl. ¶¶ 9-10; Impacted Member 6 Decl. ¶¶ 9-12; Impacted Member 7 Decl. ¶¶ 8-9. Outside of work, the Impacted Members have also censored their personal participation in social media and willingness to make political donations. Impacted Member 3 Decl. ¶ 9; Impacted Member 6 Decl. ¶ 13; Impacted Member 7 Decl. ¶ 10. Such "self-censorship in response to a 'well-founded fear that the law will be enforced against them' is an injury in fact." *Brighton Park Neighborhood Council v. McMahon*, 2026 WL 1707623, at *8 (D.D.C. June 12, 2026) (quoting *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 193 (2026)).

Defendants fault NARFE for failing to disclose specific member names in the Amended

Complaint, Gov. Mot. at 17, but that is not the law. At the pleading stage, NARFE's Amended Complaint need only allege specifically that such members exist, Am. Compl. ¶ 149, particularly where NARFE then identifies those individuals via sworn declarations. *Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. USDA*, 573 F. Supp. 3d 324, 336 (D.D.C. 2021) (association "can survive a facial challenge to its standing without identifying specific, injured members by name in its complaint"). The cases cited by Defendants, Gov. Mot. at 16, are not to the contrary, as they involve either a failure to allege the existence of specific members who were harmed in the complaint, or petitions for review of agency action where the underlying record did not identify such a member. *See Ranchers-Cattlemen*, 573 F. Supp. 3d at 335 (distinguishing standing requirements for petitions for review because they "require[] the petitioner to 'supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review'" (quoting *Sierra Club*, 292 F.3d at 896)).

As each of these Impacted Members would have individual standing, NARFE has associational standing.

**B. NARFE Has Organizational Standing**

NARFE also has organizational standing to challenge Schedule P/C based on the cognizable harm that Schedule P/C inevitably will have on NARFE's membership and the concomitant loss in membership dues. *See Am. Ass'n of Nurse Practitioners v. McMahon,* 836 F. Supp. 3d 175, 198-99, 207 (D.D.C. 2026) (organizations harmed by decrease in membership and loss of dues). In 2024—before President Trump was re-elected—NARFE embarked on a campaign to increase its membership among active (as opposed to retired) federal employees because active federal employee members maintain their memberships for longer than people who join after their federal employment has ended, and thus present a greater lifetime value to NARFE; by contrast, short-term government employees, who do not intend to stay and do not accrue benefits, are unlikely to join an organization such as NARFE or, if they do, to maintain their membership. Am. Compl. ¶ 156; Hatton Decl. ¶ 15. The conversion of thousands of federal jobs into at-will positions subject to change with presidential administrations is designed to and will shrink the pool of active

federal employees potentially interested in NARFE membership, impede NARFE's membership drive, and reduce NARFE's ability to sustain memberships over a longer period of time. Am. Compl. ¶¶ 157-58; Hatton Decl. ¶ 12. *See Nat'l Treasury Emps Union v. I.R.S.*, 2006 WL 416161, at *2 (D.D.C. Feb. 22, 2006) (impact on union membership from replacement of government employees with contractors constitutes injury-in-fact); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 27-28 (D.D.C. 2025) (loss of members, and dues, confers standing).

These certain and immediate harms with respect to NARFE's membership are not speculative. The government admits a purpose of Schedule P/C is to shrink the federal workforce from which NARFE draws its members, *see* Deferred Resignation Email, and to allow positions to change from one administration to the next, turning surviving civil service positions into short-term partisan appointments. This intentional shrinking of NARFE's membership pool does not depend upon the other predictable effects that Schedule P/C will have on federal employees, including that many will leave of their own accord. Even if it did, those effects are supported by the record before this Court and far from mere "guesswork," *contra* Gov. Mot. at 20. *See* Hatton Decl. ¶ 11 (job security among top reasons current federal employee members were interested in working for federal government). Defendants' own rulemaking record acknowledges the "vast body of research" showing that stability in government jobs is a significant motivating factor for employees. *See* 2024 Final Rule, 89 Fed. Reg. at 25,043-44 (discussing "vast body of research" showing stability of public jobs is motivating factor); *id.* at 25,040-41 (discussing impact of job protections on recruitment and retention). Defendants' argument that NARFE's increase in current federal employee membership in 2025 suggests that Schedule P/C might "increase interest in NARFE membership," Gov. Mot. at 20, is mere speculation, and incorrect: NARFE's membership drive to increase the total number of current federal employee members predates President Trump's re-election, the Challenged EOs, and the 2026 Final Rule. *See* Am. Compl. ¶ 156.

**A. GAP Has Organizational Standing**

Plaintiff GAP has organizational standing to challenge Schedule P/C both because Schedule P/C "directly affect[s] and interfere[s] with [its] core business activities" and because

GAP must "divert[] and redirect[] its limited resources to counteract and offset" the impacts of Schedule P/C. *Ctr. for Taxpayer Rts. v. I.R.S.*, 2026 WL 2635380, at *4-5 (D.C. Cir. Sep. 8, 2026) (internal quotations and citations omitted); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016).

**1. Impact to Core Business Activities**

GAP is the nation's premier whistleblower advocacy and protection organization. GAP's mission is providing a safe, effective voice for employees who use free-speech rights to challenge abuses of power that betray the public trust. Am. Compl. ¶ 126. GAP advances its mission through two primary means. First, GAP represents whistleblowers. GAP provides legal advice, representation, and strategic guidance to whistleblowers, including current tenured federal employees, who reasonably believe they have information concerning violations of laws, rules or regulations, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to public health and safety ("Reportable Conduct"). Am. Compl. ¶ 127; Ex. 2, Declaration of Thomas Devine ("Devine Decl.") ¶ 12. GAP provides advice to potential federal whistleblowers on their rights, options, and risks of retaliation, advice which depends upon the contours of the whistleblower protections under the CSRA. Am. Compl. ¶¶ 128, 130; Devine Decl. ¶ 14. GAP also assists clients in navigating these legal protections to ensure that clients report Reportable Conduct in a way that maximizes both the impact of the disclosure and the individual client's available protections. Am. Compl. ¶ 130; Devine Decl. ¶ 15. When such whistleblowers are retaliated against, GAP represents them before the Office of Special Counsel ("OSC") and the MSPB, under the CSRA's whistleblower protection provisions. Am. Compl. ¶ 133; Devine Decl. ¶ 16. Prevailing employees in MSPB proceedings are entitled to attorney's fees, 5 U.S.C. §§ 5596(b)(1)(A)(ii), 7701(g), and settlements in such proceedings often include such fees. When fees are awarded to clients whom GAP represents, GAP typically receives those fees. Am. Compl. ¶ 138; Devine Decl. ¶ 19.

Second, GAP investigates Reportable Conduct. GAP furthers its mission by using the information disclosed by whistleblower clients to conduct thorough investigations of alleged fraud,

waste, abuse, and safety violations, and publicizing the results of those investigations to help ensure accountability. Am. Compl. ¶¶ 141; Devine Decl. ¶ 11. Through this work, GAP has uncovered, publicized, and obtained corrective action regarding misconduct involving drug safety, anti-terrorism efforts, protection of U.S. troops, dangerous nuclear waste, unsafe nuclear power plants, contaminated meat, immigration detention abuse, and illegal domestic surveillance. Am. Compl. ¶ 142. GAP has also developed professional expertise in how to structure disclosures of Reportable Conduct at a level of detail sufficient to ensure that an appropriate and fruitful investigation results from the disclosure.

Schedule P/C "perceptibly impair[s]" GAP's "organizational interests" in both investigating Reportable Conduct and representing those who help bring it to light by stripping thousands of affected employees of whistleblower protections under Chapters 23 and 75(II) of the CSRA. *See Ctr. for Taxpayer Rts. v. I.R.S.,* 815 F. Supp. 3d 1, 29, 59 (D.D.C. 2025), *aff'd* 2026 WL 2635380 (D.C. Cir. Sep. 8, 2026); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). While Defendants attempt to reduce this injury to nothing more than "pessimism about its future fee revenue," Gov. Mot. at 21, the impacts on GAP's core activities are far more extensive.[9] The CSRA's whistleblower protections are critical to providing federal employees with the confidence to disclose misconduct. Devine Decl. ¶ 17. GAP's federal employee clients report that the existence of these whistleblower protections is an important factor in their willingness both to

---

[9] GAP does allege that its fee revenue will decrease, but that is only a part (and an indication) of the broad impact on its activities. When GAP represents whistleblowers in OSC/MSPB proceedings, it often recovers attorney's fees, as authorized under the CSRA. Am. Compl. ¶¶ 138-39; Devine Decl. ¶ 19. Since 2020, GAP has represented over 45 employees in OSC/MSPB proceedings and been paid approximately $402,650 in attorney's fees as a result of such representation. Devine Decl. ¶ 19. Under Schedule P/C, those federal employees who are moved to Schedule P/C but continue to proceed and blow the whistle will lack the right to challenge any subsequent retaliation in OSC/MSPB proceedings. This loss of representation represents a direct hit to GAP's bottom line. *See Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("monetary injury" constitutes injury in fact); *Whitman-Walker Clinic v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 22 (D.D.C. 2020) ("The precise amount of economic harm a plaintiff suffers is irrelevant, as even a dollar is still an injury in fact for standing purposes." (cleaned up)).

share Reportable Conduct and to make a disclosure containing a level of detail sufficient to bring about change related to the Reportable Conduct. Am. Compl. ¶ 132. Several of GAP's clients likely would not have come forward and blown the whistle absent those protections. *Id.*; Ex. 3, Declaration of Erez Reuveni ("Reuveni Decl.") ¶ 12. By removing them, Schedule P/C is chilling potential whistleblowers from disclosing misconduct, thereby impairing GAP's core organizational interest in investigating and facilitating whistleblowing. Am. Compl. ¶¶ 136-37; Devine Decl. ¶ 32. This is GAP's *raison d'être*. *See E.Q. v. DHS*, 2026 WL 946181, at *12 (D.D.C. Apr. 8, 2026) (legal services providers "forced to reconfigure their programming and the representation they provide to clients" sufficiently alleged that government's actions "affect[] and interfere[] with the organization's core business activities.") (internal quotations and citations omitted); *League of United Latin Am. Citizens v. Exec. Off. of President ("LULAC")*, 808 F. Supp. 3d 29, 55 (D.D.C. 2025) ("[O]rganizations can have standing to challenge practices that directly interfere with their core activities, such as direct services programs.") *aff'd*, 2026 WL 1991571 (D.C. Cir. July 2, 2026); *Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 29-30 (decreased engagement with target clientele constitutes injury in fact).

Moreover, GAP's ability to conduct further investigations and publicize its findings depends not only on whistleblowers' willingness to share information with GAP in the first instance, but also on the quality and level of detail of the information received. Am. Compl. ¶ 143; Devine Decl. ¶ 35. Defendants' actions impair GAP's investigative efforts by impacting the level of detail that potential whistleblowers are willing to disclose and the willingness of potential whistleblowers to identify themselves. Am. Compl. ¶ 135; Devine Decl. ¶ 35. This materially affects the likelihood that the disclosure will be impactful, and negatively impacts GAP's ability to advance its organizational interest in using the information disclosed to investigate alleged fraud, waste, abuse, and safety violations and publicize the results of those investigations. Am. Compl. ¶¶ 135, 141-43; Devine Decl. ¶ 35.

Defendants argue that these impacts are too attenuated, depending "entirely on guesswork as to how independent decisionmakers will exercise their judgment." Gov. Mot. at 21. But GAP's

injuries are premised "on the predictable effect of Government action on the decisions of third parties." *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *5 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). The record contains evidence of a *direct* link between the whistleblower protections Schedule P/C removes and the willingness of whistleblowers to come forward, not an attenuated chain of causation turning on speculative hypotheses about human behavior. Reuveni Decl. ¶ 12; Devine Decl. ¶ 33; Impacted Member 1 Decl. ¶ 12; Impacted Member 3 Decl. ¶ 10; Impacted Member 5 Decl. ¶ 11. The harms articulated above all flow from the predictable effect that Schedule P/C has had, and will have, on potential whistleblowers. *See Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 487 (D.D.C. 2020) ("The probable effects of a rule can be sufficient to establish standing.") *aff'd*, 105 F.4th 449 (D.C. Cir. 2024); *Oregon Env't Council v. I.R.S.*, 836 F. Supp. 3d 1, 27 (D.D.C. 2026) ("When the 'entire purpose' of a policy is to induce certain behavior from market participants, it is often 'predictable' that the policy will have its intended effect.") (citing *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112-13 (2025)). The whistleblower protections stripped from those employees moved to Schedule P/C (or never afforded to those hired into Schedule P/C) exist for the very purpose of encouraging potential whistleblowers to come forward. *See, e.g., Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 152 (D.C. Cir. 1982) ("A central purpose of the [CSRA] is to provide increased protection for 'whistleblowers.'"). Conversely, it is entirely predictable and foreseeable that eliminating those protections is likely to cause fewer potential whistleblowers to do so. Indeed, GAP's whistleblower clients confirm this impact. Reuveni Decl. ¶ 12. *See People for the Ethical Treatment of Animals v. Stein*, 466 F. Supp. 3d 547, 562 (M.D.N.C. 2020) (finding GAP had standing based on impact of challenged law on potential whistleblowers); *cf. United States v. Garde*, 673 F. Supp. 604, 607 (D.D.C. 1987) ("[I]t is but a short step to the conclusion" that GAP's "efforts to gather and present safety allegations will suffer" if GAP were required to disclose identity of whistleblowers.).[10] The

---

[10] Defendants' reference to GAP's recent press releases, *see* Gov. Mot. at 22, is of no import. These whistleblower disclosures all occurred prior to the issuance of the 2026 EO. In any case, GAP's standing case is not premised on establishing that whistleblowing will never again occur.

causal link here thus "is easily distinguished from the highly attenuated chain of possibilities deemed insufficient in *Clapper*." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 23; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). "Indeed, the D.C. Circuit has routinely found causation established in cases where the relevant third-party conduct ... is voluntary but reasonably predictable." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 24 (citation omitted).

The possibility that agencies may adopt internal policies addressing whistleblower retaliation is immaterial to GAP's organizational injury. *Contra* Gov. Mot. at 22. Agency-level protections cannot replicate those Congress codified in the CSRA because they are discretionary, lack independent enforcement and access to judicial review, and provide no guarantee of a remedy. Most importantly, agency remedies present an institutional conflict of interest, as they require a whistleblower to seek redress from the very agency alleged to have engaged in wrongdoing and retaliation: it is the quintessential fox guarding the henhouse. Regardless, Defendants have made no record as to the existence, scope or effectiveness of any agency-level whistleblower protections—despite filing a Rule 12(b)(1) motion to ensure the Court could assess evidence outside the four corners of the Complaint and having easy access to such evidence, if it existed.

**2. Diversion of Resources**

GAP has also alleged that it is "'divert[ing] and redirect[ing] its limited resources to counteract and offset' the effects" of Schedule P/C, including revamping the services it provides to clients, undertaking new programmatic efforts, and diverting resources to educate potential whistleblowers about the risks of whistleblowing in the face of Defendants' actions. *See Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *5 (citing *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015)); *see also E.Q.*, 835 F. Supp. 3d at 244 ("new programmatic expenditures" to address government interference with legal services offered is "analogous to the paradigmatic organizational injury described by the Supreme Court"). Historically, GAP has been able to tell potential federal employee whistleblowers that laws exist to protect them from retaliation for whistleblowing and create a pathway for vindicating those protections. Am. Compl. ¶ 133; Devine Decl. ¶ 16. GAP has been able to encourage and support

whistleblowing by pointing to its stellar record of defending whistleblowers from retaliation in OSC/MSPB proceedings. Am. Compl. ¶ 133; Devine Decl. ¶ 16. Because Schedule P/C places many federal employees outside of the legal protections in Chapters 23 and 75(II) of the CSRA, GAP has revised its intake procedure for potential new clients and the advice it provides existing clients concerning retaliation. Am. Compl. ¶ 144; Devine Decl. ¶¶ 29-30. GAP must now warn federal whistleblowers who are or may be moved to Schedule P/C that they can no longer rely on these legal protections and may not be able to seek recourse for retaliation through the OSC/MSPB. Am. Compl. ¶ 134; Devine Decl. ¶ 30. *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 29 (discussing impact of nature of advice given to clients). GAP has also devoted time and resources toward new programmatic efforts designed to compensate for the removal of CSRA protections, including evaluating and pursuing alternative legal options for existing and potential clients who may now be vulnerable to retaliation. Am. Compl. ¶ 147; Devine Decl. ¶ 31.

GAP also produces resources about whistleblowing for federal employees, including a whistleblower guide. Am. Compl. ¶ 146; Devine Decl. ¶ 26. GAP must now overhaul this guide and other resources to educate federal employees on Schedule P/C. Am. Compl. ¶ 147; Devine Decl. ¶ 36. This requires redrafting and reformatting these resources, redistributing them, training pro bono volunteer attorneys who provide rapid response and legal support to potential clients, and conducting new trainings for federal employees, the press, and public interest partners, such as unions. Am. Compl. ¶¶ 145, 147; Devine Decl. ¶ 36.

Defendants argue that this theory of standing is foreclosed by *Alliance for Hippocratic Medicine*. Gov. Mot. at 23. Not so. While a plaintiff cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action," *id.* at 19 (quoting *All. for Hippocratic Med.*, 602 U.S. at 394), GAP is not claiming standing based on any diversion of resources toward advocacy against Schedule P/C. Where, as here, government action causes an organization to divert resources to address the detrimental effect of that action on its general organizational mission, this "concrete harm" supports standing. *See Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *5 (citing *All. for Hippocratic Med.*, 602 U.S. at 395); *Am. Anti-Vivisection*

*Soc'y v. U.S. Dep't of Agriculture*, 946 F.3d 615, 618 (D.C. Cir. 2020) (finding organizational standing based on impact to education efforts, including development of "How To Guides, webinars, and informational pamphlets"). "Such concrete and demonstrable injury to [GAP's] activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to [GAP's] abstract social interests." *Havens*, 455 U.S. at 379.

## II. The Court Has Jurisdiction over Plaintiffs' Claims Under *Thunder Basin*

This Court has federal question jurisdiction to hear Plaintiffs' claims, which arise under federal law and the Constitution. *See* 28 U.S.C. § 1331. Congress's choice to channel certain employee claims challenging CSRA Covered Personnel Actions to an alternative "statutory review scheme" adjudicated by an independent MSPB does not change that result. *See Thunder Basin*, 510 U.S. at 207; *see also Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185-86 (2023) ("But a statutory review scheme ... does not necessarily extend to every claim concerning agency action."). This Court retains jurisdiction under *Thunder Basin* unless *both* the Court can "fairly discern[]" a congressional intent to "preclude district court jurisdiction" from the statute's "text, structure and purpose," *and* Plaintiffs' claims "are of the type Congress intended to be reviewed within this statutory structure." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9-10 (2012); *Thunder Basin*, 510 U.S. at 212.

On the first *Thunder Basin* factor, congressional intent to preclude judicial review is no longer fairly discernable in the CSRA in light of the MSPB's lack of independence. The statute itself does not expressly strip district court jurisdiction. Courts' historical inference of such channeling intent, *see, e.g.*, *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009), is inextricably intertwined with Congress's statutory mandate that the MSPB—and thus review of CSRA Covered Personnel Actions—should be insulated from presidential pressure and interference. Congress expressly structured the CSRA to insulate the MSPB from the mechanism of executive control available at the time. *See* 5 U.S.C. §§ 1201-02, 7701(d)(1); S. Rep. No. 95-969, at 6-7, 24 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723, 2729, 2746 ("Establishment of a strong and independent Board and Special Counsel will discourage subversions of merit principles

…. As a result of this structure, the Board should be insulated from the kind of political pressures that have led to violations of merit principles in the past. Both the Board and the Special Counsel will exercise statutory responsibilities independent of any presidential directives" and will be "independent of any control or direction by the President."). If the President has at-will removal authority over MSPB board members, *see, e.g.*, *Trump v. Slaughter*, 609 U.S. 422 (2026), the inferences that prior courts made to discern congressional intent to preclude jurisdiction no longer hold. *See Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 306-07 (4th Cir. 2025), *rev'd on other grounds sub nom. Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339 (2026).

Regardless, the second *Thunder Basin* factor is dispositive here. Though the CSRA allows many personnel action claims brought by federal employees to proceed before the MSPB, Plaintiffs' claims are not among them. As a foundational matter, and contrary to the picture painted by Defendants, *see* Gov. Mot. at 23-24, not every claim related to federal employment belongs in the MSPB, as appellate courts across the country have recognized. *See, e.g.*, *Manivannan v. U.S. Dep't of Energy*, 42 F.4th 163, 171-72 (3d Cir. 2022) ("[The CSRA] funnels only certain employment disputes to the Protection Board. … [T]he mere fact that the challenged conduct occurred in the federal employment context is not enough to bring it within the CSRA's exclusive ambit."); *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1030 (9th Cir. 2025) ("Plaintiffs' *ultra vires* and APA claims plainly fall outside the scope of the CSRA's review provisions."); *Esparraguera*, 101 F.4th at 33 (hearing claim by SES member outside CSRA's review provisions). Courts assess three factors to determine whether Plaintiffs' claims are of the type Congress intended to channel to the MSPB rather than to district court: (1) whether precluding district court jurisdiction forecloses all "meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral" to the statute's MSPB review provisions; and (3) whether the claim is outside the agency's expertise. *Thunder Basin*, 510 U.S. at 212-13. Here, all three factors weigh in favor of review in this Court.

### A. Precluding Jurisdiction Here Would Foreclose Judicial Review

This factor is "all but dispositive," and Plaintiffs' claims must remain in this Court, *Lucas*

*v. Am. Fed'n of Gov't Emps.*, 151 F.4th 370, 387 (D.C. Cir. 2025), because precluding district court jurisdiction would "foreclose all meaningful judicial review" of Plaintiffs' claims, *Axon*, 598 U.S. at 186. This is true for two independent reasons.

*First*, the MSPB lacks jurisdiction to adjudicate the claims Plaintiffs bring here because Defendants stripped the MSPB of that jurisdiction as part of the very acts that Plaintiffs challenge. The MSPB does not have jurisdiction to hear general grievances involving the federal civil service. Instead, where the CSRA's protections apply, the CSRA provides individual employees with the right to seek MSPB review of discrete conduct they allege constitutes a For Cause Action or whistleblower retaliation. *See* 5 U.S.C. §§ 7701(a), 7513(d), 4303(e) 1221(a). Separately, Subpart F of the 2024 Final Rule provided MSPB appeal rights to employees occupying positions moved to an excepted schedule where the moving agency asserted that such a move would eliminate "any procedural and appeal rights"—like the CSRA's protections—that had previously accrued to the employee. 5 C.F.R. § 302.603 (2024).

Defendants have rendered these provisions inapplicable and so cannot now contend that they would permit the MSPB to review their actions. The CSRA's protections—including recourse to the MSPB to challenge certain CSRA Covered Personnel Actions—will no longer apply to those in Schedule P/C positions if Defendants' unlawful actions are allowed to stand. 2026 Final Rule, 91 Fed. Reg. at 5580. And the 2026 Final Rule revoked Subpart F—the only other provision in the CFR that could conceivably have permitted the MSPB to review movement of these positions into that schedule. 2026 Final Rule, 91 Fed. Reg. at 5617-19, 5655; Am. Compl. ¶¶ 80-81. Defendants thus closed the very doors through which they now seek to channel Plaintiffs. Even if (as the government incorrectly contends), Gov. Mot. at 28, an aggrieved employee could have brought claims like Plaintiffs' to the MSPB *prior to* Defendants' actions challenged herein, they cannot do so now. The government cannot seek to eliminate MSPB review of its actions and then claim that illusory MSPB review precludes jurisdiction in this Court.

This fact, alone, resolves this all-but-dispositive prong in Plaintiffs' favor. This Court previously reached that same conclusion in connection with Executive Order 14251, which

purported to strip statutory and contractual collective bargaining rights under the Federal Service Labor Management Relations Statute ("FSLMRS") from certain federal workers. *See Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 249 (D.D.C. 2025) ("*NTEU*") (holding claims not channeled to Federal Labor Relations Authority ("FLRA") because employees at issue "have been excluded from the FSLMRS's coverage by the very Executive Order at issue here."), *stay granted on other grounds*, 2025 WL 1441563 (D.C. Cir. May 16, 2025);[11] *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 259 (D.D.C. 2025) (holding "because the Executive Order excludes the agency subdivisions from the Statute, AFSA cannot seek enforcement of the Statute's provisions through the administrative review scheme established by Congress"), *stay granted on other grounds*, 2025 WL 1742853 (D.C. Cir. June 20, 2025); *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 84 (D.D.C. 2025) (asserting jurisdiction on similar grounds), *stay denied*, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025).[12] Moreover, Judge Pan—the only D.C. Circuit judge to have opined on channeling in connection with Executive Order 14251 to date—found that *Thunder Basin* did not preclude jurisdiction in that case because "the FLRA would almost certainly rely on the Executive Order to dismiss their case for lack of jurisdiction, just like it has handled similar

---

[11] In *NTEU* this Court distinguished the government's key authorities, like *American Federation of Government Employees v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) and *American Federation of Government Employees v. Secretary of Air Force*, 716 F.3d 633 (D.C. Cir. 2013) ("*Air Force*"), on this same logic—namely, that the challenged government action had removed any possibility of reviewing the claims at issue via a statutory review scheme, and therefore channeling was improper. *NTEU*, 780 F. Supp. 3d at 251.

[12] It is no answer to argue (as the government does) that an aggrieved employee could obtain judicial review by bringing a claim before the MSPB which, pursuant to the 2026 Final Rule and Executive Orders, the MSPB would then dismiss for lack of jurisdiction, and which dismissal the employee could then appeal to a federal court. Gov. Mot. at 28. The government advanced, and this Court rightly rejected, that very argument in *NTEU*. As in that case, "[t]he government's argument misses the point" because "by virtue of the Executive Order, the claims ... now are 'expressly outside the [MSPB]'s purview'" to begin with. 780 F. Supp. 3d at 251 (quoting *Am. Fed'n of Gov't Emps., v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007)). A federal court's review would be limited to assessing whether the MSPB erred in concluding it lacked jurisdiction; affirming that decision would not then permit federal court review—it would end the case. *See, e.g.*, *Chadwell v. Merit Sys. Prot. Bd.*, 629 F.3d 1306, 1311 (Fed. Cir. 2010).

cases" and "Congress likely did not intend to require unions to bring futile claims." *Fed. Educ. Ass'n v. Trump*, 2025 WL 2738626, at *6-7 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring).

The government's authorities are all easily distinguishable. In *American Federation of Government Employees*, 929 F.3d at 757, the plaintiffs were able to obtain "most of the review and relief that they sought" from the administrative agency. Not so here. And in *Fausto*, the Supreme Court concluded that Congress had intentionally withdrawn federal court jurisdiction for back pay claims brought by "nonpreference members of the excepted service"—even though they could not obtain statutory relief on those claims—because such employees were deliberately carved out from the definitional sections of Chapter 75. 484 U.S. at 447. The President cannot achieve a similar result here by carving out these employees from Congress's statutory review scheme: It is *Congress*'s intent in designing that review scheme, not the President's interpretation, which is the touchstone for the *Thunder Basin* analysis. *Thunder Basin*, 510 U.S. at 212. The government's argument would mean that employees are excluded from judicial review by the very action they seek to challenge—exactly the kind of denial of "meaningful judicial review" that *Thunder Basin*'s first factor guards against.

*Second*, even if GAP's and NARFE's rescheduled clients and members were entitled to bring these claims before the MSPB in their own right—which they are not—each is a nonprofit organization asserting an organizational harm to its own activities. Neither entity seeks redress of a CSRA Covered Personnel Action, yet each entity has incurred a cognizable injury in fact, *see supra* Section I, caused by actions that the MSPB cannot redress, but this Court can. *Cf. Elgin*, 567 U.S. at 5 ("The CSRA 'established a comprehensive system for reviewing *personnel action taken against federal employees*.'") (quoting *Fausto*, 484 U.S. at 455) (emphasis added). Plaintiffs thus do not complain merely of an inability to obtain "immediate" or "pre-implementation" relief. *Contra* Gov. Mot. at 27. They seek to remedy here-and-now injuries flowing directly from the challenged executive actions—the current harms to NARFE's members and the harms to both GAP and NARFE as organizations from the creation of Schedule P/C—not any future CSRA Covered Personnel Action for which the MSPB might be able to provide redress. Plaintiffs thus

can proceed before this Court. *See Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*, 835 F. Supp. 3d 191, 206-207 (D.D.C. 2025) (because plaintiffs could not meaningfully proceed before the FLRA, CSRA did not preclude federal district court jurisdiction).

The D.C. Circuit has previously underscored the prevailing importance of this *Thunder Basin* factor. *Lucas*, 151 F.4th at 387. That importance is further heightened where, as here, the precluded claims include constitutional violations. *Lamb v. Holder*, 82 F. Supp. 3d 416, 423 (D.D.C. 2015). This first factor therefore weighs definitively in favor of jurisdiction.

**B. Plaintiffs' Claims Are Wholly Collateral to the MSPB's Review Scheme**

The Court need not move past the first factor, but the remaining factors also support jurisdiction. Plaintiffs' claims are "wholly collateral" to the CSRA's review provisions. "Under this factor, courts are to consider the nature of the claim, and whether it is the type of personnel action regularly adjudicated within the CSRA's scheme." *Bakken v. U.S. Military Academy*, 833 F. Supp. 3d 460, 497 (S.D.N.Y. 2026) (cleaned up). It is not. Even if the Executive Orders and Final Rule had left MSPB jurisdiction untouched, Plaintiffs do not challenge CSRA Covered Personnel Actions for which MSPB review was at one point available. *See Elgin*, 567 U.S. at 11-12 (explaining that the CSRA provides a scheme "for covered *employees* to obtain review of adverse *employment actions*") (emphasis added). Their challenge to Defendants' actions turns on questions of executive authority to act in light of statutory and constitutional limitations, not on individualized questions regarding personnel actions.

The CSRA prohibits two main categories of personnel actions: For Cause Actions—removal, extended suspension, and reduction in grade or pay, and certain furloughs, *see* 5 U.S.C. § 7512(1)-(5)—and Prohibited Personnel Practices—including political affiliation discrimination, unlawful preference, or retaliation against whistleblowers, *id.* § 2302(b), (8). Neither the 2026 Final Rule nor the Challenged EOs—the objects of Plaintiffs' claims—are themselves CSRA Covered Personnel Actions, and Defendants do not contend otherwise.[13] *See Am. Fed'n of Gov't*

---

[13] Rescheduling a position does not change the nature of the employee's duties or work, so it is not "a detail, transfer, or reassignment," 5 U.S.C. § 2302(a)(2)(A)(iv), nor a "significant change in

*Emps.*, 139 F.4th at 1031 ("It is telling that in nearly every case cited by Defendants in which a court channeled a constitutional or statutory claim through the CSRA, the plaintiffs raised at least one claim properly within the unquestioned jurisdiction of the MSPB or FLRA."). Rather, Plaintiffs seek a declaration that the government did not have the authority to promulgate a rule and take related action inconsistent with statutory and constitutional limits, as well as certain employees' constitutional rights, and an injunction against the purported exercise of that authority.[14]

The Supreme Court in *Axon* recognized that where, as here, Plaintiffs object to the government's "power generally, not to anything particular about how that power was wielded" in a specific case pertaining to a specific federal employee, such a general authority claim is wholly collateral to the as-applied claims Congress reserved to agencies. 598 U.S. at 193. *Axon* and *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), each distinguish between claims challenging the *existence* of various powers within the FTC or the PCAOB, respectively, which were wholly collateral to those statutory review schemes, and claims challenging *how* those powers were wielded in particular instances. *Axon*, 598 U.S. at 193; *Free Enter. Fund*, 561 U.S. at 490. Reinforcing this point, the Supreme Court in *Axon* analogized the "wholly collateral" prong of *Thunder Basin* to the collateral order doctrine, noting that both turn on whether the claim whose jurisdiction is in question is "separate from the merits" that the tribunal

---

duties, responsibilities, or working conditions," *id.* § 2302(a)(2)(A)(xii). Neither the 2026 Final Rule nor the Executive Orders purport to "significant[ly]" change the nature of an employee's work; instead, they change the governing legal framework applicable to specific personnel actions. *Bakken* is instructive. There, the court concluded that a policy requiring prior approval for public speaking was not a personnel action covered under Chapter 23 or Chapter 75 because, as here, it was a generally applicable polic*y governing* agency personnel, not a personnel action itself. 833 F. Supp. 3d at 485-93.

[14] The government mischaracterizes the relief Plaintiffs seek, inaccurately describing it as "the very relief that the MSPB may supply, and in the context Congress specified: invalidation of an OPM regulation, or of its implementation, insofar as it requires prohibited personnel practices." Gov. Mot. at 32. Plaintiffs do not claim that the actions challenged here "require prohibited personnel practices" or themselves are prohibited personnel practices (or are personnel practices at all). They challenge the executive's authority to take the actions in the first place.

is set up to decide—here, the review of individual CSRA Covered Personnel Actions. *Axon*, 598 U.S. at 193. As *Bakken* recognized, channeling Plaintiffs' generally applicable policy challenge "into the OSC and MSPB even when no personnel action has resulted from the challenged policy would … threaten the balance that Congress struck when drafting the CSRA." 833 F. Supp. 3d at 492.

The conclusion that general-authority claims like this one are wholly collateral to claims challenging discrete personnel actions is consistent with the D.C. Circuit's interpretation of this *Thunder Basin* prong in *Federal Law Enforcement Officers Association v. Ahuja*, 62 F.4th 551, 561 (D.C. Cir. 2023). There, the plaintiff brought an APA challenge to a retirement benefit apportionment policy, but the "gravamen of the ... claims [was] that [OPM]" was "unlawfully direct[ing] apportionment" of "individual retiree's Annuity Supplement[s] to a former spouse." *Id.* The D.C. Circuit noted that challenge therefore went "directly to how OPM calculates civil service benefits for a particular class of beneficiaries," *id.* (cleaned up)—in other words, a challenge to OPM's chosen method of calculating benefits, not a challenge to OPM's authority to calculate benefits. Plaintiffs do not seek relief specific to one class of employees they claim was subjected to a personnel action covered by the CSRA—the type of authority-as-applied challenge at issue in *Ahuja*. Plaintiffs claim the President's conception of Schedule P/C is unconstitutional and unlawful because—in all applications—it exercises authority he does not have. Such a claim does not exist in any sense within the CSRA's statutory review scheme.[15] In any case, the government's position brings *Ahuja* into conflict with the Supreme Court's later holding in *Axon* that objections to the government's exercise of "power generally" are wholly collateral to a statutory review scheme like the CSRA's. *Ahuja* need not, and cannot, be read that broadly.

---

[15] Defendants' citations to *Sackett v. Environmental Protection Agency*, 566 U.S. 120, 130 (2012), and *Air Force*, 716 F.3d at 636, Gov. Mot. at 25, are beside the point. These cases (at most) stand for the proposition that when Congress grants some plaintiffs the right to bring certain claims within a statutory review scheme it implicitly precludes other plaintiffs from bringing those same claims outside that scheme. But for all the reasons discussed above, Plaintiffs do not bring claims that fall within the CSRA's statutory review scheme at all, no matter the plaintiff.

This Court employed precisely this logic in *Abramowitz v. Lake*, 803 F. Supp. 3d 1, 12 (D.D.C. 2025), *appeal filed* Sep. 3, 2025. There, Abramowitz, a terminated federal employee with undisputed recourse to the MSPB in cases of termination, was permitted to bring a collateral federal court "challeng[e] [to] the [government's] 'power to proceed' with his termination at all," distinct from "the substantive rationale underlying his termination." *Id.* Even though a removal is an adverse action covered by Chapter 75, the court held that "his challenge is collateral to the CSRA review scheme" because it raised "constitutional separation of powers" issues concerning the general structure of the agency. *Id.*; *see also Am. Fed'n of Gov't Emps.*, 139 F.4th at 1031 (*ultra vires* claims were collateral to CSRA's review provisions—even when brought "within an individual employment dispute"); *Bakken*, 833 F. Supp. 3d at 498 ("[Plaintiff's] claim is not the CSRA's standard fare, such as employee misconduct, hostile work environments, whistleblowing, and the like" (cleaned up)). As in *Bakken*, "Plaintiff's claim is wholly collateral because it falls into a long line of cases that establishes that federal employees can bring facial, pre-enforcement actions against federal policies outside of the CSRA." *Id.* (cleaned up).[16]

**C. The MSPB Has No Specialized Expertise over Plaintiffs' Claims**

Finally, Plaintiffs' claims "do not 'involve "threshold" and other "questions unique to the employment context" that "fall[] squarely within the MSPB's expertise."'" *Abramowitz*, 803 F. Supp. 3d at 12 (quoting *Axon*, 598 U.S. at 187-89 (internal citation omitted)). While the MSPB "knows a good deal about" how to adjudicate issues related to individual CSRA Covered Personnel Actions, *Axon*, 598 U.S. at 194, such expertise is irrelevant here. No aspect or phase of this case, for example, will require this Court to consider the appropriateness of an individual employee's duties or the propriety of demoting an employee from one GS level to another.

The MSPB has no specialized knowledge about core principles of constitutional and administrative law, statutory interpretation generally, nor "about the separation of powers," and is

---

[16] Defendants' arguments regarding collaterality devolve into a nonsensical digression about Plaintiffs' separation-of-powers and *ultra vires* claims. Gov. Mot. at 30-31. But the question before the Court is whether those claims are collateral to the CSRA's review provisions.

"generally ill-suited to address structural constitutional challenges—like those maintained here." *Axon*, 598 U.S. at 194-95 (internal citation omitted); *cf. Carr v. Saul*, 593 U.S. 83, 93 (2021) (noting Social Security Administration Administrative Law Judges "have no special expertise" in "purely constitutional claims"). To be sure, as Defendants point out, *see* Gov. Mot. at 31-32, where a constitutional question is embedded in the particulars of an individual's employment claim under the CSRA, the MSPB may still adjudicate those constitutional issues as part of adjudicating that employment claim. But observing that the MSPB *might* be capable of considering an issue is not a complete analysis of this *Thunder Basin* factor; the Court must weigh the *relative expertise* of the competing tribunals. Unlike *Elgin,* where resolving the plaintiff's constructive discharge claim (which is at the heart of the MSPB's expertise) would moot his constitutional claims, 567 U.S. at 22-23, this case raises unavoidable questions about the scope of the executive branch's power. Accordingly, Plaintiffs' claims are best addressed by an Article III court in the first instance; the relative balance of MSPB expertise against district-court expertise tips decidedly toward this Court.

Finally, the scope of relief sought makes an Article III court the proper forum for adjudicating these claims. Plaintiffs seek wide-ranging relief not routinely granted by the MSPB, including vacatur of the 2026 Final Rule, injunctive relief against Defendants OPM, Kupor, and the United States, and a declaration that certain provisions of the Executive Orders are unlawful and unconstitutional. Am. Compl. 48-49. By contrast, the consequences of the MSPB's adjudication of ancillary constitutional questions in cases about personnel actions are limited to ordering relief specific to whatever adverse action that employee suffered. The Supreme Court has never suggested that the MSPB should, or may, adjudicate constitutional claims that have wider implications both for executive power and the many thousands of individuals affected by it here.

### D. The CSRA Does Not Remove Judicial Review of Plaintiffs' Claims

Unable to fit the round peg of Plaintiffs' claims into the square hole of claims the CSRA channels to the MSPB, Defendants argue that the CSRA's preclusive power is so vast that Plaintiffs' claims cannot be brought in any forum. Gov. Mot. at 32-35. That argument

mischaracterizes fundamental preclusion principles and the nature of Plaintiffs' claims. While Congress has sometimes precluded some *types of suits* that would frustrate its carefully crafted, comprehensive statutory review scheme, this principle does not apply to a claim that is wholly collateral to and of a different nature than the claims for which Congress established the MSPB. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348 (1984) ("Suits *of this type* would effectively nullify Congress' intent to establish an 'equitable and expeditious procedure.'" (emphasis added) (quoting S. Rep. No. 74-1011, at 14 (1935)). When courts have held that they lack jurisdiction over suits relating to federal employment, it has been because the claims were the *type* of claim covered by the CSRA—challenges to covered personnel actions—and thus Congress's choice to omit certain plaintiffs or specific personnel actions reflects a choice not to allow them at all. *See, e.g., Filebark*, 555 F.3d at 1012. Those decisions have no application to challenges, like this one, grounded in other sources of law, which Congress simply did not address in the CSRA. *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 372 (5th Cir. 2023), *cert. granted, and judgment vacated as moot*, 144 S. Ct. 480 (2023) (section 1331 jurisdiction exists over federal employees' claims outside the CSRA's covered personnel actions); *Manivannan*, 42 F.4th at 173-74 (federal employee's Federal Tort Claims Act and Privacy Act claims "d[id] not concern employment actions covered by [the CSRA]" and thus were not precluded by it). Moreover, courts have not found that constitutional challenges, which Plaintiffs bring here, lack a forum entirely, thus "avoid[ing] the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Esparraguera*, 101 F.4th 28 (consistent with the *Webster* principle, holding that a former SES employee whose claims the CSRA excluded from the MSPB's jurisdiction could bring constitutional claims in federal court).

## III. The Court Has Inherent Equitable Power to Enjoin the Executive Orders (and Agency Action Implementing Them) as *Ultra Vires*

The government is flatly wrong to contend that the President's actions are unreviewable because the President is beyond this Court's inherent equitable authority and because the issuance

of the 2026 EO (and agency action implementing that EO) is an unreviewable exercise of presidential discretion. Gov. Mot. at 35-41. The federal courts have a long tradition—extending to the most recent Supreme Court decisions—of enjoining unlawful and *ultra vires* actions by the President, and Defendants' actions are not exercises of delegated presidential discretion.

### A. The President's Actions Are Subject to Review and Relief Under the Traditional Standard for *Ultra Vires* Review

The Supreme Court "has often held that Plaintiffs may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious act by a public officer.'" *Trump v. Cook,* 2026 WL 1855613, at *11 n.2 (U.S. June 29, 2026) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (internal quotation omitted)); *Armstrong*, 575 U.S. at 327 (describing a "long history of judicial review of illegal executive action, tracing back to England," in which courts have employed their inherent equitable power to enjoin "violations of federal law" by the executive); *Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). Contrary to the government's argument, Gov. Mot. at 36-38, the President is not outside this aspect of the law. *See McAnnulty*, 187 U.S. at 108. "The President's power ... must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Where the President's actions go "beyond [the] limits" prescribed by statute or the Constitution, "[h]is actions are *ultra vires* his authority, and therefore may be made the object of specific relief." *Larson v. Domestic & Foreign Com. Corp.,* 337 U.S. 682, 689 (1949).

Although they move to dismiss for lack of jurisdiction under Rule 12(b)(1), Defendants' arguments focus on whether Plaintiffs' allegations meet the applicable standard for an *ultra vires* claim, *see* Gov. Mot. at 40-41—a merits question that arises only if jurisdiction exists. In their brief, Defendants invoke Rule 12(b)(6) in parallel as a vehicle for these arguments. *See id.* at 36 n.5. Under both Rule 12(b)(1) and 12(b)(6), Defendants' argument fails because the government applies the wrong legal standard. Plaintiffs' claims are governed by the traditional standard for *ultra vires* review, applicable to claims brought where there *is not a* statutory limitation on judicial review—a standard established as far back as *McAnnulty*. Under this standard, the question is

simply whether the executive action at issue is supported by a proper source of authority, such as a statute or the Constitution. *McAnnulty*, 187 U.S. at 108. If not, the action is *ultra vires* and may be enjoined. Defendants do not seriously dispute that Plaintiffs' claims meet this standard.

Defendants cite a different standard, Gov. Mot. at 40, set forth in *Nuclear Regulatory Comm'n v. Texas* ("*NRC*"), 605 U.S. 665 (2025), which applies only to claims brought where there *is* an applicable statutory limitation on judicial review—which is not the case for Plaintiffs' claims. *NRC* interpreted and applied a standard first stated in *Leedom v. Kyne*, 358 U.S. 184 (1958). In *Kyne*, the Supreme Court allowed a challenge to an interlocutory order of the NLRB despite a statutory limitation on judicial review of NLRB "final orders" because the agency action "was an attempted exercise of power that had been specifically withheld" and it violated a "specific prohibition" in the agency's organic statute. *Id.* at 188-89; *see also NRC*, 605 U.S. at 681-82 (interpreting and applying *Kyne*). Before and since, the Supreme Court has consistently applied the heightened *Kyne* standard only to this narrow subset of *ultra vires* claims that would otherwise be subject to statutory limits on judicial review, and it is only as to those claims that the Supreme Court has rendered *ultra vires* review of executive action "unavailable" in all but the most exceptional of circumstances. *NRC*, 605 U.S. at 682 (noting the alternative standard's application to situations where the "statutory review scheme forecloses all other forms of judicial review").

Defendants' argument that *NRC* adopted *Kyne*'s approach as the new universal standard for all forms of *ultra vires* review is irreconcilable with history and precedent. The narrow *Kyne* doctrine has peacefully coexisted with the traditional standard for *ultra vires* review for over sixty-five years and has never displaced it. *Id. Kyne*'s alternative standard developed to address the narrow concern that "ultra vires review could [otherwise] become an easy end-run around the limitation of ... judicial-review statutes." *NRC*, 605 U.S. at 681. This was the case in *Kyne* itself. 358 U.S. at 187. It was also the case in *NRC*, where the plaintiff attempted to circumvent limitations in the Hobbs Act. 605 U.S. at 669, 679-80. Not so here. Where there are no applicable statutory "limitation[s]" on review of a plaintiff's claim, there can be no "end-run" around congressional review limits, and the *Kyne* standard is unwarranted. *Id.* at 681. While the CSRA

limits judicial review of some claims, it does not limit review of the claims at issue here, so *Kyne* does not apply. As another court recently held, "the heightened standard set out by the Supreme Court in [*NRC*] only applies where Congress has provided a reticulated judicial review scheme that allows injured parties 'a meaningful and adequate opportunity for judicial review.'" *League of Women Voters of Mass. v. Trump*, 2026 WL 2620871, at *14 n.32 (D. Mass. Sep. 4, 2026) (quoting *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)); *see also id*. ("Plaintiffs otherwise have no access to judicial relief."). Because there is no statutory limit on Plaintiffs' claims here, this Court should apply the traditional standard of equitable relief.

As the D.C. Circuit has recognized, "[t]he reasoning of *McAnnulty* has been employed repeatedly" since 1902—before and after *Kyne*. *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). This past term alone, the Supreme Court twice enjoined actions by the President as beyond his statutory powers without using the *Kyne* standard. In *Learning Resources, Inc. v. Trump*, private individuals sued to enjoin the President from imposing tariffs through executive orders claiming authority under the International Emergency Economic Powers Act. *See* 607 U.S. 229, 237-39 (2026). Rather than cabining its review to the demanding standard the government advances here, the Court took up directly the underlying question of statutory interpretation necessary to decide the scope of the President's authority. *See id.* at 651 ("Our task today is to decide only whether the power to 'regulate ... importation,' as granted to the President in IEEPA, embraces the power to impose tariffs. It does not.").[17] And in *Trump v. Cook*, where Lisa Cook brought an *ultra vires* claim to challenge the President's decision to remove her from the Federal Reserve board, the Supreme Court embraced even more explicitly the inherent equitable power of courts to enjoin illegal executive action as unsupported by a statute. *See* 2026 WL 1855613, at *11 n.2. It did not adopt the position—urged by the government, by Judge Katsas in dissent at the D.C. Circuit, and by Justice Thomas in dissent at the Supreme Court—that Cook should have to meet

[17] This case further demonstrates Defendants are wrong to say that this Court's inherent equitable review powers are only available against the President in "the narrow context of principal officer removal." Gov. Mot. at 36.

the heightened *Kyne* standard for *ultra vires* review. *See Suppl. Br. for Applicant, Trump v. Cook,* 2025 WL 3284267, at *14; *Cook v. Trump,* 2025 WL 2654786, at *6 (D.C. Cir. Sep. 15, 2025) (Katsas, J., dissenting); *Cook,* 2026 WL 1855613, at *31 (Thomas, J., dissenting). Rather, without once mentioning *Kyne* or *NRC*, the Court undertook its responsibility "to independently interpret the statute and effectuate the will of Congress," *Cook*, 2026 WL 1855613, at *7 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)), as this Court should here.

Regardless, Plaintiffs' claims would meet even the heightened *Kyne* standard because Defendants' actions "violate[] some specific command of a statute." Gov. Mot. at 40 (quoting *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)). Plaintiffs challenge actions contrary to a specific and clear command in the CSRA—namely, a statutory term of art prohibiting the President from removing protections against CSRA Covered Personnel Actions from career civil servants. *See supra* Bkgd.A (describing long history of consistent usage of Exclusion Phrase which Congress adopted into the CSRA); *see also Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1224 (D.C. Cir. 2026) (*ultra vires* review available under *Kyne* "when the President acts based on an utterly unreasonable statutory interpretation or a patent misconstruction of the law" (cleaned up)).

**B. The 2026 EO and Its Implementation Are Reviewable**

Defendants argue that because the President's exercise of un-cabined discretion has been found unreviewable, *see Dalton v. Specter*, 511 U.S. 462 (1994), the 2026 EO and its implementation are also unreviewable. Gov. Mot. at 38-39. Neither *Dalton* nor the other cases cited by Defendants support such a far-reaching conclusion where, as here, the President's actions exceed the limits Congress placed on presidential power.

Defendants mischaracterize the nature of the President's actions and authority at issue here. Plaintiffs do not challenge an abuse of discretion granted to the President by Congress or the Constitution; they challenge the President's authority to act under Section 7511(b)(2) *at all* with respect to career positions. Defendants focus on the discretion Congress conferred on the President in Section 3302(1) to make "necessary exceptions" from the competitive service. Gov. Mot. at 39.

But the exception of positions from the competitive service is not what strips employees of CSRA protections; such "excepted service" positions maintain those protections. *See* 5 U.S.C. §§ 2302(a)(2)(B) (excepted service employees covered); 7511(a)(1)(B)-(C) (same). And many of the positions that the President moved into Schedule P/C in the 2026 EO were *already* in the excepted service (e.g., all attorney positions, 5 C.F.R. § 213.3102(d)), so the President's actions had no effect on the excepted status of those positions. The challenged actions are not an exercise of the President's discretionary authority under Section 3302; they involve the President's designation of positions as subject to the Exclusion Phrase under Section 7511(b)(2)—which confines the President's authority to remove the protections of Chapters 23 and 75(II) only to political appointee positions.

Plaintiffs' claims are thus dissimilar to *Dalton*, which involved unconstrained presidential discretion to approve or disapprove (but not alter) a list of recommended military base closures. 511 U.S. at 465. There, the Court held the President's decision to approve the recommendation non-reviewable because "nothing in [the statute] prevents the President from approving or disapproving the recommendations for whatever reason he sees fit." *Id.* at 476; *see also Reich*, 74 F.3d at 1331 ("*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that authority, judicial review of *an abuse of discretion claim* is not available." (emphasis added)); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (Congress "chose not to limit the President's discretion"), *aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895, 903 (D.C. Cir. 2018) (affirming dismissal of APA claim because decision committed to agency discretion by law); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 24 (D.D.C. 2001) ("The Antiquities Act sets forth no means for reviewing a President's proclamation other than specifying that a President has discretion in his or her use of the Act."), *aff'd on other grounds*, 306 F.3d 1138 (D.C. Cir. 2002). Even the MSPB has recognized that the Exclusion Phrase provides judicially manageable standards for assessing whether a position meets the Exclusion Phrase criterion, *Peace Corps*, 31 M.S.P.R. at 231–32, underscoring

how Plaintiffs' claims categorically differ from the sort of "whatever reason he sees fit" discretion at issue in *Dalton*, 511 U.S. at 476.

Even the cases cited by Defendants recognize that courts can "evaluate whether [the] President [] exercised his discretion in accordance with the standards of the [law]." *Tulare*, 185 F. Supp. 2d at 25. And the government has conceded that in cases involving grants of discretion, "just because the President tells [an] agency to do something and it has no basis in law … Then that can be reviewable." Oral Argument at 1:02:51-1:03:04, *Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec.*, No. 25-5473 (D.C. Cir. argued Mar. 9, 2026), https://tinyurl.com/35udscfc. That is what Plaintiffs seek here. Congress *constrained* the President's discretion in the CSRA through the Exclusion Phrase, cabining his power to remove CSRA protections to only those positions that are political appointments not meant to continue from one administration to the next. The President may not strip the CSRA's protections from positions that fall outside of Congress's intended meaning of the Exclusion Phrase, just as the President could not modify the list of base closure recommendations presented to him in *Dalton* before approving it. Where the President makes decisions about the employment protections available to bona fide political appointees as Congress intended, he acts within the discretion Congress granted him in the CSRA. But that does not mean the President also has discretion to decide which positions are subject to the Exclusion Phrase in the first place or that courts cannot police that line.[18]

Even if the *Dalton* rule of non-reviewability did apply to the challenged presidential actions, which it does not, it would not apply to the agency actions challenged here. The scope of *Dalton*'s application beyond the President's own acts to agency actions "remains an open question in the D.C. Circuit." *Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec.*, 815 F. Supp. 3d 73, 108 (D.D.C. 2025), *appeal pending*, No. 25-5473 (D.C. Cir.). But other circuits and courts in this district have reached the correct conclusion that *Dalton* has no application to agency action,

[18] The weakness of Defendants' statutory discretion argument is exemplified by their repeated reliance on the President's inherent Article II powers under the Constitution. *See infra* Section III.C. These invocations of constitutional authority underscore that this is a case about the President asserting power that Congress did not give him.

because "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential action," *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024), and it would be indefensible to allow the President and any agency to "unilaterally eviscerate the judicial oversight that Congress contemplated in passing the APA" simply by having agencies act under a presidential directive, *Kingdom v. Trump*, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025). The implication of Defendants' argument is staggering: it would mean the President could designate all federal positions as Exclusion Phrase positions and there would be no recourse by anyone. Defendants offer no argument for why *Dalton* should extend to agency action; on the contrary, Defendants recognize that "courts often exercise judicial review" of agency actions, including where the President has directed the exercise of that authority, Gov. Mot. at 38, even where the President's action itself would not be reviewable under the APA.

Finally, even were Defendants correct that *Dalton* non-reviewability applies to agency action, it would still not preclude Plaintiffs' constitutional and *ultra vires* claims. While Defendants cast their net broadly (though imprecisely), challenging "*all* claims relating to the President's exercise of his own statutory discretion," Gov. Mot. at 38 (emphasis in original), their cited authorities apply this principle only to *APA claims* while separately assessing other claims on their merits. *See Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 90-93, 108-10 (assessing constitutional and other claims without reference to *Dalton* non-reviewability theory); *Tulare*, 185 F. Supp. 2d at 24-27 (same); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 405-18 (D. Md. 2011) (assessing *ultra vires* and constitutional claims notwithstanding finding APA claims non-reviewable), *aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012). There is simply no basis to dismiss Plaintiffs' *ultra vires* and constitutional claims based on this purported theory.

### C. Plaintiffs' Separation of Powers Claim Properly Challenges Defendants' Assertion of Constitutional Authority for Their Actions

In scattered places in its brief, the government argues that Count III, Plaintiffs' separation-of-powers claim, "lacks any cause of action" because it "repackage[s] alleged statutory violations

as constitutional claims to evade … limits on ultra vires review." Gov. Mot. at 31, 41. That argument is disingenuous; the government itself makes this a separation-of-powers dispute by putting the extent of presidential versus congressional control of civil servants at issue.

Plaintiffs' separation-of-powers claim asserts that the Constitution gives Congress the authority to regulate the removal of inferior officers and federal employees. *See United States v. Perkins*, 116 U.S. 483, 485 (1886); *Myers v. United States*, 272 U.S. 52, 129 (1926); *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). The government's position, as set forth in the 2025 EO and 2026 Final Rule, is that Article II gives the President exclusive power to manage the civil service as he sees fit, and that to the extent Congress attempted to regulate the oversight and removal of career civil servants in the CSRA, those provisions of the CSRA are unconstitutional. 2025 EO at 1 ("Article II of the United States Constitution vests the President with the *sole and exclusive authority over the executive branch*, including the authority to manage the Federal workforce to ensure effective execution of Federal law." (emphasis added)); 91 Fed. Reg. at 5590 (referencing "the President's judgment within his core Article II authority to address the problems of poor performance, misconduct, and corruption in the civil service"); *id.* at 5627 n.318 (President is not limited to statutory authority; "OPM recognizes that the inherent authority vested in the President under Article II grants him the authority to supervise the executive branch including acting as he did here in issuing E.O. 14171."); *id.* at 5607 ("[D]etermining whether positions are 'of a confidential, policy- determining, policy-making or policy- advocating character' and thus exempt from adverse action procedures, is a part of the core Article II power of the President to manage the executive branch."). Although Defendants have not expressly raised this issue in this motion, they have consistently raised it in merits briefing in other litigation.[19] Thus, even if Plaintiffs were

[19] *See, e.g.*, Defs.' Combined Reply in Supp. of Their Mots. to Dismiss the *Doe* & *Garman* Compls. for Lack of Subject-Matter Juris. & Failure to State a Claim for Relief at 20, *Doe 1 v. Patel*, No. 1:26-cv-00959 (D.D.C. Aug. 18, 2026), ECF 38 ("FBI agents fall squarely within the Article II removal authority."); Defs.' Resp. to Ct.'s Aug. 18, 2026, Minute Ord. Regarding Pls.' Notices of Suppl. Auth. at 17, *Gordon v. Exec. Off. of the President*, No. 1:25-cv-02409 (D.D.C. Sep. 15, 2026), ECF 30 ("Plaintiffs' [(an AUSA, supervisory public affairs specialist and DOJ chief ethics officer)] removal was based on a delegated exercise of the President's Article II removal authority"); Mem. of L. in Supp. of Defs.' Mot. for J. on the Pleadings at 4, *Comey v. U.S. Dep't*

to prevail on their statutory claims, the core constitutional dispute would remain in this case—each side arguing that the wrong branch has seized inappropriate control over the regulation of career civil servants. This is a classic example of a separation-of-powers dispute in the context of federal personnel; it closely resembles similar claims recently heard by the Supreme Court. *See Cook*, 2026 WL 1855613; *Slaughter*, 609 U.S. 422.

That Plaintiffs also press statutory claims does not cause their constitutional claim to run afoul of the line articulated in *Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025). There, the court considered whether the government had improperly impounded funds in violation of a particular appropriations statute, finding that the plaintiffs did not truly press an independent constitutional claim—instead, merely rephrasing their statutory claim in constitutional language. *See id.* Critically, there the government did "not contest[] the constitutionality of the relevant statutes" and "disclaim[ed] any constitutional defense" on appeal, *id.* at 14-15, such that the dispute between the parties truly could be resolved through pure statutory analysis. Not so here.

Applying *Global Health Council*, courts look principally to whether the parties actually dispute a constitutional issue or whether the government's justifications for its actions are purely statutory. For example, in *LULAC*, plaintiffs challenged an Executive Order that directed changes to the federal voter registration form, which plaintiffs argued were inconsistent with federal statutes and exceeded the President's constitutional authority. Applying *Global Health*, the court permitted the separation-of-powers claim to proceed alongside the statutory claims, noting that the government "invok[ed] the Article II Vesting Clause, arguing that the President has inherent constitutional authority" to take the challenged actions. 808 F. Supp. 3d at 71. *See also Am. Hist. Ass'n v. Trump*, 835 F. Supp. 3d 1, 18 (D.D.C. 2026) (reaching same result where a key question was "whether the executive has exceeded its inherent constitutional authority by adopting a policy

---

*of Just*., No. 1:25-cv-07625 (S.D.N.Y. June 5, 2026), ECF 68 ("Because Plaintiff in her duties as an Assistant United States Attorney exercised the President's conclusive and preclusive executive authority, she was removable at-will under Article II by the Attorney General."); Defs.' Suppl. Br. in Supp. of R. 12(b)(1) Mot. to Dismiss for Lack of Juris. at 15, 18, *Comans v. Exec. Off. of the President*, No. 1:25-cv-01237 (E.D. Va. Apr. 7, 2026), ECF 41 ("Article II did require … [Ms. Comans, an SES FEMA employee,] to be removable at will").

incompatible with the express will of Congress”). Conversely, where courts have dismissed constitutional claims, it has generally been where the government did *not* invoke its inherent constitutional authority as a ground for its action that was alleged to be in violation of a statute. *See, e.g.*, *Council for Opportunity in Educ. v. U.S. Dep’t of Educ.*, 2026 WL 1480903, at *3 (D.D.C. May 27, 2026); *Nat’l Tr. for Historic Pres. in the U.S. v. Nat’l Park Serv.*, 821 F. Supp. 3d 62, 75 (D.D.C. 2026); *Am. Ass’n of Physics Tchrs., Inc. v. Nat’l Sci. Found.*, 804 F. Supp. 3d 45, 73 (D.D.C. 2025); *Rural Dev. Innovations Ltd. v. Marocco*, 2026 WL 710260, at *4 (D.D.C. Mar. 13, 2026).

In pressing their separation-of-powers claim, Plaintiffs seek a declaration that the CSRA is a valid exercise of Congress’s constitutional authority, and that the executive branch has exceeded its Article II authority and intruded on Congress’s own powers by attempting to regulate the removal of federal employees and inferior officers via “measures incompatible with the expressed or implied will of Congress.” *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Supreme Court precedent firmly establishes that this power belongs to Congress. *Perkins*, 116 U.S. at 485; *see also Comans v. Exec. Off. of the President*, No. 1:25-cv-01237 (E.D. Va. July 21, 2026), ECF 64 (noting that *Slaughter* did not touch the *Perkins* “line of cases”); *Morrison v. Olson*, 487 U.S. 654, 724 n.4 (1988) (Scalia, J., dissenting); *Free Enter. Fund*, 561 U.S. at 500. As the government disputes this allocation of constitutional powers in a way that could be dispositive to the outcome of the case, Count III presents a true constitutional claim and must be allowed to proceed, particularly at this early stage of litigation.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants’ Motion to Dismiss.

Dated: October 23, 2026

Respectfully submitted,

By: */s/ Corey Stoughton*

SELENDY GAY PLLC
Andrew R. Dunlap*
Corey Stoughton (D.C. Bar No. 472867)
Drake Reed*
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
adunlap@selendygay.com
cstoughton@selendygay.com
dreed@selendygay.com

PROTECT DEMOCRACY PROJECT
Ori Lev (D.C. Bar No. 452565)
Julia L. Torti*
Protect Democracy Project
2020 Pennsylvania Ave. NW, Suite #163
Washington, D.C. 20006
Tel: (202) 579-4582
Fax: (202) 769-3176
ori.lev@protectdemocracy.org
jules.torti@protectdemocracy.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*