# Exhibit 2

**Declaration of Thomas Devine**

I, Thomas Devine, declare as follows:

1. I am over the age of 18 and have personal knowledge of the facts in this declaration.

2. I am a graduate of Georgetown University and Antioch Law School.

3. I am the Legal Director of the Government Accountability Project (GAP), a nonprofit, nonpartisan, public interest whistleblower protection and advocacy organization. I have served in this role since approximately 1980 and have worked at GAP since 1979.

4. I have authored or co-authored numerous books and law review articles about whistleblowing and that analyze and monitor the track records of whistleblower rights legislation. *See, e.g.,* Tom Devine, *The Whistleblower's Survival Guide: Courage Without Martyrdom* (Fund for Constitutional Government, 1997); Thomas M. Devine, *The Whistleblower Protection Act of 1989: Foundation for the Modern Law of Employment Dissent*, Administrative Law Review, 51 no. 2 (1999): 531-79; Tom Devine and Tarek F. Maassarani, *The Corporate Whistleblower's Survival Guide: A Handbook for Committing the Truth* (Berrett-Koehler Publishers, 2010); Samantha Feinstein and Tom Devine, *Are Whistleblowing Laws Working? A Global Study of Whistleblower Protection Litigation* (International Bar Association & GAP, 2021).

5. I am familiar with the Administration's January 20, 2025, Executive Order, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce,* and its June 3, 2026, Executive Order, *Implementing Schedule Policy/Career in the Excepted Service* (the "Executive Orders"). I am also familiar with Office of Personnel Management's 2026 regulation *Improving Performance, Accountability and Responsiveness in the Civil Service*, 91 Fed. Reg. 5580 (Feb. 6, 2026) (the "Final Rule"); 2024 regulation Upholding Civil Service Protections and Merit System Principles, 89 Fed. Reg. 24982 (April 9, 2024); and the issuance and partial implementation of Executive Order 13957 of October 21, 2020 (*Creating Schedule F in the Excepted Service*), which was issued by President Trump near the end of his first term. On September 17, 2024, I testified before the Senate Homeland Security and Governmental Affairs Committee about Executive Order 13957 and the Nixon Administration's prior attempt to politicize the civil service through the Malek Manual.

<u>Government Accountability Project</u>

6. GAP is an independent, non-partisan, and non-profit organization founded in 1977 that promotes corporate and government accountability through effective, impactful whistleblower disclosures; protecting whistleblowers; providing legal guidance to whistleblowers on how to make an effective, impactful and legally protected disclosure; promoting whistleblowing as a means of ensuring accountability for fraud, waste, abuse, and threats to public safety; advancing occupational free speech, and empowering citizen activists. GAP's mission is providing a safe, effective voice for those who use free speech rights to challenge abuses of power that betray the public trust.

7. GAP has led or been on the front lines of campaigns to enact or defend nearly all modern whistleblower laws passed by Congress, including the Civil Service Reform Act of 1978 (CSRA), the Whistleblower Protection Act of 1989, which amended the CSRA, as well as 1994 and 2012 amendments to this legislation. The Whistleblower Protection Act is the primary law that empowers federal employees to report violations of laws, rules or regulations, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to the public health and safety free from retaliation.

8. Internationally, GAP teamed up with professors from American University Washington College of Law to author a model whistleblower law approved by the Organization of American States to implement its Inter-American Convention against Corruption. In 2004, GAP led the campaign for the United Nations to issue a whistleblower policy that protected public freedom of expression for the first time at intergovernmental organizations, and in 2007 analogous campaigns at the World Bank and African Development Bank. In 2016 I was a leader in drafting a whistleblower protection law subsequently enacted for Serbia. In 2021 I co-authored an assessment of best practices for all 48 nations globally that have national whistleblower laws. In December 2023, GAP led a successful campaign with the United Nations Convention Against Corruption for a resolution favoring best practice global whistleblower rights enacted unanimously by 160 nations. I am regularly invited to speak on whistleblowing in international tours sponsored by the State Department, where the staff have referred to me as the "Ambassador of Whistleblowing."

9. GAP is one of the founding members of the Make it Safe Coalition, a non-partisan, cross-ideological network of more than 75 organizations whose members pursue a wide variety of missions that span defense, homeland security, medical care, natural disaster aid, scientific freedom, consumer hazards, government accountability, banking and finance, nuclear safety, food integrity, and corruption in government contracting and procurement. We are united in the cause of protecting those in government who honor their duties to serve and warn the public. Our coalition led the citizen campaign for passage of the Whistleblower Protection Enhancement Act, which recognized across issue areas that civil servant whistleblowers are guardians against legal violations, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to the public health and safety.

10. GAP currently employs eleven attorneys, part of a team of twenty-two employees. GAP has an annual budget of $5.8 million.

11. GAP's whistleblower protection and advocacy work are carried out in several ways. First, GAP provides legal advice, representation, and strategic guidance to whistleblowers, including by helping them make legally protected disclosures and/or seeking justice if they have suffered unlawful retaliation because of their whistleblowing. Second, GAP uses the information disclosed by whistleblower clients to conduct thorough investigations of alleged fraud, waste, abuse, and safety violations and publicizes the results of those investigations to help ensure accountability. Third, GAP provides education to support whistleblowers across the globe and build broad public support for the essential role whistleblowers play in protecting the public interest. Fourth,

GAP participates in legislative initiatives, including drafting and supporting whistleblower protection laws. Our work is described at https://whistleblower.org/whatwedo/.

<u>GAP's Legal Representation Function</u>

12. Federal employees who reasonably believe they have information concerning violations of laws, rules or regulations, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to public health and safety often come to GAP for legal advice and assistance. GAP supports many of those whistleblowers with legal representation and strategic guidance in exercising their rights to make protected whistleblower disclosures, including but not limited to presenting their disclosures to agencies, such as the Office of Special Counsel and/or agency Inspectors General offices authorized to receive whistleblower complaints, Congress, government regulators, civil society organizations, impacted community groups, and the media. GAP also represents whistleblowers who have been retaliated against because of their whistleblowing activity.

13. Since its founding, GAP has represented or directly helped thousands of employee whistleblowers from companies and governments. Many federal employee whistleblowers, including some of those supported by GAP, were, at the time of their whistleblowing, in positions that meet the criteria for inclusion in Schedule P/C.

14. The first step in representing a new whistleblower is an intake interview. GAP has conducted thousands of such interviews, both for those seeking to make disclosures and for those seeking to defend themselves from retaliation for their whistleblowing. The purpose of the interview is to hear the whistleblower's story but also to counsel the whistleblower on their rights and options and what retaliation to expect should they decide to proceed and "blow the whistle." This advice depends upon the contours of the whistleblower protections under the CSRA. I think of this discussion as attempting to talk the potential whistleblower out of proceeding in light of the potential impact on their life. It is a primary duty that GAP respect potential whistleblowers' right to make fully informed decisions on the retaliation they are risking, consulting with their families and dependents. Whistleblowers need to understand that once they start the process of whistleblowing, there is no going back, and they cannot easily quit in the middle.

15. Should whistleblowers choose to move forward with a disclosure and work with GAP, GAP then assists these whistleblowing clients in navigating the legal protections provided by the CSRA to ensure that clients report in a way that maximizes both the impact of the disclosure and their available protections.

16. One of the unfortunate consequences of being a whistleblower is the potential for retaliatory employment action. Such retaliation is prohibited under federal law with respect to federal employees in covered positions. As a result of these statutory protections, I have been able to tell prospective whistleblowers that GAP has a stellar record of defending whistleblowers from retaliation and that although they may suffer illegal retaliatory action, the administrative process before the Office of Special Counsel (OSC) and Merit Systems Protection Board (MSPB), or subsequent appeal to the Federal

Circuit, is likely to provide a remedy for such illegal conduct, most typically through a negotiated settlement.

17. In representing thousands of federal employee whistleblowers, GAP has observed that these statutory protections are critical to providing federal employees with the confidence to disclose misconduct. GAP's federal employee clients have reported that the existence of these whistleblower protections has been an important factor in their willingness both to share information and to make a disclosure containing a level of detail sufficient to bring about change. Some GAP clients would not have come forward and blown the whistle absent these protections.

18. When our whistleblowing clients decide to proceed and are subjected to retaliatory action by their federal government employing agency, GAP provides them legal representation to challenge the retaliatory action before the OSC, and, subsequently, in MSPB proceedings and otherwise. Vindicating whistleblowers' right to be free from retaliation is essential to ensuring the continued flow of information concerning violations of laws, rules or regulations, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to the public health and safety from whistleblowers, and its dissemination to the public.

19. Prevailing parties in MSPB proceedings are entitled to attorney's fees, and settlements in OSC proceedings often include attorney's fees as well. Federal law does not provide for attorney's fees for representation of whistleblowers in federal court. Since 2020, GAP has represented over 45 federal employees in OSC/MSPB proceedings and recovered approximately $402,650 in attorney's fees for such representations.

Investigations

20. For decades, GAP's investigations have exposed corruption and kept public, private, and international organizations and corrupt individuals accountable, contributing to thousands of articles in major news outlets.

21. GAP frequently supplements and further corroborates whistleblowers' disclosures through investigations. Freedom of Information Act (FOIA) requests, as well as records and testimony gleaned in the course of litigation discovery, contribute to developing additional evidence about the fraud, waste or abuse disclosed by a whistleblower.

22. Federal whistleblowers' disclosures have also spurred collaborative cross-border investigations. Using independent sourcing, bulk data analysis through cutting-edge tools, and open-source research, GAP takes whistleblowers' disclosures and builds deep-dive investigations that have resulted in high-profile publications with media partners. For example, GAP's investigations sparked by federal whistleblowers have uncovered and publicized misconduct involving drug safety, federal contractor corruption, anti-terrorism efforts, protection of US troops, and dangerous nuclear waste, unsafe nuclear power plants, contaminated meat, immigration detention abuse, and illegal domestic surveillance.

23. GAP's investigations function is critically dependent on whistleblowers being willing to share information with GAP. Absent whistleblowers, GAP would not have the information necessary to identify investigation targets or to guide its investigations and would not be able to publicize the wrongdoing that such investigations uncover. One specific example: after the train derailment in East Palestine, Ohio, federal employee and contractor whistleblowers provided information that led GAP to file FOIA requests, take affidavits of impacted residents, and secure the review and testimony of independent toxicologists. All this led to GAP representing and working with additional whistleblowers who were emboldened to come forward because of GAP's successful investigative and advocacy efforts.

Education

24. GAP's education function shares GAP's expertise to support whistleblowers across the globe and build broad public support for the essential role whistleblowers play in protecting the public interest.

25. GAP produces resources about whistleblowing for both federal employees considering reporting abuses and for key whistleblower allies, such as journalists and public interest advocates, who often work with federal employees and receive valuable information about misconduct. GAP also shares its expertise on whistleblowing through frequent talks, trainings, and workshops to a wide range of audiences, including students, concerned citizen groups, professional associations, Congressional or agency staff, unions, corporate leadership, and the general public. GAP works closely with academics on whistleblowing-related research and scholarship.

26. GAP's education function includes the preparation of a number of whistleblower guides that it provides to the public and prospective whistleblowers. For example, GAP publishes a whistleblower guide for federal employees, *Truth-Telling Government: A Guide to Whistleblowing for Federal Employees, Contractors, & Grantees*, available at https://whistleblower.org/resources/, as well as guides for journalists and civil society organizations who may interact with whistleblowers about how to do so safely and effectively. GAP's free education resources can be found at https://whistleblower.org/resources/#resources-about-whistleblowing.

27. Among the ways that GAP advances its education function are maintaining a blog, producing news articles, press releases, and reports, and issuing fact sheets and action alerts. These materials rely on and relay the important evidence that whistleblowers have provided about both public and private employers' unethical or illegal activities.

28. In short, GAP's education efforts ensure that whistleblowers are protected and make a difference, thus increasing the flow of information that is the fuel of accountability.

Impact of the Executive Orders and the Final Rule

29. The Executive Orders and Final Rule have a direct impact on GAP's legal representation of whistleblower clients, investigations, and education efforts. As a result of the

movement of federal employee positions into Schedule P/C, GAP must fundamentally alter its intake process for federal employees and the advice it provides existing clients concerning retaliation for prior protected whistleblowing activity in the event that these individuals' positions are moved to Schedule P/C.

30. As described above, the first step in representing a new federal whistleblower is the intake interview at which GAP explains to the whistleblower the possible consequences of his actions and the applicable legal framework that, until the Executive Orders and Final Rule, provided protections against retaliation for the vast majority of federal employees. Now, GAP must tell potential federal whistleblowers who are in or may be moved to Schedule P/C that they lack or could lack the protections described above and are unlikely to prevail in the event of employer retaliation for their whistleblowing. This fundamentally alters GAP's relationship with clients, affecting their willingness to make disclosures; GAP's ability to work on their behalf; the level of services GAP can provide; the demand for those services; and the general counseling GAP provides to potential clients inquiring about GAP's services.

31. GAP has also devoted time and resources toward new programmatic efforts designed to compensate for the removal of these whistleblower protections, including evaluating and pursuing alternative legal options for existing and potential clients who may now be vulnerable to retaliation.

32. As a result of many federal employees losing their rights to vindicate unlawful retaliation before the OSC/MSPB, the Executive Orders and Final Rule will result in substantially fewer federal employees who will decide to follow through and blow the whistle. If fewer federal employees agree to blow the whistle, GAP's efforts to gather and present information concerning legal violations, gross mismanagement, gross waste of funds, abuses of authority, and substantial and specific dangers to the public health and safety will suffer.

33. Indeed, this in turn will create a vicious cycle of further silencing and suppressing other federal employees from coming forward—even those not impacted directly by the Executive Orders and Final Rule. GAP has long seen a pattern that when one employee dares to exercise their whistleblower rights when represented by GAP, often through media reporting or congressional oversight, more employees come forward to blow the whistle, offering either new evidence supporting the original client's disclosures of wrongdoing, or with new disclosures entirely after learning that GAP is available to provide legal representation and support. When directly impacted employees are silenced due to the loss of their rights, other employees will also stay silent and not seek assistance from GAP, as they will not be spurred to action by the disclosures that would have been made by the directly impacted employees. In this way, a vicious cycle of silence is created and perpetuated.

34. The Executive Orders and Final Rule's elimination of many federal employees' OSC and MSPB rights will also result in fewer federal whistleblowers who are able to litigate their retaliation claims in OSC and MSPB Proceedings. A direct consequence of that will be a substantial shrinking of GAP's litigation function. Fewer whistleblowers, coupled with

fewer of those whistleblowers with OSC and MSPB rights, will mean fewer clients that GAP can represent in OSC and MSPB proceedings. The result will be a decline in the revenue that GAP earns from representing whistleblowers in such proceedings. Even if whistleblowers have rights to pursue claims in federal court, the attorney fee provisions of the CSRA would not apply to such claims. The Executive Orders and Final Rule will therefore have a direct and substantial financial impact on GAP.

35. The Executive Orders and Final Rule will also impede GAP's ability to investigate and publicize important information related to whistleblower disclosures. These investigations depend on whistleblower willingness to share information which, in turn, depends on access to CSRA protections. And even if some federal employees are still willing to blow the whistle despite the loss of CSRA protections, the Executive Orders and Final Rule will also affect the level of detail of such disclosures and whistleblowers' willingness to identify themselves, which materially affects the likelihood that the disclosure will be impactful.

36. As a result of the Executive Orders and Final Rule, GAP must revise its federal employee whistleblower guide and other educational materials to reflect the establishment of Schedule P/C and the loss of protections for many federal employees. Updating these materials will entail redrafting and reformatting these resources, redistributing them through multiple partner channels, social media and press outreach, and conducting new trainings for federal employees as well as for the press, public interest partners such as unions, professional associations and civil society organizations that interact with federal employees in the course of their work. GAP has also expended resources training pro bono volunteer attorneys for rapid response and legal support because of the Executive Orders and Final Rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 21, 2026.

Thomas Devine

Thomas Devine