**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GOVERNMENT ACCOUNTABILITY PROJECT, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *et al.*,<br><br>*Defendants*. | Case No. 25-0347 (PLF) |

**[PROPOSED] BRIEF OF *AMICUS CURIAE* JUSTICE CONNECTION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 2

I. The Rule threatens to chill the protected speech of tens of thousands of federal employees. ........ 2

A. This sweeping reorganization of the federal workforce constitutes a sea change. ........ 2

B. Congress specifically designed the CSRA to prevent political patronage. ........ 4

C. The First Amendment prevents the government from punishing or removing employees for their political affiliation where political loyalty is not necessary for the role. ........ 5

D. Precedent suggests that Schedule P/C could lead to widespread corruption and waste and invite constitutional litigation. ........ 8

II. The CSRA does not channel Plaintiffs' systemic challenges to executive actions. ........ 9

A. The exceptional circumstances of this case necessitate judicial review under *Thunder Basin*. ........ 9

B. Judicial review is the only way to guarantee Plaintiffs' consequential claims are heard. ........ 12

C. The MSPB has been captured and litigants who are forced to appear before it will not receive fair adjudication. ........ 14

CONCLUSION ........ 16

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023)....11

*Beckwith v. Clark County*, 827 F.2d 595 (9th Cir. 1987)....3

*Branti v. Finkel*, 445 U.S. 507 (1980)....5, 6

*Comey v. United States Department of Justice*, 25-CV-7625, 2026 WL 1142679 (S.D.N.Y. Apr. 28, 2026)....10, 12–13

*Elrod v. Burns*, 427 U.S. 347 (1976)....5

*Esparraguera v. Department of the Army*, 101 F.4th 28 (D.C. Cir. 2024)....2

*Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023)....13–14

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010)....11

*Heffernan v. City of Patterson*, 578 U.S. 266 (2016)....6

*O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996)....5

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)....5–6

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)....9

**Statutes**

5 U.S.C. § 1201....14

5 U.S.C. § 1202(a)....14

5 U.S.C. § 1214....13

5 U.S.C. § 2302....13

**Other Authorities**

Alexandra Sabater Baerge & Jean R. Santiago Cruz, *A Spoiled Spoils System: Puerto Rico's Epidemic of Political Discrimination and the Federal Courts*, 85 Rev. Jur. U.P.R. 1327 (2016)....9

Andrea Hsu, *Trump strips job protections from 8,000 federal workers*, WYPR (June 3, 2026), https://perma.cc/6F4C-BDEX....3

Andrea Hsu & Carrie Johnson, *Beyond 'draining the swamp': How Trump is knocking down checks on presidential power*, NPR (Sep. 17, 2025), https://www.npr.org/2025/09/17/nx-s1-5475191/trump-executive-power-supreme-court-whistleblower ..........14

Appendix, 91 Fed. Reg. 34893 (June 3, 2026) ..........3

*Appendix to Executive Order, Implementing Schedule Policy/Career in the Excepted Service*, The White House, https://perma.cc/3LD4-2FA3 (last visited Oct. 26, 2026) ..........3

Chris Piper, *Schedule Policy/Career Extends Beyond Policy Roles, Stripping Job Protections from Legal, Budget, Human Resources and Independent-Agency Personnel*, Partnership for Public Service: Blog (June 16, 2026), https://perma.cc/S3VJ-5FAA..........3

Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978)..........5

Drew Friedman, *After Slaughter decision, MSPB no longer calling itself 'independent'*, Federal News Network (July 21, 2026), https://perma.cc/UR7J-862S..........15

Drew Friedman, *Trump moves about 8,000 federal positions to Schedule Policy/Career*, Federal News Network (June 3, 2026), https://perma.cc/FFC3-2MZP ..........3

Executive Order No. 14410, 91 Fed. Reg. 34893 (June 3, 2026)..........3

Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended at 5 U.S.C. §§ 1501–08, 7321–26) ..........5

Improving Performance, Accountability, and Responsiveness in the Civil Service, 91 Fed. Reg. 5580 (Feb. 6, 2026)..........2, 7, 10, 12

Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563 (2024) ..........4

Memorandum from OPM Director Scott Kupor to Heads of Departments and Agencies on Initial Implementing Guidance for Schedule Policy/Career Final Rule (Feb. 5, 2026), https://perma.cc/BK55-HU4V ..........6

Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883)..........4

S. Rep. No. 95-969 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 2723 ..........5

Stephen A. Plass & Naomy M. Rivera, *Executive Power and Patronage: Lessons from Puerto Rico*, 52 U.C. Law S.F. Const. Q. 80 (2024) ..........8

## INTEREST OF *AMICUS CURIAE*

Justice Connection provides direct support to the Department of Justice's apolitical career workforce. As a network of DOJ alumni, the organization connects current and recent employees with pro bono legal representation, mental health counseling, whistleblower assistance, employment help, coaching, and media support. It also advocates for the integrity of DOJ's mission-critical work and speaks out in defense of the rule of law. Justice Connection operates as an independent 501(c)(3) organization. It submits this brief because it has a direct and informed interest in ensuring that the civil service remains apolitical and, merit-based, as Congress intended. The reclassification of more than one hundred DOJ position descriptions threatens to upend that status quo.

## SUMMARY OF ARGUMENT

In drafting the Civil Service Reform Act (CSRA), Congress intended to protect all but a narrow class of political appointees from termination on the basis of their political ideology. President Trump's Executive Order 14171 (E.O. 14171), formalized by the Office of Personnel Management (OPM) in a final rule (the Rule), flouts this clear intent by vastly expanding this limited power to permit the president to reclassify tens of thousands of federal employees as Schedule Policy/Career (Schedule P/C). Because these reclassified employees can be fired without explanation or pre-dismissal appeal before a neutral decisionmaker, the Rule opens the door to government coercion of political affiliation and belief that will chill the federal workforce.

The Supreme Court has consistently interpreted the First Amendment as prohibiting the government from hiring, firing, or taking other adverse employment actions on the basis of the actual or perceived political affiliation of an employee. By adopting this Rule, Defendants invite the president to exercise his discretion in moving thousands of federal employees who previously

enjoyed removal protections into a Schedule in which they are terminable at-will, which is precisely what President Trump has done.

The Court should reject Defendants' efforts to channel Plaintiffs' claims into the CSRA's administrative review scheme. Plaintiffs' case goes far beyond the individual appeals and personnel actions typically heard by the Merit Systems Protection Board (MSPB) and the Office of Special Counsel (OSC) and instead challenges the legality of a government-wide scheme that Defendants attempt to justify by relying on the president's inherent Article II powers. The Rule threatens to expose tens of thousands of employees to the loss of longstanding protections against politically motivated termination. Resolution of this claim could impact the statutory and constitutional rights of a broad swath of the federal workforce, and thus it warrants prompt and fair consideration.

## ARGUMENT

### I. The Rule threatens to chill the protected speech of tens of thousands of federal employees.

#### A. This sweeping reorganization of the federal workforce constitutes a sea change.

Defendants assert that the Executive Branch may override Congress's constitutional authority to establish and set rules for the federal civil service. ECF No. 37, Am. Compl. ¶¶ 7–14, 176–79 (Am. Compl.). Defendants made these changes final over the opposition of current and former civil servants, nonprofit organizations, federal employee unions, and legal experts. *Id.* ¶¶ 106–21. One of the explicit purposes of the changes is to deprive covered employees of their property interest in certain federal employees' procedural rights. Improving Performance, Accountability, and Responsiveness in the Civil Service, 91 Fed. Reg. 5580, 5580, 5606, 5657 (Feb. 6, 2026) (making employees who are moved to Schedule P/C ineligible for CSRA protections); *see Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) ("[A]

property interest exists if the employee can be removed only for cause.") (citation modified); *Beckwith v. Clark Cnty.*, 827 F.2d 595, 598 (9th Cir. 1987) (plaintiff had "property right in his civil service status"). The Executive has already done so by reclassifying 8,000 employees[1] and moving them to at-will positions without the opportunity to be heard as to why their positions are not of a "confidential, policy-determining, policy-making, or policy-advocating character." *See* ECF No. 45, Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss at 15 (MTD Opp'n). The federal government could do the same to tens of thousands more.[2]

While the administration asserts that these reclassifications are intended to provide accountability for employees in "confidential, policy-determining, policy making, and policy advocating roles," E.O. 14171, it has stretched these terms far beyond any ordinary meaning typically assigned to them.[3] For example, hundreds of legal, human resources, and budget and finance positions have been converted, despite not being traditional policy-making roles.[4] Converting these positions will function to allow the administration to exert political control over employees in reclassified positions.[5] This is particularly concerning given the important role that legal, human resources, and financial employees play in the function and management of their employing agencies.[6] And the uncertainty of whether additional positions will be reclassified—

---

[1] *Appendix to Executive Order, Implementing Schedule Policy/Career in the Excepted Service*, The White House, https://perma.cc/3LD4-2FA3 (last visited Oct. 26, 2026). The Appendix is also located at 91 Fed. Reg. 34893, 34896–35124 (June 3, 2026).
[2] Exec. Order No. 14410, 91 Fed. Reg. 34893, §§ 1, 5 (June 3, 2026); Andrea Hsu, *Trump strips job protections from 8,000 federal workers*, WYPR (June 3, 2026), https://perma.cc/6F4C-BDEX.
[3] Chris Piper, *Schedule Policy/Career Extends Beyond Policy Roles, Stripping Job Protections from Legal, Budget, Human Resources and Independent-Agency Personnel*, P'ship for Pub. Serv.: Blog (June 16, 2026), https://perma.cc/S3VJ-5FAA.
[4] *See supra* note 1.
[5] Hsu, *supra* note 2, *Trump strips job protections from 8,000 federal workers*, https://perma.cc/6F4C-BDEX.
[6] Drew Friedman, *Trump moves about 8,000 federal positions to Schedule Policy/Career*, Fed. News Network (June 3, 2026), https://perma.cc/FFC3-2MZP.

and the criteria that will be used to make those decisions—will serve to chill protected First Amendment speech, including exercising statutory whistle blower rights, which necessarily requires free speech. Federal employees who once felt comfortable reporting waste, fraud, abuse, or mismanagement because they were protected from retaliation now fear for their livelihoods if they do so. Some reclassified employees have already reported being "less willing to raise issues with their supervisors, advocate for the positions and opinions of their teams, push back against concerning policy decisions, and engage in productive internal debate within their agencies." *See* MTD Opp'n at 16; ECF No. 44-2, Impacted Member 1 Decl. ¶¶ 9–11; ECF No. 44-3, Impacted Member 2 Decl. ¶¶ 9–10; ECF No. 44-5, Impacted Member 4 Decl. ¶¶ 9–10; ECF No. 44-6, Impacted Member 5 Decl. ¶¶ 9–10; ECF No. 44-7, Impacted Member 6 Decl. ¶¶ 9–12; ECF No. 44-8, Impacted Member 7 Decl. ¶¶ 8–9. These employees have also censored their political participation outside of work due to their fear of retaliation. *See* Impacted Member 3 Decl. ¶ 9; Impacted Member 6 Decl. ¶ 13; Impacted Member 7 Decl. ¶ 10.

### B. Congress specifically designed the CSRA to prevent political patronage.

Congress has long recognized a need to create and protect a merit-based federal employment system, and it began passing laws to that end in 1883. The Pendleton Act reflected Congress's belief that federal workers should be hired based on their qualifications rather than their political affiliation or ideology. Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883). Congress saw this as a necessary response to the so-called spoils system, under which "[p]olitical leaders installed cronies—sometimes manifestly unqualified ones—in a range of positions, with the ever-present prospect of turnover undermining expertise, morale, and the quality of government service."[7] The Hatch Act subsequently restricted federal employees' political

[7] Katherine Shaw, *Partisanship Creep*, 118 Nw. U. L. Rev. 1563, 1573 (2024) (citing Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 Am. Hist. Rev. 301, 301–02 (1959)).

activities to ensure they would remain nonpartisan while executing official duties. Hatch Act, Pub. L. No. 76-252, 53 Stat. 1147 (1939) (codified as amended at 5 U.S.C. §§ 1501–08, 7321–26). The CSRA embraced these prior civil service protections while also expanding procedural protections and review mechanisms. Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978). Specifically, the CSRA created an independent MSPB to mitigate the political conflicts of interest that existed under the prior system for adjudicating civil servants' claims. *See* S. Rep. No. 95-969, at 5, 24 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723. Each of these laws was thus intended to insulate executive branch administration from politics and to allow the government to function in a manner that benefits all Americans, regardless of political affiliation.

### C. The First Amendment prevents the government from punishing or removing employees for their political affiliation where political loyalty is not necessary for the role.

The Rule will permit the government to punish or remove employees for their political beliefs, speech, or association, which violates the First Amendment. The "political patronage" line of cases forbids governments from hiring, firing, promoting, transferring, or taking other adverse employment actions on the basis of actual or perceived political affiliation of an employee, *see Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990), where political affiliation is not a "reasonably appropriate requirement for the job," *see O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). This line of cases establishes that government employment decisions based on political affiliation violate the First Amendment because they are conditioned on employees aligning their speech and association with government leaders, *Branti*, 445 U.S. at 514, and because they coerce employees to conform their beliefs, *see id.*, and distort the electoral process by insulating the incumbent party from political challengers and raising the costs of political dissent. *See Elrod*, 427 U.S. at 355–56. These protections apply even where the government targets an employee because

of their *perceived*, rather than actual, political ideology. *See Heffernan v. City of Patterson*, 578 U.S. 266, 270 (2016).

The Supreme Court has recognized that for a small class of high-level policymakers and staff, the "government's interest in securing employees who will loyally implement its policies" can be properly advanced by hiring and firing based on political views. *See Rutan*, 497 U.S. at 74. The Court described this limited exception in *Branti*:

> It is [] clear that party affiliation is not necessarily relevant to every policymaking or confidential position. The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government. On the other hand, it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti*, 445 U.S. at 518.

As the Court made clear, political loyalty is only deemed to be an appropriate employment requirement in narrow circumstances, and Defendants have not cleared that high bar here. *See* E.O. 14171; Memorandum from OPM Director Scott Kupor to Heads of Departments and Agencies on Initial Implementing Guidance for Schedule Policy/Career Final Rule 1 (Feb. 5, 2026), https://perma.cc/BK55-HU4V (neglecting to offer a description of these employees beyond that they are those "entrusted to shape and implement actions that have a significant impact on all Americans"). Practically any federal employee may, in some minor fashion, affect the implementation of presidential policy by how they perform their duties. However, courts must be attentive to the actual discretion and policymaking authority a role entails. Otherwise, the narrow exception could become a sweeping license to condition public employment on political allegiance.

Prior to the Rule, the category of federal employees who could be fired based on political views was narrow: at the federal level, such employees have traditionally been a class encompassing only a few thousand compared to a federal workforce that had more than 2 million employees. 91 Fed. Reg. 5580, 5639, 5650. After the Rule, an estimated 50,000 employees could fall within this category, the vast majority of whom do not possess the requisite discretion or autonomy in developing the President's policy priorities to fit within the exception. *See* Am. Compl. ¶ 82. Of those, approximately 45,000 are incumbents who stand to lose their existing removal protections. *Id.* Significantly, these incumbent employees began their roles with the understanding that their personal political ideology had no bearing on their continued employment and that they could maintain this employment for the duration of their careers barring any behavior that constitutes "cause" within the meaning of the CSRA. The Rule upends that expectation, subjecting thousands of career employees to the threat of politically motivated removal despite their lack of meaningful policymaking authority.

Defendants cannot mitigate the Rule's inevitable chilling effect on employees' speech by simply asserting that no such thing will occur. Defendants argue that *Elrod* and its progeny are inapplicable and that the Schedule P/C rule presents a distinct context from patronage firings barred by the First Amendment, both because individuals in these positions "are neither expected nor required to personally support the President or his policies" and because the Rule supposedly makes Schedule P/C employees only "terminable for poor performance or insubordination." *See* 91 Fed. Reg. 5580, 5644–45. However, while protesting that the government will not fire reclassified employees for partisan reasons, Defendants have changed the standard for firing to enable exactly that. Under the prior "for cause" protections, individuals could already be fired for "poor performance or insubordination," the ills Defendants assert they aim to root out. Thus, the

Rule is better explained by a desire for the ability to remove federal workers on the basis of their actual or perceived political beliefs. Despite the government's attestations to the contrary, the Rule has already chilled federal employees' speech in contravention of well-established First Amendment principles.

### D. Precedent suggests that Schedule P/C could lead to widespread corruption and waste and invite constitutional litigation.

Puerto Rico provides a stark model for the pervasiveness of political patronage in the absence of the Civil Service Reform Act's procedural protections. Puerto Rico's civil service system is not governed by the CSRA and instead enables the party in power to reclassify employees as "Trust Employees" (individuals who substantially intervene or collaborate in the formation of public policy or who directly advise or render direct services to the head of an agency) and then remove them at will. As the inevitable result of such a setup, patronage practices have persisted.[8]

Puerto Rico also offers a model of the corruption and waste that result from systems of political patronage. In 2023, a study by the Observatory of Society, Governance, and Public Policy at the Pontifical Catholic University of Puerto Rico estimates that corruption costs the Puerto Rican government approximately $527 million per year.[9] The study's authors identified a merit-based civil service for high-level positions as among the critical policy solutions to addressing this corruption.

Still, civil servants in Puerto Rico retain the federal constitutional protection of *Elrod* and its progeny. Consequently, Puerto Rico has seen hundreds of legal challenges concerning political patronage practices, flooding the federal courts. From 1970 to 2015, 561 cases were appealed to

---

[8] *See* Stephen A. Plass & Naomy M. Rivera, *Executive Power and Patronage: Lessons from Puerto Rico*, 52 U.C. Law S.F. Const. Q. 80, 99 (2024).
[9] *See id.* at 118 (citing *Corruption Costs $527 Million Annually*, SIN COMILLAS (June 6, 2023), https://sin comillas.com/la-corrupcion-cuesta-527-millones-anuales/).

the federal circuit courts involving claims of political patronage, with 276 of those cases brought in the District Court of Puerto Rico alone.[10]

The Rule is likely to lead to considerable litigation across the federal courts. Because reclassified employees will lose their Chapter 43 and 75 adverse action rights, they will no longer be entitled to a process that would provide them an explanation for their dismissal, an opportunity to present evidence, or a chance to appeal to a neutral adjudicator. Defendants could dismiss an employee without any given reason. Further, Schedule P/C firings would invite complicated inquiries into the motivations behind personnel decisions, without any meaningful factual record developed at the agency level. This will only increase the burden on district courts and invite intrusion into executive branch decision-making.

## II. The CSRA does not channel Plaintiffs' systemic challenges to executive actions.

### A. The exceptional circumstances of this case necessitate judicial review under *Thunder Basin*.

The massive change in employment protections that stem from this Rule as well as the serious constitutional issues at the heart of this litigation support a finding that Plaintiffs' complaint should not be channeled to the MSPB. The CSRA does not categorically preclude federal court jurisdiction over federal employment challenges. Instead, as Plaintiffs note, *see* MTD Opp'n at 25, courts use a two-step inquiry to determine whether a case *must* proceed through the statutory review scheme, commonly known as the *Thunder Basin* test. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207–12 (1994). This involves first asking whether it is discernible from the statute's language, structure, purpose, and legislative history that Congress intended to preclude judicial review. *Id.* at 207. In the second step of the inquiry, courts consider the specific facts and context

[10] *See* Alexandra Sabater Baerge & Jean R. Santiago Cruz, *A Spoiled Spoils System: Puerto Rico's Epidemic of Political Discrimination and the Federal Courts*, 85 Rev. Jur. U.P.R. 1327, 1348 (2016).

of the case and determine whether the nature of the claim or resulting harm could place the case outside of the agency review process or render eventual resolution by the Federal Circuit insufficient.

Here, several factors do just that: first, Defendants' vague reliance on Article II authority; and second, the significant harm not only to Plaintiffs' rights, but also to those of many other parties not in front of this Court. While Plaintiffs respond to Defendants' arguments about the *Thunder Basin* factors in greater detail, MTD Opp'n at 25–35, *amicus* writes to emphasize the systemic consequences of channeling this challenge into the administrative review scheme.

Where the government has grounded a challenged action in independent constitutional authority—here, Article II of the U.S. Constitution—rather than in a statutory grant of authority, courts will look beyond the general completeness of an administrative scheme to determine whether Congress intended to channel a particular challenge. *See, e.g.*, *Comey v. U.S. Dep't of Just.*, 25-CV-7625, 2026 WL 1142679, at *5, *12 (S.D.N.Y. Apr. 28, 2026) (denying motion to dismiss where defendants relied on Article II rather than on one of the actions covered by a CSRA provision). Defendants repeatedly assert that Article II of the Constitution inherently vests the entire executive power in the President, and that the President's ability to reclassify employees as policy-influencing derives from this constitutional power. *See, e.g.*, 91 Fed. Reg. 5580, 5627 n.318 ("Consistent with this final rule, OPM recognizes that the inherent authority vested in the President under Article II grants him the authority to supervise the executive branch including acting as he did here in issuing E.O. 14171."). Defendants' characterization of the source of authority for the Rule reinforces the conclusion that Plaintiffs' challenge does not necessarily fall within the CSRA's review scheme: they cannot simultaneously characterize Schedule P/C as an exercise of

independent Article II authority and assert, without more, that the CSRA necessarily provides the sole mechanism for challenging it.

Plaintiffs represent only a small cross section of an enormous class of individuals and entities who stand to suffer injury at the hands of an administration claiming for itself the power to designate thousands of federal employees as terminable at will. Plaintiffs bring a "general-authority" challenge to the government's establishment of a regime that could rescind traditional removal protections for a vast group of career employees and expose those employees to constitutionally impermissible political control and possible termination based on political ideology. *See* MTD Opp'n at 32. Where a complaint alleges that an "agency is wielding authority unconstitutionally in all or a broad swath of its work," the Supreme Court has found cases properly reviewable in federal district court using the *Thunder Basin* factors. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023). Like in *Axon* and *Free Enterprise Fund*, Plaintiffs challenge neither a "specific substantive decision" nor the "commonplace procedures agencies use to make such a decision." *Id.*; *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010). Instead, they challenge Defendants' contention that the President possesses apparently boundless Article II authority to determine which positions are policy-influencing and thus exempt from ordinary removal protections.

That asserted authority raises concerns well beyond those in any individual employment dispute. The Rule threatens to strip thousands of career employees of removal protections, potentially exposing them to retaliation or discrimination on the basis of their actual or perceived political beliefs and associations. The scope of the potential fallout is not limited to those affected by the June round of reclassifications: this new scheme enables the administration to reclassify any number of additional employees or to condition continued employment on conformity. Thus,

despite Defendants' repeated efforts to characterize Plaintiffs' allegations as routine "employment claims" that fit neatly within the administrative scheme, ECF No. 42-1, Mem. in Supp. of Defs.' Mot. to Dismiss at 14, 23, 39 (MTD), Plaintiffs' claims are existential in that they get to the heart of Defendants' constitutional and statutory powers.

Resolving this challenge through individual administrative appeals would fragment review of the legality of the scheme as a whole, which could potentially leave unresolved the broad constitutional implications until individual plaintiffs suffer adverse personnel actions. Even then, as Plaintiffs note, MTD Opp'n at 26-28, review of these actions would be constricted by the fact that reclassified Schedule P/C employees are no longer able to initiate appeals to actions taken under Chapters 43 and 75, *see* 91 Fed. Reg. 5580. The constitutionally existential nature of Plaintiffs' claims brings this case far afield of the administrative scheme and makes prompt judicial review not just suitable but imperative.

### B. Judicial review is the only way to guarantee Plaintiffs' consequential claims are heard.

Plaintiffs' claims, which include constitutional challenges to an unprecedented move by the Administration that could potentially leave tens of thousands of workers in a diminished legal position, warrant prompt judicial review. Defendants themselves acknowledge that Plaintiffs stand to be left without *any* avenue—judicial, administrative, or otherwise—for relief. *See* MTD at 25 (asserting that it is "no matter" that Plaintiffs may be precluded entirely from review). But, as the Southern District of New York explained in *Comey*, "[t]o the extent that the statute would foreclose [plaintiff] from obtaining judicial review of colorable constitutional claims, 'serious constitutional questions . . . would arise." 2026 WL 1142679, at *10. The consequence of Plaintiffs' allegations here should lead this Court to the same conclusion.

To the extent that, as Defendants argue, *see* MTD at 2, 6, 25, Plaintiffs have a potential path to judicial review under the CSRA's scheme, it "provides no *guarantee* of judicial review—much less a meaningful one." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 379 (5th Cir. 2023) (emphasis added). Chapter 23, which protects career civil servants from a specified list of personnel actions motivated by an improper purpose and lays out the process for appealing these actions, applies "only to relatively mild personnel actions" and thus its "review mechanisms are also relatively modest." *Id.* at 371; 5 U.S.C. § 2302. If administrative review were the sole avenue for relief for clients and members of Plaintiff organizations, they would be required to file an appeal with either the MSPB or the Office of Special Counsel (OSC), depending on the nature of the challenge they are bringing. In appeals brought before the OSC, the OSC would then have "total and unfettered discretion to decide whether to bring the claims before the MSPB." *Feds for Med. Freedom*, 63 F.4th at 380; 5 U.S.C. § 1214. Further, as the Southern District of New York noted in *Comey*, "a decision by the Office of Special Counsel not to pursue a claim is unreviewable and bars any substantive review of the claim in the Federal Circuit." 2026 WL 1142679, at *10. And even if these claims were to somehow survive this "gauntlet" and make it to the Federal Circuit, *id.*, the scope of judicial review at that stage would be "extremely limited" since "judicial scrutiny [is] limited, at most, to [en]suring compliance with the statutory requirement that the OSC perform an adequate inquiry." *Feds for Med. Freedom*, 63 F.4th at 371 (quoting *Carducci v. Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983)). Claims before the MSPB under this new regime would not fare any better. *See* MTD Opp'n at 28 n.12 (describing the process for reviewing whistleblowers' claims which would inevitably lead to dismissal by the MSPB and affirmance by the district court). As the Fifth Circuit concluded, and as is true here, "the narrowness of Chapter 23's review provisions—and the fact that any review at all turns on the unreviewable discretion of Government

officials—puts the lie to the Government's . . . suggestion that the OSC or MSPB could or would give" Plaintiffs a path to meaningful judicial review. *Feds for Med. Freedom*, 63 F.4th at 380.

### C. The MSPB has been captured and litigants who are forced to appear before it will not receive fair adjudication.

Congress specifically designed the MSPB to operate as an independent body in order to mitigate any conflicts of interest in the process of adjudicating civil servants' claims. *See supra* Part I.B. In particular, Congress did not want the resolution of personnel disputes to be influenced by presidential control. However, the MSPB no longer operates independently from presidential control, meaning that Defendants' proposed path for review does not comport with Congress's original plan for an apolitical, independent MSPB.

The MSPB's structure reflects Congress's goal of establishing independence from Presidential control to provide fair arbitration of employment disputes in the executive branch. The statute requires the MSPB to consist of three members, no more than two of whom may belong to the same political party. 5 U.S.C. § 1201. Board members serve seven-year terms, exceeding the term of any President who appoints them. *Id.* § 1202(a). The Senate must advise and consent to any nomination to the Board. *Id.* § 1201. Each of these provisions was put into place to safeguard the Board from absolute control by the President, and the MSPB operated largely as intended for nearly 50 years.

In 2025, that changed when President Trump fired MSPB Chair Cathy Harris, a Democrat and a Biden appointee. This termination was widely viewed as politically motivated rather than based on one of the narrow statutory grounds for removal.[11] As a result of this firing and the

[11] *See, e.g.*, Andrea Hsu & Carrie Johnson, *Beyond 'draining the swamp': How Trump is knocking down checks on presidential power*, NPR (Sep. 17, 2025), https://www.npr.org/2025/09/17/nx-s1-5475191/trump-executive-power-supreme-court-whistleblower (referring to the firing as part of a trend of "firing bureaucrats [President Trump] sees as problematic").

President's failure to appoint additional members, the MSPB now has a minimum quorum of two members, both of whom are members of the Republican party. Further, internal MSPB communications directed staff to refrain from describing the agency as "independent."[12] While the actual implications of the recent personnel decisions for the MSPB have yet to be determined, it is clear that Congress did not intend for claims like the ones Plaintiffs present here to be channeled to an MSPB beholden to the President. Because Plaintiffs will not have the opportunity for fair and efficient review under the administrative scheme, prompt federal judicial review in this Court is appropriate.

Leaving Plaintiffs without meaningful judicial review not only tilts the *Thunder Basin* factors in favor of allowing Plaintiffs to pursue relief in this Court but would also mean that Plaintiffs and potentially thousands of similarly situated nonparties must seek relief through a slow-moving scheme—if they are able to at all. Plaintiffs' complaint credibly alleges that Defendants have infringed on the constitutional rights of many within the federal workforce in enacting this rule. This case thus involves possible irreparable harm to Plaintiffs' fundamental rights, but also to those of tens of thousands of other federal workers whose legal protections are now in jeopardy. These weighty claims warrant prompt judicial resolution, lest federal employees and other interested parties are left wondering whether they will be reclassified and subsequently terminated without cause, and what channels for review will be available to them in that event. Delaying federal judicial review works specific and unique harm on impacted nonparties who see that relief—if available at all—will come only after long delay, great expense, and a review process involving a factfinder that is, at a minimum, tainted by the appearance of conflicts of interest.

---

[12] Drew Friedman, *After Slaughter decision, MSPB no longer calling itself 'independent'*, Fed. News Network (July 21, 2026), https://perma.cc/UR7J-862S.

Channeling this claim through the administrative scheme would signal to the about two million civil servants and to the public that federal courts are unwilling to act quickly to stop clear attempts to make the federal workforce more politically homogenous and obedient, at the expense of workers' constitutional protections.

**CONCLUSION**

For the foregoing reasons, *amicus* Justice Connection respectfully urges the Court to deny Defendants' motion to dismiss and permit Plaintiffs' claims to proceed before this Court.

Dated: October 27, 2026

Respectfully submitted,

*/s/ Alexis Grady*
Alexis Grady (DC Bar No. 90017620)
Sejal Jhaveri (DC Bar No. 90043488)
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW, Suite 300
Washington, DC 20036
(202) 736-2200
agrady@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org

*Counsel for* amicus curiae *Justice Connection*