**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GOVERNMENT ACCOUNTABILITY PROJECT, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*,

*Defendants*.

Civil Action No. 1:25-cv-00347-PLF

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**INTRODUCTION** .......... **1**

**ARGUMENT** .......... **2**

**I. PLAINTIFFS FAIL TO CARRY THEIR BURDEN TO SHOW ARTICLE III STANDING.** .......... **2**

A. GAP Lacks Organizational Standing .......... 2

B. NARFE Lacks Organizational Standing. .......... 7

C. NARFE Lacks Associational Standing. .......... 8

**II. THE CSRA PRECLUDES PLAINTIFFS' CLAIMS.** .......... **10**

A. Congress intended to preclude district court jurisdiction. .......... 10

B. These claims are the type Congress intended to be reviewed through the CSRA's administrative scheme. .......... 11

C. Plaintiff's claims are precluded under Thunder Basin and its progeny .......... 16

**III. ALL CLAIMS AGAINST THE PRESIDENT, AND ALL CLAIMS RELATING TO THE PRESIDENT'S EXERCISE OF HIS STATUTORY DISCRETION, SHOULD BE DISMISSED.** .......... **17**

A. None of the relief that Plaintiffs seek is available against the President, so he should be dismissed as a Defendant in this case. .......... 18

B. The President's exercise of his own statutory discretion is not reviewable .......... 19

C. Plaintiffs cannot evade these limitations by bringing an ultra vires claim .......... 22

**CONCLUSION** .......... **24**

## TABLE OF AUTHORITIES

### Cases

*AFGE v. Sec'y of Air Force*,
716 F.3d 633 (D.C. Cir. 2013) .......... 13

*AFGE v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) .......... *passim*

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) .......... 7

*Am. Foreign Serv. Ass'n v. Trump*,
783 F. Supp. 3d 248 (D.D.C. 2025) .......... 12

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) .......... 21

*Axon Enter., Inc. v. FTC,*
598 U.S. 175 (2023) .......... 10, 16

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) .......... 13

*Center for Taxpayer Rights v. IRS*,
190 F.4th 990 (D.C. Cir. 2026) .......... 7

*Chamber of Com. of U.S. v. DHS*,
815 F. Supp. 3d 73 (D.D.C. 2025), *appeal filed*, No. 25-5473 (D.C. Cir.) .......... 21, 22

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......... 18

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .......... 24

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .......... 3

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
144 F.4th 296 (D.C. Cir. 2025) .......... 6

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 1, 17, 19, 22

*Detroit Int'l Bridge Co. v. Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018) ........ 21

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ........ 18

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ........ 10, 16

*Env't Working Grp. v. U.S. FDA*,
301 F. Supp. 3d 165 (D.D.C. 2018) ........ 6, 7

*Farm Sanctuary v. U.S. Dep't of Agric.*,
No. 24-382-cv, 2026 WL 1030616 (2d Cir. Apr. 16, 2026) ........ 6

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 3, 5, 7

*Fed. Educ. Ass'n v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025) ........ 12

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ........ 24

*Filebark v. U.S. Dep't of Transp.*,
555 F.3d 1009 (D.C. Cir. 2009) ........ 10, 17

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) ........ 10, 13

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 18

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 22, 23

*Graham v. Ashcroft*,
358 F.3d 931 (D.C. Cir. 2004) ........ 17

*Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*,
238 F. Supp. 2d 174 (D.D.C. 2002) ........ 19

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ........ 18

*Kingdom v. Trump*,
No. 1:25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ........ 21

*League of United Latin Am. Citizens v. Exec. Off. of President*,
808 F. Supp. 3d 29 (D.D.C. 2025) .......... 18

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) .......... 19

*Margolin v. Nat'l Ass'n of Immigr. Judges*,
608 U.S. 339 (2026) .......... 10, 11

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) .......... 18

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 3, 4, 8

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) .......... 22

*Nat'l Ass'n of Immigr. Judges v. Owen*,
139 F.4th 293 (4th Cir. 2025), *rev'd on other grounds sub nom. Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339 (2026) .......... 10

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
185 F.4th 1185 (D.C. Cir. 2026) .......... 24

*Nat'l Treasury Emps. Union v. Trump*,
780 F. Supp. 3d 237 (D.D.C. 2025) .......... 12

*New York v. Trump*,
181 F.4th 132 (D.C. Cir. 2026) .......... 13, 16

*NRC v. Texas*,
605 U.S. 665 (2025) .......... 24

*Sacket v. EPA*,
566 U.S. 120 (2012) .......... 13

*Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) .......... 18

*Smart Approaches to Marijuana v. Kennedy*,
835 F. Supp. 3d 37 (D.D.C.), *appeal filed*, No. 26-5205 (D.C. Cir. June 8, 2026) .......... 6

*Special Couns. v. Peace Corps*,
31 M.S.P.R. 225 (1986) .......... 12

*Stanley v. DOJ*,
423 F.3d 1271 (Fed. Cir. 2005) .......... 12

*Tate v. Pompeo*,
513 F. Supp. 3d 132 (D.D.C. 2021) .......... 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 5

*Trump v. Cook*,
609 U.S. 528 (2026) .......... 19

*Tulare Cnty. v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) .......... 21, 22

*United States v. Fausto*,
484 U.S. 439 (1988) .......... 10

**Statutes**

5 U.S.C. § 1204 .......... 11

5 U.S.C. § 2302 .......... 14, 15

5 U.S.C. § 2303 .......... 9

5 U.S.C. § 3302 .......... 1, 14, 20

5 U.S.C. § 7511 .......... 1, 20

5 U.S.C. § 7703 .......... 11

**Rules**

Federal Rule of Civil Procedure 12 .......... 1, 24

**Regulations**

*Implementing Schedule Policy/Career in the Excepted Service*,
Exec. Order No. 14,410, 91 Fed. Reg. 34,893 (June 3, 2026) .......... 1, 23

## INTRODUCTION

As to a small subset of employees who occupy positions that are of a "confidential, policy-determining, policy-making, and policy-advocating roles," the President determined that "ensuring that such employees can be removed for misconduct or poor performance is essential to protecting democratic self-government by an elected President." *Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14,410, § 1, 91 Fed. Reg. 34,893, 34,893 (June 3, 2026). Contrary to Plaintiffs' suggestions, those positions will continue to "be filled based on merit and not political affiliation." *Id.* And although Plaintiffs frame the issues before the Court as a "constitutional clash," Opp'n at 1–2, the central merits question here is statutory: that is, whether the President properly excepted those positions from the competitive service under the express authority in 5 U.S.C. §§ 3302(1) and 7511(b)(2)(A).

He did, but this Court should never reach that question—at least not in this case. Without any affected federal employee as a party, the advocacy organizations bringing this suit are left to stretch Article III standing doctrine beyond its breaking point. And even if they could show standing, Plaintiffs' suit is foreclosed by the comprehensive remedial scheme in the Civil Service Reform Act of 1978 ("CSRA"). Although Plaintiffs may prefer to bring their claims directly in federal district court, Congress foreclosed that path and instead channeled Plaintiffs' claims through the CSRA process, which ultimately may lead to an appeal to the U.S. Court of Appeals for the Federal Circuit. Even if Plaintiffs could overcome those jurisdictional obstacles, they fail to grapple with what makes this case different from most litigation under the Administrative Procedure Act ("APA"): this suit challenges a decision by the President, exercising the President's own statutory authority. Where, as here, "a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton v. Specter*, 511 U.S. 462, 477 (1994).

This case should thus be dismissed, without prejudice, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

## ARGUMENT

### I. PLAINTIFFS FAIL TO CARRY THEIR BURDEN TO SHOW ARTICLE III STANDING.

After Defendants identified the deficiencies in the Amended Complaint, Plaintiffs now seek to manufacture standing in their opposition brief through anonymous declarations and naked assertions, while rehashing the same failed theories. None of these arguments work.

#### A. GAP Lacks Organizational Standing.

GAP asserts that it has organizational standing due to an impact to its "core business activities" because of a loss of future legal fees and voluntary diversion of resources to "counteract and offset" Schedule P-C. Opp'n at 18–25 (citation omitted). However, as explained, neither theory supports standing and the Opposition does not lead to a different conclusion. *See* MTD at 21–23.

**Loss of legal fees.** Presumably because it cannot show any actual loss of legal fees, GAP seeks to salvage its flawed theory by arguing that: (i) Schedule P-C inflicts a free standing injury to "GAP's 'organizational interests' in both investigating Reportable Conduct and representing those who help bring it to light," (ii) the future loss of legal fees "is only a part (and an indication) of the broad impact on [GAP's] activities," (iii) the declarations submitted by unnamed NARFE members show harm to GAP and (iv) any internal policies by agencies addressing whistleblower retaliation are immaterial. Opp'n at 19–23 & 20 n.9 (citation omitted). None of these theories demonstrate standing.

As a preliminary matter, GAP's attempt to create a free-standing injury to an alleged interest in "investigating Reportable Conduct and representing those who help bring it to light," *id.* at 20, fails for the same reason as their loss of legal fees argument. GAP does not allege—and cannot show—that Schedule P-C has caused any reduction to this alleged interest. *See id.* at 20–21. As with NARFE, *see infra* at 7–8, GAP is unable to provide a single non-speculative allegation of any harm that *has* occurred. This is telling, as Plaintiffs allege that Schedule P-C has been affecting them for months. *See* Am. Compl. ¶ 70; *id.* ¶ 76; *id.* ¶ 89. Any argument that this trend will suddenly change is the type of pure speculation and guesswork concerning the behavior of independent

decisionmakers rejected by the Supreme Court as a basis for standing. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (explaining the Supreme Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.") (citation omitted). And, if Plaintiffs seek to rely upon an alleged harm to an independent, free-standing interest in their policy preferences on these topics, that theory is foreclosed by *Alliance. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (holding that an argument that an agency "impaired" an organization's "ability to provide services and achieve their organizational missions . . . does not work to demonstrate standing." (citation omitted)).

GAP's effort to contest their inability to show any loss of legal fees in a footnote fails for the same reasons. Despite its submission months after the Executive Orders, the declaration submitted by GAP does not allege *any* actual loss of legal fees thus far. *See* ECF No. 45-3. Any assumption that this will change in the future is impermissibly speculative guesswork. Similarly, GAP provides no allegations about any current impact on their business activities that could support standing. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (explaining Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient.") (alteration in original and citation omitted).

Recognizing its failure to allege that any whistleblower *has* been impacted by Schedule P/C, GAP seeks to rely upon the declarations of unnamed members of co-Plaintiff NARFE. *See* Opp'n at 21–23. Those declarations are not currently in the record, and should not be added to the record, for the reasons stated in Defendants' opposition to Plaintiffs' motion for leave file. *See also infra* at 8–9. But even on their own terms, these anonymous declarations—submitted months after the Final Rule and Executive Orders—still do not allege a *single* individual who had a whistleblower complaint under Schedule P/C, let alone one who would have chosen GAP to represent them and thereby generated legal fees for GAP. None of these declarations asserts that any of the declarants have ever been a whistleblower, had a complaint they could have brought forward but did not due to Schedule P/C, would have chosen GAP to represent them, or will not bring a whistleblower claim

in the future due to Schedule P/C. Instead, these declarants only speculate about what they *might* do in a *future hypothetical* situation. *See* ECF Nos. 44-2 ¶ 12 (I.M. 1 stating, "I *would* also have more concerns . . . *should* I witness activities or learn of information that should be disclosed." (emphasis added); 44-4 ¶ 10 (I.M. 3 stating, "I *would* also be more *hesitant* to come forward as a whistleblower . . . particularly *if* the impacts" implicated certain individuals.) (emphasis added); 44-6 ¶ 11 (I.M. 5 stating, "Schedule P/C also *reduces* my willingness to come forward as a whistleblower *in the event* I learn information that needed to be disclosed.") (emphasis added). This type of hypothetical future injury based on a disjointed chain of possible future decisions by third parties cannot support standing. *Murthy*, 603 U.S. at 57.

Even more fundamentally, Plaintiffs also fail to connect these third parties to GAP. This missing link is fatal. For example, not a single declarant states that, but for Schedule P/C, they would use GAP's services in relation to hypothetical whistleblower complaints. *See* ECF Nos. 44-2, 44-3, 44-4, 44-5, 44-6, 44-7, 44-8. Nor does any current federal employee declarant even mention GAP. *Id.* Accordingly, even if the declarations could demonstrate a nonspeculative harm to the declarants' whistleblowing activities, whether any of these independent individuals would have chosen to be represented by GAP is pure speculation and cannot support a concrete harm against GAP sufficient to give it organizational standing in its own right. *Murthy*, 603 U.S. at 57.

The only employee declaration that mentions GAP, ECF No. 45-4, fares no better. That declarant was terminated in April 2025 prior to *any* position being moved into Schedule P/C. Accordingly, the declarant can offer only hypothetical guesswork concerning what his "likely" behavior would have been *if* he had been a member of Schedule P/C and cannot save GAP's theory of harm. *Id.* ¶ 5, 12; *see Murthy*, 603 U.S. at 57. That sort of speculation is unhelpful to the Court.

Finally, GAP's attempt to claim that "the possibility that agencies may adopt internal policies addressing whistleblower retaliation is immaterial to GAP's organizational injury" misses the mark. *See* Opp'n at 23. As part of this argument, GAP argues that "[a]gency-level protections cannot replicate those Congress codified in the CSRA" and that these polices will be somehow less adequate. *Id.* GAP is not itself a whistleblowing employee, but a "non-profit organization" bringing

"this action in its own capacity." Am. Compl. ¶¶ 15–16. GAP's arguments concerning the alleged inadequacy of internal oversight do not suggest that it will receive reduced legal fees or suffer some other harm. *See generally* Opp'n at 23. Rather, the argument is limited to how the agencies' polices will affect third parties unrelated to GAP. *Id.* This is irrelevant to GAP's organizational standing. *See Alliance*, 602 U.S. at 393–95. Recognizing the Amended Complaint does not account for the impact of agency-level whistleblower protections, *see* MTD at 22–23, Plaintiffs seek to flip the burden and argue Defendants "have made no record" that their standing allegations are insufficient. *See* Opp'n at 23. But Plaintiffs bear the burden on this issue, not Defendants. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

**Diversion of Resources.** GAP does not contest that it relies upon a diversion-of-resources argument, but claims that its standing theory falls outside of *Alliance* "as here, government action causes an organization to divert resources to address the detrimental effect of that action on its general organizational mission, this 'concrete harm' supports standing." Opp'n at 24 (citation omitted).

This theory fails for the same reason as the loss of legal fees, *see supra* at 2–5, primarily because GAP fails to allege concrete harm to its organizational mission. Rather, Plaintiffs' filings reflect only GAP's speculative "guesswork" on the number of whistleblowers who may or may not come forward in the future. *See generally* Am. Compl.; Opp'n, ECF No. 45-3. The Amended Complaint does not contain an allegation of *any* harm that has occurred to GAP's core mission, which it describes as "to provide a safe, effective voice for employees who use free-speech rights to challenge abuses of power that betray the public trust." Am. Compl. ¶ 126. It does not allege that a *single* whistleblower refused to participate in a case GAP would have brought, or a loss of a *single* dollar in attorney's fees. Indeed, just as with its co-Plaintiff PEER, while GAP asserts in a footnote that all whistleblower disclosures referenced in "recent press releases . . . occurred prior to the issuance of the 2026 EO," neither the Opposition nor the accompanying declarations contends that any concrete harm has occurred in the months since the challenged actions. *See* Opp'n at 22 n.10. Rather, GAP speculatively alleges that: (i) *future* whistleblowers may not come forward, Am.

Compl. ¶¶ 134–35, (ii) *future* whistleblowers disclosures will somehow be less impactful, *id.* ¶ 135, (iii) *future* potential whistleblowers will be "chill[ed]', *id.* ¶ 136, and (iv) this speculative "chilling effect[]" will generate fewer attorney's fees for GAP. *id.* ¶ 140. For the reasons discussed above, *see supra* at 3–5, none of these actions rise to concrete harm and thus they cannot support standing.

But even more problematically, GAP's diversion-of-resources theory is not that it diverted resources to combat these effects, but that it did so to combat Schedule P-C as a policy, updating its educational messaging to reflect legal changes, giving clients different advice due to changes in law, and providing trainings concerning such change. Am. Compl. ¶¶ 133, 145, 147. Consider the limitless breadth of that theory of standing: every securities lawyer in America would have standing to sue over any change to the federal securities laws, for instance, on the basis that these changes required them to give clients different advice, conduct new trainings for their associates, and revise their firm's materials. *See id.* ¶¶ 133, 145, 147. That sort of limitless theory of associational standing cannot be squared with *Alliance*, as courts have recognized. *See, e.g.*, *Smart Approaches to Marijuana v. Kennedy*, 835 F. Supp. 3d 37, 54–55 (D.D.C.) (finding no-injury-in-fact when plaintiffs "claim[ed] that they diverted resources in response to" defendants actions), *appeal filed*, No. 26-5205 (D.C. Cir. June 8, 2026); *Farm Sanctuary v. U.S. Dep't of Agric.*, No. 24-382-cv, 2026 WL 1030616, at *2 (2d Cir. Apr. 16, 2026) ("Both the Supreme Court and this Court have held that these types of injuries—the diversion of an organization's resources or frustration of its mission—are inadequate to establish standing."); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (rejecting standing when injuries were based on "issue advocacy"); *Env't Working Grp. v. U.S. FDA*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) (rejecting standing when the alleged harm was the need to engage in activities that were "exactly what these organizations always do.").

The cases that Plaintiffs rely upon for this argument do not support a different conclusion. *See* Opp'n at 23–25. *American Anti-Vivisection Society v. USDA* predates *Alliance*. To the extent that case endorses "finding organizational standing based on impact to education efforts, including development of 'How To Guides, webinars, and informational pamphlets'", Opp'n at 24–25

(quoting *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020)), the Supreme Court foreclosed that theory in *Alliance.* 602 U.S. at 394; *see also* MTD at 18–19.

Meanwhile, rather than supporting Plaintiffs' standing, the D.C. Circuit's stay opinion in *Center for Taxpayer Rights v. IRS*, 190 F.4th 990 (D.C. Cir. 2026), underscores the failing of their allegations. In contrast to GAP's generic allegations, the plaintiff tax clinic in *Center for Taxpayer Rights,* had specifically alleged "a 'drastic' reduction of cases" as a result of the challenged policy that required it to "reallocate[] 'nearly' 10 percent 'of [its] operating expenses to increase client outreach." *Id.* at 1001 (citation omitted). In the D.C. Circuit's view, those particularized allegations demonstrated concrete harm to the organization directly resulting from the challenged policy, and thus stand in stark contrast to GAP's conclusory allegations. *Compare id., with* Am. Compl. ¶ 133 (different advice due to changes in law); *id.* ¶ 145 (trainings due to changes in law); *id.* ¶ 147 (revise resources to reflect Schedule P-C). By contrast, GAP's allegations of generic training, consultation and advice to potential clients due to Schedule P-C describe not a concrete harm but "exactly what these organizations always do" and therefore cannot support standing. *Env't Working Grp.*, 301 F. Supp. 3d at 172; *see also* MTD at 18–19, 23.

**B. NARFE Lacks Organizational Standing.**

NARFE's organizational standing theory fares no better. In the Opposition, it abandons its diversion-of-resources theory and only addresses its theory that it has organizational standing "based on the cognizable harm that Schedule P/C inevitably will have on NARFE's membership and the concomitant loss in membership dues." Opp'n at 17–18. Yet NARFE's guesswork on the effects of Schedule P/C on its membership is too speculative to support standing, as Defendants have explained. MTD at 19–20.

Indeed, while Plaintiffs assert that "certain and immediate harms with respect to NARFE's membership are not speculative" they still do not allege that they have lost a single member due to Schedule P/C; nor do they dispute that their only factual allegation about changes in NARFE membership indicates their membership has *grown* rather than reduced in size. Opp'n at 18; Am. Compl. ¶ 158; MTD at 19–20. Indeed, Plaintiffs once again assert that "[s]ince January 2025, more

than 4,000 active federal employees have joined NARFE." ECF No. 45-2 ¶ 9. Whether "NARFE's membership drive to increase that total number of current federal employee members predate[] [President] Trump's re-election, the Challenged EOs, and the 2026 Final Rule" misses the point. Opp'n at 18. Regardless of when NARFE began to seek to increase its membership, the Amended Complaint alleges that, rather than decreasing in membership, NARFE's membership has increased over the relevant period—thus rendering its theory of lost membership impossibly speculative, if not outright implausible. Am. Compl. ¶ 158; ECF No. 45-2 ¶ 9. And although Plaintiffs' Opposition asserts a speculative parade of horribles, *see* Opp'n at 17–18, it is telling that Plaintiffs still cannot point to any harm that *has occurred* to its organization despite Executive Order No. 14,171 being issued ten months prior to the Opposition, the Final Rule being issued nine months prior to the Opposition, and Executive Order No. 14,410 being issued four months prior to the Opposition. *See* Am. Compl. ¶ 70 (E.O. No. 14,171 issued January 20, 2025); *id.* ¶ 76 (Final Rule published on February 6, 2026); *id.* ¶ 89 (E.O. No. 14,410 issued June 3, 2026). Any claim that this trend will suddenly reverse in the future, dependent on the independent choices of parties not before this Court, is the exact type of "guesswork" that the Supreme Court has rejected in the context of Article III standing. *See Murthy*, 603 U.S. at 57 (citation omitted).

### C. NARFE Lacks Associational Standing

Presumably recognizing that the Amended Complaint, on its face, is insufficient to support Article III standing, NARFE now seeks to rely upon seven anonymous declarations Plaintiffs have sought leave to file with the Court on the same day as the Opposition. Opp'n at 14–17; *see also* ECF No. 44. Indeed, NARFE does not even attempt to assert the allegations in the Amended Complaint independently demonstrate associational standing. Instead, it argues that "NARFE meets this requirement, as it provides seven declarations from current tenured federal employee members in career positions who have been moved into Schedule P/C." Opp'n at 15. These declarations are not currently in the record and thus provide no support for NARFE's standing, unless the Court grants Plaintiffs' motion for leave to file them. For the reasons in Defendants' Opposition to Plaintiffs' Motion for Leave to Identify Plaintiffs' Declarants by Pseudonym, ECF

No. 50, the Court should deny Plaintiffs' motion for leave to file these anonymous declarations. That would necessarily be fatal to NARFE's theory of associational standing, at least on the current record, and based on this complaint.

Even if the Court grants Plaintiffs' motion for leave to file these declarations, NARFE still cannot make the required showing of Article III standing as Plaintiffs cannot show redressability. Rather, this Court is unable to redress the declarants' alleged injuries, all of which relate to the movement of Declarants positions into Schedule P/C. The associational members seek to redress a prohibited personal practice. *See* 5 U.S.C. § 2303 (prohibited personal practices including "take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles."). Congress has elected to channels challenges to prohibited personal practices, like the associational members, and the relief the associational members seek away from the Court into the CSRA's administrative scheme, discussed *infra* at Section II, precluding this Court from granting any relief that would address the injuries the associational members allege. Similarly, all the identified NARFE members positions were moved into Schedule P/C by President Trump's Executive Order, Executive Order 14,410. *See* ECF Nos. 44-2, 44-3, 44-4, 44-5, 44-6, 44-7, 44-8. Accordingly, the associational members seek to redress a decision by the President, exercising the President's own statutory authority. As discussed in Section III, the Court cannot address such injuries or provide the relief the associational members seek. *Infr*a at Section III. As the associational members' injuries cannot be redressed by the Court, the members lack standing in their own right and cannot provide associational standing to NARFE. *See, e.g.*, *Rangel v. Boehner*, 20 F. Supp. 3d 148, 161 (D.D.C. 2013) (no redressability because "this Court cannot order the relief he seeks" due to other justiciability constraints), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015).

## II. THE CSRA PRECLUDES PLAINTIFFS' CLAIMS.

### A. Congress intended to preclude district court jurisdiction.

In their Opposition, Plaintiffs hardly engage with the cases cited by Defendants demonstrating Congress' intent to preclude district court jurisdiction under the CSRA, instead trying to distinguish them on the theory that binding precedent no longer applies because the "Courts' historical inference of such channeling intent . . . is inextricably intertwined with Congress's statutory mandate that the MSPB—and thus review of CSRA Covered Personnel Actions—should be insulated from presidential pressure and interference." Opp'n at 25–26. Plaintiffs cite little support for this argument.

As explained in Defendants' Motion to Dismiss, *see* MTD at 24–26, the Supreme Court and the D.C. Circuit have both repeatedly made clear the CSRA provides a comprehensive administrative scheme that impliedly precludes district-court jurisdiction. *See Axon Enter., Inc. v. FTC,* 598 U.S. 175, 185 (2023) (for an implicit preclusion scheme, "Congress typically chooses . . . review in a court of appeals following the agency's own review process"); *United States v. Fausto*, 484 U.S. 439, 445 (1988) (CSRA is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration."); *AFGE v. Trump,* 929 F.3d 748, 752 (D.C. Cir. 2019) (CSRA provides for "administrative and judicial review"); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 8 (2012) (CSRA precludes constitutional claims); *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) ("[T]his comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief—that is, what you get under the CSRA is what you get." (quoting *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005)).

In the face of this clear precedent, Plaintiffs can only cite a single out-of-circuit case, *National Association of Immigration Judges v. Owen,* which the Supreme Court reversed and remanded on appeal. *See* Opp'n at 25–26 (citing "*Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 306-07 (4th Cir. 2025)*, rev'd on other grounds sub nom. Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339 (2026)"). Plaintiffs cite the case as reversed on other grounds without

providing more information on why the Supreme Court reversed it. *See id.* But the omitted information is quite relevant: the Supreme Court explicitly held that the Fourth Circuit "violated the principle of party presentation" by even considering the question of whether the CSRA "channel[ed] *any* claims." *Margolin*, 608 U.S. at 340, 343. This is the very proposition that Plaintiffs seek to rely upon *National Association of Immigration Judges* as its sole support for. *See* Opp'n at 25–26. And, in direct contrast to Plaintiffs' theory, when rejecting the Fourth Circuit's approach, the Supreme Court emphasized "our precedent establishes that Congress, through the CSRA, intended to channel covered claims to the MSPB." *Margolin*, 608 U.S. at 343. And the concurrence of Justice Thomas and Justice Barrett is even more explicit in rejecting Plaintiffs' theory. As they explained, Plaintiffs' theory "bears little resemblance to legal interpretation" as "[n]either the President's view that he can remove federal executive officials . . . nor his having done so, change the meaning of the statute or the binding nature of this Court's interpretation of it." *Id.* at 344-45 (Thomas, J., concurring).

**B. These claims are the type Congress intended to be reviewed through the CSRA's administrative scheme.**

As explained in Defendants' opening brief, all three prongs of the *Thunder Basin* analysis make clear Congress intended Plaintiffs' claims to be reviewed through the CSRA's scheme. *See* MTD at 26–35. Nothing in the Opposition leads to a different conclusion.

**The first *Thunder Basin* Factor favors preclusion.** As detailed in Defendants' opening brief, the CSRA provides for meaningful judicial review. *Id.* at 27–29. In response, Plaintiffs argue that "the MSPB lacks jurisdiction to adjudicate the claims Plaintiffs bring here because Defendants stripped the MSPB of that jurisdiction as part of the very acts that Plaintiffs challenge." Opp'n at 27. But Plaintiffs overlook the key point: whatever the MSPB might conclude, a pathway to meaningful judicial review remains available for these claims, including appeal to the Federal Circuit. *See* MTD at 27. Under the CSRA, the Special Counsel may file a complaint that requires MSPB review; a party may petition the MSPB for review; and a reviewable final order may be reviewed under Section 7703. *See id*; 5 U.S.C. §§ 1204(f), 7703. Rather than dispute the existence

of this pathway, Plaintiffs suggest that it is insufficient. Opp'n at 27–28. At its core, Plaintiffs' argument is that they will not get the review they prefer in the manner they prefer it. But that position has been squarely rejected by the D.C. Circuit. *See AFGE v. Trump,* 929 F.3d at 755–57; *see also* MTD at 27–28.

In the Opposition, Opp'n at 27–29, Plaintiffs do not meaningfully contend with the binding authorities cited in Defendants' Motion to Dismiss, which evaluate the administrative review system of the CSRA, but seek to rely on a handful of cases related to the FSLMRS, a separate organized labor review scheme within the CSRA that does not apply to GAP or PEER. *See Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025) (evaluating the FSLMRS); *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248 (D.D.C. 2025) (same); *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025) (Pan, J., concurring) (same). Plaintiffs' efforts to avoid the CSRA makes sense, because, as explained in Defendants' opening brief, the Federal Circuit can—and has—reviewed whether a position was validly designed as "confidential, policy-determining, policy-making, or policy advocating [in] character" under the CSRA. MTD at 28; *Stanley v. DOJ*, 423 F.3d 1271, 1273 (Fed. Cir. 2005). That is the very question at issue here and alone forecloses Plaintiffs' argument. *AFGE v. Trump,* 929 F.3d at 757.

Limiting the body of their brief to an analysis of FSLMRS caselaw, Plaintiffs only briefly address the thrust of Defendants' argument—in particular, the eventual availability of Federal Circuit review—in a conclusory footnote that relies on the same inapposite cases. *See* Opp'n at 28 n.12. Plaintiffs' footnote misses the point. Plaintiffs concede that "a federal court[]" can review "whether the MSPB erred in concluding it lacked jurisdiction[.]" *Id*. But ultimately, this is the very question Plaintiffs seek to bring to this Court: whether the relevant positions have been lawfully excepted from the jurisdiction of the MSPB. *See Stanley,* 423 F.3d at 1273. Indeed, elsewhere in their brief, Plaintiffs explicitly *concede* that their claims are the type of claim the MSPB can and does review, arguing that "the MSPB has recognized that the Exclusion Phrase provides judicially manageable standards for assessing whether a position meets the Exclusion Phrase criterion." Opp'n at 40 (quoting *Special Couns. v. Peace Corps*, 31 M.S.P.R. 225, 231–32 (1986)). So even

on Plaintiffs' understanding, these questions can be (and have) been addressed by the MSPB. And it is undisputed that a federal court can review the MSPB's decisions. *See id.* at 28 n.12. No more is required. *AFGE v. Trump,* 929 F.3d at 757.

In an effort to salvage their claims, Plaintiffs assert that GAP and NARFE are "nonprofit organization[s] asserting an organizational harm to its own activities" and the CSRA does not provide meaningful review for these organizations. Opp'n at 30. But that theory of a CSRA end-around has been foreclosed by the Supreme Court and D.C. Circuit. *See* MTD at 28–29; *Sackett v. EPA*, 566 U.S. 120, 130 (2012) ("Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong."); *Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984) (similar); *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) ("[n]othing about the fact that plaintiffs' action is a systemic challenge to [personnel] policy mitigates" this preclusion); *New York v. Trump*, 181 F.4th 132, 141 (D.C. Cir. 2026) (plaintiffs cannot evade channeling simply "because it is not their preferred remedial path.").

Plaintiffs do not meaningfully address this precedent, but assert in conclusory fashion that they are challenging "here-and-now injuries." Opp'n at 29–30. Plaintiffs provide no citation to the Amended Complaint for the alleged injuries that are somehow separate from the challenged reclassification and the Amended Complaint does not suggest any such injuries. *See id.* In any event, the law is clear. "Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong." *Sackett*, 566 U.S. at 130. Indeed, "[w]ere [the Court] to hold otherwise, a union local could circumvent the CSRA's structures by requesting that a national union file general APA claims outside the CSRA on its behalf." *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 639 (D.C. Cir. 2013). While Plaintiffs may prefer to proceed in this Court, they cannot evade Congress' scheme "because it is not their preferred remedial path." *New York*, 181 F.4th at 141.

**<u>The second *Thunder Basin* Factor favors preclusion</u>.** Plaintiffs' efforts to dispute the second *Thunder Basin* Factor fare no better, as Plaintiffs' claims are not wholly collateral to the CSRA's system of review. *See* MTD at 29–32. In the Opposition, Plaintiffs argue that because they "do not seek relief specific to one class of employees they claim was subjected to a personnel action covered by the CSRA" and rather "claim the President's conception of Schedule P/C is unconstitutional and unlawful because—in all applications—it exercises authority he does not have" "[s]uch a claim does not exist in any sense within the CSRA's statutory review scheme." *See* Opp'n at 32. Plaintiffs' argument is flawed for several reasons.

*First*, this is a new theory that appears nowhere in the Amended Complaint. *See generally* Am. Compl. Plaintiffs allocate nearly four pages of their Opposition to this argument, but that stretch contains no citation to the Amended Complaint. *See* Opp'n at 30–33. For its part, the Amended Complaint makes clear that Plaintiffs do assert claims based on the effect of alleged prohibited personal practices on specific classes of employees, specifically concerning the movement of employees into Schedule P/C by Executive Order 14,410. *See* 5 U.S.C. § 2302(b)(12) (prohibited personal practices including "take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles."). And the Amended Complaint concedes "Congress delegated authority to except civil service positions from the competitive service to the executive in 5 U.S.C. § 3302", Am. Compl. ¶ 31, so it cannot allege that "the President's conception of Schedule P/C is unconstitutional and unlawful . . . in *all applications*." Opp'n at 32 (emphasis added). Rather, the Amended Complaint explicitly challenges the designation of certain employees into Schedule P-C through Executive Order 14,410. *See, e.g.,* Am. Compl. ¶¶ 89–101. Indeed, despite Plaintiffs' efforts to walk away from their own complaint, it contains numerous allegations that make apparent Plaintiffs seek the invalidation of an OPM regulation, or of its implementation, insofar as it requires prohibited personnel practices. *See, e.g.*, *id.* ¶¶ 149, 151, 157–58, 171–72, 193–96, 199–201.

*Second,* if Plaintiffs argue that their entire challenge focuses not on the movement of any

employee into Schedule P-C, but against the government's "power generally" and the "policy governing agency personnel, not a personnel action itself," this characterization is utterly in contrast with Plaintiffs' theory of associational standing. Opp'n at 31, n.13 (emphasis and citation omitted); *see also id.* n.14. In fact, Plaintiffs seek to assert standing based on the representation that "Schedule P/C has deprived Impacted Members of their protected property interest in their protections from CSRA Covered Personnel Actions and moved them into at-will positions without advance notice or an opportunity to be heard as to why their positions were not of a 'confidential, policy-determining, policy-making, or policy-advocating character.'" *Id.* at 15. This is a challenge to a prohibited personnel practice. *See* 5 U.S.C. § 2302. And this is not some minor wrinkle of Plaintiffs standing theory, as Plaintiffs seek to support this argument by submitting seven declarations. *See* ECF Nos. 44-2, 44-3, 44-4, 44-5, 44-6, 44-7, 44-8. Having represented to the Court their theory of standing is based, at least in part, on the alleged loss of NARFE's members' "protected property interest in their protections from CSRA Covered Personnel Actions", Plaintiffs cannot claim at the same time they only challenge the government's "power generally." *Compare* Opp'n at 14–15, *with id.* at 30–33.

*Third,* as explained in Defendants' opening brief, all of Plaintiff's claims revolve around whether Defendants' actions in issuing the Final Rule and implementing Schedule P-C violate the CSRA, the APA, or the Due Process Clause, and as a result, none is collateral to the CSRA's system of administrative review. *See* MTD at 29–31.

**<u>The third *Thunder Basin* factor favors preclusion</u>.** Plaintiffs' effort to dispute the third *Thunder Basin* factor is similarly deficient. *See id.* at 32. Plaintiffs cannot dispute the OSC and MSPB specialize in prohibited personnel practices, merit-system principles, adverse actions, and civil-service implementation, but instead argue in the Opposition "the MSPB's expertise is 'irrelevant here'" and that while "the MSPB might be capable of considering an issue [this] is not a complete analysis of this *Thunder Basin* factor; the Court must weigh the *relative expertise* of the competing tribunals." Opp'n at 33–34 (citation omitted). This argument is meritless.

Plaintiffs concede that the MSPB has experience and expertise in weighing statutory and

constitutional claims in the employment context, *see id.* at 34, but assert that the Court must engage in a balancing test between the "*relative expertise* of the competing tribunals." *Id*. Plaintiffs once again provide no support for the test that they seek to rely upon. The relevant question is whether the claim is "outside of the agency's expertise." *Axon*, 598 U.S. at 186 (citation omitted). Given the MSPB's experience in litigation about in prohibited personnel practices, none of the questions of this suit are "outside of the agency's expertise." *Id.* (citation omitted).

In any event, the Supreme Court already rejected this argument, holding that "preliminary questions unique to the employment context" include factual questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers." *Elgin*, 567 U.S. at 22–23*; see also* MTD at 32. And the one sentence Plaintiffs allocate to that binding precedent does not change that *Elgin* forecloses Plaintiffs' attempt to dress up their claims in constitutional language. Rather, the OSC and MSPB specialize in prohibited personnel practices, merit-system principles, adverse actions, and civil service policy implementation—exactly the types of issues that are relevant to challenges to Schedule P-C. This alone is sufficient, particularly as "at *Thunder Basin* step two, the presumption is that a statutory review scheme is exclusive with respect to claims within its scope," *New York*, 181 F.4th at 142. Nothing from the Opposition suggests that presumption should be overcome. Finally, Plaintiffs' assertion that they "seek wide-ranging relief not routinely granted by the MSPB" once again misses the point. Opp'n at 34. All of Plaintiffs' claims fit within the CSRA's administrative scheme. *See* MTD at 28.

### C. Plaintiff's claims are precluded under *Thunder Basin* and its progeny.

In the final section of the Opposition related to *Thunder Basin*, Plaintiffs contend with a strawman argument and claim Defendants were wrong to "argue that the CSRA's preclusive power is so vast that Plaintiffs' claims cannot be brought in any forum." Opp'n at 34. Importantly, this is not Defendants' position, which is that review of these types of claims is available under Congress' designed scheme, "in the context of concrete . . . disputes." *AFGE v. Trump*, 929 F.3d at 757; *see* MTD at 27–29. These claims absolutely can be reviewed (including in a federal court)—just not in *this* Court, on this complaint, by these Plaintiffs, at this time.

Ultimately, Plaintiffs' free-standing argument on pages 34 and 35 of the Opposition is just a repackaged version of their argument concerning whether their claims are wholly collateral and fails for the same reasons outlined above. *See supra* at 14–15; MTD at 29–32, 34–35. And, to the extent Plaintiffs seek to argue the relief they seek is not allowed through the CSRA's administrative scheme or these particular organizations cannot bring a claim under the CSRA, it is well-settled that the CSRA will properly provide some plaintiffs "no relief and preclude[] other . . . relief[s]." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.). This is an intentional feature of Congress' administrative scheme. *See Filebark,* 555 F.3d at 1014 ("[W]e treat the CSRA and Congress's related employment statutes as covering the field of federal employee claims, and so our cases expressly teach that those left out of this scheme are left out on purpose.)

Indeed, despite Plaintiffs' contentions, the relevant question is not whether a particular plaintiff outside the direct employment relationship can bring a claim or if a particular type of relief is available, but if the CSRA offers a pathway to challenge the movement of employees into Schedule P-C. *See* MTD at 25–29. This pathway exists, provides review in the Federal Circuit and allows the relevant questions to be litigated "in the context of concrete . . . disputes" under the administrative mechanisms Congress intended. *AFGE v. Trump*, 929 F.3d at 757.

## III. ALL CLAIMS AGAINST THE PRESIDENT, AND ALL CLAIMS RELATING TO THE PRESIDENT'S EXERCISE OF HIS STATUTORY DISCRETION, SHOULD BE DISMISSED.

Even if Plaintiffs could overcome every other jurisdictional problem in this case, at a minimum, this Court should dismiss: (i) all claims brought directly against the President of the United States (and thus dismiss the President as a defendant) and (ii) all claims (and requests for relief) as to the President's exercise of his statutory discretion (including claims against the other Defendants). Plaintiffs largely fail to respond on the first point. On the second, Plaintiffs' responses fail to overcome the Supreme Court's clear message that where, as here, "a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton*, 511 U.S. at 477. Finally, Plaintiffs' efforts to evade these principles by

repackaging their statutory-interpretation claims as constitutional ones, or by attempting to water down the standard for an ultra vires claim, should be rejected.

### A. None of the relief that Plaintiffs seek is available against the President, so he should be dismissed as a Defendant in this case.

With respect to all claims seeking relief directly against the President, Defendants explained, *see* MTD at 36, that Plaintiffs cannot invoke the APA because "the President is not an agency within the meaning of the" APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) ("[B]ecause 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework.") (quoting *Franklin*, 505 U.S. at 796). Plaintiffs do not respond, conceding the point.

As for suing the President outside of the APA, Defendants also explained, MTD at 36-37, more generally, that there is no tradition of equitable relief issued directly against the President himself. To the contrary, both the Supreme Court and the D.C. Circuit have long shown "a reluctance to bring judicial power to bear directly on the President," in sharp contrast with "the long established non-statutory review of a claim directed at a subordinate executive official." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996). "This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)); *Severino v. Biden*, 71 F.4th 1038, 1042 (D.C. Cir. 2023) ("A court generally may not 'enjoin the President in the performance of his official duties'") (quoting *Franklin*, 505 U.S. at 802). For this reason, district courts in the D.C. Circuit often dismiss the President as a defendant or at least exclude him from the scope of an injunction that otherwise binds the President's subordinates. *See, e.g.*, *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018) ("Given that the Court will not grant Plaintiffs the relief that they seek against the President himself, the President should be dismissed."). This Court should take the same approach.

Plaintiffs' opposition hardly engages with these arguments. Indeed, the landmark decisions in *Franklin* and *Mississippi* go entirely unmentioned in their brief, as do the recent D.C. Circuit precedents applying them. Rather, Plaintiffs rely on implicit inferences from a passing remark in a footnote in a stay opinion in *Trump v. Cook*, 609 U.S. 528, 549 n.2 (2026)—a footnote that Defendants already acknowledged as derived from "the narrow context of principal officer removal challenges." MTD at 36. Instead, Plaintiffs focus their responses on: (i) Defendants' distinct arguments under *Dalton* about the non-reviewability of Presidential exercises of the President's own statutory discretion (discussed *infra*, Section III.B.), and (ii) the proper standard for an ultra vires claim (discussed *infra*, Section III.C.). Plaintiffs otherwise do not respond on the more general question of whether an injunction directly against the President is available.[1] They likewise do not dispute that "the narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform 'ministerial' functions does not apply here," or that declaratory relief issued directly against the President is "unavailable for essentially the same reasons as an injunction." MTD at 37, 38. All those points are now conceded. *See, e.g.*, *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002). Accordingly, the Court should dismiss all claims brought against the President, and dismiss the President as a defendant.

### B. The President's exercise of his own statutory discretion is not reviewable.

This is not a routine challenge to an agency's exercise of that *agency's* congressionally delegated discretion. Instead, this case is a challenge to the President's exercise of the *President's* statutory discretion. But the Supreme Court has squarely held that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [a court's] review." *Dalton*, 511 U.S. at 476. In other words, as here, "[w]here a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477.

[1] Also in a footnote, Plaintiffs identify *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 237-39 (2026), as a purported counterexample to Defendants' point about the context of principal-officer removal challenges. But this wrinkle was not discussed in *Learning Resources*—neither in the Court's opinion, nor in the government's briefs—so it does not *sub silentio* displace the prior precedent from both the Supreme Court and the D.C. Circuit on this issue.

That holding is fatal to all of Plaintiffs' claims that challenge the President's exercise of the President's statutory discretion. Plaintiffs' responses lack merit.

Plaintiffs' first response seems to be that, in Plaintiffs' view, the President violated statutory constraints on his discretionary authority in designating positions for Schedule P-C. But even if Plaintiffs were correct *on the merits* that "the President's actions exceed the limits Congress placed on presidential power," Opp'n at 39, that is non-responsive to Defendants' argument about whether that question is subject to judicial review at all. Defendants disagree with Plaintiffs' interpretation: essentially, that the statutes invoked by the President in Executive Order 14,410 are subject to an atextual limitation that limits the President's exception authority "only to political appointee positions." *Id.* at 40. But right or wrong, that goes to the merits of the statutory-interpretation issue at stake in this case, to be addressed later in the litigation if (and only if) the Court denies Defendants' Motion to Dismiss. Those arguments are thus no help to this Court in adjudicating this Motion to Dismiss, which raises threshold non-merits arguments.

Plaintiffs next argue that their claims are "dissimilar to *Dalton*," because that was a case about "unconstrained presidential discretion to approve or disapprove (but not alter) a list of recommended military base closures." Opp'n at 40. But both this case and *Dalton* raise the same core premise: a statute that gives the President (rather than a subordinate Executive Branch official) broad discretion to make a policy choice. *See* 5 U.S.C. § 3302(1) ("The President may prescribe rules governing the competitive service" including those that address "necessary exceptions of positions from the competitive service"); *id.* § 7511(b)(2)(A) ("This subchapter does not apply to an employee . . . whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character by . . . the President for a position that the President has excepted from the competitive service."). And nothing in *Dalton* turned on the fact that the President was acting upon a recommendation from his subordinates—and here too, Plaintiffs do not allege that the President himself, for example, prepared the first draft of Executive Order 14,410, rather than relying, at least in part, on the work of his subordinates. The relevant point is that the legal action that Plaintiffs challenge was an action by the President, invoking the President's

statutory authority—not an action by an agency, invoking that agency's statutory authority.

Despite asserting elsewhere that their jurisdictional theories are "long-established," Plaintiffs ultimately acknowledge that "*Dalton*'s application beyond the President's own acts to agency actions 'remains an open question in the D.C. Circuit.'" Opp'n at 2, 41 (quoting *Chamber of Com. of U.S. v. DHS*, 815 F. Supp. 3d 73, 108 (D.D.C. 2025), *appeal filed*, No. 25-5473 (D.C. Cir.)). Defendants largely agree with that framing—though it also tellingly confirms (contrary to other portions of Plaintiffs' brief) that *Dalton*'s application, at the very least, to "the President's own acts" is well-grounded in precedent, most obviously *Dalton* itself. That concession is thus fatal to many of Plaintiffs' claims here, which directly challenge "the President's own acts," *id.* at 41, in designating certain positions for Schedule P-C.

Even with respect to the other Defendants, however, while it may be an "open question" in a sense, the weight of authority in this District favors the government. As Judge Collyer explained in the seminal case on this issue, where, as here, an agency is carrying out "action on behalf of the President, involving discretionary authority committed to the President," that action is equally "'presidential' and unreviewable under the APA." *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *op. amended and superseded*, 883 F.3d 895 (D.C. Cir. 2018); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402-03 (D. Md. 2011) (similar), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) (similar, as to action by the Forest Service "carrying out directives of the President"), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).

To be clear, contrary to Plaintiffs' caricature of Defendants' position, Defendants are *not* arguing that any agency action can escape judicial review solely because the agency is taking action that the President directed. In other words, Defendants *agree* (to borrow from one of Plaintiffs' cases) that "the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review" for that reason alone. *Kingdom v. Trump*, No. 1:25-cv-691-RCL, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (cited in Opp'n at 42). But

that principle is not implicated here, which instead presents the less common circumstance in which the President *himself* is the one exercising the relevant statutory authority.

With respect to most of Plaintiffs' claims—most notably, claims challenging the President's designation of roughly 8,000 federal positions for Schedule P-C by Executive Order—any involvement of government agencies (like OPM) reflects at most their ministerial efforts to carry out an action already taken by the President, rather than some distinct and reviewable agency action taken *by OPM*. *See Chamber of Commerce*, 815 F. Supp. 3d at 109 ("The line-drawing on whether APA review is available, or not, may depend on whether an agency's actions involved 'mere ministerial implementation of presidential action,' which might be shielded from APA review, or independent decisionmaking that 'flesh[ed] out" a presidential directive, which might not be.'" (quoting *Tate v. Pompeo*, 513 F. Supp. 3d 132, 143 (D.D.C. 2021)). OPM's ministerial efforts to implement Presidential action is not subject to judicial review for effectively the same reasons that the Court cannot review the President's action directly. *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (no review because "the State Department is acting solely on behalf of the President, and in doing so, it is exercising purely presidential prerogatives"). Any other rule "would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action." *Tulare Cnty.*, 185 F. Supp. 2d at 18, 28-29.

**C. Plaintiffs cannot evade these limitations by bringing an ultra vires claim.**

As anticipated in Defendants' opening brief, many of Plaintiffs' arguments seek to "evade these limitations on review" discussed above "by invoking the ultra vires doctrine," and by "repackag[ing] alleged statutory violations as constitutional claims." MTD at 40-41. These arguments fail essentially for the reasons that Defendants already previewed.

Plaintiffs first argue that constitutional claims get special treatment. Perhaps, but the Supreme Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472 (collecting cases); *accord Glob. Health Council v. Trump*, 153 F.4th 1, 16 (D.C. Cir. 2025) ("*Armstrong* as

well as *Dalton* rejected the idea that a plaintiff may transform a statutory claim into a constitutional one to avoid limits on judicial review.”). Plaintiffs largely ignore that distinction—insisting this is “a separation-of-powers dispute” about “the extent of presidential versus congressional control of civil servants.” Opp’n at 43. They are mistaken: the Presidential actions challenged here do not reflect any Article II-based effort “to override Congress’ constitutional authority to establish and set rules for the federal civil service.” Am. Compl. ¶ 179. Indeed, Executive Order 14,410 identifies the specific statutory provisions on which it relies. *See* 91 Fed. Reg. at 34893 (“By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 3301, 3302, 5595 and 7511 of title 5, United States Code, . . . .). The first sentence of Plaintiffs’ brief frames the case more accurately: asserting that Schedule P-C “strikes at a landmark statute at the heart of America’s nonpartisan, professional civil service: the Civil Service Reform Act of 1978.” Opp’n at 1.

Of course, Defendants disagree that their actions are inconsistent with the CSRA. But right or wrong, that is a statutory-interpretation issue, and one that has little to do with the President’s Article II powers in a vacuum.[2] If this motion were denied, the Court could eventually decide those statutory-interpretation questions (in either direction) without saying anything about the limits of Article II. That is why Plaintiffs have little choice but to reference “merits briefing in other litigation,” *id.* at 43—where (unlike here) the Executive Branch *has* relied heavily on Article II to justify its actions, rather than on express statutory authorizations.

Accordingly, even if Plaintiffs are correct that constitutional claims are more amenable to review under *Dalton* and its progeny—a principle that they assert, but do not actually establish, *see id.* at 42—that is no help to them here, given the D.C. Circuit’s recent rejection of essentially the same argument last year. *See Glob. Health Council*, 153 F.4th at 16.

Finally, Plaintiffs spill much ink trying to establish that ultra vires review is generally

[2] Defendants reserve the right to cite Article II in any future merits briefing. For example, background constitutional understandings of Presidential control over the Executive Branch might be relevant to the proper interpretation of the statutes that Congress enacted. Even so, that would not transform this statutory-interpretation case into a separation-of-powers case.

permissible in this context. *See* Opp'n at 35-45 (citing older ultra vires precedent, like *McAnnulty* and *Kyne*). But Defendants never said otherwise—only that these Plaintiffs, on these claims, could not satisfy the high standard for an ultra vires claim. Plaintiffs only halfheartedly resist that premise, acknowledging that they would have to show "an utterly unreasonable statutory interpretation or a patent misconstruction of the law," *Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, 185 F.4th 1185, 1224 (D.C. Cir. 2026), to prevail under the standard set forth in *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (citation modified), or the D.C. Circuit cases that came before and after *NRC*. *See, e.g.*, *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

Instead, Plaintiffs insist that a lower standard applies here, on the theory that the expansive Supreme Court and D.C. Circuit ultra vires precedent does not apply where "there *is not a* statutory limitation on judicial review[.]" Opp'n at 36. That assertion, accompanied by no citation, is of no help to Plaintiffs, even if it were correct. There are many relevant limitations (statutory and otherwise) on judicial review here—they are the subject of many of Defendants' arguments above.

In any event, Plaintiffs are wrong. Where normal judicial review is available—for example, if a plaintiff can simply bring a typical APA claim against an agency—there is *never* a need to bring a non-statutory ultra vires claim. For that reason, *NRC* itself rejects the availability of an ultra vires claim in exactly those circumstances. 605 U.S. at 681 ("Ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review.") (citation omitted). Accordingly, to bring an ultra vires claim, Plaintiffs must satisfy the standard set forth in *NRC v. Texas* and show an egregious violation of specific statutory text—rather than, for example, relying (as Plaintiffs do here) on atextual inferences about a "history of consistent usage" or their policy views about an undefined "statutory term of art." Opp'n at 39.

## CONCLUSION

Plaintiffs' Amended Complaint should be dismissed, in its entirety, without prejudice, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

Dated: November 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
D.C. Bar No. 995500
Chief Litigation Counsel
CONNOR J. RITSCHARD
N.Y. Bar No. 5849187
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov

*Counsel for the United States*